UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------------------X

KENNETH CREIGHTON,

                          Plaintiff,                    **DECLARATION OF**

      -against-                                **JOHN AFRIDES**

                                                                         12 CIV 7454 (PGG)

THE CITY OF NEW YORK, DETECTIVE DEAN ROBERTS
(Shield No. 05861), DETECTIVE GLENN GODINO
(Shield No. 2756), POLICE OFFICERS JOHN DOES 1-10
(names being fictitious and presently unknown and intended
to be employees of the NYPD who were involved in Plaintiff's
arrest, detention, imprisonment, and/or prosecution),
DISTRICT ATTORNEY ROBERT T. JOHNSON,
ASSISTANT DISTRICT ATTORNEY BRUCE BIRNS
A/K/A BURNS, ASSISTANT DISTRICT ATTORNEY ED
TALTY a/k/a ED TULTY and ASSISTANT DISTRICT
ATTORNEY MICHAEL COOPER,

                          Defendants.

---------------------------------------------------------------------------X

      John Afrides declares the following under penalty of perjury pursuant to 28 U.S.C. §1746:

      1.     I am a photographer/videographer specializing in the field of photography and videography evidence with thirty years of experience. I graduated from the German School of Photography in 1976. Since 1986, I have been the president of John Afrides Photography, Inc. specializing in photography and videography for the legal profession. I have worked in over twenty thousand legal cases involving photography and videography evidence. I am certified by the national court reporter's association, a division of certified legal video specialists (CVLS). I have provided expert testimony in court referable to photography and videography evidence.

2. I have extensive experience in videography, including Day-in-the-Life videos; Discovery and Inspections; Depositions (for which I am certified by CLVS) using both analog and digital systems; presentations of video in Court (with and without equipment) and video editing.

3. I have been retained by the law firm of Pazer, Epstein & Jaffe in the matter of *Creighton v. City of New York* presently pending in the United District Court for the Southern District of New York to review the footage contained in DVD format from a surveillance video taken inside the premises of a bodega known as "Prospect Mini Mart" located AT 820 East 168th Street, Bronx, New York 10459.  The video in question was recorded on December 26, 2006.  I have also been asked to attempt to enhance the video.

4. In addition to reviewing the subject DVD footage, I also reviewed the deposition transcripts of Fawaz Tareb dated June 3, 2015 and of Glenn Godino dated April 11, 2016 and April 19, 2016.

5. In my opinion, if the original DVR had been retained in its native format (Hard Drive) even at 640 x 480 resolution the images would have been significantly clearer and more details in the video could be discerned.

6. The original hard drive DVR images would have depicted the best evidence of the images captured by the DVR.

7. The failure by the detectives and police to secure the hard drive of the DVR, digitally transfer the images from the hard drive represents the loss of the best evidence available, which could have permitted Mr. Creighton to definitively show that he was not the person who passed a gun in the bodega.  A VHS tape was used to download the DVR images

from the DVR. This second generation media is analog in nature and can only resolve, at best, 50% of the original DVR information and thereby does not represent the best evidence.

8. This surveillance video was originally recorded on a DVR (digital video recorder). A VHS tape was used to record the pertinent surveillance footage of the incident on December 26, 2006. This VHS recording was done within days of the incident and was obtained by NYC Police Detective, Glenn Godino. At some point, the VHS tape created from the DVR was copied either to another VHS tape or was eventually digitized to produce a DVD.

9. The video clip I reviewed was 5 minutes and 42 seconds in length.

10. The DVD provided to me was of very poor quality and thus enhancement would not substantially improve it for identification purposes. I, therefore, recommended that counsel obtain the original video. Plaintiff's counsel, however, indicated that the DVR was not secured by the police and the original VHS tape given to the police has been lost.

11. No enhancements were made to this video by my office.

12. The best practice for enhancement and amplification of videos is to obtain the primary recorded source, in this case, the hard drive and/or the DVR itself and to extract or copy the digital video signal in its native format. A digital to digital copy loses no image quality. This was apparently not done here.

13. The deposition transcripts reviewed, and particularly Mr. Godino's testimony, indicated that the VHS tape that the police obtained was viewed four or five times. It was not clear as to whether the format viewed four or five times was the first generation VHS recorded from the DVR.

14. Multiple viewings of the same VHS tape including fast forward, rewind, frame-by-frame, and pausing for still images can and will degrade a tape.

15. The DVD I reviewed had portions that were in real time, slow motion, played forward and reverse and frame-by-frame. These playback functions originated at the original DVR recordings. This was revealed by the data embedded in the video (date, time and playback function) seen at the upper right portion of each scene.

16. Videos from that time period were most likely recorded in DV resolution. This format has a ratio of 4:3. As a DV recording format with this ratio, the finest original resolution would most likely be 640 x 480 pixels. This means that the image is comprised of 480 horizontal lines. Typically, VHS tapes have a maximum horizontal line resolution of only 240 lines and is an analog recording. If the DVR was recorded onto a VHS, the resolution on that first generation copy would be reduced by 50% or more. A VHS copy to another VHS copy would further degrade the image as the VHS format is an analog signal and every generation in the analog world degrades. Most DVRs (year 2000) would output a composite analog video signal which was a maximum of 240 lines.

17. After reviewing the images on the DVD provided by plaintiff's counsel and looking closely at the overlaid lettering identifying the camera, time and date of the recording, it is my opinion, with a reasonable degree of certainty in the area of videography, that the subject DVD was digitized from a second generation VHS tape. The recording at several points shows "dropouts" and tape distortions that are usually seen from a tape to tape copy. A second generation VHS tape would again lower the resolution. The equivalent would be a significant degradation of the 240-line optimal horizontal line resolution to as little as half (120 lines.)

18.     At some point this video was re-transferred to a DVD or mpeg2 format.  In this format the resolution for a 4:3 ratio yields an image resolution of 640 x 480 pixels.  When an analog signal is converted to a digital signal, there is some pixilation in the process (box-like formations).  This is inherently due to the compression of the video to produce the DVD.  Although the degradation of the image to the DVD format is minimal, it further distances us from the original quality recorded by the DVR.  When the DVD is produced in digital format the resolution cannot be "up-converted."  While interpolation can be used to aid in enhancement or amplification, based on the quality of the DVD of the bodega incident, it is my opinion that enhancement/amplification of the image in this case would be of little value.  For the best image possible, the original DVR format should have been enhanced.

19.     Another consideration in reaching my conclusions was the quality of the VHS tape used to copy the video from the DVR.  A new VHS tape produces a better quality image than a tape recorded and erased multiple times.  The quality of the brand of tape used is also a factor as well as how the VHS tape was stored since the time of the recording from the DVR.

20.     VHS tapes are notoriously susceptible to degradation of image quality when a segment is played repeatedly and especially when slow-motion or still frame-by-frame playback is excessively used.  The tape is subjected to a high RPM spinning video head which stays in contact with the tape continuously during playback.  When the tape is paused, the spinning video head continues to spin against the tape causing heat from friction and also deforms the tape.  When a tape is abused this way it causes "dropouts." These dropouts are from damage to the tape and can be serious enough to distort the image.  To preserve image quality on a VHS tape, VHS tapes must be stored vertically away from any magnetic fields or electromagnetic producing objects and in a cool environment.

21. After reviewing the DVD provided to plaintiff's counsel, I noticed several segments where image degradation had been recorded. In some sections there are four video streams one of which is a blue screen. The blue screen noise in the lower right box of the four-up view shows evidence of a tape to tape copy and further supports my above conclusions.

/s
_____
JOHN AFRIDES