1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - -X

KENNETH CREIGHTON,

              Plaintiff,

        -against-          12 CV 07454


THE CITY OF NEW YORK, DETECTIVE DEAN ROBERTS (Shield
No. 05861), DETECTIVE GLENN GODINO (Shield No. 2756),
POLICE OFFICERS JOHN DOES 1-10 (names being fictitious
and presently unknown and intended to be employees of
the New York City Police Department who were involved
in plaintiff's arrest, detention, imprisonment and/or
prosecution), DISTRICT ATTORNEY ROBERT T. JOHNSON,
ASSISTANT DISTRICT ATTORNEY BRUCE BIRNS, ASSISTANT
DISTRICT ATTORNEY BRIAN BURNS, ASSISTANT DISTRICT
ATTORNEY ED TALKY a/k/a ED TULTY and ASSISTANT
DISTRICT ATTORNEY MICHAEL COOPER,

              Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - -X

                    20 Vesey Street
                    New York, New York

                    April 11, 2016
                    10:10 a.m.


          DEPOSITION of DETECTIVE GLENN GODINO, a

Defendant herein, held at the above time and place,

taken before Joanna Bojaryn, a Notary Public of the

State of New York, pursuant to the Federal Rules of

Civil Procedure and stipulations between Counsel.

                                                              2

 1

 2    A P P E A R A N C E S

 3

 4    RUBERT & GROSS, PC
                   Attorneys for the Plaintiff
 5                 150 Broadway – suite 712
                   New York, New York 10038
 6
      By:      RICHARD GROSS, ESQ.
 7

 8

 9    PAZER, EPSTEIN & JAFFE, PC
                   Attorneys for the Plaintiff
10                 20 Vesey Street
                   New York, New York 10007
11
      By:      MICHAEL JAFFE, ESQ.
12

13

14    NEW YORK CITY LAW DEPARTMENT
                   Corporation Counsel for the Defendants
15                 100 Church Street
                   New York, New York 10007
16
      By:      KAVIN THADANI, ESQ.
17    File No.  2012-006428

18

19

20

21

22

23

24

25

3

1

2                        S T I P U L A T I O N S

3              IT IS HEREBY STIPULATED and AGREED, by and
    between the attorneys for the respective parties
4    hereto, that:

5              IT IS HEREBY STIPULATED and AGREED, all
    rights provided by the C.P.L.R., and Part 221 of the
6    Uniform Rules for the Conduct of Depositions,
    including the right to object to any question, except
7    as to form, or to move to strike any testimony at this
    examination is reserved; and in addition, the failure
8    to object to any question or to move to strike any
    testimony at this examination shall not be a bar or
9    waiver to make such motion at, and is reserved to, the
    trial of this action.
10

11              IT IS HEREBY STIPULATED and AGREED, this
    deposition may be sworn to by the witness being
12    examined before a Notary Public other than the Notary
    Public before whom this examination was begun, but the
13    failure to do so or to return the original of this
    deposition to counsel, shall not be deemed a waiver of
14    the right provided by Rule 3116 of the C.P.L.R., and
    shall be controlled thereby.  The filing of the
15    original of this deposition is waived.

16              IT IS FURTHER STIPULATED and AGREED, that a
    copy of this examination shall be furnished to
17    attorney for the witness being examined without
    charge.

18
                  *           *           *
19

20

21

22

23

24

25

4

1

2   G L E N N    G O D I N O,

3            after having been first duly sworn by

4            Joanna Bojaryn, a Notary Public of the

5            State of New York, was examined and

6            testified as follows:

7   EXAMINATION BY

8   RICHARD GROSS, ESQ.

9            Q    Please state your full name for the

10  record.

11           A    Glenn Godino.

12           Q    Please state your business address for

13  the record.

14           A    167 East 51st Street, New York, New York

15  10022.

16           Q    Good morning.

17           A    Good morning.

18           Q    My name is Richard Gross, for the

19  record, and I represent Mr. Creighton in the lawsuit

20  that you are a defendant in.

21           A    Okay.

22           Q    I am going to be asking you some

23  questions about the events that took place that may

24  have involved you or information that you might have.

25  If I ask you any questions that you don't understand,

5

1                     GLENN GODINO

2     please let me know and I will rephrase them.

3             A    Okay.

4             Q    You have to answer verbally, I am sure

5     you know that by now.  She can't get nods of the head

6     or grunts accurately.

7             A    Okay.

8             Q    As I said, if you don't understand a

9     question that I ask, let me know and I will try to

10    rephrase it.  Otherwise, I am going to assume that you

11    are answering the questions responsively, okay?

12            A    Okay.

13            Q    What was the date of your appointment as

14    a police officer?

15            A    June 30th, 1995.

16            Q    Okay.  And after you became appointed as

17    a police officer, was the first place you went as a

18    police officer to the police academy?

19            A    Yes.

20            Q    Okay.  And you were there for six

21    months?

22            A    Nine months.

23            Q    Did you have any specialized training

24    other than the usual courses that were given during

25    the nine months that you were at the police academy?

6

1                    GLENN GODINO

2              MR. THADANI:  Objection.

3         Q    You can answer.

4         A    Not that I am aware of.

5         Q    During the time you were at the police

6    academy you were given courses and tested in a variety

7    of subjects?

8              MR. THADANI:  Objection.

9         A    Yes, I was.

10        Q    And that included law, political

11   science, social sciences, correct?

12        A    Yes, I was.

13        Q    Okay.  And some of that training

14   involved the Penal Law and procedures, correct?

15        A    Yes, it was.

16        Q    And while you were at the police

17   academy, were you given specific training with regard

18   to Brady requirements?

19             MR. THADANI:  Objection.

20        A    I don't know what Brady requirements

21   are.

22        Q    Are you familiar with Brady Rosario as a

23   concept?

24             MR. THADANI:  Objection.

25        A    Is that Rosario where you have to keep

7

1                    GLENN GODINO

2    anything regarding the case?

3            Q    That's correct.

4            A    I didn't know it was Brady, so yes,

5    Rosario.

6            Q    Sometimes they call it Brady and

7    sometimes they call it Rosario.  I will go into a

8    little more depth later.

9            For the basis of the questions I am going

10   to be asking you today, I may not always say Brady

11   Rosario, but that's what I am referring to even if I

12   am just talking about it as Brady, understood?

13           A    Okay.

14           Q    At some point early in your career did

15   you receive what's known as a patrol guide?

16           A    Yes, I did.

17           Q    Do you still have a patrol guide?

18           A    If I do, I have no idea where it is, but

19   there is on the computer a patrol guide.

20           Q    So if you need to check something about

21   procedures, you can go on the computer and access it

22   that way?

23           A    Yes, I can.

24           Q    Would you agree that the patrol guide is

25   basically the rules that police officers and

8

```
 1                    GLENN GODINO
 2   detectives are required to operate under on a
 3   day-to-day basis?
 4            A    Patrol guide is a guide.  It guides you
 5   on what you may or may not have to do.  It's not
 6   chiseled in stone, that's why they call it a guide.
 7            Q    But there are procedures laid out there
 8   in the patrol guide that are standards generally to be
 9   followed with regard to the various things a police
10   officer would do, right?
11            A    It guides them to what they should do.
12            Q    Some of those areas that are covered in
13   the patrol guide are things like how to conduct line
14   ups, how to conduct photo arrays, the warnings that
15   you have to give somebody when you are questioning,
16   that kind of thing?
17            A    Yes.
18            Q    Have you ever received anything, and I
19   may not have the title exactly right, I know it's
20   changed, that involves being a detective, a manual,
21   paperwork that regards procedures to follow as a
22   detective?
23            A    I don't know exactly what manual you are
24   talking about.
25            Q    Let me make the question more general.
```

9

1                    GLENN GODINO

2   Have you received manuals regarding procedures to

3   follow and other things that would involve acting as a

4   detective more specifically than the general stuff

5   that would go to uniform?

6           A    I received booklets at trainings that

7   I've gone to.

8           Q    Okay.  Did you receive training after

9   you graduated from the police academy and before you

10  became a detective from time to time?

11          A    Yes, I did.

12          Q    Could you just briefly tell me what that

13  training would have been and when?

14          A    I went to -- before I made detective,

15  they sent me to CIC course, which is a Criminal

16  Investigation Course.

17          Q    And did they provide you with written

18  materials during that course?

19          A    Yes, they did.

20          Q    How long was the course?

21          A    CIC at that time I believe it was a

22  three week course.

23          Q    Was that a course that you took because

24  you were in a career path that was going to take you

25  into investigator and eventually detective?

1                        GLENN GODINO

2          A     Yes.

3          Q     About how long after you joined the

4    force did you take that CIC course?  I know you may

5    not remember exactly.

6          A     I joined the force on June 30th, 1995

7    and I believe I went to that course, because I got up

8    to the squad June 1999, I think that October, if I'm

9    not mistaken, I was sent to the CIC course.

10         Q     Let me go back to the time that you were

11   in the police academy.  One of the documents that you

12   received during that time was something known as the

13   police student's guide, correct?

14         A     I have no idea what that is.

15         Q     Okay.  I am going to ask you, we talked

16   a little bit about Brady, I am going to quote you

17   something and then ask you if you agree with it or not

18   and no surprises here, this is from the police

19   student's guide.

20              Under the heading of collecting and

21   processing evidence and then the subheading Brady

22   material.  It says, "another important area that a

23   police officer should be familiar with is exculpatory

24   evidence commonly referred to as Brady material.

25   Exculpatory evidence is evidence that tends to clear

                              GLENN GODINO

 1

 2    someone's guilt.  The prosecution is mandated by law

 3    to disclose any evidence that is favorable to the

 4    defense upon request by the defense.  Unsolicited

 5    exculpatory evidence must also be disclosed when it

 6    creates a reasonable doubt that would not otherwise

 7    exist.  A police officer must bring any such evidence

 8    to the attention of the district attorney.  Failure to

 9    do so may jeopardize the prosecution and bring out

10    judicial sanctions.  Remember, a police officer should

11    gather and preserve as much evidence as possible at

12    the scene of a crime.  The district attorneys will

13    determine what evidence, if any, is exculpatory."

14             Now that I read that to you, does that

15    refresh your recollection generally about what Brady

16    is?

17             MR. THADANI:  Objection.

18        A    I don't remember that specific quote,

19    but I understand what that is saying, yes.

20        Q    When we were speaking earlier that's

21    what you referred to as being Rosario or is that

22    something else?

23             MR. THADANI:  Objection.

24        A    That would be Rosario.

25        Q    Okay.  Would you agree that in a much

1                    GLENN GODINO

2    shorter version that this is a fair statement of a

3    police officer's Brady obligations to furnish

4    defendant now and on a continuing basis all evidence

5    or information which may tend to exculpate a defendant

6    either by indication of innocence or by potential

7    impeachment of a prosecution witness?

8                    MR. THADANI:  Objection.

9          Q    Do you agree with that as a general

10   proposition?

11         A    I don't understand what the term

12   exculpate means.

13         Q    Exonerate.

14         A    Can you repeat that again?  Sorry.

15         Q    Sure.  Furnish a defendant now and on a

16   continuing basis all evidence or information which may

17   tend to exculpate the defendant either by indication

18   of innocence or by potential impeachment of a

19   prosecution witness.

20         A    Yes.

21                   MR. THADANI:  Objection.

22         Q    So in practical terms, if during the

23   course of your investigation you acquire information

24   that would either tend to exculpate a target of the

25   investigation or information that would impeach the

1                    GLENN GODINO

2    testimony of a witness that's incriminating the

3    client, you would understand you would have to turn

4    that over to the district attorney?

5           A     Yes, I do.

6           Q     When you took that CIC course, there

7    were particular areas that were covered that included

8    identification and line ups, show ups, photo arrays

9    and identifications in general as part of your

10   training in that area?

11          A     I don't know if that's specifically the

12   CIC course, but yes.

13          Q     You were trained in that?

14          A     Yeah.

15          Q     And more than once over the years that

16   you have been in the department?

17          A     Yes.

18          Q     From time to time when there have been

19   changes with regard to certain things, you receive

20   fliers as part of your duties as a police officer that

21   supposedly are going to go into the patrol guide?

22               MR. THADANI:  Objection.

23               MR. GROSS:  Let me rephrase that.

24          Q     Did you, over the course of years that

25   you have been with the department, receive updates to

14

1                        GLENN GODINO

2    the patrol guide in loose leaf form?

3         A    My first patrol guide I had updates, but

4    that stopped after a while and I couldn't tell you

5    when so I have gotten updates, but I can't tell you

6    when the updates stopped exactly.

7         Q    Okay.  During the period of time which I

8    gather has been most of your career that you have been

9    a detective, have you received information from time

10   to time from the hierarchy as to procedures that had

11   to be followed on paper?

12              MR. THADANI:  Objection.

13        A    Yes.

14        Q    When there are changes that involved the

15   work that you did, they would call it to your

16   attention either at meetings or by information that

17   was given to you in writing?

18        A    I don't know if every single change has

19   been brought to my attention, but there are some

20   things that periodically are brought to my attention.

21        Q    So for instance, in terms of things like

22   the use of force when there have been policy changes

23   in the department, as soon as those changes came down,

24   you were made aware of them, correct?

25              MR. THADANI:  Objection.

15

1                          GLENN GODINO

2          A     Regarding the use of force, yes.

3          Q     I don't want to take too much time with

4    this, but very briefly, after you got out of the

5    police academy, what was the first assignment that you

6    got in terms of where you were located?

7          A     Patrol in the 42nd Precinct.

8          Q     Okay.  That would have been 1999-2000?

9          A     No, I got in -- I went into the academy

10   June of 1995 so I got out March of 1996.

11         Q     And your first assignment was in the 42?

12         A     Yeah, patrol.

13         Q     Okay.  And you told us off the record a

14   little earlier that you are not in the 42 anymore.

15   When did you leave the 42?

16         A     I was assigned to the 17 squad on May

17   19th, 2014.

18         Q     Is it a fair statement that up to that

19   change of assignment your entire career as a police

20   officer has been at the 42?

21         A     Yes.

22         Q     When, approximately, did you go from

23   being a uniformed patrol officer to an investigator?

24         A     June 14th, 1999.

25         Q     When did you make detective?  When did

16

1                     GLENN GODINO

2    you get your gold shield?

3            A     December 13th, 2000.

4            Q     Between June of 1999 and December of

5    2000, you were doing essentially the same work as the

6    detective, but without the pay grade, fair statement?

7                  MR. THADANI:  Objection.

8            A     Yes.

9                  MR. GROSS:  For the record, to counsel,

10               the detective gave his address as the

11               precinct.  If we need to serve a subpoena,

12               you will accept on his behalf?

13                 MR. THADANI:  Yes.

14           Q     Since your change of location in terms

15   of assignment, have your duties as a detective

16   changed?  Do you do different things now?

17           A     Still doing investigations, but

18   different types of investigations.

19           Q     Okay.  What types of investigations are

20   you doing since you have been in the 17, just

21   generally?

22           A     Mostly just grand larcenies.

23           Q     And is the unit that you are assigned to

24   there the 17 detective squad?

25           A     Yes.

17

1                    GLENN GODINO

2          Q    In that detective squad, are the types

3    of investigations that are done broken down between

4    various assignments, are there squads for burglaries,

5    homicides, things like that?

6          A    There is only two different units.

7    There is the regular squad that catches everything but

8    grand larcenies with checks and credit cards.

9          Q    So --

10         A    And one unit which is me that catches

11   all grand larcenies that has to do with credit cards

12   and checks.

13         Q    And you are the only person in that unit

14   I gather?

15         A    Unfortunately, yes.

16         Q    Going back to the 42, your current grade

17   is?

18         A    First.

19         Q    Congratulations.

20         A    Thank you.

21         Q    When did you make detective second

22   grade, about?

23         A    December 30th, 2005.

24         Q    I take it before that when you were a

25   detective you were a detective third grade, right?

1                    GLENN GODINO

2         A    Yeah.

3         Q    And while you were an investigator and

4    before you made detective, did you receive any

5    specific training with regard to issues that

6    detectives would be involved in that were specific to

7    the 42 precinct?

8              MR. THADANI:  Objection.

9         A    No.  All training is based on wherever

10   you work.  I don't think there is specific training

11   for specific precincts.  Not that I am aware of.

12        Q    I may have misspoken.  What I was trying

13   to get at was, in the time that you were first

14   assigned to the 42 both as an investigator and later

15   as detective, were there specific things that tended

16   to occur in that precinct rather than generally that

17   you got specific training in regard?

18             MR. THADANI:  Objection.

19        A    No, not that I am aware of.

20        Q    The 42 back in around 2006, as far as

21   you are aware, did it have high incidents of any

22   particular kinds of crimes as compared to generally?

23        A    The 42 has a lot of violence compared to

24   like the 17 Precinct which hardly has any violence.

25        Q    Were there things that were done in

19

```
 1                    GLENN GODINO
 2  terms of the way the manpower was focused in the 42
 3  that were specific to that precinct in terms of
 4  dealings with the issues of violence?
 5                 MR. THADANI:  Objection.
 6       A    Not that I am aware of.
 7       Q    The squad that you were assigned to in
 8  the 42 is the 42 detective squad?
 9       A    Yes, it was.
10       Q    And is that detective squad broken down
11  into various units?
12       A    At the time I was working there, yes.
13       Q    Okay.  Most of my questions, unless I
14  say otherwise, are going to be referring to the time
15  frame of 2006 and thereafter, okay?
16       A    Okay.
17       Q    Back in 2006, how was the organization
18  of the detective squad in terms of the kinds of crimes
19  that were handled?
20       A    You have the regular squad that handles
21  mostly all the cases, homicide, shootings, not
22  robberies, grand larcenies, certain grand larcenies,
23  missing persons.  Then you have a BRAM unit, which
24  handles burglaries and robberies and grand larcenies
25  from the person.
```

20

1                    GLENN GODINO

2          Q     Was there any specific designation

3    within the 42nd detective squad where particular

4    detectives were generally getting shooting or homicide

5    cases as opposed to catching everything that came

6    along?

7                 MR. THADANI:  Objection.

8          A     The BRAM unit would catch a shooting

9    only if it was a robbery involved because they did the

10   robbery so if it was a robbery shooting, the BRAM unit

11   would get it.  Any other dispute, you know, shooting,

12   the regular squad would get it.

13         Q     Generally back in around 2006 and

14   thereafter, about how many detectives were there in

15   the 42nd detective squad?

16         A     I would have to guess, because, you

17   know, things change all the time.  I would say

18   approximately twenty to twenty-two.

19         Q     Again, I know these are approximations,

20   but around 2006-2007, how many of those detectives

21   would have been in the BRAM unit?

22                MR. THADANI:  Objection.

23         A     I don't remember.  Normally it would be

24   depending on what time there could be two or there

25   could be four.  Depending, because they had at that

21

1                          GLENN GODINO

2    time two people would have had Fridays and Saturdays

3    off, two people had Sundays and Mondays off.  It could

4    have been two people in that unit or four people,

5    approximately.

6           Q    But the bulk of the detectives were in

7    the general unit?

8           A    The squad.

9           Q    Was that the designation, the BRAM squad

10   and what was the other squad called?

11          A    Just the squad.

12          Q    Okay.  Back in 2006 into 2007, which

13   unit were you assigned to?

14          A    On the squad, regular squad.

15          Q    Okay.  And during the time that you were

16   in the 42nd Precinct, were you ever in the BRAM unit?

17          A    Yes, I was.

18          Q    For how long?

19          A    When I first went in on June 14th, 1999

20   to, I believe, 2003.

21          Q    Then you transferred or were transferred

22   to the general unit?

23          A    Yeah.

24          Q    Okay.  Was that a choice that you made

25   or was that just the way it was assigned or something

22

1                         GLENN GODINO

2     else?

3              A     It gets shifted all the time.  You can

4     be in the squad one time, somebody could retire from

5     the BRAM, they need somebody to put in the BRAM so

6     they will put somebody else in.  It's just the way it

7     went at that time.

8              Q     Compared to the general squad, was the

9     BRAM unit considered to be a favorable or unfavorable

10    assignment or something else?

11                   MR. THADANI:  Objection.

12             A     It wouldn't be either one.  Normally

13    when newer detectives come into the squad, they put

14    them in the BRAM because you are not handling the

15    heavier cases so they want you to start there.  And

16    then after a while if somebody retires and there is

17    room, they push you into the regular squad and then

18    the next new person comes in, normally if they are

19    brand new, they would go into BRAM.  And if they need

20    somebody in the squad, they can put somebody straight

21    in the squad, it doesn't have to be put into BRAM.

22             Q     But generally people would go through

23    the BRAM before they wound up in the squad if it could

24    be done?

25             A     Generally, yes.

23

1                    GLENN GODINO

2              MR. THADANI:  Objection.

3         Q     Have the confines of the 42 changed at

4    all?  The borders, as far as the time you were there,

5    did they always remain the same?

6         A     Yes, they remained the same.

7         Q     What are the boundaries of the 42

8    Precinct?

9         A     They go from the Cross Bronx Expressway

10   from Webster Avenue to the Sheridan Expressway and

11   then down the Sheridan Expressway to Westchester

12   Avenue, then across Westchester -- a small part of

13   Westchester Avenue and it cuts down 167 Street to, I

14   believe, Prospect Avenue.  Then it goes south on

15   Prospect Avenue to the north side of 160th Street.  It

16   would go up 160th Street all the way to Cortland

17   Avenues.

18        Q     The boundaries are irregular?

19        A     Yeah, it's just cut out.

20        Q     The adjoining precincts to the 42 are

21   which?

22        A     To the west, it's the 44.  To the north,

23   it's the 48.  To the east is the 43.  And the

24   southeast the 41 gets a part of it and the southwest,

25   the 40 gets a part of it.

24

1                        GLENN GODINO

2         Q     Back in 2006 and 2007, how were the

3   detective's shifts organized?

4               MR. THADANI:  Objection.

5               MR. GROSS:  Let me withdraw the

6         question.

7         Q     Were the shifts organized the same for

8   all the detectives regardless of whether they were in

9   the general squad or the BRAM squad?

10        A     I believe they were separate at that

11  time.

12        Q     So for the general squad, how were the

13  shifts arranged?

14              MR. THADANI:  Objection.

15        A     The general squad has the four and two

16  chart.  We would do two 1600 by 0100s.  And then two

17  0800 by 1600s.  And then two days off.

18        Q     So in layman's terms, can you repeat

19  what you said?

20        A     Two 4:00 to 12:00 say.  It's 4:00 to

21  12:00.  Two 8:00 to 4:00 and then two days off.

22        Q     The days off and the shifts would be

23  scattered so there was always coverage between the

24  various detectives?

25              MR. THADANI:  Objection.

25

                              GLENN GODINO

1

2       A      Yes.

3       Q      Back in 2006 and 7, how many supervisors

4   were there in the detective squad?

5       A      The 42 when I was there, I went through

6   thirty something supervisors.  They couldn't keep a

7   supervisor so I couldn't narrow it down to at least

8   one.  There was sometimes three so I don't remember

9   what year how many supervisors, but between one and

10  three.

11      Q      Was there a particular designation

12  regardless of who the person was who was the commander

13  of the 42 detective squad at any given moment?

14      A      Yes.

15      Q      Would that generally be a lieutenant?

16      A      Yes, but there was times that I only had

17  -- when I first got up there, there was a sergeant who

18  was the CO and still to this date there are precincts

19  who have sergeants that are COs.  Generally, yes, it

20  would be a lieutenant, but there are times when they

21  don't have a lieutenant, that they make the sergeant a

22  squad commander.

23      Q      The period of late 2006 into 2007 when

24  the events took place in this investigation, do you

25  remember who the squad commander, detective squad

26

1                      GLENN GODINO

2   commander was?

3              A    I have no idea.

4              Q    Beside the squad commander, do you

5   remember how many other supervisors there were in the

6   detective squad?

7              A    I don't remember at that time.

8              Q    Okay.  Other than the squad commander,

9   would the detective supervisors go into the field or

10  did they generally stay in the precinct?

11             MR. THADANI:  Objection.

12             A    They generally stay in the precinct

13  unless a major case comes and then they would go into

14  the field.

15             Q    Okay.  When you created paperwork in

16  your job as a detective back in 2006 and forward, some

17  of that paperwork was required to be co-signed by a

18  supervisor?

19             A    Yes.

20             Q    So when a supervisor would co-sign a

21  document that you created, would that be whatever

22  supervisor was on duty at that time or were they

23  specific to you or something else?

24             A    It would most likely be whoever was on

25  duty at that time.  It varies because you can submit a

1                    GLENN GODINO

2   report and the supervisor might not sign off on it for

3   a day or two so --

4          Q    If I mentioned a Sergeant Lopuzzo

5   (phonetic), would that have been somebody that was one

6   of your supervisors back in 2006-2007?

7          A    He was a supervisor from the 40th

8   Precinct, but it wasn't my supervisor.

9          Q    He wasn't from the 42?

10         A    No.

11         Q    How would it be that a supervisor from

12   another precinct would sign off on paperwork you

13   created?

14              MR. THADANI:   Objection.

15         A    If you have a large case, two ways.  If

16   we only had one supervisor, sometimes they would send

17   another supervisor from another precinct to help out

18   or he could have had the coverage that day.  That

19   means, we don't have a supervisor and he would cover

20   anything that goes wrong that's major so he would come

21   to a precinct that had, you know, somewhat of a major

22   incident to sign off on.

23         Q    Other than supervisory personnel, would

24   investigations for crimes that occurred in the 42 be

25   investigated routinely by detectives from other

28

1                    GLENN GODINO

2    precincts?

3                    MR. THADANI:   Objection.

4         A    Just major incidents usually.

5         Q    What qualifies as a major incident, the

6    severity of the crime or other factors?

7         A    Usually the severity.   Homicides,

8    shootings.   If there was a young child involved, you

9    know.

10        Q    I am going to refer to this

11   investigation as the Caldwell investigation.   You

12   follow what I am talking about, correct?

13        A    Yes, yeah.

14        Q    Regarding the Caldwell investigation, to

15   your recollection, were detectives from other

16   precincts directly involved in doing the fieldwork in

17   this case, if you remember?

18        A    Yes.

19        Q    Do you remember from which precincts

20   those detectives would have come in from?

21        A    I know homicide squad came to help with

22   this case.

23        Q    Okay.   So you mentioned the homicide

24   squad.   Tell me a little bit about how that's

25   organized with reference to the homicide squad you

29

```
 1                    GLENN GODINO
 2   were talking about just a moment ago?
 3          A    Can you repeat that?  I don't understand
 4   the question.
 5          Q    You said the homicide squad helped out.
 6   Where was that homicide squad assigned?
 7          A    At the detective bureau at 1086 Simpson
 8   Street.
 9          Q    So the homicide command was a
10   borough-wide command?
11          A    Yes.
12          Q    Was there a procedure involved where
13   detectives from the precinct would routinely ask for
14   involvement from the homicide squad other than if it
15   was a homicide?
16                MR. THADANI:  Objection.
17          A    Yes.  If you had something that could
18   turn into a homicide, if someone was likely to die,
19   then they would come out and help out.
20          Q    So in every case where somebody was
21   either likely to die or there was a homicide confirmed
22   would the homicide squad get involved in all of those
23   cases borough wide, to your knowledge?
24                MR. THADANI:  Objection.
25          A    I don't know if they've gone to every
```

30

```
 1                    GLENN GODINO

 2    single case, but they would get involved in cases like

 3    that.

 4         Q     Obviously if the case got closed

 5    immediately they would not get involved, but in cases

 6    where there was an ongoing investigation, would the

 7    homicide squad routinely get involved?

 8              MR. THADANI:  Objection.

 9         A     If it looked like it was going to turn

10    into a homicide, they would get involved.

11         Q     Do you have a specific recollection

12    regarding this case as to how and when the homicide

13    squad became involved?

14         A     No.

15         Q     Okay.  As a general procedure, what

16    would you expect would happen in a case such as this

17    where Mr. Caldwell eventually passed away, how would

18    the homicide squad get involved?

19         A     Somebody from the detective squad or

20    wherever the incident happened would call homicide and

21    tell them we either had a homicide or we have somebody

22    who is likely to die.

23         Q     Would that be the function of one of the

24    detectives who caught the case or would that be a

25    supervisor that did or somebody else?
```

31

                              GLENN GODINO

1

2         A     Either one.

3         Q     In an attempt to save a little bit of

4    time, I am going to ask you to agree with some of the

5    things that I am about to refer to.  If I left

6    something out or if you disagree with it, please let

7    me know.  Otherwise, if you can tell me whether it's

8    accurate or not, okay?

9         A     Okay.

10        Q     Okay.  Would you agree that the duties

11   and responsibilities of a homicide detective include

12   investigating current homicides as well as exploring

13   leads on older, active homicide investigations?

14              MR. THADANI:  Objection.

15        A     Yes, I would agree with that.

16        Q     More specifically, would you agree that

17   a homicide investigation typically entails

18   interviewing witnesses, gathering physical evidence,

19   requesting physical evidence be examined by other

20   entities such as the police lab, medical examiner's

21   office, ballistics, tracking down and apprehending

22   suspects and testifying at any subsequent proceedings?

23        A     Yes.

24        Q     Okay.  Is there anything in that list of

25   functions that I neglected that comes to mind?

1                       GLENN GODINO

2          A     No, I think you covered everything.

3          Q     Okay.  When a shooting takes place where

4    there is either a homicide or there is a likely to

5    die, is the usual response by the uniformed personnel

6    in the field?

7                 MR. THADANI:  Objection.

8          A     Yes.

9          Q     And when it's determined by the officers

10   in the field that this is either a victim who was

11   likely to die or has already died, was there some

12   procedure in place for the uniformed patrol officers

13   to notify the detective squad?

14         A     Yes.

15         Q     Tell me how that's done or was done back

16   in 2006-2007 in the 42?

17         A     They would just call up to the squad and

18   say they had somebody either shot, you know, DOA or,

19   you know, homicide.  It doesn't have to be a shooting,

20   it could be somebody was stabbed.

21         Q     When such a notification was made, was

22   there a standard response either in a homicide or

23   likely to die situation as to who from the detective

24   squad and other units would respond?

25         A     I don't know if there's a standard

33

1                          GLENN GODINO

2    response, but you would have the person who is getting

3    the case.

4              Q      Right.

5              A      Normally the people who are working with

6    that person.  Supervisors that were working.  And if

7    you didn't have many people in the office at that

8    time, you would call other commands to see if they

9    could send other people to help.

10             Q      In that kind of a scenario with a

11   deceased or likely to die, approximately, how many

12   detectives would respond if they were available?

13                    MR. THADANI:  Objection.

14             A      It's different at all times.  You could

15   have an additional three, four different detectives.

16   You could have eight.

17             Q      Going back to my general statements

18   about police procedures.  Would you agree that the

19   first document that the detective squad would become

20   aware of with regard to an investigation in a death or

21   likely to die would be a complaint report created by

22   the patrol units who responded?

23                    MR. THADANI:  Objection.

24             A      Complaint report should be the first

25   document.  It's not always the first document.

34

1                    GLENN GODINO

2          Q     Now, based on your experience, are the

3    documents that are created by the uniformed patrol

4    officers assigned sequential case numbers?

5          A     Report numbers?

6          Q     Yes.

7          A     Report numbers, yes.

8          Q     There is also a sequential number

9    assigned by the detective bureau that would be a

10   different number, correct?

11         A     Yes.  A case number would be assigned to

12   that report number.

13         Q     Okay.  Once a case number is assigned to

14   a case like the Caldwell case, would a case folder

15   then be created?

16         A     Yes.

17         Q     The case folder would be created, I

18   presume, after the initial visit to the scene,

19   correct?

20         A     Yes.

21         Q     So at the time that the lead detective

22   would come back to the precinct, would he be the one

23   to create the case folder?

24               MR. THADANI:  Objection.

25         A     He could be.

35

1                    GLENN GODINO

2          Q     Okay.

3          A     Doesn't have to be.

4          Q     Well, tell me generally how the

5    procedure existed in the 42 Precinct back in 2006 and

6    7 of a case folder being created in a homicide case?

7          A     Once a complaint report was entered into

8    the computer and a report number is generated, then

9    anybody in the office could assign the case number.

10   Whatever the next case number is.

11         Q     Okay.  And based on that case number

12   that's been assigned, is a physical case folder then

13   started for that case?

14         A     It could be.  It doesn't have to be.

15         Q     Okay.  At some point, assuming the case

16   is not solved immediately or close to that, would a

17   case folder be created?

18         A     Yes.

19         Q     And would you agree that once that case

20   folder is created, the various documents that are

21   generated in connection with the homicide

22   investigation, that's where they are supposed to go?

23         A     Yes.

24         Q     Would you agree that all the significant

25   documents regarding that particular investigation are

36

1                        GLENN GODINO

2    supposed to go into that case folder?

3                   MR. THADANI:   Objection.

4         A     Yes, they are.

5         Q     The case folder physically, what does it

6    look like?

7         A     Well, there is --

8         Q     Again, my questions refer to the 42 back

9    in 2006 and forward.

10        A     Individual case folders could be

11   different colors.  It's like sort of a cardboard

12   folder and you would put it into that.  But in cases

13   of a non-fatal shooting or homicide, you would put

14   those individual case folders into a larger folder.

15        Q     Like a box?

16        A     Not a box, but just like a brown folder

17   that's large enough to hold, you know, case folders

18   and other little legal files.

19        Q     Is that larger folder compartmentalized?

20        A     No.

21        Q     It's just a bigger --

22        A     Just a bigger space to put everything

23   in.

24        Q     The case folders that were generated in

25   the 42 Precinct back in that time frame, was there

37

```
 1                      GLENN GODINO
 2   anything on the outside of those folders that was
 3   imprinted on it where you could enter information?
 4        A    Yes.
 5        Q    What kind of information was on the
 6   outside of the case folder, the boxes to fill in on
 7   the outside of the case folder?
 8             MR. THADANI:  Objection.
 9        A    Name, report number, case number,
10   location, detective assigned, assistant detective,
11   crime scene, ME.
12        Q    By ME, you mean the ME that caught the
13   case?
14        A    Medical examiner's office.
15        Q    The particular ME that caught the case?
16        A    Yes.  There might be a couple other
17   captions, I just can't recall the other ones.
18        Q    Back in that time frame, was there a
19   document either by the name of an index sheet or
20   something that corresponded to that that would be kept
21   as a list of the documents that were created in
22   connection with that investigation?
23             MR. THADANI:  Objection.
24        A    I don't remember if indexes were done
25   back then.  The newer computer systems they are in now
```

38

                          GLENN GODINO

 1

 2   automatically print out.

 3          Q    An index sheet?

 4          A    An index sheet.  But I just can't

 5   remember if index sheets were used at that time.

 6          Q    Okay.  Based on your experience with

 7   index sheets, there would be a list of documents, some

 8   of the documents created that would be assigned

 9   numerical numbers within that category?  For instance,

10   DD5s are typically numbered?

11               MR. THADANI:  Objection.

12          A    Yes.

13          Q    Back in the 42 Precinct in 2006, was it

14   the custom of the detective squad when DD5s were

15   created to number them numerically in the order they

16   were created?

17          A    Yes.

18          Q    For the record, what is a DD5?

19          A    It's just a --

20          Q    I am sorry.  Complaint information is

21   the name inscribed on it, correct?

22          A    Yes.

23          Q    In that case folder, would records

24   outlining the various investigative steps taken be

25   routinely put into that case folder and would those

39

1                          GLENN GODINO

2      include things like interviews of witnesses, computer

3      checks, identification procedures, arrests, requests

4      for subpoenas and other documentation, depending on

5      what investigative steps were necessary?

6                      MR. THADANI:  Objection.

7           A     Yes, they would.

8           Q     In cases such as this one, the folders

9      are kept track of by the names of the victims,

10     correct?  Not by the suspects or accused names, is

11     that a fair statement?

12          A     Yes, it is.

13          Q     What name would have appeared on the

14     case folder involving the Caldwell shooting; would it

15     have been Mr. Caldwell's name or would it be Lissette

16     Ayala's name, the other victim?  Would her name have

17     been included as well?

18          A     They would each have their own folder.

19          Q     There would be a separate folder created

20     for both?

21          A     Yeah.  A separate smaller folder.

22          Q     When you say a separate smaller folder,

23     would those two folders then go inside that larger

24     folder you mentioned before or would they be kept

25     separate?

1                        GLENN GODINO

2           A     They should go into the larger folder.

3           Q     In this case, do you have a recollection

4    that this investigation involved using one of those

5    larger folders?

6           A     Yes, I do.  Yes, it was.

7           Q     Okay.  And the information you told me

8    about what was on the outside of the folder, you were

9    referring to the larger folder?

10          A     I was referring to the smaller one, but

11   some of that information that's on the smaller folder

12   could be placed on the outside of the larger folder.

13          Q     Okay.  Would you agree that anything

14   that occurred that was significant to an investigation

15   should be reflected in a record that wound up in the

16   case folder?

17                MR. THADANI:  Objection.

18          A     Yes.

19          Q     As a general proposition, would you

20   agree that records that are maintained in a case

21   folder are supposed to indicate which detective or

22   other police personnel created them?

23          A     Yes, they do.

24          Q     Would the information that would be on

25   the outside of the case folder be more detailed on the

41

1                    GLENN GODINO

2    larger case folder or there would be more information

3    on the smaller ones that went inside it?

4         A    It all depends on what detective put on

5    what, you know, case.

6         Q    I am sorry.  I misspoke.  I meant before

7    it's filled out.

8              MR. GROSS:  Let me withdraw that.

9         Q    The outside of these case folders are

10   imprinted with categories of information that can be

11   either handwritten in them by the detective, correct?

12        A    Only on the small cases.  The large one

13   is blank.

14        Q    Whatever information you choose to put

15   on that is done without any boxes to indicate what's

16   supposed to be done?

17        A    Yeah.  What was done was you draw boxes

18   and you just put the information in.  There is no

19   preprinted questions on the outside of the larger

20   folder.

21        Q    Okay.  So the preprinted questions that

22   would be on the outside of the two folders that were

23   created in this case, Ayala and Caldwell, would that

24   information include all of the detectives involved

25   assigned to this case besides the lead detective?

42

1                    GLENN GODINO

2         A    No.

3         Q    Is that case folder involving the

4    Caldwell and Ayala investigation still in the 42

5    Precinct, to your knowledge?

6         A    No, it is not.

7         Q    Do you know where it is now?

8         A    Yes, I do.

9         Q    Where is it?

10        A    It's at the law department.

11        Q    And to your knowledge, the case folder

12   that is at the law department -- when you say law

13   department, you are talking about the law department

14   maintained by the corporation counsel who is defending

15   you in this case, correct?

16        A    Exactly.

17        Q    Do you know when that case folder was

18   either given to or requisitioned by the law

19   department?

20        A    Not exactly.

21        Q    Can you give me your best approximation?

22             MR. THADANI:   Objection.

23        A    It would have had to be sometime after

24   Kenny was released, but I have no idea when that would

25   have went to them.

43

                              GLENN GODINO

1

2          Q     If I suggested to you that it would have

3    been sometime after the lawsuit in this case would

4    have been started, does that refresh your recollection

5    as to when that probably would have occurred?

6                MR. THADANI:  Objection.

7          A     Yes.

8          Q     And the answer would be it would be

9    after the lawsuit was instituted?

10         A     Yes, but I don't know when the lawsuit

11   was instituted.

12         Q     You don't know exactly when that was, I

13   understand that.

14         A     Yeah.

15         Q     When that case folder was provided to

16   the law department in this case, to your knowledge,

17   was all the documentation that existed with regard to

18   this investigation within that case folder?

19               MR. THADANI:  Objection.

20         A     No, it was not.

21         Q     What was not in there anymore?

22         A     I believe there was some DD5s that were

23   missing.  And it might have been an identification

24   photo that was missing.  I know it wasn't a complete

25   folder.

44

                              GLENN GODINO

1

2          Q     Do you know of your own knowledge

3    whether or not, and I will go back to this in detail

4    later, whether or not the case file involving this

5    investigation of Ayala and Campbell was requisitioned

6    by the district attorney's office?

7          A     It's Caldwell.  And what was your

8    question?  You said Campbell.

9          Q     I am sorry.  Do you know of your own

10   knowledge whether or not that folder was ever

11   requisitioned by the district attorney's office?

12         A     Given to them?

13         Q     Yes.  Physically?

14         A     Yes, it was.

15         Q     To your knowledge, was that case folder

16   when it was given to the district attorney, were the

17   originals given or was the case folder copied and

18   turned over to them or something else?

19         A     At first it was copied, but then the

20   whole original case folder was given to them.

21         Q     And do you happen to remember, again, I

22   will get back to this, which district attorney

23   requisitioned the folder?

24         A     Yes.  Bruce Burn, Birns.

25         Q     To your knowledge, if you know, when was

45

1                          GLENN GODINO

2    that case folder returned to the 42 Precinct?

3                    MR. THADANI:  Objection.

4         Q     If not by a date, by an event.

5         A     It was at one time a Dan McCarthy

6    inherited the case from the district attorney's

7    office.  He passed away.  But when we thought this

8    case was starting to -- going to go to trial, I went

9    to go over the case with him.  That's when I finally

10   saw the case file and a few years have gone by since

11   then, but I don't recall that date.

12        Q     Okay.  As far as the case file being

13   returned to the precinct, to your knowledge, did that

14   happen after the case was dismissed against Ken

15   Creighton?

16        A     I don't know if it ever came back to the

17   42nd Precinct.  I think it was held onto by the

18   district attorney's office and I went and picked it up

19   after the lawsuit when the law department was

20   requesting the case file.  I believe I picked it up

21   from ADA Gottlieb.

22        Q     Okay.  ADA Gottlieb is a supervisor in

23   the DA's office as opposed to a personal --

24        A     No, I don't think -- she was assigned

25   that case at that time.  She was the last one to be

46

1                    GLENN GODINO

2    assigned the case.  I don't know if she is a

3    supervisor now, but at that time I believe she was

4    just --

5            Q    A regular?

6            A    A regular ADA.

7            Q    Okay.  As far as your recollection goes,

8    the case file remained, the original case file

9    remained for some period of time with the district

10   attorney's office?

11           A    Yes.

12           Q    Can you approximate for me about when

13   the original file went over to the DA's office?  I

14   don't care whether it's by date or by a particular

15   event that would jog your memory about it.

16           A    It had to be not too long after the

17   arrests were made.  You know, within -- I am only

18   approximating here, within a month or so after.  Once

19   all the DD5s were done and everything was into the

20   case, I provided everything to the district attorney's

21   office and handed them the folder.

22           Q    Again, I will go over this in detail in

23   a moment, but the first person that was arrested in

24   connection with this case was Ken Creighton, correct?

25           A    Yes, he was.

47

1                         GLENN GODINO

2           Q     And Dior was arrested sometime

3      thereafter?

4           A     Yes, he was.

5           Q     When Dior Creighton was arrested, was

6      the case marked closed at that time or did it remain

7      open?

8           A     I would think it would still be open.

9           Q     When the district attorney's office

10     either requisitioned the file in writing or you

11     brought it over, however that happened, was a copy

12     made of all the documents that were contained in that

13     file before the originals were given to the district

14     attorney?

15          A     I am not sure if a complete copy of the

16     whole folder was given prior to the whole folder.  I

17     don't have an answer for that.

18          Q     I didn't follow that.  The original

19     folder was what the DA got, not a copy, right?  He got

20     the original documents, however many he got?

21          A     I don't know.  I just don't have a

22     recollection if I gave him partial of the documents,

23     you know, or the whole thing at once.  I just don't

24     recall.

25          Q     Okay.  When you gave it to him, however

48

GLENN GODINO

1    quantity of documents you gave, you gave him

2    originals, not copies you provided, is that a fair

3    statement?

4    A    I don't know.

5    Q    What I am trying to get at is, who kept

6    the copies and who kept the originals?

7    A    I understand what you are saying, but I

8    don't remember if I gave him copies of what I had,

9    then gave him the other folder or if they got

10   everything together.  I just don't remember.

11   Q    But at some point during the time that

12   this investigation was being conducted, the district

13   attorney's office got the original folder, whether it

14   happened in one shot or in more than one event, it did

15   happen, correct?

16   A    Yes.

17   Q    As far as you are aware of back in the

18   time frame we are discussing, if a record was created

19   by a detective that wound up in the case folder, it

20   was supposed to have either been signed by him or

21   indicated in some fashion that he created it, correct?

22   A    The name of the investigator would be

23   typed at the bottom of the report.

24   Q    Okay.

49

1                    GLENN GODINO

2        A    Only -- I don't believe we would sign

3   that particular --

4        Q    I am not worried about the signature, I

5   misspoke.  What I am saying is every document that

6   wound up in the case folder would have been a document

7   that would identify who it was that created it?

8             MR. THADANI:  Objection.

9        A    Yes.

10       Q    During an investigation, written notes

11  are made by detectives generally?

12       A    Yes.

13       Q    Are those notes that are created during

14  the investigation stored in the case folder when the

15  investigation is ongoing or are they kept on the

16  person of the detective or something else?

17            MR. THADANI:  Objection.

18       A    If you are going out into the field to

19  do an investigation or whatever you are going to do,

20  you would carry that note pad with you.  But when you

21  come back, it would end up back in the folder.

22       Q    And the reason it goes back into the

23  folder is so that if anybody was in need of

24  information regarding that, he would have access to

25  the handwritten notes as well?

50

1                     GLENN GODINO

2          A     Correct.

3          Q     Is it a fair statement that other than

4    the times where field investigations were actually

5    taking place by you or other detectives involved in

6    this case, those notes should have been in the case

7    folder?

8                MR. THADANI:  Objection.

9          A     Yes.

10         Q     You are aware that when a case comes

11   into the hands of a district attorney those notes are

12   sometimes very important information that has to be

13   made available to the district attorney for a variety

14   of reasons?

15               MR. THADANI:  Objection.

16         A     Yes.

17         Q     You are aware that on some occasions,

18   both in civil or criminal litigation, those notes may

19   be required to be turned over or the notes or copies

20   of them may be required to be turned over to

21   third-parties, correct?

22               MR. THADANI:  Objection.

23         A     Yes.

24         Q     In the 42 Precinct back in 2006 and

25   2007, did those notebooks have a name that they were

51

1                    GLENN GODINO

2    officially or unofficially known by?  Like, spiral

3    notebooks?

4            A    Yes, it could be spiral notebooks.

5            Q    And was there a uniform notebook that

6    was carried by each detective in the 42 Precinct in

7    that time frame that was issued by the department or

8    did they acquire their own or something else?

9            A    It was issued by the department, but

10   there was two types.  They have larger ones and then

11   small, skinny ones.

12           Q    Okay.  Other than the size of them, is

13   there anything different about them in terms of any

14   information that would be contained in the notebook

15   itself?

16           A    No.  All the notebooks come with just

17   lines.

18           Q    So you make entries in them?

19           A    Correct.

20           Q    Does the notebook, whichever one that's

21   being used, does it have a place on the notebook

22   anywhere where the date that a document was or part of

23   the notebook was created would be inscribed?

24           A    Not a specific location.

25           Q    As a general proposition when you made

1                     GLENN GODINO

2    entries into these spiral notebooks, did you date the

3    entries?

4              A    I sometimes do and unfortunately,

5    sometimes don't.

6              Q    As you sit here right now, do you

7    remember, other than Detective Roberts, who is a

8    detective in this case, the names of any other

9    detectives who actively assisted in this

10   investigation?

11             MR. THADANI:   Objection.

12             A    I believe Detective Schwartz from Bronx

13   Homicide was assigned this case with me and Detective

14   Claude O'Shea from the Bronx Homicide was on this case

15   also.  I don't know if he was specifically assigned

16   the case.  He might have been just helping out

17   Detective Schwartz.

18             Q    What kind of things do you remember the

19   two homicide detectives doing with regard to this

20   investigation, which types of activities?

21             A    I believe Detective O'Shea recovered a

22   videotape from a bodega.

23             Q    He is one of the homicide detectives?

24             A    Yes.

25             Q    To your knowledge, was Detective O'Shea

53

1                    GLENN GODINO

2    somebody who had technical training in handling that

3    kind of material?

4                    MR. THADANI:  Objection.

5         A    I don't know if he had training.

6         Q    Again, I will come back to this, but the

7    video that was recovered from the bodega, was that on

8    a disk or was it on a tape?

9         A    It was a VHS tape.

10        Q    VHS tape.  Do you know whether or not

11   the tape itself was removed from the recording

12   equipment by Detective O'Shea or by the bodega owner?

13        A    I have no idea.  I wasn't there when

14   they got the tape.

15        Q    And you don't have any notation or any

16   recollection about how that was done?

17        A    No, I do not.

18        Q    By the way, the bodega owner we are

19   talking about is Mr. Terab?

20        A    What's his first name?  It starts with

21   an A, I think.

22        Q    Fawaz.

23        A    I believe that's his name.

24        Q    Do you have a recollection as to how

25   long after the shooting took place that the tape was

1                    GLENN GODINO

2    recovered by Detective O'Shea?

3            A    I am not sure.

4            Q    If I indicated to you that the shooting

5    took place on the evening of December 26th, 2006,

6    would you agree with that?

7            A    Yes.

8            Q    Do you know whether or not that tape

9    came into the possession of the police department

10   before Mr. Terab was interviewed in connection with

11   this case?

12           A    I don't know if Detective O'Shea

13   interviewed him at that store at that time.

14           Q    You interviewed Mr. Terab at some point,

15   did you not?

16           A    Yes, I did.

17           Q    At the time that you interviewed Mr.

18   Terab, was that tape in the police department's

19   possession in the 42 Precinct?

20           A    Yes, it was.

21                MR. GROSS:  For the record, I am going

22           to ask that, I will formalize this as well, I

23           am going to call for the production of the

24           original case folder right now.  Is it here

25           physically?

55

1                    GLENN GODINO

2          MR. THADANI:  It's not here physically.

3      You can put that in writing and we will

4      respond accordingly.

5          MR. JAFFE:  For the record, we have put

6      it in writing and we did ask that it be

7      provided and produced for the purposes of the

8      deposition today.  I believe we are entitled

9      to question the witness on the original

10     folder.

11         We could call over to Judge Freeman and

12     ask for it to be produced for purposes of

13     this deposition unless you are going to

14     re-produce Detective Godino once we get the

15     original folder in our possession.  You have

16     two choices.  We get a chance to question him

17     as to the original file.

18         MR. GROSS:  In any case, one of the

19     things we were clearly not provided with in

20     this case and I am not sure whether we

21     specifically asked for it, but I believe it

22     was included generally, is the outside of

23     those two case folders which contain

24     information that we have not otherwise had

25     access to.  So I am making a formal request

1                    GLENN GODINO

2        right now that as soon as reasonably

3        possible, whatever happens with the

4        production of the original folders, that the

5        outside of those two case folders be copied

6        and sent to us.

7              MR. THADANI:  Okay.  You can put the

8        request in writing and we will respond

9        accordingly.

10             With respect to the contents of the

11       file, my understanding is they were copied

12       and produced.  To the extent the outside of

13       the case folders weren't produced, I will

14       check that and again, put the request in

15       writing.  To the extent they weren't, we will

16       have them copied and produced.

17             MR. JAFFE:  What do you want to do about

18       the original?  We are supposed to have it

19       here.  We are supposed to be able to question

20       him as to the original file.

21             MR. THADANI:  It's my understanding that

22       the file has been produced maybe perhaps with

23       the exception of the outside of the case

24       folders.  I have to check that.

25             MR. JAFFE:  It's right across the

57

```
 1                    GLENN GODINO
 2         street.
 3              MR. GROSS:  So the record is clear, we
 4         are not being obstructive here.  One of the
 5         problems we have had with the records that
 6         were produced is on any number of particular
 7         occasions, the copying process, especially if
 8         the documents are on colored paper, or other
 9         things, don't come out clear so they are not
10         readable.
11              There is a multitude of documents that
12         were produced in this case that the only way
13         we are going to make any sense at all about
14         what's on them is to actually see them.  For
15         that reason alone, I think it's only fair we
16         have the original documents here when
17         there is a question as to whether our copies
18         accurately reflect what's on them or not.
19              MR. THADANI:  I want to clarify.  So you
20         are asking me to bring the files over and you
21         will inspect them and the questioning will
22         take place with respect to those files today,
23         is that what you are saying?
24              MR. JAFFE:  Yeah.
25              MR. THADANI:  I can go over and get them
```

58

1                    GLENN GODINO

2          when we find a suitable time for a break.  If

3          you want to do that now --

4               MR. GROSS:  I can question without it

5               right now.  I have a fair number of questions

6               I can do now without the documents in

7               question so if you want to get those done,

8               then we can take a break and do that.

9               MR. THADANI:  It's your deposition.

10              MR. GROSS:  Sure, I am happy to do it

11              that way.

12         Q    Do you happen to know if Detective

13  O'Shea is still employed by NYPD?

14         A    He is not.  He is retired.

15         Q    Do you have an approximate date about

16  how long ago he retired, if you know?

17         A    He's probably retired, and I am

18  guessing, I would say around seven years.  Six years,

19  maybe.

20         Q    What about Detective Schwartz, the other

21  homicide detective?

22         A    He is long gone.  He is retired.

23         Q    The way the case file was setup, was

24  that part of your duties as the lead detective in this

25  case?

59

1                          GLENN GODINO

2          A     Yes.

3          Q     And I think we got this covered, but let

4    me go back for a moment.  The way you caught this

5    particular case, was that based on your just being the

6    next one up or you were singled out for the assignment

7    by a supervisor or some other way?

8                MR. THADANI:  Objection.

9          A     Just being the next one up.

10         Q     And in the 42 Precinct back in 2006 and

11   7 that was typically the way cases were caught, just

12   whoever was next up in line?

13               MR. THADANI:  Objection.

14         Q     Or as they sometimes say, the next one

15   in the barrel?

16         A     Just for homicides and shootings.

17         Q     Okay.  So in homicide and shooting

18   cases, whoever was next in line to catch the case

19   would catch the next event?

20         A     Correct.

21         Q     Is it a fair statement that each time a

22   witness was interviewed with regard to this particular

23   investigation there would have been documentation

24   created for that interview?

25               MR. THADANI:  Objection.

60

1                    GLENN GODINO

2        A    No, there was not.

3        Q    Witnesses got interviewed in this case

4   in a variety of ways.  The first one was generally by

5   canvas, correct?

6        A    Yes.

7        Q    And after the shooting took place, a

8   canvas took place in connection with the shooting

9   itself?

10       A    Yes, it did.

11       Q    And a variety of ways to find people to

12  talk to were used including 911 calls, if they

13  existed?

14       A    Yes.

15       Q    Okay.  How else did you determine on

16  this particular investigation where and how to canvas?

17       A    You start from where you think the

18  incident happened and you just branch out from there.

19       Q    Okay.  The people that were doing this

20  canvas, were they all detectives or were some

21  uniformed personnel involved in it as well?

22            MR. THADANI:  Objection.

23       A    I don't know if any uniformed people

24  knocked on doors.

25       Q    Typically in 2006-7 in the 42 Precinct,

61

                              GLENN GODINO

1

2       were uniformed officers generally used to do

3       canvassing to find potential witnesses?

4                  MR. THADANI:  Objection.

5            A    Sometimes they would.

6            Q    Okay.  You have no recollection about

7       whether they were in this case or not?

8            A    I have no recollection.

9            Q    But when a canvas is done, was part of

10      the procedures back in 2006-2007 in the 42 Precinct to

11      record on particular documents who was questioned and

12      who the questioner was, correct?

13                 MR. THADANI:  Objection.

14           A    At least who was questioned.  Not

15      necessarily who was asking the question.

16           Q    So would it be a fair statement that

17      presumptively a person who was contacted in connection

18      with this case, that their name should be reflected in

19      that case folder somewhere?

20                 MR. THADANI:  Objection.

21           A    It doesn't have to be.

22           Q    In what situations would it not be?

23           A    If you spoke to somebody and they had,

24      if they were just saying, and this is hypothetically,

25      I was just walking by, I didn't see anything and they

62

1                      GLENN GODINO

2    would keep walking, that's something you wouldn't

3    document.

4         Q    But if you went to a particular location

5    and knocked on a door or you stopped somebody and

6    actively questioned them about what they knew, that

7    would be recorded and should be in the case folder

8    somewhere, right?

9              MR. THADANI:  Objection.

10        A    It should be, but I can't guarantee it

11   always happens.

12        Q    Okay.  Routinely, once the names of the

13   victims in the shooting case are ascertained, are

14   computer checks done on them?

15             MR. THADANI:  Objection.

16        A    Yes.

17        Q    And that's standard procedure in a

18   homicide investigation in the 42 Precinct?

19        A    It should be.

20        Q    One of the things that that computer

21   check would determine is any prior criminal history,

22   that's part of what the computer check would involve?

23        A    Yes.

24        Q    What other kind of information does the

25   computer check on the victims attempt to ascertain?

63

1                          GLENN GODINO

2          A      Their pedigree, the names, date of

3    births, addresses, if they have multiple addresses.

4          Q      And what kinds of databases are checked

5    to get that information by the computer?

6          A      Back in 2006-2007 it was much limited

7    than it is now.

8          Q      I know there has been some changes, but

9    back in 2006-2007 when those computer checks are run,

10   can you give me the names of the databases and what

11   information they reflect?  Like, if a fingerprint was

12   done or that type of stuff, what kind of databases

13   would have been run back in 2006-2007?

14                (Whereupon, Mr. Kenneth Creighton came

15                into room.)

16         A      There used to be a program called BADS

17   (phonetic).

18         Q      That's what?

19         A      You would be given the person's arrest

20   record.  I think it was WNAM at the time.  That's

21   another database, I think that covered warrants at the

22   time.  I can't remember.  They switched the names to

23   check people for warrants so I don't remember if WNAM

24   was still around at that time or it was switched to

25   another name.

64

                          GLENN GODINO

1

2         Q    Let me ask you just to interrupt for a

3    moment.  In the databases that were available then,

4    would the existence of an I-card be something that

5    would show up when you did the first routine checks?

6         A    I believe at that time -- I am not sure,

7    but they should have shown up at that time.

8         Q    You mentioned warrant checks.  Those

9    would certainly have come up?

10        A    Yes.

11        Q    Just so we understand, what exactly is

12   an I-card?

13        A    I-card is an investigative card that if

14   you are looking to either speak to somebody who might

15   be a suspect or you have probable cause to arrest that

16   person, you would issue an I-card so if that person is

17   stopped, arrested, we would, the investigator would be

18   made aware that they were arrested or stopped.

19        Q    As far as your understanding goes, does

20   issuance of an I-card authorize the person to be taken

21   into custody if there is no outstanding warrant or are

22   they just subject to being questioned if they choose

23   to or something else?

24             MR. THADANI:  Objection.

25        A    There is different I-cards.  There is

65

GLENN GODINO

1   suspect only I-cards, if you believe they might be

2   involved in something.  And then there is probable

3   cause to arrest I-cards.

4   

5       Q    Okay.

6       A    With the probable cause to arrest

7   I-cards, they would be brought in.

8       Q    On the first type of I-card, the person

9   refused to cooperate, did they have the option to just

10  walk away?

11      A    A suspect only?

12      Q    Yes.  Or would the officer who found

13  them be authorized to take them into custody?

14           MR. THADANI:  Objection.

15      A    The officer who found them would call up

16  and see if they wanted that person brought in.

17      Q    Again, assuming the person said I don't

18  want to come in, was it your understanding the I-card

19  created an authority to take them into custody or not?

20      A    I don't know.

21      Q    Back in 2006-2007, did the computer

22  checks that were done for the victims differ for the

23  computer checks that would be done for people who were

24  suspects in a case?

25      A    I think the same checks would be done.

```
 1                      GLENN GODINO
 2          Q    Again, some general questions and maybe
 3     we will find the time to see about the file.
 4               If a witness was shown photographs for the
 5     purposes of attempting to identify a perpetrator of a
 6     homicide, would records be routinely kept of that
 7     identification procedure?
 8               MR. THADANI:   Objection.
 9          A    Yes.
10          Q    Those records that are shown are what
11     are known as photo arrays?
12          A    It could be a photo array or it could be
13     just a single photo.
14          Q    Are you aware of any policy, general
15     prohibition about showing a single photo to somebody
16     attempting to identify a suspect?
17          A    If somebody -- it depends on how well --
18     I will use the word complainant or victim or witness
19     knows the suspect or perpetrator.  It all depends on
20     how well they know each other.
21          Q    Let's take it in steps.  Assuming that
22     the person who was attempting to make the
23     identification when you are attempting to find out who
24     it is does not necessarily know the person's identity,
25     would you be required to show what is known as a
```

1                          GLENN GODINO

2    standard photo array of six photos?

3                    MR. THADANI:  Objection.

4         A    Yes.

5         Q    And in other situations where the person

6    is, I think the language is, known to the identifiers,

7    sometimes less than six are used?

8                    MR. THADANI:  Objection.

9         A    You are talking about photographs and

10   photo arrays?

11        Q    Photographs or mug shots.

12        A    Normally it's six photos, but I think it

13   might be line ups that you can use only five.  But

14   normally photo arrays usually have six people in them.

15        Q    If somebody was making what is known as

16   a confirmatory identification where they knew the

17   person or indicated that they knew the perpetrator by

18   name, would it be required to use a photo array or did

19   you consider it okay to use a single photo?

20                   MR. THADANI:  Objection.

21        A    I would consider a single photo okay,

22   but depending on what district attorney you are

23   working with, sometimes they want you to show a photo

24   array.

25        Q    Okay.  Not necessarily in this case, but

68

GLENN GODINO

1    generally in cases that you work on, if a person who

2    was making an identification claims to know the person

3    by name, was it standard practice to, if possible,

4    show the person at least one photograph to confirm

5    that you are talking about the same person assuming

6    they were not in custody, of course?

7

8            MR. THADANI:  Objection.

9        A    Yes.  It all depended on how well they

10   knew him.

11       Q    So if somebody said I know John Smith

12   did something, you would, if at all possible, based on

13   the person naming them, show them a photograph, at

14   least one, for confirmation of the person they are

15   naming being the person, in fact, who you were looking

16   for?

17           MR. THADANI:  Objection.

18       A    As long as they knew him fairly well,

19   yes.

20       Q    When photographs are used, whether they

21   are photo arrays or single photographs, are those

22   photographs once used supposed to be kept in the case

23   folder?

24           MR. THADANI:  Objection.

25       A    Yes.

69

1                              GLENN GODINO

2            Q     They should designate to whom they were

3     shown?

4            A     Yes.

5            Q     If a photo array was shown to a

6     potential witness and the identification was not made,

7     would you still put the photo or photo arrays into the

8     case folder indicating it was negative for an

9     identification?

10           A     Yes.

11           Q     To generalize about it, every time a

12    photo identification was attempted, the photograph,

13    who it was shown to and the outcome should be in the

14    case folder, correct?

15           A     It should be.

16           Q     With regard to line ups, same

17    procedures?  You have to take photographs of the line

18    up and the identification procedures, there are set

19    rules as to how that stuff is supposed to be kept?

20           A     Yes.

21           Q     The reason for that, you know, is

22    because otherwise, the identifications may be

23    challenged later by the defense if there is a

24    prosecution, correct?

25           A     Yes.

70

1                         GLENN GODINO

2          Q     So the documentation is to try to

3     attempt to show the fairness of the identification

4     procedure that was used?

5          A     Yes.

6          Q     And includes things like making sure the

7     choices are similar in the way they appear?

8          A     Yes.

9          Q     As much as possible?

10         A     As much as possible.

11         Q     There is a third category of

12    identifications that sometimes happen in

13    investigations called show ups, correct?

14         A     Correct.

15         Q     Show ups are at-the-scene

16    identifications made by either victims or witnesses?

17         A     At the scene or close by.

18         Q     Okay.  To your knowledge, were there any

19    show ups conducted in connection with this case at

20    all?

21         A     Not that I am aware of.

22               MR. GROSS:  Off the record.

23               (Whereupon, a discussion was held off

24          the record.)

25         Q     Did you, as a matter of policy, back in

71

1                        GLENN GODINO

2    the 42 in 2006-2007 have a procedure about when and

3    how a case is to be closed?

4                  MR. THADANI:  Objection.

5         A    I don't understand what you are saying.

6         Q    When a case is started, the case is

7    open, correct?

8         A    Yes.

9         Q    At some point most cases eventually get

10   closed, correct?

11        A    Correct.

12        Q    Who makes a determination about when a

13   case is to be closed?

14                  MR. THADANI:  Objection.

15        A    The ultimate determination is up to the

16   supervisor.  A detective will submit a closing DD5

17   when he believes it's closing, but the supervisor will

18   determine if it should be closed at that time or not.

19        Q    To your knowledge, was a closing DD5

20   ever created by you or another detective in connection

21   with this case?

22        A    It should have been.

23        Q    During this investigation, was it your

24   determination that the gunfire that took place on the

25   street that night emanated from one person or more

72

1                      GLENN GODINO

2    than one person?

3             A     More than one person.

4             Q     The other person that was involved in

5    the shooting, whatever investigation was done with

6    regard to that person should have wound up in that

7    same case folder, correct?

8                   MR. THADANI:  Objection.

9             Q     Since it's kept by victim?

10            A     It's kept by who?

11            Q     The case folder was kept by victim as

12   opposed to suspect so whatever investigation was done

13   with regard to the other shooter in this case, that

14   information regarding that investigation should have

15   wound up in this case folder, correct?

16                  MR. THADANI:  Objection.

17            A     Correct.

18            Q     Do you remember any documentation that

19   was ever created in connection with this case as to

20   the other perpetrator that was involved in the

21   shooting?

22                  MR. THADANI:  Objection.

23            A     We didn't have -- when you say other

24   perpetrator, who do you mean?

25            Q     Well, you told me a moment ago that

73

1                          GLENN GODINO

2    based on the ballistics evidence and other information

3    you got there was more than one person involved in

4    this shooting, correct?

5              A    Yes.

6              Q    And basically your understanding was

7    they were shooting at each other as opposed to a

8    third-party?

9              A    I don't think -- no, I don't think they

10   were shooting at each other.  I think they were

11   shooting at a particular person.

12             Q    So you think there were two different

13   shooters that were shooting at one intended victim or

14   more than one intended victim?

15                  MR. THADANI:  Objection.

16             A    That's what I believe.

17             Q    On what do you base that?

18             A    There were certain shell casings found

19   outside the bodega on the sidewalk and by a van and

20   then there was a smaller caliber.

21             Q    Up the block?

22             A    Shell casings up the block by Union

23   Avenue so I know there is two different guns and two

24   different people, you know, shooting at that time.

25             Q    My question is, what made you believe

GLENN GODINO

1    that they weren't shooting at each other, but rather

2    at a third-party?

3    

4                    MR. THADANI:  Objection.

5            Q    If that's what you testified to earlier.

6    I thought that's what I heard.

7            A    Yeah.  I believe either -- I think I

8    interviewed or somebody interviewed another person who

9    gave a story about what happened.  I don't know who

10   took those notes on that, somebody else did.

11           Q    But whatever those notes were and who

12   took them, it reflected what piece of information

13   reflected that they weren't shooting at each other but

14   rather at some third-party?

15           A    You asked me does it reflect.

16           Q    I know you don't remember specifically,

17   but you said you got the impression.  Can you tell me

18   what information gave that to you?

19           A    An interview from a particular person

20   said that a group, you know, somebody went on the

21   other side of the street and they were shooting at

22   somebody who was standing on a stoop.

23           Q    You think both of them --

24           A    That made me believe that they were

25   shooting both at that particular person.

75

GLENN GODINO

1          Q     Was there any evidence that you
3    collected to lead you to believe that one of the
4    shooters were shooting at the other shooter?

5          A     No.

6          Q     The weapons in this case were never
7    recovered, correct?

8          A     Correct.

9          Q     To your knowledge, was the other
10   perpetrator ever arrested in connection with this
11   case?

12              MR. THADANI:  Objection.

13         A     No, he was not.  He or she was not.

14         Q     Do you have any recollection as you sit
15   here right now about who the witness would have been
16   that led you to believe, either by name or by
17   category, that the shooting wasn't directed at a
18   third-party?

19         A     I believe his name was Kwan.

20         Q     Kwan was interviewed in connection with
21   this investigation?

22         A     I think he was.

23         Q     If Kwan was interviewed in connection
24   with this investigation, there should be documents
25   that reflect that, correct?

76

1                    GLENN GODINO

2              MR. THADANI:  Objection.

3         A    I'm not sure if there is documents.

4         Q    Do you know what Kwan's real name is?

5              MR. THADANI:  Objection.

6         A    I am not sure his last name.

7         Q    To your knowledge, Kwan is not a

8    confidential informant, is he?

9         A    Not that I know of.

10        Q    If he was interviewed as a witness in

11   connection with this case, there should have been a

12   document created, a DD5 or some other police record to

13   reflect that interview, correct?

14             MR. THADANI:  Objection.

15        A    Not always.

16        Q    Would there be any reason not to put

17   that interview in an official document as opposed to a

18   notebook?

19             MR. THADANI:  Objection.

20        A    If the person didn't want to be

21   involved.

22        Q    Well, when you interview witnesses and

23   they don't want to be involved, that's not a choice

24   that you generally offer them, is it?

25             MR. THADANI:  Objection.

77

GLENN GODINO

 1

 2          A     I don't ask them if they want to be

 3     involved, but if they are sitting there, I don't know

 4     anything, I don't want to be involved, you know,

 5     that's --

 6          Q     Assuming that you indicated in this case

 7     that you think that Kwan gave relevant information to

 8     the investigation, and he is not a confidential

 9     informant, is there any reason why a DD5 should not

10     have been created documenting that interview or

11     memorializing that interview?

12          A     I don't know.

13          Q     Can you think of a reason as you sit

14     here right now if it turns out that there was no DD5

15     created with regard to Kwan as to why that occurred?

16               MR. THADANI:   Objection.

17          A     No, I don't.

18          Q     Is it your understanding that Kwan was

19     an eyewitness to this shooting as you sit here now?

20          A     I don't recall if he actually saw the

21     shooting or that he just heard.  I don't know that

22     answer.

23          Q     Okay.  I take it that based on the

24     answers you have given up to now, you have an

25     independent recollection of the events that took place

78

1                      GLENN GODINO

2   in connection with this investigation, fair statement?

3                  MR. THADANI:  Objection.

4        A    Say that again.

5        Q    You have an independent recollection,

6   other than the records, as to what occurred with

7   regard to this investigation?

8        A    Certain recollections.

9        Q    Now, before you came here to testify

10  today, did you review any records in connection with

11  the testimony you were going to give?

12       A    Yes, I did.

13       Q    And when was the most recent time that

14  you reviewed any records in connection with the

15  testimony you are giving here today?

16       A    Within the last two weeks.

17       Q    Okay.  Where did that review take place?

18       A    At the corporation counsel.

19       Q    What records did you review?

20                  MR. THADANI:  Objection.  Don't answer.

21       I am invoking privilege on that.

22                  MR. GROSS:  I am not asking about

23            conversations, I am asking the records he

24            reviewed.

25                  MR. THADANI:  To the extent you are

```
 1                    GLENN GODINO
 2        asking about documents that someone at
 3        corporation counsel decided to show him or
 4        not show him, I am objecting to privilege and
 5        instructing him not to answer.
 6             MR. GROSS:  I want a ruling on that.
 7        Let's go off the record a minute.
 8             (Whereupon, a discussion was held off
 9        the record.)
10              Phone call with Judge Freeman for a
11        ruling:
12             COURT CLERK:  Good morning.
13             MR. JAFFE:  Good morning.  This is
14        Michael Jaffe at Pazer, Epstein and Jaffe.
15        I've got defense counsel with me in a
16        deposition on a file called Creighton against
17        the City of New York.  We are in a deposition
18        of one of the named defendants and we have an
19        issue that requires a ruling from the judge.
20        Is that something we can possibly do by phone
21        now by calling in?
22             COURT CLERK:  It might be.  The judge
23        is on the other line right now on a call, I
24        am not sure how long she expects that one to
25        go.  I can run this by her as soon as she is
```

80

1                      GLENN GODINO

2          off that call and get an answer back to you.

3          Can you give me a little bit of an idea about

4          what the issue is?

5               MR. JAFFE:  Very briefly.  It's a civil

6          rights, wrongful arrest, malicious

7          prosecution case.  We are questioning the

8          arresting detective who is a named defendant

9          and he has testified that prior to being

10         deposed, he reviewed certain documents at

11         corporation counsel's office relative to his

12         preparation for deposition.

13              We've asked for the production of those

14         documents since he reviewed them in

15         preparation and that's met with an objection

16         which requires a ruling from the Court.

17              MR. GROSS:  We asked him what documents

18         verbally he reviewed.

19              MR. THADANI:  This is Kavin Thadani on

20         behalf of defendants.  It's not my

21         understanding that counsel asked for

22         production of those documents.  He asked what

23         those documents were.  It's our position that

24         to the extent the questioning is with respect

25         to what documents his attorneys decided to

81

GLENN GODINO

1    show him in preparing him for this

2    deposition, that is immaterial and an answer

3    that would be covered by the attorney/client

4    privilege.

5         It is our position that counsel can ask

6    whether he reviewed documents, which they

7    have, and the witness has said that he has.

8    They can ask whether any of those documents

9    refresh his recollection and they can ask him

10   to identify those documents.

11        With respect to whether the question

12   pertains to what counsel decided to show him

13   and not to show him, it's our position that

14   that's covered by attorney/client privilege

15   and I have instructed the witness not to

16   answer pending a ruling by the judge on this.

17        MR. GROSS:  Just to be clear --

18        COURT CLERK:  As you are telling me

19   this, I see the judge is off the other line.

20   I am going to put you on hold to see if she

21   is available to do this now or she'll give

22   you a call back.

23        MR. JAFFE:  Thank you.

24        MR. GROSS:  Thank you.

82

1                    GLENN GODINO

2              MR. THADANI:  Thank you.

3              THE COURT:  Hi, it's Judge Freeman.

4              MR. GROSS:  Your Honor, this is Richard

5         Gross.

6              MR. JAFFE:  Mike Jaffe.

7              MR. THADANI:  And Kavin Thadani on the

8         line for defendant.  Good afternoon, your

9         Honor.

10              THE COURT:  Hi.  Are we on the record?

11              MR. JAFFE:  We are.

12              THE COURT:  I have a telephone

13         conference call coming in at 12 o'clock and

14         by my clock, it's any second so I don't

15         really have a window of time to talk to you

16         and make a ruling.

17              Based on what my clerk said, there is a

18         refusal to produce documents or testify about

19         documents?

20              MR. GROSS:  No, actually, that's not

21         correct.

22              THE COURT:  Tell me really quick.

23              MR. GROSS:  I only asked the witness --

24              THE COURT:  Who is this speaking?

25              MR. GROSS:  This is Richard Gross, your

GLENN GODINO

1

2    Honor.

3         I only asked the witness where he

4    reviewed the documents and what documents he

5    reviewed.  No other questions were posed to

6    him.  I never brought up how he got the

7    documents or who gave them to him.  I think

8    those are straightforward questions that have

9    to be answered.

10        MR. THADANI:  Your Honor, this is Kavin

11   Thadani on behalf of defendants.  Mr. Gross

12   is correct that he did ask the witness where

13   he reviewed the documents.  He answered that

14   he reviewed the documents at corporation

15   counsel's office.  And then he asked what

16   documents he reviewed.

17        I objected to that on the grounds of

18   attorney/client privilege and instructed

19   the witness to not answer on the basis that

20   it's our position, respectfully, to the

21   extent that the questioning is going into

22   what documents counsel decided to show him

23   and not to show him in preparing him for this

24   deposition is covered by the attorney

25   client/privilege.  I also --

84

1               GLENN GODINO

2          THE COURT:  Hold on a second.  Work

3     product?  Are you talking about work product?

4          MR. THADANI:  Not work product.

5     Attorney/client privilege with respect to

6     what documents --

7          THE COURT:  Wait, wait, wait.  I am

8     going to say something really quickly and

9     then I'm probably going to have to get off

10    the phone, okay?  If the matter is not

11    resolved by the time I have to get off, make

12    whatever record you have to make and revisit

13    it afterwards.  You already have another

14    issue that has to be re-visited anyway.

15         As you know, for something to be

16    attorney/client privilege, there has to be a

17    communication where something has to ask for

18    legal advice or give legal advice and it has

19    to be understood that asking for legal advice

20    or giving legal advice is the core of

21    attorney/client privilege.  That is the

22    communication between the attorney and the

23    client.

24         Work product can include, and I am

25    assuming you know, something that reveals the

85

```
  1                    GLENN GODINO

  2        inner workings of the mind of the attorney

  3        making strategic determinations on the

  4        litigation and that's what's usually invoked

  5        when you are talking about these documents.

  6             I selected to show somebody something

  7        out of the larger selection and the very fact

  8        that I chose to show someone something that

  9        will reveal my thinking, that's usually work

 10        product.

 11             MR. THADANI:  Right.

 12             THE COURT:  So I am not really seeing an

 13        attorney/client issue here.  If the documents

 14        themselves that you showed are

 15        attorney/client privilege, then even on a

 16        privilege line you would have to identify

 17        what a document is.  You would have to give

 18        enough information on it so the other side

 19        can challenge the contents of whether it's

 20        really privileged or not, a general

 21        description of the document and so on and so

 22        that you can have a privilege log.  Does that

 23        makes sense?

 24             So merely identifying a document or not

 25        identifying a document does not itself reveal
```

86

GLENN GODINO

1       whether the document is privileged or does

2       not reveal privileged information.  It's the

3       substance of the communication that would or

4       would not be privileged.

5            Now, if what you are making is a work

6       product objection, you know, generally, a

7       party is entitled to inquire about what

8       documents are reviewed by a witness in

9       preparation for the deposition.  That's

10      fairly standard.  That's generally answered.

11           So, if it's as simple as that, what

12      documents did he review in preparation for

13      your deposition, in preparation for giving

14      this testimony, usually that's answered.

15           If you really think something is so

16      sensitive about what documents were shown to

17      him that could give rise to some kind of work

18      product claim, then, you know, you are

19      entitled to instruct the witness not to

20      reveal attorney/client privilege or work

21      product, if you really feel that's necessary.

22           Bear in mind, anybody who does not allow

23      questioning to go forward on the basis of a

24      claim and if those claims are defeated, if I

87

GLENN GODINO

1         thought there was no good faith basis for it,

2         I am going to require you to re-open the

3         deposition to be on that side's time, okay?

4         MR. THADANI:  Understood.

5         THE COURT:  I hear the phone ringing,

6         that's my phone call conference.

7         MR. THADANI:  Thank you.

8         MR. GROSS:  Hopefully we resolved it.

9   Thanks.

10        MR. THADANI:  In light of the judge's

11        statements, you can go ahead with the

12        questioning.

13        MR. GROSS:  Okay.

14   Q    What documents did you review in

15   connection with your preparation at corporation

16   counsel's office?

17        A    I reviewed a document, a Detective

18   Laducca (phonetic) that was on the wanted card team,

19   I-card team at that time.  There was one or two other

20   documents, I can't recall right now which ones it was,

21   but I particularly remember that one document.

22        Q    Okay.  You indicated you did that review

23   about when?

24        A    I think in the last two weeks.

88

GLENN GODINO

1

2      Q    When that review took place, was the

3  entire case file available to you?  Was it physically

4  in the room?

5      A    I don't know.

6      Q    In preparation for this case, the

7  testimony that you were going to give, whether it was

8  on that occasion or any other occasion, did you have

9  access to the entire case file?

10            MR. THADANI:  Objection.

11      A    This case went from corporation counsel

12  person to corporation counsel.  Previously, yes, I

13  looked at the folder within the last couple of years.

14  But just recently, I haven't looked at the whole

15  folder.

16      Q    When is the last time that you

17  physically saw the case folder itself?

18      A    I believe I gave the case folder when I

19  picked it up to Silverstein.  Another corporation

20  counsel person.  I don't remember his whole name.

21            MS. GROSS:  Feel free to fill it in.

22            MR. THADANI:  For the record, I believe

23        Steve Silverman.

24      A    That's the last recollection I have of

25  seeing the folder.

89

                         GLENN GODINO

1

2          Q     About how long ago was that?

3          A     I'm approximating.  It's over a year, a

4    year and a half.  Approximately.  I don't remember.

5          Q     Okay.  From that time when you saw the

6    entire case folder up until sometime in the recent

7    past that you just testified about, have you reviewed

8    any other documents in connection with this case

9    whether it was for giving testimony here or otherwise?

10         A     Just the I-card document I told you

11   about and one or two other ones.  I just can't

12   remember what they are.

13         Q     Was there some other occasion between

14   the two you mentioned where you reviewed records in

15   connection with this case?

16         A     I don't think so.

17         Q     Specifically, have you ever reviewed the

18   grand jury testimony that was given in connection with

19   this case?  And by that I mean, have you read the

20   transcript?

21               MR. THADANI:  Objection.

22         Q     At any time?

23         A     Not that I can recall.

24         Q     As you sit here right now, are you aware

25   of the fact that Mr. Spruell and Mr. Terab have been

1                    GLENN GODINO

2    deposed in connection with the civil case?

3           A    Yes.

4           Q    Did you learn by any means any of the

5    information that was contained within either of those

6    depositions either by being told about it, reading it

7    or any other way?

8                MR. THADANI:  Objection.  Answer with

9           respect to communications not had between

10          either myself or prior counsel and you.

11               MR. GROSS:  Let me be clear on this for

12          the record in case we get a ruling.

13               My position is that regardless of how he

14          came about that information, since I am

15          questioning the witness about what he knows

16          about this case and the events, it doesn't

17          matter whether it was provided by counsel as

18          part of preparation or otherwise.  I am only

19          asking him, and I don't care where the

20          information was gotten from, what he knows.

21          Not where he acquired it from.  And I think I

22          am perfectly entitled to get that information

23          without having the attorney/client privilege

24          used as a shield to prevent me from that

25          inquiry.

91

```
 1                    GLENN GODINO
 2              Again, if you instruct him not to
 3         answer, I can't stop you, but I am telling
 4         you that I think that borders on being
 5         frivolous.
 6              MR. THADANI:  I understand.  Can you
 7         re-ask the question.
 8              (Whereupon, the requested question was
 9         read back by the reporter.)
10         A    Yes.
11         Q    Let's start with have you ever seen
12    copies of the depositions that were taken in the
13    Spruell and Terab case -- that were taken in this case
14    of those two witnesses?
15         A    I have not.
16         Q    Did you learn about particular pieces of
17    information that were contained in those cases that
18    are relevant to this lawsuit in your opinion?
19              MR. THADANI:  Objection.
20         A    In regards to the depositions?
21         Q    Yes.
22         A    No.
23         Q    Did you ever learn for instance, what
24    Mr. Terab testified to with regard to his
25    identification of the person who passed the gun to
```

                         GLENN GODINO

1

2   Dior Creighton?

3                  MR. THADANI:  Objection.

4         A     Are you saying specifically at

5   corporation counsel?  Because I have learned from

6   other means.

7         Q     No, I don't want to know where you got

8   it from, because I may not be entitled to know that.

9   All I am asking you is, did you learn from any source

10  information contained in that deposition about Mr.

11  Terab's testimony as to who he said passed the gun to

12  Dior Creighton?

13                 MR. THADANI:  He is asking about

14             deposition testimony.

15        A     Deposition, no, I did not.

16        Q     Did you learn that Mr. Spruell, the

17  person who claimed to have been the party that -- one

18  of the people to have claimed to pass the gun to Dior

19  testified under oath in connection with this case?

20                 MR. THADANI:  Objection.

21        A     Yes, I learned.

22        Q     Did you learn from any source that Mr.

23  Spruell admitted in that deposition that he was the

24  one who, in fact, passed the gun to Dior Creighton?

25                 MR. THADANI:  Objection.

93

                        GLENN GODINO

1

2          A     I wasn't given any information that came

3    out of the deposition.

4          Q     Okay.  Did you learn from whatever the

5    source might have been that Mr. Spruell formally

6    admitted that he was the one that passed the gun to

7    Dior Creighton?

8                MR. THADANI:  Objection.

9          A     Yes, I did.

10         Q     How did you learn that?

11         A     When I watched Kenny's television

12   interview and it had Kijafa Spruell on there saying

13   that he was the one that passed the gun.

14         Q     Okay.  You became aware of the civil

15   suit being started when papers were served on you at

16   some point, correct?

17               MR. THADANI:  Objection.

18         A     Correct.

19         Q     After those papers were served on you,

20   you made a formal request to corporation counsel to

21   represent you in this case?

22         A     Yes, I did.

23         Q     And they agreed to represent you?

24         A     Yes, they did.

25         Q     After you received the papers in this

94

                              GLENN GODINO

1

2    case, did you ever discuss anything with regard to

3    this lawsuit with any present or former district

4    attorney?

5         A    The content of -- I ran into ADA Terri

6    Gottlieb last week when I was preparing for a homicide

7    trial and she needed to pick up a folder that we are

8    going to be working with so she just told me that she

9    is going to be deposed coming up at the end of this

10   month, but we didn't get into details of what may be

11   in the deposition or not, because neither of us had

12   been deposed at that point.

13        Q    But I am not talking about what might be

14   in the deposition.  All I am asking you is, other than

15   ADA Gottlieb, did you ever discuss the substance of

16   this case, the investigation, anything you did since

17   the lawsuit has been started with any ADA?  I am not

18   referring to the deposition itself, just whether you

19   ever discussed it with them.

20        A    I ran into Bruce Birns.  I was on

21   another trial and he came out of a court room and he

22   had just acknowledged that there was the lawsuit.  But

23   I don't believe we discussed in detail what the, you

24   know, case at that time.

25        Q    To your knowledge --

1                    GLENN GODINO

2        A    He wasn't an ADA anymore at that time.

3        Q    That was my next question.

4        A    Yeah.

5        Q    Any other ADAs?

6        A    Not that I am aware of.

7        Q    Have you discussed this case with any of

8   the police officers or detectives who were involved in

9   the investigation or the prosecution of this case

10  since the civil case has been started, since you

11  received the papers?

12       A    I spoke with Detective Roberts just in

13  general that this case is going on, but we didn't

14  discuss particulars of the case.

15       Q    Is Detective Roberts still at the 42?

16       A    He is retired.

17       Q    Do you remember approximately how long

18  ago he retired?

19       A    Actually, it was just three years a

20  couple of weeks ago.

21       Q    Other than ADAs and police officers,

22  former or otherwise, have you discussed this case

23  other than with your counsel with anybody else?

24       A    No, I did not.

25       Q    You indicated earlier in your testimony

96

1                          GLENN GODINO

2   that you believe there was some documents that were in

3   the case file at one point that are no longer there.

4   When did you come to learn that?

5                   MR. THADANI:   Objection.

6          A      When Dan McCarthy was assigned the case.

7   He called me into his office so we could start going

8   over the case and when I looked into the folder, a lot

9   of the DD5s were missing.

10         Q      Were you the person who delivered, if

11  that's how it happened, the case folder to the

12  district attorney?

13         A      Yes.

14         Q      Were those documents, to your knowledge,

15  that are now missing in the case folder at the time

16  you delivered it?

17         A      I believe they were.

18         Q      As best as you can recollect from

19  looking through the file at that time, are we talking

20  about one or two documents, a large number of DD5s,

21  something else?  Can you give us a little more

22  specificity about how much was missing?

23         A      I don't know the amount.  I wouldn't say

24  more than thirty, but a few documents.  I don't even

25  know exactly how many.

97

                              GLENN GODINO

1

2        Q     So I asked you before, let me go back to

3    it for a moment.

4           The DD5s that were created in connection

5    with this investigation, would there have been a list

6    maintained of the DD5s that were created in this case

7    that would have either gone in the case file or have

8    been attached to it?

9               MR. THADANI:  Objection.

10       A     I am not sure if I kept an index.

11       Q     As you sit here right now, is there

12   anyway that the DD5s that have gone missing, that we

13   could find a list of those, that you know of?

14              MR. THADANI:  Objection.

15       A     I tried to locate them because back

16   then, we used to -- I think there was three copies of

17   each DD5.  One would stay with the case folder, one

18   would get sent over to Bronx Robbery, and one would

19   get sent over downtown to some unit, I couldn't tell

20   you which unit.  I tried tracking down those documents

21   and I wasn't able to find any of them.

22       Q     The original DD5 goes in the case folder

23   and the copies were the ones that would be distributed

24   wherever they went?

25       A     Yes.

98

1                    GLENN GODINO

2          Q     Based on your understanding of how the

3    police department works, should those other DD5s, I

4    know you said you couldn't find them, but based on

5    your understanding of how the police department is

6    organized and works, should those DD5s still be in

7    existence somewhere?

8               MR. THADANI:  Objection.

9          A     I don't know how long the department

10   keeps those particular files for.

11         Q     Okay.  I know things have changed.  In

12   2006 and forward when documents were created, whether

13   or not the documents themselves went on a computer,

14   would there have been a record made of the DD5s that

15   were created that should be on some computer database?

16              MR. THADANI:  Objection.

17         A     I am not aware of that.

18         Q     When DD5s were created in connection

19   with this case, were they created from a paper copy or

20   were they done on a computer and then printed or

21   something else?

22         A     No, they were preprinted documents that

23   we put into a typewriter and we used to type the DD5s.

24         Q     Physically type?

25         A     Physically type them.

99

1                    GLENN GODINO

2        Q     That was done in 2006 and 2007?

3        A     Yes.

4        Q     It's not done that way anymore, I

5   gather?

6        A     No, thank God.

7        Q     Can you specifically tell me which DD5s

8   you noticed were missing at the time you became aware

9   of them when you were speaking to the ADA?

10       A     No, I can't.

11       Q     Can you mention any that were missing?

12       A     I don't -- I didn't see that file for --

13  I am going to say a good three, over three years so I

14  don't recall exactly how far the DD5s went up to.

15       Q     Okay.  DD5s when they are created are

16  dated both as to the date they were created and the

17  starting event they are being created about, correct?

18       A     Correct.

19       Q     The DD5s that were created in connection

20  with the Caldwell case, were they numbered?  Usually

21  it's in the upper right-hand corner somewhere on the

22  DD5 so when you look at an index sheet, if one

23  existed, they would have a number that corresponded to

24  that on the DD5 itself?

25                    MR. THADANI:  Objection.

100

1                        GLENN GODINO

2          A    I don't remember if these were numbered.

3    They should have been numbered, but I don't recall if

4    they were numbered.

5          Q    So if you had the last numbered DD5 and

6    you could tell by date approximately when that DD5 was

7    created, that would give you a way to check back to

8    see which ones you had and which ones you didn't,

9    correct?

10                   MR. THADANI:  Objection.

11         A    If I knew specifically when the last one

12   was, yes.

13         Q    So if they are not numbered, then there

14   is no way to tell, correct?  That's one of the reasons

15   why the DD5s are numbered so that you can tell the

16   consecutive order of where they are, is that a fair

17   statement?

18         A    Yes, it is.

19         Q    How did you come to be aware of the fact

20   when you looked at the file, if you recollect, as to

21   the fact that there were DD5s that were missing?  What

22   made you think -- were you looking for a particular

23   DD5 or something else?

24         A    I think there was an ID photo that went

25   missing because I was looking for an ID photo.  And I

GLENN GODINO

1          think I recall that the DD5s just stopped because the

2          last one in most cases, it wasn't in this case, should

3          be a blue DD5, but if we close the case when you have

4          one arrest, it would have been a blue DD5 at that

5          time.

6                    Q     That's known as an administrative

7          closing as opposed to a final closing?

8                         MR. THADANI:  Objection.

9          A     I don't know.  I don't know that term.

10         Q     Okay.

11         A     But if you make an arrest after that

12         blue DD5, it would be a pink DD5, which was -- it

13         wasn't a follow up, it was another DD5.  I can't

14         remember the name.

15                   Q     Okay.  Are those DD5s, other than being

16         different colors, did they contain different

17         information on them or did they all have the same

18         information?

19                        MR. THADANI:  Objection.

20         A     It would have different things inside.

21         Q     So a DD5 is a catchall for any follow up

22         information, but there are different types used for

23         different purposes?

24                   A     Yeah.  There is DD5 that you would use

GLENN GODINO

1
2   when you were starting to put information in.  Then
3   they have a second sheet if that DD5 becomes too long.
4   Then there is a blue DD5 at that time that if you were
5   closing the case as far as an arrest or if it was
6   previously reported in a different command.  I think
7   that might be answer to that question.
8           Q    Okay.  Do you know if there was any --
9   if I asked you this before, I apologize.  If there
10  were any documents created in connection with looking
11  for the other perpetrator who was associated with the
12  difference in the ballistics evidence that showed
13  different shell casings?
14               MR. THADANI:  Objection.
15          Q    Of any kind.
16          A    I don't believe I ever knew who the
17  other shooter was so I don't know if there could be a
18  document looking for that person, because I don't
19  believe I learned who the other person was that was
20  shooting.
21          Q    You received the surveillance video from
22  a detective you mentioned earlier who picked it up
23  from the bodega where Mr. Terab was the proprietor,
24  correct?
25          A    Correct.

1                          GLENN GODINO

2          Q    Would it refresh your recollection if I

3   told you that Mr. Terab was interviewed and there was

4   documentation created in connection with that

5   interview on December 31st, 2006, does that sound

6   correct to you?  I will show you the document.

7          A    He was interviewed.

8          Q    At the time that that interview took

9   place, that was after you had received the

10  surveillance video, correct?

11         A    I believe it was.

12         Q    So the shooting is on the 26th, the

13  interview is on the 31st and you testified earlier

14  that the video was picked up within a day or two at

15  the latest from the time of the shooting, correct?

16              MR. THADANI:  Objection.

17         A    Correct.

18         Q    As part of your initial investigation of

19  this case, did you look at that video?

20         A    Yes, I did.

21         Q    You looked at that video before you

22  interviewed Mr. Terab?

23         A    Yes, I did.

24         Q    How many times in all from the time you

25  came into possession of that surveillance video until

104

1                    GLENN GODINO

2    the present day have you looked at it?

3          A    Maybe four or five times.

4          Q    Do you know as you sit here right now

5    whether the investigation into the Caldwell shooting

6    is open or closed?

7                MR. THADANI:  Objection.

8          A    It's closed.

9          Q    Other than the fact that this file is in

10   civil litigation, what happens to a closed file after

11   it's closed; does it stay in the same place in the

12   precinct where it was or does it move or something

13   else?

14               MR. THADANI:  Objection.

15         A    It should go into -- each detective

16   squad has a particular closet that you put all

17   homicide folders in.  It should stay there so it

18   doesn't disappear.

19         Q    When you say all homicide folders, you

20   are talking about the ones that are no longer under

21   active investigation?

22         A    They could be still open and not solved.

23   They could be put in there or they could be closed to

24   an arrest and put in there.

25         Q    Okay.  In the 42nd Precinct back in 2006

1                    GLENN GODINO

2    and the couple of years following it, was there a

3    designation of files where there was some portion of

4    it that was not solved known as cold case files?

5              MR. THADANI:  Objection.

6        A    In regarding this case or in general?

7        Q    No.  In general.  Just in general.

8        A    Yes.

9        Q    How does a case, based on your knowledge

10   back then, how would a case wind up in the cold case

11   files?

12        A    Just when you don't have any witnesses,

13   any leads and it's just practically going nowhere, it

14   gets put into the closet.

15        Q    But they kept these cold case files

16   because there are procedures in place that sometimes

17   they get re-investigated or people get assigned to

18   them, things like that?

19              MR. THADANI:  Objection.

20        Q    If you know.

21        A    They are all put in one same closet, you

22   know.  It's not separate from a cold case.  All the

23   homicide folders get put into the closet and if

24   somebody down the line gets a witness that they didn't

25   know at the time, they can always go to that closet,

                             GLENN GODINO

1

2    hopefully find the folder and investigate it.

3         Q    Okay.  If a case has more than one

4    perpetrator and one of the perpetrators is arrested

5    and one of the other perpetrators is not arrested, is

6    that a case that routine gets closed or does it stay

7    open?

8                   MR. THADANI:  Objection.

9         A    It all depends on the amount of time

10   that goes by.  If you arrest somebody, you would close

11   it with a blue DD5 at that time just to get the

12   closing for that case, but it's still active pending

13   if you get the second or third person, whoever you are

14   looking for.

15                  MR. GROSS:  We are going to stop based

16             on our earlier conversation and you are going

17             to get us that wonderful original case file.

18                  MR. THADANI:  Sure.

19                  MR. GROSS:  I assume that anything that

20             you deemed privileged based on the discovery

21             we have had on this case should be in that

22             case file, correct?  It should contain all

23             the documents?

24                  MR. THADANI:  I mean, I assume we are

25             talking about the detective file, the file

107

1                    GLENN GODINO

2           that's been referred to here.  We didn't

3           withhold anything on the basis of privilege

4           so I will bring you the whole file.

5                MR. GROSS:  That's what I was getting

6           at.  Thank you.

7                (Whereupon, this portion of the

8           examination was concluded.  Time

9           noted: 12:34 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

108

1

2                    A C K N O W L E D G M E N T

3

4    STATE OF NEW YORK  )

5                              SS:

6    COUNTY OF          )

7

8              I, GLENN GODINO, hereby certify that I

9    have read the transcript of my testimony taken under

10   oath in my deposition of April 11th, 2016; that the

11   transcript is a true, complete and correct record of

12   what was asked, answered and said during this

13   deposition, and that the answers on the record as

14   given by me are true and correct.

15

16                            _____

17                                GLENN GODINO

18

19   Subscribed and sworn to

20   before me this _____ day

21   of _____, 2016.

22

23   _____
          NOTARY PUBLIC
24

25

109

1

2                          I N D E X

3

4    WITNESS                EXAMINATION BY            PAGE

5    Glenn Godino       Mr. Gross                    4-106

6

7            INFORMATION/DOCUMENTS REQUESTED

8    DESCRIPTION                                      PAGE

9    - Outside of two case folders                     55

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

110

1

2                    C E R T I F I C A T I O N

3           I, JOANNA BOJARYN, a Notary Public of the

4    State of New York, do hereby certify:

5           That the testimony in the within proceeding

6    was held before me at the aforesaid time and place;

7           That said witness was duly sworn before the

8    commencement of the testimony, and that the testimony

9    was taken stenographically by me, then transcribed

10   under my supervision, and that the within transcript

11   is a true record of the testimony of said witness.

12          I further certify that I am not related to

13   any of the parties to this action by blood or

14   marriage, that I am not interested directly or

15   indirectly in the matter in controversy, nor am I in

16   the employ of any of the counsel.

17          IN WITNESS WHEREOF, I have hereunto set my

18   hand this 18th day of April, 2016.

19

20

21

22                    JOANNA BOJARYN

23

24

25

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

KENNETH CREIGHTON,

                              Plaintiff,
                              12 CV 07454
            -against-

THE CITY OF NEW YORK, DETECTIVE DEAN ROBERTS (Shield No.
05861), DETECTIVE GLENN GODINO (Shield No. 2756), POLICE
OFFICERS JOHN DOES 1-10 (names being fictitious and
presently unknown and intended to be employees of the New
York City Police Department who were involved in
plaintiff's arrest, detention, imprisonment and/or
prosecution), DISTRICT ATTORNEY ROBERT T. JOHNSON,
ASSISTANT DISTRICT ATTORNEY BRUCE BIRNS, ASSISTANT
DISTRICT ATTORNEY BRIAN BURNS, ASSISTANT DISTRICT
ATTORNEY ED TALKY a/k/a ED TULTY and ASSISTANT DISTRICT
ATTORNEY MICHAEL COOPER,

                              Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - x

                              20 Vesey Street
                              New York, New York

                              April 11, 2016
                              2:39 P.M.


            CONTINUED EXAMINATION BEFORE TRIAL OF GLENN

GODINO, one of the Defendants in the above-entitled

action, taken by the attorney for the plaintiff, pursuant

to the Federal Rules of Civil Procedure and Stipulations

between Counsel, held before Andrea Bloecker, a Notary

Public within and for the State of New York, at the above

time and place.

```
 1                                                    112

 2    A P P E A R A N C E S:

 3

 4        RUBERT & GROSS, P.C.
                Attorneys for Plaintiff
 5              150 Broadway, Suite 712
                New York, New York 10038
 6
          BY:   RICHARD GROSS, ESQ.
 7

 8
          PAZER, EPSTEIN & JAFFE, P.C.
 9              Attorneys for Plaintiff
                20 Vesey Street
10              New York, New York 1007

11        BY:   MICHAEL JAFFE, ESQ.

12

13        NEW YORK CITY LAW DEPARTMENT
                Corporation Counsel for the Defendants
14              100 Church Street
                New York, New York 10007
15
          BY:   KAVIN THADANI, ESQ.
16              File #2012-006428

17

18

19

20

21

22

23

24

25
```

1                          GLENN GODINO                    113

2                    MR. THADANI:  I just want to let the

3               record reflect that on behalf of defendants I

4               brought the original detective's file for

5               plaintiff counsels' inspection, and

6               plaintiff's counsel has spent some time

7               inspecting those documents.

8                    MR. GROSS:  Okay.

9     EXAMINATION BY

10    RICHARD GROSS, ESQ.:

11        Q     Again, I'll pick this up later, but you caught

12    this case on the day that it happened, correct?

13        A     Yes, I did.

14        Q     Did you go to the area where the shooting

15    occurred on the same day as the shooting itself

16    occurred?

17        A     Yes, I did.

18        Q     The shooting took place around sometime after

19    5:00 on the 26th?

20                   MR. THADANI:  Objection.

21        A     I'm not sure what time that day it was.

22        Q     Just for the purposes now of identifying the

23    time and place that it happened, I'm going to show you a

24    copy of this document and ask you if you recognize what

25    it is.

1

2              MR. THADANI:  For the record, it's Bates

3         stamped NYC 004053.  It's a two page document.

4         It's NYC 004053 and NYC 004054.

5     Q     Do you recognize what that is?

6     A     Yes.

7     Q     What is that?

8     A     It's a complaint drawn up by the Bronx

9     district attorney's office.

10    Q     What is the terminology that you use when

11    you're describing that?  Is that what you'd call a sworn

12    complaint?

13    A     A complaint, yeah.

14    Q     If you look at the top of that, you indicated

15    when you made out this complaint with the date and time

16    what the events were?

17    A     This is approximately 5:48 P.M.

18    Q     Assuming that that information is accurate,

19    does that give you some idea of how long after the

20    shooting you went to the scene?

21             MR. THADANI:  Objection.

22    A     I must have responded within around about that

23    time.

24    Q     Within an hour or so of the shooting itself,

25    would you say?

```
 1                      GLENN GODINO                  115

 2       A      Most likely.  I don't recall what time.

 3       Q      Again, just to establish it in the record, the

 4  document I just showed you indicates that the shooting

 5  took place at 800 East 168th Street in the Bronx.  Is

 6  that accurate, based on your recollection, or that

 7  general vicinity?

 8       A      Yeah, close to it.

 9       Q      Before that date of December 26, 2006, had you

10  ever known of either personally but more likely

11  professionally who Kenneth Creighton was?

12       A      Yes, I did.

13       Q      Did you know Dior Creighton or know of him

14  before that date?

15       A      Yes, I did.

16       Q      Did you know of or know Kijafa Spruell prior

17  to that date?

18       A      No.

19       Q      Did you know of Fawaz Terab, F-a-w-a-z,

20  T-e-r-a-b, for any reason based on your police work prior

21  to the date of this incident?

22       A      I don't think so, but I can't -- I've been in

23  that bodega prior to this incident, but I don't know if I

24  ever knew him.

25       Q      I'll get to this in more detail later, but in
```

```
1                        GLENN GODINO               116
```

2    this case, there's somebody that has been identified as a

3    confidential informant or a CI?

4        A      Correct.

5        Q      Did you know that person prior to the date of

6    this incident?

7        A      Yes.

8        Q      Again, I'll get to this in more detail, but a

9    CI is what is known as a handler, is that accurate

10   terminology?

11       A      Yes.

12       Q      During the time that you were a detective in

13   the precinct up to the time of this incident, had you

14   ever handled CIs personally?

15       A      Never.

16       Q      To your knowledge, was the handler of a CI,

17   generally in the 42nd Precinct, somebody who would have

18   been connected to narcotics?

19              MR. THADANI:  Objection.

20       A      It doesn't necessarily have to be.  You could

21   have a CI to do other investigations.  It doesn't

22   necessarily have to be narcotics.

23       Q      Had you had contact with the CI in this case

24   prior to this incident, where he was ever a witness in a

25   case?

```
 1                      GLENN GODINO                    117

 2      A      He wasn't a witness in the case, but he

 3  provided me with information on a case one time prior.

 4      Q      Approximately how long before December of 2006

 5  was that?

 6      A      Within a couple of years.

 7      Q      You never worked narcotics, I assume?

 8      A      No, I have not.

 9      Q      Is it a fair statement that whatever the case

10  was that he provided you information for was not a

11  narcotics case?

12      A      Correct.

13      Q      Was it, to your knowledge, a homicide case?

14      A      It was not.

15      Q      Without getting into any detail, can you tell

16  me the type of crime that he was an informant, with regard

17  to?

18      A      Ironically, it was a non-fatal shooting in

19  front of the exact building that John Caldwell got shot

20  in the head with.

21      Q      As a result of that investigation, was there

22  an arrest made?

23      A      Yes, there was.

24      Q      Did that arrest result in either a conviction

25  or a plea?
```

2     A     A plea.

3     Q     When that prior incident that he gave you

4  information about occurred, who was his handler at that

5  time, do you remember?

6     A     Yes.  The same handler, John Elliott,

7  Detective John Elliott.

8     Q     At any time either in the prior incident or

9  this incident, did you have occasion to look at any of

10  the records that the police department maintained with

11  regard to the CI?

12     A     No.

13     Q     The original contact information on the

14  earlier case was information that you got based on an

15  inquiry made to his handler?

16               MR. THADANI:  Objection.

17     A     No, I didn't inquire to him, Detective

18  Elliott, his handler.  Detective Elliott called me to

19  tell me that his CI had information on that case.

20     Q     Was it your understanding back in the time of

21  that event, that the CI was a paid informant?

22     A     Yes, he was a CI.  Yes, and CIs are paid.

23     Q     Pretty much all the time?

24               MR. THADANI:  Objection.

25     Q     Are CIs --

```
 1                    GLENN GODINO                 119

 2      A      I never had a CI myself, but they're known to

 3   get paid.

 4      Q      Over the years, you've had, I assume, other

 5   cases where CIs have been involved in supplying

 6   information to you?

 7      A      As far as I could remember, this might be the

 8   only two -- he might be the only CI that I can recall

 9   that I've been involved with.

10      Q      If you saw the CI on the street, would you

11   recognize him?

12               MR. THADANI:  Objection.

13      A      I may be able to, but it's been -- I haven't

14   seen him since this incident.

15      Q      You indicated earlier in your testimony that

16   you had looked at the surveillance video on more than one

17   occasion, correct?

18      A      Correct.

19      Q      I think you indicated that you looked at the

20   surveillance before you had any contact with Mr. Terab,

21   is that a fair statement?

22      A      I think I did.

23      Q      On the occasions that you looked at the

24   surveillance video, would that have been -- let's start

25   with the first one.  Would that have been in the presence
```

2   of any other members of the force?

3       A      Yeah.  Detective O'Shea had gotten a video.

4   So I believe I watched it with him.  It could have been

5   other people in the office, but I don't recall

6   specifically who.

7       Q      On what kind of equipment did you watch it

8   on?

9       A      VHS player.

10      Q      There was one maintained in the detective part

11  of the precinct, the 42nd?

12      A      Yes.

13      Q      Were there any technicians or people that work

14  with video that were involved in this handling or setting

15  up the video, before you saw it the first time?

16                  MR. THADANI:  Objection.

17      A      Before I saw it?

18      Q      Before you viewed it.

19      A      Not that I'm aware of.

20      Q      Do you remember you being the one who put it

21  in the machine and turned it on and viewed it?

22      A      No, I wasn't because I remember walking into

23  the kitchen -- because that's where we had the VHS

24  player -- and O'Shea already had it in the VHS player.

25      Q      When you watched the VHS for the first time,

```
1                       GLENN GODINO                  121

2    was it only running at normal speed or were there

3    sections of it that had been slowed down when you viewed

4    it or you don't remember?

5        A      I don't have an answer for that.

6        Q      Do you know if that VHS was handled by any

7    personnel from NYPD in terms of isolating certain parts

8    of it, other than the detectives themselves who worked in

9    that field?

10                   MR. THADANI:  Objection.

11       A      I believe still photos were created, if I'm

12   not mistaken, from that VHS tape.

13       Q      Who would have done that?  I don't mean the

14   specific person, but what category of personnel.

15       A      Possibly TARU, but I just don't know.  TARU,

16   That's a unit -- it's a technical response -- it's a unit

17   that we have that deals with videos.

18                   MR. JAFFE:  How do you spell that?

19                   THE WITNESS:  T-A-R-U.

20       A      I don't remember if they did it, but I just

21   don't recall.

22                   MR. JAFFE:  Where is that?

23                   THE WITNESS:  It's right over the bridge

24              in Fort Totten in Queens.

25       Q      Is that a boroughwide, citywide, something
```

```
 1                      GLENN GODINO                    122
 2  else?
 3      A      They're boroughwide.  They're based out of
 4  Queens.
 5      Q      There's not a unit like that in the Bronx?  If
 6  you want to have that done, you have to reach out to the
 7  Queens unit?
 8      A      Yeah.
 9      Q      How do you do that?
10      A      You just call them up.
11      Q      Is there a paper trail created when you bring
12  them in, or no?
13              MR. THADANI:  Objection.
14      A      I don't think so.  I don't recall it being in
15  this case, but if you would bring a DVD or something and
16  they just show up, you tell them what you want and they
17  do it.
18      Q      Did you go to them or do they come to the
19  precinct or something else?
20      A      If it's a video that needs to be downloaded --
21  say if an incident happens and we have video that we
22  can't retrieve, we call them and they'll come and
23  retrieve the video for us and put it onto DVD.  If it's
24  something like a videotape or you have the actual DVR,
25  you can bring it to them and ask them to do whatever you
```

```
 1                       GLENN GODINO                    123

 2  want them to do.

 3      Q       Do you know how that occurred in this case?

 4      A       I'm not sure.

 5      Q       Do you recollect whether you were the one that

 6  did it or another detective --

 7      A       I don't know.

 8      Q       -- or some other member of the force?

 9      A       I don't know.

10      Q       After that initial viewing, did you look at

11  the videotape again when Mr. Terab came into your office

12  to be interviewed?

13      A       I don't believe we showed Mr. Terab the

14  videotape the first time he came into the office.

15      Q       Would that first time that he came into the

16  office be the same time that you took the signed

17  statement from him on the 31st?

18      A       Yes.

19      Q       Again, I'll get into this in more detail, but

20  you also asked him in addition to giving a signed

21  statement to look at certain photo arrays?

22      A       Yes.

23      Q       He made positive identifications from those

24  photo arrays?

25                       MR. THADANI:  Objection.
```

```
1                      GLENN GODINO                    124

2       A      Yes.  I don't know if it was a photo array or

3    an actual -- it might have been a photo array -- or an

4    actual -- do you have it?  I could look at it.

5       Q      This is a copy of it, but it's New York City

6    Bates stamp number 004590, and I ask you if that is one

7    of the photo arrays that Mr. Terab identified on that

8    date.

9       A      Yes.

10      Q      The date that that identification was made,

11   just for the record, was the 31st?

12      A      Correct.

13      Q      What layman's time?

14      A      Two P.M.

15      Q      You indicated that you don't believe you

16   showed him the surveillance tape at the time that he was

17   interviewed and gave the statement, or you did or

18   something else?

19      A      I don't believe I did.

20      Q      You knew at the time that you interviewed

21   Mr. Terab that it came from security cameras that were

22   installed in his bodega, correct?

23      A      Correct.

24      Q      That was information that you had acquired

25   pretty much the first day or at the latest the second day of
```

1                        GLENN GODINO                    125

2    the investigation?

3        A       Correct.

4        Q       When you responded to the scene for the first

5    time that you went to that location, did you interview

6    Mr. Terab at that time?

7        A       I don't believe I did.  I'm not sure.  I don't

8    think I did.

9        Q       Do you remember seeing him on that first

10   occasion in the store?

11       A       I'm not sure.

12       Q       Do you remember whether or not you went into

13   the bodega on the first occasion that you went to the

14   scene?

15       A       I'm not sure if I did or not.

16       Q       When you went to the scene as early as it was

17   after the shooting, approximately how many detectives do

18   you recollect responded, just by way of number?

19       A       Me, Claude O'Shea, Pete Schwartz --

20       Q       Roberts?

21       A       I'm not sure if Roberts went or not.  I'm

22   gonna say maybe five, but I just don't recall.

23       Q       When you first went to the scene, did you know

24   at that time that this was your case, that you had caught

25   it?

1

2      A      Yes.

3      Q      In terms of the responsibility of taking care

4   of what was going to be done in this investigation, that

5   was on you, correct?

6      A      And the supervisors, whatever supervisors were

7   there supervising.

8      Q      In a case such as this, how often would you

9   consult with the supervisors in terms of the procedures

10  that were going to be followed and the kinds of

11  investigation that was done?

12                   MR. THADANI:  Objection.

13     A      Often.

14     Q      Daily?

15     A      Possibly.

16     Q      On the initial visit to the scene, was a

17  supervisor present?  Did he respond as well, or she?

18     A      It had to be a supervisor.  I just don't

19  recall who the supervisor was at that time that I was

20  working for.

21     Q      Would there be any records that would have

22  been created on that first day that would reflect who the

23  supervisor -- or any of the forms that would have been

24  filled out by you or any of the other detectives where

25  the supervisor would have signed off, who went to the

```
 1                      GLENN GODINO                    127

 2   scene?

 3                  MR. THADANI:  Objection.

 4       A      Back then I don't think we even did bullets.

 5   So I don't know if there would be something created.  We

 6   would type a DD5, and they don't necessarily have to sign

 7   it that night.  That could be signed a couple of days

 8   later, whenever they get a chance to sign the report.  So

 9   I don't know if -- after this, they started doing these

10   bullets, they call them, just information --

11       Q      Could you tell us what a bullet is?

12       A      It's just information about a case, what's

13   going on.  It's the supervisor's responsibility to do

14   the bullets, but I don't even think they were doing

15   bullets at this time.  I can't think of a report that

16   they would put their name onto.  Possibly -- I'm sorry,

17   I'm just remembering as we're talking.  Their name could

18   go on an unusual report.

19       Q      A 49?

20       A      No, an unusual.  It's a different report.

21       Q      Let me show you this document and ask you if

22   you recognize what it is.  I'm referring to -- and I'm

23   going to shorten this.  Unless I say otherwise, these are

24   all the New York City Bates numbers.  I'm just going to

25   give the last four digits.  It's 4448.  Would you take a
```

GLENN GODINO                    128

1

2   look at that and tell me if you recognize what it is.

3                       MR. THADANI:  It's two pages for the

4               record, 44- --

5       Q     It's my understanding it's a district

6   attorney's document, but I'm going to ask you if you've

7   seen it before.

8                       MR. THADANI:  Actually it's three pages

9               4448 through 4450.

10      A     I don't think I've ever seen this before.

11      Q     From looking at the first page of it, do you

12  see there are some documents that are reflected as existing

13  on that report?

14      A     Yes.

15      Q     The unusual, I think, is the first one, from

16  12/27?

17      A     Yes.

18      Q     As long as I know that that's correct, that's

19  all I need for now.

20            Would that document, you believe, reflect who

21  the supervisor was who signed off on it?

22                      MR. THADANI:  Objection.

23      A     Yes, it should have a supervisor's name who

24  responded to the scene there.

25      Q     That's all I need for now so I can locate it.

```
 1                      GLENN GODINO                   129

 2      A      Okay.

 3      Q      Thank you.

 4             Going back to the surveillance video for a

 5      moment, you indicated that you did not review it at the

 6      time that Terab was interviewed and gave a statement, or

 7      you did?

 8      A      I don't believe he viewed it.

 9      Q      I'm going to show you what has been marked as

10      P00157 by my office and ask you to look at it and ask if

11      you recognize what it is.

12      A      Yes.  It's an unusual occurrence report.

13      Q      Based on that document, when would that have

14      been created?

15      A      On 12/26/2006.

16      Q      The date of the shooting.

17             Would there be any information on there about

18      who the supervisors were that were involved or existed at

19      that time?

20      A      Yes.

21      Q      Why don't you read into the record the

22      supervisor's name and if you can tell me what their job

23      title was or what their function was?

24      A      Squad Supervisor Sergeant Odland, O-d-l-a-n-d.

25      Q      He would have been one of the squad
```

```
 1                       GLENN GODINO                    130

 2   supervisors for that particular shift?

 3       A     Yes.

 4       Q     There would be a squad supervisor for each

 5   shift that would be working or no?

 6       A     As long as you have that many supervisors,

 7   yes.

 8       Q     Any other supervisory personnel on that

 9   document?

10       A     Yeah.  A Captain McGuire.  He responded to the

11   scene.

12       Q     Would that have been a detective captain or a

13   uniform captain?

14       A     It's under detective duty captain.

15       Q     That would have been a boroughwide or --

16       A     A zone.

17       Q     A zone?

18       A     Yeah.

19       Q     What zone was the 42nd?

20       A     Zone 7.

21       Q     Approximately how many precincts would have

22   been in that zone?

23       A     Either three or four.

24       Q     Where would the headquarters for that zone

25   be?
```

```
 1                    GLENN GODINO                 131

 2      A      It's all in detective bureau, 1086 Simpson

 3   Street.

 4      Q      That's a building that doesn't house a regular

 5   precinct, just detectives or just connected to the

 6   detectives?

 7                    MR. THADANI:  Objection.

 8      A      I believe there's just detective units in

 9   there, special victims, Bronx robbery.

10      Q      You indicated earlier that you believed you

11   looked at this video about four or five times.  When

12   would the next time have been -- again, I don't want

13   necessarily the date, but on what occasion would you have

14   looked at it again?

15      A      I had the bodega owner come back into the

16   precinct to look at the video.

17      Q      After he gave you the statement, he

18   identified people from the photo array?

19      A      Yes.

20      Q      Do you remember about how long after that it

21   was?

22      A      I'm not sure.  It was after I spoke with the

23   CI.

24      Q      Did you record the date that you spoke to the

25   CI anywhere?
```

1                          GLENN GODINO                    132

2      A      I'm not sure.

3      Q      Just to skip ahead for a moment, the CI's

4  statement is contained in your memo book?

5             MR. THADANI:  Objection.

6      Q      Or somewhere else?

7      A      I think it might be in my memo book -- not

8  memo book, steno book.

9             MR. GROSS:  This hasn't been marked yet

10            so we have to mark it.

11            MR. THADANI:  We can mark that, that's

12            fine, but let's indicate Bates pages.

13            MR. GROSS:  I'm just going to mark the

14            document on the back, okay, or you want it on

15            the front?

16            MR. THADANI:  The front's fine.

17            MR. GROSS:  It has a --

18            MR. THADANI:  Like on the top there's

19            space, right.

20            (Whereupon, a steno book was marked as

21            Plaintiff's Exhibit 1, for identification, as

22            of this date.)

23      Q      By the way, this memo book which has now been

24  marked as Plaintiff's Exhibit 1 for identification, is

25  that how all the books looked in the precinct at that

```
 1                      GLENN GODINO                    133

 2   time, with that kind of front on it?

 3                   MR. THADANI:  Objection.

 4      A      They periodically get different ones.  I don't

 5   know if all of them look like that.

 6      Q      What's on the top of this, it says journalist's

 7   pad.

 8      A      It's just another -- they probably got it

 9   cheaper from someplace else, but it's a book with lines

10   that you can write in there, you know.

11      Q      I'd like to show you a page from the memo book

12   and ask you if that's the first page of the statement you

13   took from the CI.

14                   MR. THADANI:  Can we just figure out a

15              Bates stamp page for that.

16                   MR. JAFFE:  I have to see it.  I need to

17              see what it looks like.

18                   THE WITNESS:  (Handing)

19                   MR. JAFFE:  Okay.

20                   MR. GROSS:  I don't think it is Bates

21              stamped.  The copy I have has no Bates stamp

22              either, and I got it from you guys.

23                   MR. JAFFE:  It's Bates stamped NYC

24              003525.

25                   MR. THADANI:  3525?  Right, 3525?
```

```
 1                    GLENN GODINO                    134

 2                    MR. JAFFE:  Yes.

 3      Q      While we've been searching for the copy,

 4   you've been reading it?

 5      A      Yes.

 6      Q      That's the statement you took from the CI?

 7      A      Yes.

 8                    MR. THADANI:  Hold on.  Just to clarify,

 9             how many pages --

10                    MR. GROSS:  I'm going to ask him that as

11             a specific question.

12      Q      I'm going to ask you to flip through this and

13   indicate to me -- and then I'll make some notation about

14   it -- when that statement stops and something else

15   starts.

16      A      It starts on this page --

17                    MR. THADANI:  Indicating Bates stamp

18             3525.

19                    MR. GROSS:  Right.

20      A      -- and it goes to the next page.

21                    MR. THADANI:  Indicating 3526.

22      A      It goes to this page.

23                    MR. THADANI:  Indicating 3527.

24      A      I don't know -- I don't know if this is a

25   continuation of that, the next page.  It says Wayne with
```

```
1                    GLENN GODINO                    135

2    the person.

3        Q       Right.

4                MR. THADANI:  That would be 3528.

5                MR. JAFFE:  That's right.

6        A       Definitely these three pages and I'm not sure

7    about up here.

8        Q       Where it says the part Wayne, do you know who

9    the Wayne is that's referred to in that?

10               MR. THADANI:  Again, just for the

11               record, referring to 3528.

12       A       This last page -- I'm sorry -- might be a

13   continuation of that.  I don't know if I ever positively

14   IDed who Wayne was.  I'm not sure.

15       Q       Is it your belief, that paragraph that starts

16   with Wayne was information you got from the CI or not or

17   you don't know?

18       A       I believe that was from the CI, this last

19   page.

20       Q       The portion below that that starts with Apartment

21   2A, was that from the CI?

22       A       I'm not sure.

23       Q       In any case, looking at the beginning of the

24   entry, starting with Quan, is there a date associated

25   with that entry?
```

```
1                    GLENN GODINO                136

2    A     No, I didn't write one down.

3    Q     You say you went over the surveillance video

4  with Mr. Terab after you spoke to Quan on whatever date

5  that was, correct?

6              MR. THADANI:  Objection.  That's what he

7              said.

8    Q     Was that your testimony or no?

9    A     Yes.

10              MR. THADANI:  He said Quan in the

11              questioning.

12              MR. GROSS:  I said the entry beginning

13              with Quan, I thought.

14    A     Can you rephrase it.  It's a little

15  confusing.

16    Q     Let me rephrase it.  Yes.

17              You indicated that you brought Mr. Terab back

18  to the precinct and spoke to him again and showed him the

19  video after you spoke with the CI?

20    A     Yes.

21    Q     At that time, you went through the video with

22  him?

23    A     Yes.

24    Q     That was at least the second time that you had

25  seen the video?
```

```
 1                    GLENN GODINO                137

 2       A      Yes.

 3       Q      When you looked at the video before you spoke

 4  to the CI, were you able to discern the point in the

 5  video, by looking at it yourself without any help from

 6  anybody, where the gun was passed?  Could you see that on

 7  the video?

 8       A      Yes.  Well, I don't know if it's the actual

 9  gun you could see being passed or a movement of a gun

10  being passed.

11       Q      You saw two people on the video and something

12  being transferred and that you were able to tell just by

13  looking at it yourself, correct?

14       A      Yes.

15       Q      When you looked at the video at that time, did

16  you recognize the people that the object was being passed

17  from and to?

18       A      I recognized Dior, but I couldn't tell who

19  that other person that passed it was.

20       Q      You knew when you brought Mr. Terab back into

21  the office that he had unequivocally identified the

22  person who passed the gun to Dior as being Mr. Spruell,

23  correct?

24              MR. THADANI:  Objection as to the use of

25              unequivocally.
```

```
 1                       GLENN GODINO                  138

 2      A      He had said that he thought it was Mr. Spruell

 3   that passed it to him.

 4      Q      He also had indicated to you where he was at

 5   the time that the passing occurred?

 6      A      You're talking about the bodega owner?

 7      Q      Right, Mr. Terab.

 8      A      Yes.

 9      Q      Where was he?

10      A      Behind the counter.

11      Q      The distance, approximately, from the counter

12   to the place where the gun was passed was just a few

13   feet, correct?  It was pretty much directly in front of

14   the counter?

15                 MR. THADANI:  Objection.

16      A      No, it wasn't in front of the counter.  It was

17   more towards the end of the counter.  They have shelving

18   between the counter and the customers.

19      Q      In any case, when Mr. Terab gave you the

20   statement, he didn't indicate to you at the time that he

21   gave you the statement that he had any lack of certainty

22   about who it was that passed the gun, correct?

23                 MR. THADANI:  Objection.

24      A      No, he did not.

25      Q      I'm going to show you this document with Bates
```

```
 1                   GLENN GODINO                    139
```

2  number 4657 on it and ask you to look at it and then I'm

3  going to ask you a few questions about it.  Let me know when

4  you have finished reading it, and before I get to it,

5  I'll do a little background question.

6           Are you finished reading the statement?

7  A     Yes.

8  Q     Let me also show you this document.  I'll hand

9  it to you.  I'm going to ask you one question about this.

10          This document right now which is Bates

11  stamp -- I wrote it in, but it's 4590, and is this the

12  photo array that Mr. Terab identified on that date?

13  A     Yes.

14          MR. THADANI:  Objection.

15  Q     The time that that identification was made

16  based on that record is when?

17  A     2 P.M., 1400.

18  Q     What time did Mr. Terab give the written

19  statement that you have in front of you, 4657?

20  A     It looks like I headed the page at 2:15 P.M.

21  Q     Is there a time that he actually signed off on

22  it?

23  A     2:52 P.M.

24  Q     The time that's indicated at the top of that,

25  would that have been the time on December 31st that you

```
 1                    GLENN GODINO              140

 2   actually started to write out the statement and you noted

 3   it there?

 4              MR. THADANI:  Objection.

 5      A      Approximately.

 6      Q      The time that he signed off on, it would have

 7   been at 2:52, correct?

 8      A      Correct.

 9      Q      This statement would have been done, based on

10   the times indicated, after you showed Dior and he

11   identified him from the photo array?

12              MR. THADANI:  Objection.

13      A      Correct, because that was at 1400, 2 P.M.

14      Q      The time that the photo array was shown to

15   Mr. Terab, did you construct that photo array on the same

16   day that you showed it to him?

17      A      I don't know if I made that photo array or

18   not.  I might have.  I just don't recall it.

19      Q      Do you know whether or not prior to your

20   talking to Mr. Terab, if anybody up to that point in time

21   identified Dior as being involved in this crime?

22      A      The first time I spoke with him or the --

23      Q      The first time you spoke to Terab, which was

24   on the 31st, correct?

25      A      (No response).
```

```
 1                    GLENN GODINO                    141

 2              MR. GROSS:  Let me withdraw the question

 3        for a moment and back up.

 4    Q        The events took place on the 26th?

 5    A        Yes.

 6    Q        Sometime shortly thereafter Mr. Terab provided

 7 you with the surveillance tape, but not personally, it

 8 was picked up by another detective?

 9    A        Correct.

10    Q        On the 31st, based on the record I've shown

11 you, Mr. Terab came in to the precinct and was

12 interviewed by you, correct?

13    A        Correct.

14    Q        What was the first thing you did when

15 Mr. Terab came in?  Did you discuss with him what he knew

16 about the case?

17    A        I'm not sure.

18    Q        Based on your standard operating procedure,

19 given that this is when you started to collect

20 information from Mr. Terab, would the first thing that

21 you would do routinely be to interview the witness, put

22 him at ease and then try to find out what he knew about

23 the case?

24              MR. THADANI:  Objection.

25    A        Yes.
```

```
 1                    GLENN GODINO                    142

 2      Q      Is there any reason that you would have to

 3  believe that you followed some other procedure in this

 4  case?

 5                  MR. THADANI:  Objection.

 6      A      No, but I just don't recall.  So I don't want

 7  to say yes and -- when I just don't recall, but that is

 8  something that would routinely be done, yes.

 9      Q      Sometimes I know you won't recall particular

10  things so I may ask you what your routine would have been

11  under those circumstances generally, and if you think it

12  wasn't, you can tell me.

13      A      Okay.

14      Q      Based on what you do recollect about this

15  case, would it be a fair statement that based on your

16  usual routines you would have first interviewed him, put

17  him at ease and then tried to find out what he knew about

18  the events?

19      A      Yes.

20      Q      Then you would get a lot more information than

21  what would it wind up on the written statement because you

22  would be looking to get the significant information,

23  correct?

24                  MR. THADANI:  Objection.

25      A      I don't know what you mean about --
```

```
1                        GLENN GODINO                143

2                   MR. GROSS:  Let me withdraw it.  Bad

3           question.

4      Q     When you would interview somebody, before you

5   would take a written statement from them, you would get a

6   lot of information trying to find out what they knew and

7   focus on the things that would be important to your

8   investigation, correct?

9                   MR. THADANI:  Objection.

10     A     I would look for any information that they

11  were able to give me.

12     Q     The statement that you drew here would have

13  been based on the interview that you had with him before

14  you started to write out this statement for him,

15  correct?

16     A     Yes.

17     Q     By the way, the bottom of the statement

18  indicates that you were the one that wrote out the

19  statement for him, correct?

20     A     Correct.

21     Q     When you wrote this statement for him, as you

22  were writing it, did he confirm each of the things that

23  you wrote on here?

24     A     (No response)

25     Q     Or you wouldn't have written it down, I
```

2    assume?

3    A       He would tell me, I would write it down, and

4    then when -- routinely, after I would be finished with

5    the statement, before I have anybody sign it, this is

6    routinely speaking, I would have them read it first and

7    then sign it.

8    Q       When you wrote this statement, starting at the

9    top of this, you would have put the date on it and the

10   time that you recorded it in the upper right-hand corner,

11   correct?

12   A       Correct.

13   Q       Then you would have asked him and written down

14   the address where he lived, which would have been the

15   second line on that, correct?

16   A       No, the second line is the address to the 42nd

17   Precinct.

18   Q       I'm sorry, where it was given.

19           Then his name and his address below that,

20   correct?

21   A       Correct.

22   Q       That information as to his address was

23   information you got from him doing the interview?

24   A       Correct.

25   Q       Then you put down there your identifying

1                          GLENN GODINO                    145

2    information and your shield number and your assignment,

3    correct?

4         A     Correct.

5         Q     Then you wrote on 12/26/06 after 5 P.M., and

6    that would have been information that he would have given

7    you?

8         A     Yes.

9         Q     The witness, being Mr. Terab, saw Dior and

10   Kijafa walking into the store, is that correct?

11        A     Correct.

12        Q     Let me stop there for a moment.

13              You showed Mr. Terab on that occasion a second

14   photo array where he identified Kijafa as the person who

15   passed the gun to Dior, correct?

16              MR. THADANI:  Objection.

17        A     I believe I did.

18        Q     When you interviewed Mr. Terab, you didn't

19   have the photo arrays already prepared, did you, because

20   you didn't know at that point who he was going to name,

21   correct?

22              MR. THADANI:  Objection.

23        A     Correct.

24        Q     Up to the point that you met with Mr. Terab,

25   you had no firsthand or even secondhand information about

```
1                     GLENN GODINO                    146
```

2   who the people were who were involved in the passing of

3   the gun in the store, correct?

4       A      I believe we knew it was Dior passing the gun

5   because we recognized him from the video, but I had no

6   idea who the second person who handed the gun was.

7       Q      Until you spoke to Mr. Terab, you didn't know

8   until he named him, Kijafa, as to who the person was who

9   passed the gun to Dior, correct?

10                  MR. THADANI:  Objection.

11      A      Correct.

12      Q      You had not yet spoken to the CI, correct?

13      A      Correct.

14      Q      At that point when you created that photo

15  array that had Kijafa in it, you were able to get his mug

16  shot based on the information that came from Mr. Terab,

17  correct?

18      A      Correct.

19      Q      Then you took that mug shot and you found five

20  other similar looking people and you put that into the

21  photo array and you showed it to him, correct?

22      A      I don't know if I'm the one who put the photo

23  array together, but a photo array was put together and it

24  was shown to him.

25      Q      Whether you did it personally or not, created

```
 1                    GLENN GODINO               147

 2   the photo array and/or pulled the mug shot, it was done

 3   at or about the time that this took place on December 31,

 4   2006, correct?

 5       A     Correct.

 6       Q     I'm going to show you NYC 004747 and ask you

 7   whether or not that is the photo array that Mr. Terab

 8   identified Mr. Spruell as the one who passed the gun to

 9   Dior Creighton.

10       A     Yes.

11       Q     Is that dated?

12       A     Yes.

13       Q     Is it timed?

14       A     Yes.

15       Q     What time is indicated on there?

16       A     1500 hours, which is 3 P.M.

17       Q     He looked at the photo array for Dior

18   approximately an hour before he did the one on Spruell?

19                  MR. THADANI:  Objection.

20       A     Yes.

21       Q     The statement was written after the first

22   photo array was shown to him but before the second?

23                  MR. THADANI:  Objection.

24       Q     Given that you started the photo array at 1415

25   hours?
```

2      A      I started the written statement at 1415

3   hours.

4      Q      Isn't that what I said?

5      A      No, you said photo array.

6      Q      The written statement was taken between

7   showing him the first photo array of Dior and the second

8   one of Spruell, correct?

9             MR. THADANI:  Objection.

10     A      Correct.

11     Q      Going back to the signed statement for a

12  moment, the witness indicated that -- I'm continuing to

13  read -- Kijafa pulled out a silver and black gun and

14  handed the gun to Dior, correct?

15     A      (No response)

16     Q      I read correctly?

17     A      Yes.

18     Q      That the color of the gun was information that

19  you got from Mr. Terab, correct?

20             MR. THADANI:  Objection.

21     A      Yes.

22     Q      You had no other knowledge about what the gun

23  looked like up to this point in time or from any other

24  source for it, correct?

25     A      Correct.

1

2     Q      Then he goes on to say and handed the gun to

3    Dior.  I assume that when you interviewed him you asked

4    him specifically before you wrote this down whether he

5    actually saw that occurring, is that a fair statement?

6     A      He told me, you know, what he saw and I wrote

7    it down.  I don't know if I again asked him did you

8    specifically see it.  I wrote down what he told me.

9     Q      Based on the way this is written, did you have

10   any doubt at this point -- Mr. Terab specifically told

11   you at the time that you created the statement or

12   immediately in front of it that he saw Kijafa pull out a

13   silver and black gun and hand it to Dior?

14                MR. THADANI:  Objection.

15    Q      That was the information he gave you?

16    A      That was the information he gave me.

17    Q      Then it goes on, Dior took the gun and walked

18   into an aisle and pulled the gun to make it ready to go.

19   That would have been information that you would have

20   gotten from Mr. Terab?  You had no other basis for

21   getting that information at that time, correct?

22                MR. THADANI:  Objection.

23    A      Correct.

24    Q      You wrote after that in quotes -- which I

25   assume means that he said it exactly the way you wrote

```
 1                      GLENN GODINO                    150

 2    it -- he also heard the noise.  Did you state that

 3    fairly?

 4                  MR. THADANI:  Objection.

 5        A     Well, I put he.  I shouldn't have put he.  I

 6    should have put I heard the noise.  I stuck the he in there

 7    and I shouldn't have.

 8        Q     The fact is when you put the quotes there it

 9    was meaning that you weren't interpreting what he said,

10    those were the exact words that he said?

11        A     Yes.

12                  MR. THADANI:  Objection.

13        Q     Then it goes on, then Dior turned and went

14    toward the front door of the store, put on his hoodie and

15    walked out of the store with Kijafa, is that correct?

16        A     Correct.

17        Q     Then you wrote that he said approximately five

18    to ten seconds went by when he heard gunshots,

19    approximately six or seven shots.  Is that information

20    that you got specifically from Mr. Terab?

21        A     Yes.

22        Q     Then it goes on, he looked out the door and

23    saw Dior and Kijafa run toward Home Street, and that

24    would again have been information that he indicated to

25    you that he observed?
```

```
1                    GLENN GODINO                 151

2       A      Yes.

3       Q      Then it says end of statement and then it says

4    Detective Godino wrote this statement for the witness?

5       A      Yes.

6       Q      Given that you had looked at the video before

7    you wrote this statement, did you observe anything, at

8    the time that you took the statement, on the video that

9    led you to believe that there was anything inaccurate

10   about what Mr. Terab said that he observed?

11                   MR. THADANI:   Objection.

12      A      No.

13      Q      The information that you got to construct the

14   photo array showing Mr. Spruell, which is number 4747,

15   was information that you got from Mr. Terab, correct?

16      A      Correct.

17      Q      Based on that information that he gave you,

18   you went to a computer and found Mr. Spruell's mug shot,

19   correct?

20                   MR. THADANI:   Objection.

21      Q      When I say you, you or another police

22   officer?

23      A      Yes.   Yes.

24      Q      Then you took that mug shot and you or

25   somebody else from the department got five other
```

1                        GLENN GODINO                    152

2    relatively similar looking people and created the photo

3    array that's shown in that document, correct?

4         A      Yes.

5         Q      Based on that photo array, Mr. Terab picked

6    out Mr. Spruell, correct?

7         A      Correct.

8         Q      That photo array doesn't identify the people

9    by name, does it?

10        A      No, it does not.

11        Q      That's done purposely so that the person who's

12   making the identification will be making it solely on the

13   photographic evidence that's before them, rather than

14   information he might know about the person's name,

15   correct?

16        A      Correct.

17        Q      Did you learn from Mr. Terab at any time on

18   the 31st that Mr. Terab had indicated to you that both

19   Dior and Spruell were frequent visitors to the bodega?

20                       MR. THADANI:  Objection.

21        A      He indicated that Spruell and Dior were always

22   together.

23        Q      Also that he had seen them on many occasions

24   in the bodega?

25        A      (No response)

```
 1                      GLENN GODINO                    153

 2              MR. GROSS:  Withdrawn.

 3      A       He said --

 4              THE WITNESS:  Oh, sorry.

 5              MR. GROSS:  Let me re-ask it.

 6      Q       Did he indicate to you that he knew them from

 7   having relatively frequent contact with them, however he

 8   put it, in the bodega as customers?

 9              MR. THADANI:  Objection.

10      Q       Or hanging out there?

11      A       Yes.

12      Q       When you took the interview, you knew from

13   what he had indicated to you that he knew these people's

14   appearance very clearly from having seen them on many

15   earlier occasions?

16              MR. THADANI:  Objection.

17      A       Yes.

18      Q       Based on this information that you got at that

19   time, the signed statement, his identification of the two

20   people involved in passing the gun, having heard the

21   shots, did you have probable cause at that point in time

22   to charge Mr. Spruell with having passed the gun?

23              MR. THADANI:  Objection.  Calls for a

24              legal conclusion.

25      A       I would think so, yes.
```

```
1                      GLENN GODINO                    154

2       Q       As part of your job as a detective, and you're

3   currently very experienced at this point in time, part of

4   the things that you're required to do with your training

5   and background and experience is to determine at what

6   point in the case there's probable cause to make an

7   arrest, correct?

8                      MR. THADANI:  Objection.

9       Q       It's part of your job?

10      A       Correct.

11      Q       In fact, other than the information that you

12  allegedly got from the CI at a later time, you never had

13  any other witness at any time during this investigation,

14  did you, to indicate that Dior was the shooter?

15                     MR. THADANI:  Objection.

16      A       I don't think so, no.

17      Q       Without the CI, although you had information

18  from Mr. Terab that Dior got a gun and he went outside,

19  you had at that point and never after that ever developed

20  any information that directly pointed to Mr. Dior

21  actually having done the shooting, correct?  I said

22  Mr. Dior, Dior Creighton.  Is that a fair statement?

23      A       That's fair.

24      Q       Other than the information that was written in

25  the spiral notebook that we just identified as being the
```

```
 1                        GLENN GODINO                  155

 2    entry you made based on your interview with the CI,

 3    correct?

 4        A       (No response)

 5        Q       The information in the spiral notebook that we

 6    talked about a little earlier was information that you

 7    got directly from the CI and recorded in the --

 8                You don't call it a spiral?  You call it --

 9        A       A spiral notebook.

10        Q       -- in the spiral notebook?

11        A       Yes.

12        Q       Besides that spiral notebook, did you ever

13    create any document, any police record, that documented

14    what the CI had told you when you recorded it in the

15    spiral notebook?

16        A       I don't believe I did.

17        Q       There is no doubt in your mind, is there,

18    because the entry is not dated in the notebook, that you

19    got the information from the CI where he claimed that Ken

20    Creighton passed the gun to Dior after Terab had picked

21    out Spruell as the one who passed Creighton the gun, is

22    that accurate, in terms of the sequence of events?

23                    MR. THADANI:  Objection.

24        A       I believe that's the way it happened.

25        Q       Dean Roberts, Detective Roberts, you indicated
```

1

2     he's still with the department?

3         A      No, he's retired.

4         Q      I know he was one of the detectives working on

5     this case.  Was he the assistant or did he have a

6     particular name as being somebody associated with this by

7     title?

8         A      No.

9         Q      So he was just a detective who was involved in

10    the case?

11        A      Yes.

12        Q      Again jumping ahead for a moment, when arrests

13    were made in connection with this case, Detective Roberts

14    was the one who arrested Ken, correct?

15        A      Yes.

16        Q      You arrested Dior?

17        A      Yes.

18        Q      In the procedures that were followed in the

19    42nd Precinct Detective Squad back in 2006 and forward,

20    was there a person who would have been assigned to

21    homicide investigations or likely known as a riding ADA,

22    are you familiar with that term?

23        A      They have the -- the Bronx District Attorney

24    Office has a felony DA that's on paper duty, and whoever

25    has the duty at that time, if he had -- he would call

```
 1                      GLENN GODINO                    157

 2   them if he needed anything for that particular -- for

 3   that particular case.  I don't think it's the same person

 4   every single day.  They rotate the duty homicide.

 5        Q     Was there a policy in the 42nd Precinct, and

 6   for that matter in the entire Bronx, if you know, as a

 7   policy, that before an arrest was made for a homicide a

 8   DA would have to approve it?

 9                  MR. THADANI:  Objection.

10        A     Yes.

11        Q     As far as you know, is that a procedure that's

12   unique to the Bronx?

13                  MR. THADANI:  Objection.

14        Q     In terms of the five boroughs.

15        A     I'm not sure.  I haven't made a homicide

16   arrest in Manhattan, but I -- I'm not sure.

17        Q     In any case, if you thought that you had

18   probable cause to make an arrest of somebody, before you

19   made that made arrest, you would confer with an ADA?

20        A     On this particular case, because somebody died

21   or was likely to die, it waited.

22        Q     I'm sorry, I didn't hear the last.

23        A     It waited.  It waited.

24        Q     Waited for what?

25        A     First we needed somebody who saw Dior
```

```
1                    GLENN GODINO                      158
```

2  shooting.  So we wanted a witness to see -- witness the

3  shooting because the witness from the bodega didn't

4  witness the shooting.  He witnessed the passing of the

5  gun, them being in the store, but he didn't witness -- he

6  heard the shots, but he didn't actually witness anybody

7  shooting the gun.

8       Q     Skipping for a moment, Dior Creighton's

9  implication in this case, at the time that you

10 interviewed Terab, got the statement, got the identities

11 from the photo arrays, the evidence, they clearly

12 indicated that he had committed a crime, correct?

13                   MR. THADANI:  Objection, the

14                   characterization of that.

15      A     That Dior was in possession of a weapon,

16 yes.

17      Q     Right.

18            Based on the evidence that you got from Terab,

19 whether he fired the shots or not, right after the weapon

20 was passed shots were heard by the same witness,

21 correct?

22      A     Correct.

23      Q     As you told me earlier, you had at that point

24 a basis to arrest Mr. Spruell based on the evidence you

25 had for the crime of facilitation and for possession of a

```
1                    GLENN GODINO                    159
```

2      gun, isn't that a fair statement?

3                     MR. THADANI:  Objection.

4      A      Yes.

5      Q      If you were going to make that arrest in

6      connection with an event that had turned out to be a

7      homicide you would need an ADA to sign off on that

8      arrest, correct?

9      A      Correct.

10     Q      Do you have a personal recollection of

11     consulting with an ADA in connection with this

12     investigation?

13     A      Yes.

14     Q      Who was the DA that you first spoke to about

15     this case?

16     A      I don't know if a DA came to the scene for

17     this, but it ended up being assigned to Bruce Birns.  I

18     don't know if he actually responded that day or if he

19     just inherited it afterwards.

20     Q      When you say he inherited it, he inherited

21     and, in fact -- and I'll get to it when we get to that

22     point chronologically, but he's one of the people that

23     signed off on the arrests in this case, correct?

24                    MR. THADANI:  Objection.

25     A      Ultimately it's up to the bureau chief to give

1                        GLENN GODINO                    160

2    the authorization to give permission to make the arrest.

3    He would have had to have gone to his bureau chief,

4    discussed the situation, presented the evidence and then

5    get permission.

6         Q      The evidence that he would have gotten to

7    discuss with the bureau chief would have primarily come

8    from you and the other detectives that had investigated

9    the case up to that point, correct?

10        A      Correct.

11        Q      I can bring it up now, but I'll get to it

12   later.  For the purposes of my question, if I told you

13   that Bruce Birns and Talty, T-a-l-t-y, who I think was

14   the bureau chief who signed off on the arrests for this

15   case, would that sound correct to you?  I'll show you the

16   document later.

17                   MR. THADANI:  Objection.

18        A      That would sound correct.

19        Q      Basically in this case, before you arrested

20   either Ken or Dior, the district attorney's office had

21   indicated it was okay to go ahead and do that and

22   authorized the arrest, correct?

23        A      Correct.

24        Q      Based on this case or procedures, if you don't

25   remember specifically, how would the information be

```
 1                    GLENN GODINO                 161

 2   imparted to the ADA who would eventually go to a

 3   supervisor?  Would that be from speaking to you and other

 4   detectives on the case, or just you or something else?

 5       A     Me and other detectives.

 6       Q     Do you have a specific recollection about when

 7   the first time you spoke to an ADA in connection with

 8   this case was?

 9       A     No.

10       Q     Again, following procedures, when you got the

11   information from Mr. Terab that we've been talking about,

12   the IDs and the signed statement, there was enough

13   information there -- even though you may not have had the

14   evidence at that point in time to show that Dior was the

15   shooter, you certainly had enough information to go to

16   the DA and discuss with him arresting both Spruell and

17   Dior for the possession of the gun, which is a crime in

18   and of itself, correct?

19                    MR. THADANI:  Objection.

20       A     I don't know that I went and spoke to him at

21   that point.

22       Q     I'm not asking you that.  I understand.

23             You certainly had enough information at that

24   point to go to the DA and say I think I have probable

25   cause to arrest Spruell for the possession, facilitation
```

```
1                    GLENN GODINO                162
```

2    and discuss it with him if you had chosen to do so at

3    that point, correct?

4              MR. THADANI:  Objection.

5    A    Yes.

6    Q    That was because you had determined at that

7    time that you certainly had probable cause to arrest both

8    of the people on at least some of the charges if not the

9    shooting itself, fair statement?

10             MR. THADANI:  Objection.

11   A    Fair.

12   Q    I'll ask you specifically, but let me ask you

13   first generally.  During this period of time, 2006 and

14   2007, would you be investigating one or more than one

15   homicide at any given moment?

16             MR. THADANI:  Objection.

17   A    As the lead investigator you're talking about?

18   Q    Let's start with as a lead investigator and

19   then I'll expand on that.

20   A    Normally you wouldn't, unless you had the

21   homicide and then you come in another night and nobody

22   else is working you would get stuck with it, but normally

23   we would take turns.  So it usually wouldn't happen.

24   Q    So you would be the lead detective, except for

25   unusual circumstances, on one case at a time?

1                            GLENN GODINO                    163

2        A      Yes.

3        Q      One homicide case?

4        A      One homicide.

5        Q      In addition to that, would you also be, again

6   based on routines, assisting on a number of other cases,

7   when you would be working as a detective in the 42nd at

8   that time period?

9        A      I didn't understand your question.  I'm sorry.

10  I'm getting confused.

11       Q      I didn't either.  I take it back.

12              Based on what would be going on in the

13  precinct back in 2006 and 2007, in addition to being the

14  lead detective, would you also be assisting in other

15  investigations?

16              MR. THADANI:  Objection.

17       A      Yes.

18       Q      Would there be records that would be

19  maintained about how many investigations you would have

20  been working on from say December 26 to the end of the

21  month of January, where you would be assisting?

22       A      I don't think there's a specific record.  You

23  would have to go into each case to see if I typed a DD5

24  on a particular case to assist.

25       Q      As a general proposition, do you have any

```
1                    GLENN GODINO                    164

2   recollection of back in that time frame -- and I have no

3   idea how busy the precinct was then -- approximately how

4   many homicides you would have been working on in one

5   respect or another during that time frame?

6       A      Probably only one.  I don't know if we had

7   another one right after that, but I would say one.

8       Q      As the assigned detective for the case, would

9   you review the files regularly to see what, if anything,

10  had occurred from the last time you worked on it?

11                MR. THADANI:  Objection.

12      A      I'm not sure if I would.

13      Q      Given this investigation and the number of

14  detectives that were working on it, you would have to

15  from time to time to know the state of the investigation,

16  check the case folder or talk to the detectives about

17  what had happened since the last time you worked on it to

18  know what stage the case was in, correct?

19      A      Correct, but if anybody did any work on it,

20  they would hand me, or at least leave the DD5 on my desk

21  to show what they did.

22      Q      As a general proposition back in that time

23  frame, before the other detectives that were working on

24  the case would put DD5s in the folder, they would cross

25  your desk so that you would be the one who would actually
```

```
1                      GLENN GODINO                    165

2     put them in there, was that the standard operating

3     procedure?

4                    MR. THADANI:  Objection.

5         A     Yes.

6         Q     Before a DD5, regardless of who created it,

7     wound up in the case folder, it would generally pass over

8     your desk before it wound up there because you had put it

9     in, correct?

10        A     Correct.

11        Q     Absent of what we already discussed, where

12    some of the records have gone missing, as a general

13    proposition, you would expect that all the records that

14    were created in connection with this investigation of

15    Caldwell's murder went into that particular case file,

16    correct?

17        A     Correct.

18        Q     Was it standard procedure and good procedure

19    for the detective that if a witness had pertinent

20    information to give about a homicide case that a

21    detective would prepare a DD5 to memorialize it?

22                   MR. THADANI:  Objection.

23        A     It should.

24        Q     If a witness had something to say about an

25    alibi or if a witness gave information about an alibi,
```

```
 1                    GLENN GODINO              166

 2   whether it came from the accused or from some third

 3   person, was it standard practice to make a record of that

 4   and make sure it got into the case folder?

 5                    MR. THADANI:  Objection.

 6        A     I guess it should.

 7        Q     At any point, did you become aware of the fact

 8   that Ken Creighton claimed to have had an alibi for

 9   the time when the shooting took place and when the gun

10   was passed?

11        A     I don't recall if I did.

12        Q     If you were given that information, would it

13   have been good practice to make sure that that alibi

14   information, whether it came from the alibi witness

15   themselves or from the accused, wound up in the case

16   file?

17                    MR. THADANI:  Objection.

18        A     Yes.

19        Q     That kind of information would be one of the

20   classes that would be Brady information, correct?

21                    MR. THADANI:  Objection.

22        Q     Something that you would be required to let

23   the DA know so he could fulfill his Brady obligations,

24   fair statement?

25                    MR. THADANI:  Objection.
```

```
 1                       GLENN GODINO                    167

 2        A      Yes.

 3        Q      Other records such as photographs, lab

 4   reports, vouchers and any other significant information

 5   should go into the case file, correct?

 6        A      Correct.

 7        Q      In the Bronx, in that time frame -- and if you

 8   remember specifically, that's fine, otherwise I'll ask

 9   you about your routines -- given this case involved a

10   homicide and a second person being shot and injured, did

11   you confer with the ADA from time to time, whoever that

12   would have been, regarding the progress of the

13   investigation?

14                       MR. THADANI:  Objection.

15        A      I don't have a recollection on how many times

16   we did, but I could remember consulting with ADA Bruce

17   Birns.  I just don't remember how many times I consulted

18   with him.

19        Q      Can you give me an approximation of the first

20   time that you spoke to Birns about the progress of the

21   investigation?

22        A      I don't recall.

23        Q      Do you have a recollection of having spoken to

24   Birns about the information that had been conveyed to you

25   and the identifications that were made to you by
```

```
 1                        GLENN GODINO                    168
 2   Mr. Terab?
 3       A       I don't have a recollection of that.
 4       Q       Do you have a recollection of having spoken to
 5   Mr. Birns about the information you got from the CI at
 6   some point in time?
 7       A       Yes.
 8       Q       At the time that you spoke to Mr. Birns about
 9   the information you had gotten from the CI, did you also
10   make him aware of the information that you had gotten
11   from Terab?
12       A       I don't recall if I did or not.
13       Q       Would it have been good practice, based on
14   your years of experience as a detective, to make
15   Mr. Birns aware of both the information you got from the
16   CI as well as the information you got from Mr. Terab in
17   describing what had gone on in this investigation up
18   until that time?
19                    MR. THADANI:  Objection.
20       A    Yes.
21       Q       Do you have any reason to believe that you
22   didn't follow the good practices that you just
23   described?
24       A       No, I provided the whole case folder to ADA
25   Birns.  So everything that's in this case folder was
```

```
 1                      GLENN GODINO                    169
 2   provided to him.
 3        Q     No, I understand that, and I know --
 4        A     I just don't have a recollection of discussing
 5   that with him.
 6        Q     The time that you provided the case folder to
 7   the ADA Birns, was that before or after any arrests had
 8   been made in connection with this case?
 9        A     I'm not sure when he got the whole case
10   folder.
11        Q     Do you have a reasonable assurance as you sit
12   here that you spoke to him about the progress of the
13   investigation before Ken was picked up?
14        A     Yes.
15        Q     When you spoke to him -- again if you don't
16   remember specifically, based on your usual procedures --
17   you would have discussed both the information you got
18   from Terab and the information you got from the CI,
19   correct?
20        A     Correct.
21              MR. THADANI:  Objection.
22        Q     One of the documents I looked at -- and I'm
23   jumping around a little bit, forgive me -- is called a
24   lineup report identifier.  Do you know what that is?
25        A     (No response)
```

```
 1                    GLENN GODINO              170

 2      Q      It's in there somewhere, but I don't want to

 3  take the trouble to take it out.

 4      A      I think it might be something that's generated

 5  when you do a photo array, but we didn't do a lineup, so

 6  it wouldn't have anything to do with a specific lineup.

 7      Q      That was my question.

 8             In police jargon -- and I noticed it from some

 9  of the DA files -- a lineup can be either an in-person

10  lineup or what's called a corporeal, c-o-r-p-o-r-e-a-l,

11  lineup, which is a photo array?

12                  MR. THADANI:  Objection.

13      Q      There are records I saw -- and I'll go through

14  them with you, or maybe not -- that indicated there were

15  corporeal lineups conducted in this case, that would have

16  not been somebody viewing live people lineup, correct?

17                  MR. THADANI:  Objection.

18      A      That's correct because we didn't do a lineup.

19  I don't know why they used that term.

20      Q      I don't either.  Just to confuse us.

21             Apparently both photo arrays and live lineups

22  get the designation, at least on some of the paperwork,

23  they're called lineups and they distinguish them by using

24  other words.

25      A      This is the first I think I'm hearing about
```

2    that.

3    Q      When the decision was made to arrest Ken --

4    and again you indicated that the DA signed off on that --

5    had you discussed with Birns that Terab had positively

6    identified Spruell and not Ken as the person who passed

7    the gun?

8                    MR. THADANI:  Objection.

9    A      I'm not sure if I did.

10   Q      Is there any reason you can think of as you

11   sit here right now why at the time that the decision was

12   made to arrest Ken that you would not have informed the

13   ADA that there was information by a witness that

14   indicated somebody else had passed the gun?

15                   MR. THADANI:  Objection.

16   A      No.

17   Q      Is it a fair statement that you recognize that

18   that information that you got from Terab is Brady

19   information that had to be imparted to the DA's office --

20                   MR. THADANI:  Objection.

21   Q      -- because it's potentially exculpatory?

22                   MR. THADANI:  Objection.  Calls for a

23                   legal conclusion.

24   A      Yes.

25   Q      If you didn't inform the ADA that Terab had

```
 1                    GLENN GODINO                  172

 2   made a positive identification of somebody other than

 3   Ken, you would have been remiss in your responsibilities

 4   under Brady, correct?

 5                    MR. THADANI:  Objection.

 6        A     I just don't recall me having a physical

 7   conversation.  I know I provided everything to the DA's

 8   office.  I just don't recall having a conversation.

 9        Q     I want to distinguish in my questions between

10   physically giving him the file and the conversations that

11   you had because you indicated in your testimony that you

12   consulted with the ADA before you made the decision to

13   arrest Ken, correct?

14        A     Correct.

15        Q     Now what I'm asking you is if you had not told

16   the ADA at the time that the decision was made to arrest

17   Ken that there was existing exculpatory information that

18   would have been a violation of your responsibilities

19   under Brady, correct?

20                    MR. THADANI:  Objection.  It calls for a

21                    legal conclusion.

22        A     Yes.

23        Q     To your knowledge, whether you imparted the

24   information or it came from another source, including the

25   paperwork in this case, was ADA Birns made aware at any
```

```
1                    GLENN GODINO              173
```

2   time before Ken's arrest that Terab had IDed Spruell as

3   the one who passed the gun?

4              MR. THADANI:  Objection.

5       A    I'm not sure.

6       Q    When you spoke to the CI, do you have a clear

7   recollection of that encounter as we sit here right

8   now?

9              MR. THADANI:  Objection.

10      A    I had spoken to him twice and I had brought the

11  CI to ADA Birns' office.

12      Q    On the first or second occasion?

13      A    On the second occasion.

14      Q    Let me go back to the first occasion for a

15  moment.

16           I gather from what we discussed earlier, but

17  let me ask you the question, do you have a recollection

18  specifically about when you spoke to the CI, say a

19  particular --

20      A    The specific date?

21      Q    Yes.

22      A    No.

23      Q    We've established that there's no doubt that

24  you spoke to the CI after you spoke to Terab, correct?

25      A    Yes.

```
  1                      GLENN GODINO                    174

  2       Q      When you spoke to the CI, did you make the CI

  3   aware of the fact that another person had identified

  4   somebody other than Ken, as the person who passed the gun

  5   to Dior Creighton?

  6       A      Yes, I did.

  7       Q      Did you ever go over the video that you had

  8   possession of with the CI before Ken was arrested?

  9       A      I'm not sure.

 10       Q      Would you agree that based on the evidence

 11   that had been accumulated at the point when you took the

 12   statement from the CI and recorded it in your notebook

 13   that either Terab or the CI was wrong about who had

 14   passed the gun to Dior?

 15       A      Could you repeat that.  I'm sorry.

 16              MR. GROSS:  Read that one back.

 17              (Whereupon, the requested portion of the

 18              record was read back by this reporter.)

 19              MR. THADANI:  Objection.

 20       A      Yes.

 21              Just to answer a question that you said did I

 22   show him the video.  Now I remember showing the CI the

 23   video because he pointed to behind the shelving where he

 24   was standing at the time.

 25       Q      Behind the shelving, you mean near the
```

```
 1                        GLENN GODINO                    175

 2   entrance to the store?

 3       A       Yeah, by the front door.  So I did show him

 4   the video.

 5       Q       Do you remember on which occasion or

 6   approximate time that that occurred?

 7       A       It was the occasion that he came to my office.

 8   I just didn't put a time down and a date on when he came

 9   in.

10       Q       That was my next question.

11               When you interviewed the CI, he came to the

12   precinct?

13       A       Yes, he did.

14       Q       Was the arrangement for him to come to the

15   precinct made by his handler?

16       A       Yes.

17       Q       Up to the time that you spoke to the CI in

18   your office, whenever that was, had you gotten any

19   specific information from the handler or by a phone

20   conversation with the CI about what he knew about the

21   case?

22       A       No.

23       Q       At that point when the CI came into the

24   office, all you knew was that the CI knew something about

25   the shooting and you got that from his handler?
```

```
 1                     GLENN GODINO                      176

 2      A      Yes.

 3      Q      Do you know whether or not once that contact

 4  was made by the handler with you about the CI giving

 5  information that that would have been something that

 6  would have caused the payment to be made to him for the

 7  information?

 8                   MR. THADANI:  Objection.

 9      A      I don't know when they paid informants.  I've

10  never had a paid informant so I don't have an answer to

11  that question.

12      Q      Do you know as you sit here right now that

13  both Terab and the CI have testified under oath as to who

14  they saw pass the gun?

15                   MR. THADANI:  Objection.

16      A      I don't know.

17      Q      Let me break it down.

18             You know for certain, do you not, that Terab

19  testified before the grand jury in this case in

20  connection with Ken's indictment, correct?

21                   MR. THADANI:  Objection.

22      A      No, I don't believe Terab went to grand

23  jury.

24      Q      I'm sorry.  I meant the CI.

25                   MR. GROSS:  Let me do that again.  I'll
```

```
 1                      GLENN GODINO                    177

 2              withdraw it.  Start over.

 3       Q     You know, do you not, that the CI testified

 4  before the grand jury in connection with Ken's

 5  indictment?

 6       A     Yes.

 7       Q     You were made aware of the fact that Mr. Terab

 8  testified under oath at a deposition in connection with

 9  this civil suit, correct?

10       A     Yes.

11       Q     You know that both of those people have

12  testified under oath as to a different person having

13  passed the gun to Dior, correct?

14                  MR. THADANI:  Objection.

15       A     I didn't get any information on what they

16  testified in a deposition.  I know the information the CI

17  gave to the grand jury, and I'm not aware of the CI going

18  to a deposition as of yet.

19       Q     If you take a signed and written statement

20  like this from a witness, whether it's Mr. Terab or

21  somebody else, and it's determined that they lied on that

22  statement, is that a crime, to your knowledge?

23                  MR. THADANI:  Objection.  Calls for a

24              legal conclusion.

25       A     Not that I know of.
```

```
 1                    GLENN GODINO                178

 2              MR. GROSS:  Off the record.

 3              (Whereupon, a discussion was held off

 4         the record.)

 5    Q    When you had the conversation with the CI in

 6    your office, was anybody else present?

 7              MR. THADANI:  Objection.  Which time?

 8    A    Yes.

 9              THE WITNESS:  Oh.

10              MR. GROSS:  I'm sorry?

11              MR. THADANI:  Which time, just

12         clarify.

13              MR. GROSS:  The first one.  He said the

14         second one was at the DA.  Maybe I didn't make

15         the distinction clear.

16    A    No, that's correct.

17         His handler was in the room also.

18    Q    Were any other detectives in the room?

19    A    I don't believe there were.

20    Q    When the CI gave the information to you in the

21    office, is that the time that you recorded it in your

22    notebook?

23    A    Yes.

24    Q    Was there anything --

25    A    Wait.  I don't know if that's the time when he
```

GLENN GODINO                          179

2   was in my office or when he was in the office with ADA

3   Birns, because he didn't want me writing anything down.

4   He didn't want to put his name to anything.  He -- so I

5   don't know if I just jotted that down when he was talking

6   or when he was talking to ADA Birns I put that in my

7   book, but I'm not sure which time that was from.

8        Q      When he spoke to ADA Birns in connection with

9   this case, was that before Ken was arrested?

10       A      Yes.

11       Q      How long after that conversation with ADA

12  Birns do you recollect that the arrest was actually --

13  not done but when it was decided to arrest?

14       A      I don't recall exactly, but it was more than

15  one day 'cause ADA Birns ended up calling me up to tell

16  me we had authorization.

17       Q      At the time that ADA Birns called you up to

18  tell you that you had authorization to arrest Ken, did he

19  also tell you in that same conversation he gave

20  authorization to arrest Dior?

21       A      Yes.

22       Q      That's because the CI implicated Dior directly

23  in the shooting as well as Ken being the one who passed

24  the gun, right?

25       A      Correct.

```
 1                     GLENN GODINO              180

 2      Q      When the ADA authorized that arrest, had he

 3  seen the records that you had created with regard to

 4  Terab's identification of Spruell, the photo arrays and

 5  the signed statement?

 6                 MR. THADANI:  Objection.

 7      A      I'm not sure.

 8      Q      You have no doubt that you made him aware of

 9  it by that point in time, correct?

10      A      I'm not sure exactly when I handed him all the

11  information so --

12      Q      Again, I'm sorry, I --

13      A      I just don't remember --

14      Q      I'm trying to keep a distinction between when

15  you discussed it with him as opposed to when you turned

16  it over.

17             Did ADA Birns in connection with this case

18  visit the squad on a regular basis?

19                 MR. THADANI:  Objection.

20      A      Regular basis, no.

21      Q      Let's start with did he visit the squad with

22  regard to this investigation before Ken was arrested,

23  physically?

24      A      I'm not sure.

25      Q      If he had gone to the precinct and the
```

```
1                        GLENN GODINO                    181

2   detective squad before Ken's arrest, would there have

3   been any reason to deny him access to anything in the

4   case file?

5       A      No.

6       Q      Again, based on your testimony, you may not

7   know exactly when, but there's no doubt in your mind that

8   you made detective Birns aware of the fact that there was

9   conflicting evidence about who passed the gun?

10                     MR. JAFFE:  ADA Birns.

11      Q      ADA Birns.

12                     MR. THADANI:  Objection.

13      A      I don't have a specific recollection of

14  discussing that with him.

15      Q      As you sit here right now, is there any

16  possibility in your mind that you did not tell ADA Birns

17  about Terab's IDing Spruell and not Ken before Ken was

18  arrested?

19                     MR. THADANI:  Objection.

20      A      I don't think so.

21      Q      You're pretty sure you did?

22      A      I said I don't think so.

23      Q      You don't think you told him or you don't

24  think you didn't --

25      A      I don't think I didn't make him aware.
```

```
 1                      GLENN GODINO                182

 2      Q       You think you did tell him?

 3      A       I think I did tell him.

 4      Q       There you go.  My fault.

 5              At the time that --

 6      A       Can I just add something?

 7      Q       Sure.

 8      A       I'm sorry.

 9              I think the reason why we didn't use the

10      bodega owner in the grand jury was because he had the

11      two -- first he thought it was Kijafa and then he said it

12      was Kenny.

13      Q       Are you saying that the bodega owner at

14      sometime testified --

15      A       No, he didn't.  That's why we didn't --

16      Q       Let me finish the question.

17              Are you saying at some point in time the

18      bodega owner indicated that he changed his mind and Ken

19      was the one that passed the gun?

20      A       He did change his mind and said that Ken

21      passed the gun.

22      Q       Did you write that down anywhere?

23      A       I don't believe 'cause after the CI came in my

24      office and identified Ken as passing the gun and Dior is

25      the one getting the gun and going outside and shooting I
```

```
 1                    GLENN GODINO                 183

 2    called up the bodega owner.  I said are you sure on

 3    Kijafa passing the gun because I have somebody else --

 4    and I didn't tell him who was in there -- saying that it

 5    was somebody else who passed the gun, and he told me that

 6    well, he thought because Dior and -- no, Kijafa and Dior

 7    were always together that it was Kijafa, and that the

 8    shelving with all the stuff, the potato chip racks and

 9    stuff, were in his way, he might not have seen who it

10    was.  So that's why we had him come into my office and

11    view the video.  Once he saw the video, he said that's

12    Kenny passing him the gun.

13        Q     Are you aware of the fact from any resource

14    that when the bodega owner was deposed that he

15    unequivocally said that that never happened?

16                MR. THADANI:  Objection.

17        A     I don't know when on the deposition, but he

18    called me up one day and he said that lawyers came to him

19    and they wanted him to sign some papers.  He says this is

20    where I make my money.  I don't know what to do.  He was

21    fearful of Kenny.  He told me that Kenny in the past had

22    beat him up.  He goes -- I said you know what, your

23    safety is the first concern.  Do whatever you have to do.

24    So he ended up signing a piece of paper.

25                MR. GROSS:  Move to strike as not
```

```
 1                    GLENN GODINO              184

 2           responsive.

 3                    MR. THADANI:  I object to that motion to

 4           strike.

 5      Q     The question I'm asking you is are you aware

 6   of the fact that during the pendency of this civil

 7   lawsuit the witness, Mr. Terab, unequivocally testified

 8   that Ken did not pass the gun and that, in fact, he

 9   wasn't even in the store that night?

10                    MR. THADANI:  Objection.

11      Q     I'm just asking you if you're aware of that or

12   not.

13      A     I don't know what he testified in a

14   deposition.  I know what he told me, that lawyers -- and

15   I don't know who that was -- wanted him to sign, and I

16   saw the interview with Kenny on television where they had

17   him blacked out saying that he told the detectives that

18   Kijafa was the one that passed the gun, but I do not know

19   what he testified to at the deposition.

20      Q     When you took this information down originally

21   from Mr. Terab about the identification, that he picked

22   out the two people that were involved in the passing the

23   gun, Dior and Spruell, that was significant information

24   in this investigation, right?

25                    MR. THADANI:  Objection.
```

```
1                          GLENN GODINO                    185

2        Q       At the time.

3        A       Yes.

4        Q       As part of your job and responsibilities, you

5    did what you were supposed to do and you documented it by

6    creating the documents that we've been talking about

7    here, correct?

8                     MR. THADANI:  Objection.

9        A       Correct.

10       Q       Before Ken is arrested, Kijafa verbally, you

11   said, recanted that identification?

12                    MR. THADANI:  Objection.  You said

13               Kijafa.

14       Q       I'm sorry.  Fawaz verbally recanted that

15   identification?

16       A       Yes, he did.

17       Q       You never made a record of it anywhere, is

18   that your testimony?

19       A       Yes, it is.

20       Q       Do you think that that recantation was

21   significant information with regard to this investigation

22   as to who passed the gun?

23                    MR. THADANI:  Objection.

24       A       Yes.

25       Q       Did you know that if this case came to trial
```

```
1                        GLENN GODINO                186

2    that the question about that recantation without a record

3    would never have been documented anywhere?

4                MR. THADANI:  Objection.

5    A      Yes.

6    Q      Notwithstanding that, you never made a

7    notation, you never wrote it down anywhere, the first

8    time we're hearing anything of it is here today, correct?

9                MR. THADANI:  Objection.

10   A      Correct.

11   Q      By the same token, that the identification of

12   Spruell as the person who passed the gun being Brady

13   information, would you agree that a recantation of that

14   information would also be Brady information?

15               MR. THADANI:  Objection.

16   A      It wasn't written down anywhere.

17   Q      That was not my question.

18          Would you consider it to be Brady information

19   that was required to be transmitted and records made of

20   so that it would constitute Brady and information that

21   would eventually be given to Ken's defense counsel?

22               MR. THADANI:  Objection.  Calls for a

23               legal conclusion.

24   A      I'm not sure.

25   Q      Did you advise ADA Birns about Terab's
```

1                          GLENN GODINO                      187

2    recantation?

3        A      I believe I did.  I just don't remember the

4    conversation.

5        Q      How did you recount that information to him,

6    verbally, by phone, face-to-face?

7        A      I'm not sure.

8        Q      Do you have any recollection about when,

9    where, how you advised him about the recantation?

10       A      I don't remember exactly how, but he was

11   provided with everything in the case.

12       Q      When you say he was provided with everything

13   in this case, as far as you know, in fact, is there any

14   doubt in your mind that there is no paper document that

15   exists in connection with this investigation reflecting

16   that Terab recanted his identification?

17       A      I don't think there is.

18       Q      Have you ever seen a piece of paper that

19   either said that or implied that there was a recantation

20   from the day this investigation started until today?

21       A      I don't think there is.

22                   MR. JAFFE:  Take a two-minute break.

23                   MR. GROSS:  Okay.

24                   MR. JAFFE:  Let's take a two-minute

25               break.  You want to step out.

```
 1                   GLENN GODINO                188

 2              (Whereupon, at 4:39 there was a break in

 3         the proceeding.)

 4              (Whereupon, at 4:39 the deposition

 5         resumed.)

 6    Q      You indicated a little while ago that you had

 7 a conversation with Terab during the pendency of the

 8 criminal case where you told Terab that there was a

 9 concern for his safety from Ken if he maintained that he

10 had passed the gun, correct?

11              MR. THADANI:  Objection.

12    A      Are you asking me if he was concerned if Kenny

13 found out --

14    Q      Did you reassure --

15              MR. THADANI:  Let him answer the

16         question.

17    Q      Yes, I didn't mean to cut you off.

18    A      Are you saying did he have any concerns about

19 Kenny finding out that he was involved somehow?

20    Q      When you had the conversation with Terab where

21 he recanted his identification, you said that there was

22 an expression about a concern for his safety at that

23 point, is that part of what you testified to?

24    A      No, what I testified to is after this was all

25 over and a lawsuit started that lawyers -- he said
```

1                       GLENN GODINO                    189

2    lawyers went to him to sign a piece of paper and he was

3    concerned for his safety.

4        Q      As far as what?  What was his concern about,

5    having done what particular thing?

6        A      He felt that he should sign a piece of paper

7    because he didn't want Kenny to find out that he said it

8    was him in the video, or him in the store.

9        Q      He was concerned about his safety as far as

10   Ken was concerned but he had no concern about his safety

11   having gone on record that Dior was the one the gun was

12   passed to, is that your testimony?

13              MR. THADANI:  Objection.

14       Q      The one who actually did the shooting?

15       A      Right from the beginning he said he didn't

16   want to testify, he didn't want to be involved.

17       Q      Are you familiar with the term material

18   witness?

19              MR. THADANI:  Objection.

20       A      Yes.

21       Q      If the case hinged on Terab's testimony and he

22   didn't want to testify, you know very well that he could

23   be arrested as a material witness and forced to testify,

24   as long as he didn't commit a crime himself, and he would

25   be under compulsion to make that testimony, correct?

```
1                    GLENN GODINO                    190

2              MR. THADANI:  Objection.

3    A     Yes.

4    Q     Whether Mr. Terab said he didn't want to be

5    involved or not, if he was a key witness in a murder

6    case, that wouldn't excuse him from being involved, in

7    your eye, would it?

8              MR. THADANI:  Objection.

9    A     No.

10   Q     In terms of the chain of events, the fact that

11   Terab had indicated and picked out Dior as the one who

12   received the gun and then going outside and then shots

13   being fired was certainly a material part of the events

14   that were needed to be proven to make this case,

15   correct?

16             MR. THADANI:  Objection.

17   A     Correct.

18   Q     You know at some point there was a plea

19   arrangement made with Dior, correct?

20             MR. THADANI:  Objection.

21   A     Yes.

22   Q     You know that as soon as that plea arrangement

23   was made or very shortly thereafter the charges were

24   dropped against Ken?

25             MR. THADANI:  Objection.
```

```
 1                    GLENN GODINO                    191

 2      A      Yes.

 3      Q      If this case had not resolved itself and the

 4   case had gone to trial against Dior, is there any doubt

 5   that Terab, based on the information you had, would have

 6   had to have been disclosed to the defense and likely

 7   would have been a witness in this case?

 8                   MR. THADANI:  Objection.

 9      A      Yes.

10      Q      Yes, it would have happened, right?

11                   MR. THADANI:  Objection.

12      A      He probably would have been named, but we

13   had - we were counting on the CI to do the testifying.

14      Q      Now, this man is a witness, he's on record as

15   having said that Spruell was the one who passed the gun,

16   correct?

17                   MR. THADANI:  Objection.

18      A      Yes.

19      Q      Now, without any documentation, the defense,

20   because they wouldn't know, would be in a position where

21   they would call Terab as a witness in the defense to show

22   that he had picked out somebody else other than Ken and

23   there would have been this big surprise pulled out

24   without any paperwork to say oh, no he recanted it, by

25   you, is that how this would have gone down?
```

```
1                        GLENN GODINO                    192

2                 MR. THADANI:  Objection.

3      A      I don't know if he would have been used.

4      Q      The defense certainly -- if they knew that

5   there was somebody who had identified somebody other than

6   Ken, if that case had gone to trial, there's no doubt in

7   your mind that he would have been called as a defense

8   witness, whether he wanted to come in or not?

9                 MR. THADANI:  Objection.

10     A      They would have been provided with the whole

11  case folder.

12     Q      But the case folder doesn't have anything to

13  say he recanted, does it?

14     A      That he recanted, no, but it shows that he's

15  saying that Kijafa at first was the one who passed the

16  gun and picked him out in the photo array, but now

17  there's nothing stated that he recanted his story.

18     Q      Hypothetically, if this case goes to trial

19  against Ken, based on this information that you created

20  in this investigation, they see him as a great defense

21  witness who comes in and says Ken didn't pass the gun?

22                 MR. THADANI:  Objection.

23     A      Yes.

24     Q      Because you say here for the first time that

25  he recanted that you would have been called as a witness
```

```
 1                        GLENN GODINO                  193

 2   and say no, that's not true, he took it back, is that

 3   what you would expect would have happened had this case

 4   gone to trial?

 5               MR. THADANI:  Objection.  What's the

 6               relevance.  It's just asking him to

 7               speculate.

 8               MR. GROSS:  I think it's very

 9               relevant.

10   Q       Go ahead, you can answer.

11               MR. THADANI:  You're asking him to

12               speculate as to a nonexistent hypothetical.

13   Q       If you had been called as a witness and put

14   under oath, would you have testified that the

15   identification by Terab of Spruell was recanted?

16               MR. THADANI:  Objection.  Same

17               objection, speculation.

18   A       Yes.

19   Q       You would have testified to that?

20   A       That he recanted it?

21   Q       Yes.

22   A       Yes.

23   Q       Without any paper trail, there's no way that

24   the defense lawyers would have ever been able to

25   ascertain that unless and until Terab testified, correct?
```

```
 1                         GLENN GODINO                    194

 2                    MR. THADANI:  Objection.

 3        A      Correct.

 4        Q      Since there's no paper trail, the fact that

 5   you may have made that information available to the ADA

 6   would not have been something he would have disclosed to

 7   the defense because there's no documentation of it,

 8   right?

 9                    MR. THADANI:  Objection.

10        A      There's documentation of the original

11   statement that I took from him and a photo away.  That

12   has to be sent over to the defense attorney.

13        Q      I'm talking only about the recantation.  I

14   know they get the --

15        A      Yeah.

16        Q      So they have had exculpatory evidence that you

17   created and then because you got a recantation without

18   any of that being documented that defense is now going to

19   be taken away from them without any warning, correct?

20                    MR. THADANI:  Objection.  You're

21                forgetting about the letter.

22                    MR. GROSS:  I'll get to the letter in

23                due time.

24                    MR. THADANI:  Okay, I'm just saying.

25        Q      Was what I said correct?
```

```
 1                        GLENN GODINO                  195

 2      A       Correct.

 3      Q       On August 19, 2011, did you go to the district

 4  attorney's office and review the surveillance tape once

 5  again?

 6      A       August 19, 2011?

 7      Q       That's correct.

 8      A       With which district attorney?  I know I

 9  reviewed --

10      Q       ADA Gottlieb.

11      A       Yes, but I don't think it was in 2011.  Wait.

12  Wait.  This was 2006.

13      Q       I understand that.

14      A       Then it could be '11.  I'm confused in the

15  dates.  I was at the district attorney's office with ADA

16  Gottlieb and reviewed the video with the bodega owner.

17      Q       With the bodega owner?

18      A       Yeah.

19      Q       Did you know that there was a letter sent to

20  the defense counsel as a result of that?

21      A       Yes.

22      Q       Did you know that at the time that that letter

23  was sent, the bodega owner had been identified and the

24  documentation that you created had been supplied to him?

25                    MR. THADANI:  Objection.
```

```
1                        GLENN GODINO                      196

2        A       I don't know if he was identified.

3        Q       In any case, the identification that we've

4    been talking about here and the signed statement, you

5    would except that information would find the way into the

6    hands of the defense counsel, correct?

7                        MR. THADANI:  Objection.

8        A       At what point?

9        Q       At some point --

10       A       At some point at trial they would have to, you

11   know, give everything to the defense counsel.  So I don't

12   know at one point that they handed everything over.

13       Q       If I were to tell you that during the time

14   that Ken was in jail he wrote a letter himself where the

15   identification had been supplied, not only to his lawyer

16   but to him, that Spruell had been identified by Terab and

17   that there were the two photo arrays and a signed

18   statement and they had been supplied to his defense

19   counsel.

20                       MR. THADANI:  Objection.  What's the

21               question?  That wasn't a question.

22                       MR. GROSS:  I'm asking if he knows it or

23               not.

24                       MR. THADANI:  You just made a statement.

25               There was no question.
```

```
 1                    GLENN GODINO                    197

 2      Q      Did you know that before the viewing of the

 3   videotape in Gottlieb's office the defense had been made

 4   aware of Mr. Terab as a witness who identified someone

 5   other than Ken?

 6                  MR. THADANI:  Objection.

 7      A      I'm not aware of that.

 8      Q      Do you know that the information that was

 9   disclosed to the defense counsel did not indicate who it

10   was --

11                  MR. THADANI:  Objection.

12      Q       -- that had picked him out from the

13   videotape?

14                  MR. THADANI:  Objection.

15      A      I'm not aware of that.

16      Q      You testified earlier, did you not, that when

17   you looked at the videotape you couldn't ascertain from

18   looking at the tape itself who passed the gun to Dior,

19   correct?

20      A      Correct.

21      Q      If I understand your testimony, on August 9,

22   2011, this same person who positively identified Spruell

23   as the one who had passed the gun went to the DA's office

24   and now, in effect, recanted that testimony by saying it

25   was Ken on the videotape, correct?
```

```
 1                    GLENN GODINO                    198

 2               MR. THADANI:  Objection.

 3      A      Yes.

 4      Q      Did you make a record of that anywhere?  Did

 5   it wind up in your case folder?

 6      A      No, it did not.

 7      Q      Would you agree that based on your

 8   understanding of proper police procedure and the patrol

 9   guide and a host of other documents that it's a violation

10   of that procedure not to create documentation with regard

11   to something as significant as a witness recanting his

12   identification?

13               MR. THADANI:  Objection.

14      A      It should have been documented.

15               MR. JAFFE:  What's the answer to that

16            question?  We need an answer to that

17            question.

18      A      Yes, it should have been documented.

19               MR. JAFFE:  Is it a violation?

20      Q      It was a violation of proper police procedures

21   not to, correct?

22               MR. THADANI:  Objection.

23      A      I don't know if it --

24               MR. THADANI:  He's not an expert on

25            police procedure.
```

1                          GLENN GODINO                    199

2        Q      Based on your understanding of the police

3    procedures --

4                       MR. GROSS:  I'll withdraw that for a

5                moment.

6        Q      The recantation was, without any doubt, in

7    your mind, significant information, was it, in regard to

8    this case?

9                       MR. THADANI:  Objection.

10       A      Correct.

11       Q      You have already testified that any

12   significant information that would be developed with

13   regard to an investigation belongs in the case folder,

14   correct?

15       A      Correct.

16       Q      This never wound up in the case folder, did

17   it?

18       A      No, it did not.

19       Q      Now back to the other question, isn't it a

20   violation of proper police procedures not to document

21   something as significant as a recantation of a key

22   witness?

23                      MR. THADANI:  Objection.  He's not an

24               expert on police procedures.

25       A      I'm not sure.

```
1                       GLENN GODINO                   200

2       Q     Do you think the net effect of not recording

3   that information could have had an impact on the criminal

4   prosecution?

5                   MR. THADANI:  Objection.  Calls for

6               speculation, legal conclusion.

7                   MR. GROSS:  He's certainly qualified to

8               say that.

9       A     I'm not sure if it would have.

10      Q     We spoke about this a moment ago.  Based on

11  the records that exist in your case file, there is

12  nothing in that case file to indicate that Mr. Terab was

13  anything but a very powerful witness to show that Ken was

14  not the one who passed the gun, correct?

15                  MR. THADANI:  Objection.

16      A     We also had the CI who --

17      Q     Not my question.

18                  MR. THADANI:  Let him answer though.

19      A     -- who saw Ken pass the gun to Dior.

20      Q     The CI who was never disclosed to anybody in

21  this case, correct?

22                  MR. THADANI:  Objection argumentative.

23      Q     You know that, don't you?

24                  MR. THADANI:  Objection.

25      A     He told ADA Birns about it.
```

```
 1                     GLENN GODINO                    201

 2      Q      [--- Confidential

 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19                              ---]

20              MR. GROSS:  This is not confidential.

21      Q     I'd like you to assume that the CI testified

22   and lied about his name after he was sworn in.  Were you

23   aware of that, prior to your testimony here today?

24              MR. THADANI:  Objection.

25      A      No, I was not.
```

1                    GLENN GODINO                    202

2      Q      When you spoke to the witness, the CI, is it

3   your testimony that you never learned his real name?

4      A      Yes.

5      Q      Yes, you never learned it?

6      A      I never learned it.

7      Q      Going back to Terab's identification of

8   Spruell as the one who passed the gun, that documentation

9   was put in your case folder and that document went to the

10  DA's office, correct?

11                    MR. THADANI:  Objection.

12     A      Correct.

13     Q      You were aware, were you not, that the grand

14  jury indicted Ken, correct?

15     A      Yes, they did.

16     Q      Sometime later the same grand jury indicted

17  Dior, correct?

18                    MR. THADANI:  Objection.

19     A      I don't know if it was the same panel, but a

20  grand jury did indict both of them.

21     Q      You testified at the portion of the

22  proceedings where the grand jury indicted Dior,

23  correct?

24                    MR. THADANI:  Objection.

25     A      Yes.

```
 1                      GLENN GODINO                    203

 2       Q      You did not testify at the portion of the

 3  proceedings where Ken was indicted, correct?

 4       A      I did not.

 5       Q      Were you ever made aware of the fact that the

 6  CI testified at the grand jury when Ken was indicted?

 7       A      I'm not sure.  I'm sure he did, but I don't

 8  remember being told that, but I'm sure he did.

 9       Q      As the lead detective in this investigation,

10  you were kept abreast of what was going on with the grand

11  jury but the ADAs involved, were you not?

12                      MR. THADANI:  Objection.

13       A      Yes.

14       Q      So when the case was being presented against

15  Ken, were you involved in helping to gather the evidence

16  that would be used in presenting that case to the grand

17  jury?

18       A      Yes.

19       Q      You were also involved in gathering the

20  evidence when the case was presented against Dior

21  sometime later to a grand jury, correct?

22       A      Yes.  It was the same gathering of evidence

23  for Dior that went into Kenny.

24       Q      When the testimony was presented in the grand

25  jury proceeding against Ken, were you made aware of what
```

2    that proof was going to be?

3              MR. THADANI:  Objection.

4    A    I wasn't around when that grand jury went for

5    Kenny so, you know, Detective Roberts handled it because

6    he took the arrest.

7    Q    But he didn't testify at that grand jury

8    proceeding, did he?

9              MR. THADANI:  Objection.

10   A    I'm not sure if he did or not.

11   Q    I have the grand jury proceedings.  For now

12   will you take my word for the fact that he did not

13   testify at the grand jury?

14             MR. THADANI:  Objection.

15   A    If you read it and you did not see his name --

16   Q    There's no dispute that he did not testify in

17   front of the grand jury?

18   A    I wasn't aware that he did or he didn't.

19   Q    Regardless of who made the arrest on Ken, this

20   homicide investigation was yours, not his, correct?

21   A    Correct.

22   Q    As the lead detective, the assigned detective

23   in this case, organizing the file, keeping track of what

24   went in the case folder and making the evidence available

25   to the ADA was your responsibility, correct?

1

2     A     Yes.

3     Q     You knew when Ken was indicted, did you not,

4  that there was exculpatory evidence in the folder un-

5  rebutted that Ken was not the one who passed the gun,

6  correct?

7              MR. THADANI:  Objection.

8     A     Could you just rephrase that.  I'm sorry.  I

9  didn't --

10     Q     I'll rephrase it, sure.

11              You knew that as far as the case against Ken

12  that there existed in the case folder documentation by

13  Terab that indicated that Ken was not the person who

14  passed the gun to Dior, correct?

15              MR. THADANI:  Objection.

16     A     Correct.

17     Q     You also knew, did you not, that that

18  information had been imparted to the ADA before he

19  presented the case to the grand jury, correct?

20              MR. THADANI:  Objection.

21     A     Correct.

22     Q     Do you know one way or the other that that

23  information that there was exculpatory evidence

24  un-rebutted by any documentation was not presented to the

25  grand jury in this case?

```
 1                    GLENN GODINO                206

 2               MR. THADANI:  Objection.

 3      A     I don't know if he presented it or not, ADA

 4  Birns.

 5      Q     If I tell you again -- subject to if you want

 6  to review the grand jury presentation in this case,

 7  because we have it all -- that there was no evidence ever

 8  created before the grand jury in any way, shape or form

 9  indicating that there was a witness who had exculpatory

10  information that indicated that Ken was not the one who

11  passed the gun.

12               MR. THADANI:  Objection.  That's not a

13               question.

14      Q     My question is this:  Do you think that the

15  failure to provide the recantation of that evidence was

16  something the DA needed to have documentation of with

17  regard to the prosecution of Ken?

18               MR. THADANI:  Objection.  Calls for a

19               legal conclusion.

20               MR. GROSS:  As a detective.  Not as a

21               lawyer.

22      Q     Did you think that there was a requirement

23  that he have an indication, a record created, to show

24  that the witness had recanted his identification of Ken?

25               MR. THADANI:  Objection.
```

```
 1                      GLENN GODINO                207

 2      A      I provided everything to ADA Birns.  I just

 3  don't recall exactly when that particular conversation

 4  went, but he was given everything in the case, you know,

 5  folder.

 6      Q      The one thing that we know for certain that

 7  was not provided to ADA Birns was any written

 8  documentation that he recanted, other than you verbally

 9  saying it to him and you're not writing it down anywhere,

10  is that a fair statement?

11                 MR. THADANI:  Objection.

12      A      That's a fair statement.

13      Q      If ADA Birns felt the obligation to disclose

14  that information to the defense, he had no documentation

15  to point to to show that there had been a recantation of

16  the identification of Spruell by Terab, correct?

17                 MR. THADANI:  Objection.  We've been

18                 through this.  Asked and answered.

19      A      They would have the written statement where he

20  first identified Kijafa and the photo array.

21      Q      And nothing else?

22                 MR. THADANI:  Objection.

23      Q      Correct?

24      A      And nothing else.

25      Q      When Terab recanted, he did it verbally to
```

```
1                        GLENN GODINO                    208

2    you?

3        A      Yes.

4        Q      And on the phone?

5        A      No.  I called him up, the bodega owner, and

6    said I had somebody else who came in and picked somebody

7    else as handing the gun to Dior, and I asked him to come

8    in because I wanted to show him the video, and when he

9    looked at the video, he saw that -- he said that's Kenny

10   passing the gun, and I asked him how do you first say it

11   was Kijafa and now you're saying it's Kenny.  He goes --

12   he made it a point to say that all the -- I'm going to

13   call them shelving.  There's clear Plexiglas that holds

14   candy and racks that was between the other side of the

15   counter and where Kenny was standing.  So he thought he

16   was mistaken.

17       Q      All of this detail that was incorporated in

18   this written statement, where he very specifically

19   described him walking in the store, the description of

20   what the gun looked like, him handing the gun to Kijafa,

21   all of that information now he said was mistaken because

22   he was obstructed and he made it all up, is that your

23   testimony?

24                   MR. THADANI:  Objection.

25       A      He changed it, yes.
```

```
 1
 2     Q      Did he change the person who the gun was
 3   passed to or did he change the information about what he
 4   observed?
 5                  MR. THADANI:  Objection.
 6     A      He didn't change the person who the gun was
 7   passed to.  He just changed -- after looking at the
 8   video, he said that was Kenny passing him the gun.
 9     Q      You're telling us that he wrote this statement
10   out based on what he verbally told you and all of this
11   detailed information he made up because he never observed
12   any of it and that's what he admitted to you?
13                  MR. THADANI:  Objection.  That's not
14            what he said.
15     A      The story's the same.  It's just the person's
16   different.  The person who handed Dior the gun is
17   different.
18     Q      So you're saying --
19     A      But the scenario is the same.
20     Q      He got everything else right except the face
21   that went with the person that passed the gun, is that
22   what you're saying?
23                  MR. THADANI:  Objection.
24     A      Yes.
25     Q      You accepted that notwithstanding the fact
```

1                              GLENN GODINO                    210

2    that you knew at that point that he knew all of these

3    people very well by sight?

4                    MR. THADANI:  Objection.

5         A    Well, first, that's why I showed him the video

6    to clarify.  Once he saw the video, he said that's

7    Kenny.

8         Q    He said that was Kenny?

9         A    Yeah.

10        Q    When he testified under oath at the deposition

11   that he never changed his story and he always said --

12   including the time that he was interviewed by you at

13   Gottlieb's office -- that he maintained that it was

14   Spruell who passed the gun, he was lying then too,

15   correct?

16                    MR. THADANI:  Objection.  That's

17                    improper.

18        A    He wasn't telling the truth because he even

19   was in Gottlieb's office, viewed the video on a computer

20   and said that's Kenny 100 percent.

21        Q    I'm telling you -- and I'll show it to you

22   when we come back -- that he absolutely said that was not

23   true, he never said such a thing.  In fact, he told the

24   DA and you at that time that he maintained that it was

25   Spruell and indicated when he was asked specifically was

```
 1                    GLENN GODINO                211

 2  it Kenny that was passing the gun he said no.  In fact,

 3  he even told the ADA and you that Kenny wasn't in the

 4  store that night.

 5                 MR. THADANI:  Objection.

 6     Q    Is that all made up?

 7                 MR. THADANI:  That's not a question.

 8     Q    If I'm saying his testimony accurately, are

 9  you saying that none of that happened in Gottlieb's

10  office?

11                 MR. THADANI:  Objection.

12     A    He never -- in Gottlieb's office, he said that

13  that was Kenny on the video.

14     Q    I'm saying --

15                 MR. THADANI:  Hold on.

16     Q    That's one question.

17                 MR. THADANI:  He's answering the

18            question.  Let him answer the question.

19                 MR. GROSS:  No, he's not.

20                 MR. THADANI:  If you're asking a

21            question, let him answer the question.

22                 MR. GROSS:  That wasn't the question

23            that I asked.

24                 MR. THADANI:  He's answering the

25            question as --
```

1                        GLENN GODINO                        212

2              MR. GROSS:  I'm going to withdraw it.

3              MR. THADANI:  You already asked the

4         question.  You can't withdraw it.  He's

5         already started answering.

6              MR. GROSS:  We'll just do it again.

7              MR. THADANI:  Finish your answer.

8    A    When he looked at the video, he said that was

9    Kenny 100 percent.

10   Q    Now I'm asking you specifically if I tell you

11   that when he testified at the deposition in the civil

12   case that he denied ever saying that and that he said

13   that letter which I showed him was not true, that he

14   never identified Ken at the viewing of the surveillance

15   tape at Gottlieb's office while you were present, based

16   on your recollection of what happened, he was lying,

17   correct?

18              MR. THADANI:  Objection.

19   Q    At that deposition.

20   A    He wasn't telling the truth.

21   Q    There's a difference between not telling the

22   truth and lying?

23   A    He's lying.

24   Q    When he was asked at the deposition, and he

25   was asked specifically was Ken there when the gun was

1                          GLENN GODINO                    213

2    passed, he denied that, he was lying about that as well,

3    correct?

4                    MR. THADANI:  Objection.

5        A      Yes, he was.

6        Q      When you had this information from Mr. Terab

7    that identified Spruell as the one that passed the gun,

8    did you issue an I-card for Spruell?

9        A      No, I did not.

10       Q      Did you ask to have a warrant issued for his

11   arrest?

12       A      No, I did not.

13       Q      We don't know the exact period of time, but we

14   know from the time that Terab indicated that it was

15   Spruell that passed the gun some time passed before the

16   CI came forward and indicated that it was Ken, correct?

17       A      Yes.

18       Q      You took no action during that period of time,

19   did you, to arrest, question Spruell or do anything else

20   in regard to him?

21                    MR. THADANI:  Objection.

22       Q      Is that true?

23       A      I did not.

24       Q      Up to the time that the CI came forward, the

25   only evidence that you had, and based on the information

GLENN GODINO                    214

1

2    we've been talking about here, very strong evidence,

3    indicated that Spruell was the one that passed the gun,

4    he was one of the participants in the crime that

5    you were investigating, correct?

6              MR. THADANI:  Objection.

7        A     That he was, yes, and Dior is the one who got

8    the gun passed to him.

9        Q     Yet based on that you made no attempt, as you

10   indicated earlier -- at that point in time, you had

11   probable cause to arrest Spruell, correct?

12             MR. THADANI:  Objection.

13       A     I wouldn't want to arrest Spruell at that time

14   for just passing the gun.  I would want a witness who saw

15   the shooting and that would be able to connect the

16   homicide to them.

17       Q     The crime that Spruell committed, if he passed

18   the gun, is a stand-alone crime, the mere possession of

19   the gun is a crime and passing it to somebody and then

20   having it later used in the commission of a crime,

21   whether or not Dior was the one that pulled the trigger,

22   is facilitation, correct?

23             MR. THADANI:  Objection.

24       A     Correct.

25       Q     You had plenty of probable cause based on what

1

2    you got from Mr. Terab to arrest him for criminal

3    facilitation at that point in time, correct?

4              MR. THADANI:  Objection.

5    A    Yes.

6              MR. GROSS:  It's ten after and I'm kind

7              of pooped, and we're going to go on for a

8              while with this anyway.

9              On the record, I have obviously -- and

10             we only saw it for the first time today a lot

11             of original records that I have not been able

12             to make sense out of and that I had planned on

13             questioning.  I expect to probably have a full

14             day with the witness the next time we come

15             back.

16             Is that a problem with you?

17             MR. THADANI:  What do you mean by

18             original documents that you saw for the first

19             time?

20             MR. GROSS:  You brought over the

21             original file today.

22             MR. THADANI:  I brought over the

23             original file.  My recollection is there were

24             two pages that were photocopied that were,

25             perhaps, not previously disclosed that were

GLENN GODINO                216

1
2      part of the spiral notebook and other pages

3      were copied due to legibility, which wasn't

4      raised, at least while I've been assigned to

5      this case, to me as an issue before today.

6           From our perspective, at least right

7      now, right this moment, is you have seven

8      hours in one day to do the deposition.  We

9      understand that there was time today taken to

10     reviewing the documents.  So at this time what

11     I'm allowing for is two hours on a subsequent

12     day to continue and continue the deposition.

13          MR. GROSS:  Then you're going to stop

14     the deposition at this point?

15          MR. THADANI:  That's our position at the

16     moment.

17          MR. GROSS:  I want to make a record that

18     based on what you're saying now I want to go

19     back to Judge Freeman and have a very thorough

20     discussion about this, and I'd like to have

21     her have the transcript available when we do

22     so.  I'm hoping we can work it out --

23          MR. THADANI:  We may be able to.  That's

24     my position on the record right now.

25          MR. GROSS:  Subject to what, when we

```
1                    GLENN GODINO              217

2          reschedule this and he's coming back, is that

3          going to be your position then or are you

4          going to possibly change it?

5               MR. THADANI:  My position right now on

6          the record is we're allowing for two more

7          hours on a subsequent day.  If we have

8          subsequent discussions after we're off the

9          record in terms of scheduling, we'll talk

10         about that and see if it's necessary to go to

11         the judge on this or not.

12              MR. GROSS:  Just for the record,

13         notwithstanding what that discussion may

14         entail, I think your position is entirely

15         unreasonable in light of what's going on

16         here.

17              MR. THADANI:  On what basis?

18              MR. GROSS:  On the basis of the fact

19         that there is an enormous amount of

20         information of this particular witness, and

21         he's the most significant witness as far as

22         the police department is concerned in this

23         case and I shouldn't have my hands tied in

24         being able to fully examine him.

25              The ability to examine beyond seven
```

```
 1                  GLENN GODINO                218

 2          hours is always subject to either an agreement

 3          or getting the magistrate.  I think under the

 4          circumstances of this case I have no doubt

 5          that the magistrate is going to say we're

 6          entitled to more.

 7              MR. THADANI:  What is your expectation

 8          with respect to how much longer you think

 9          you'll need to completely finish this witness?

10              MR. GROSS:  I don't know.

11              MR. THADANI:  Do you think it's gonna

12          take more than another full day?

13              MR. GROSS:  No, I'll finish him in one

14          day.

15              MR. THADANI:  Defendants' position is on

16          the record, but we'll have a discussion about

17          this further.

18              MR. GROSS:  Okay.  That's fine.

19              MR. THADANI:  The deposition is being

20          kept open, obviously.

21              MR. GROSS:  Yes.

22              We left the other issue open, which

23          still has to be addressed, which is the letter

24          application we made with regard to the --

25              MR. THADANI:  That will be addressed by
```

1                        GLENN GODINO                    219

2            the filings, so understood.

3                    MR. GROSS:  Right.  Okay.

4                    Thank you.

5                    (Whereupon, the within examination was

6            adjourned at 5:15 P.M.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                                                    220

2                    A C K N O W L E D G M E N T

3

4    STATE OF NEW YORK      )

5                          :      SS:

6    COUNTY OF             )

7

8            I, GLENN GODINO, hereby certify that I have

9    read the transcript of my testimony taken under oath in

10   my deposition of April 11, 2016; that the transcript is a

11   true, complete and correct record of what was asked,

12   answered and said during this deposition, and that the

13   answers on the record as given by me are true and

14   correct.

15

16

17                              _____

                                        GLENN GODINO
18

19

20   Subscribed and sworn to

21   before me this _____ day

22   of _____, 2016

23

24   _____
              NOTARY PUBLIC
25

```
 1                                                    221
 2                      I N D E X
 3
 4   WITNESS             EXAMINATION BY          PAGE
 5   Glenn Godino          Mr. Gross           113 - 215
 6
 7                        EXHIBITS
 8   PLAINTIFF'S                                 PAGE
 9      1               Steno book              132
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1                                                              222

2                        C E R T I F I C A T E

3

4    STATE OF NEW YORK          )
                               :      SS:
5    COUNTY OF NASSAU           )

6

7        I, ANDREA BLOECKER, a Shorthand Reporter and Notary

8    Public within and for the State of New York, do hereby

9    certify:

10       That GLENN GODINO, the witness whose deposition is

11   hereinbefore set forth, was duly sworn by me, and that

12   such deposition is a true record of the testimony given

13   by such witness.

14       I further certify that I am not related to any of

15   the parties to this action by blood or marriage, and that

16   I am in no way interested in the outcome of this matter.

17       IN WITNESS WHEREOF, I have hereunto set my hand this

18   15th day of April, 2016.

19

20

21                          _____
                                   ANDREA BLOECKER
22

23

24

25