UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ x

KENNETH CREIGHTON,

                                 Plaintiff,

           -against-

THE CITY OF NEW YORK, DETECTIVE DEAN
ROBERTS (Shield No. 05861), DETECTIVE GLENN
GODINO (Shield No. 2756), POLICE OFFICERS JOHN
DOES 1-10 (names being fictitious and presently unknown
and intended to be employees of the NYPD who were
involved in Plaintiff's arrest, detention, imprisonment,
and/or prosecution), DISTRICT ATTORNEY ROBERT T.
JOHNSON, ASSISTANT DISTRICT ATTORNEY
BRUCE BIRNS A/K/A BURNS, ASSISTANT DISTRICT
ATTORNEY ED TALTY a/k/a ED TULTY and
ASSISTANT DISTRICT ATTORNEY MICHAEL
COOPER,

                                 Defendants.

------------------------------------------------------------------------ x

**PLAINTIFF RESPONSE
TO DEFENDANTS'
RULE 56.1 STATEMENT**
12 CV 7454 (PGG)

         Plaintiff Kenneth Creighton, by his attorneys, Rubert & Gross, P.C. and Pazer, Epstein &

Jaffe, P.C., responds to defendants' Local Rule 56.1 Statement as follows:

Plaintiff, KENNETH CREIGHTON, by his attorneys, PAZER, EPSTEIN & JAFFE, P.C, and RUBERT

& GROSS, P.C.  hereby sets forth his objections and responses to the Statement of Material Facts

pursuant to Local Rule56.1, dated June 27, 2016, by defendants, City of New York ("City"), Glenn

Godino ("Godino"), Dean Roberts ("Roberts"), Bruce Birns ("Birns") and Ed Talty (First Cause

of Action).

GENERAL RESPONSES

1.   Defendants' Rule 56.1 Statement of Material Facts contains supposed "facts" that are either: (1) not

supported by admissible evidence; (2) not "facts" at all, but rather mere legal conclusions; (3)

"supported" by citations to the record that do not support the alleged "fact" and/or (4) completely immaterial to the issues in this case.

2. The term, "immaterial" is defined as: tending to prove some fact that is not properly at issue.

3. The term, DKI, is defined as: deny upon information and belief facts that are not capable of independent verification by Kenneth Creighton.

4. Plaintiff objects to the extent that the supposed "facts" are overbroad, non-descriptive and confusing.

5. Plaintiff objects to the extent that the "factual" assertions are not set forth in individually numbered paragraphs, but instead are compound. Individual Rules of Practice of United States District Court Judge Paul G. Gardephe,4(A).

## SPECIFIC RESPONSES

The numbered paragraphs below correspond to the numbered paragraphs set forth in Defendants' Statement of Material Facts submitted in connection with plaintiff's motion for summary judgment , dated June 27, 2016. Notwithstanding the general objections set forth above, plaintiff:

1. Admits that on December 26, 2006, at approximately 5:50 p.m., in the vicinity of 810 East168th Street and Union Avenue, Bronx, New York, a shooting took place outside of a bodega.

2. Admits that John Caldwell sustained a gunshot wound to his head and died as a result.

3. Admits that Lisette Ayala sustained a gunshot wound to her left leg calf area.

4. Denies to the extent that the word "shortly" is a characterization, not a fact. Godino does not know when he met with the confidential informant (CI). Plaintiff's Response below (Plaintiff's Response) ¶¶ 104-108. Plaintiff objects to the characterization of a paid confidential informant with a history of drug abuse

2

as a "Grand Jury Witness". Notwithstanding the foregoing, plaintiff admits that
Godino claims he met with the CI before plaintiff's arrest.

5.   Denies the characterization of "reliable and credible" with respect to any
purported information previously provided by the CI. Plaintiff objects to the
characterization of a paid confidential informant with a history of drug abuse as a
"Grand Jury Witness". Notwithstanding the foregoing, plaintiff admits that
Godino testified that he had previously received information from the CI, whose
name he never learned, that resulted in an arrest and guilty plea concerning a prior
shooting.  *Plaintiff's response* ¶ Godino had never handled any CI, let alone this
particular one. *Plaintiff's Response.* ¶254. Godino never learned the name of the
CI.  *Plaintiff's Response ¶¶ 109-110.* Godino claims he knew only of one instance
where the CI allegedly provided information that led to an arrest but in that
instance, the CI was not a witness but instead told Godino "who he thought the
perp was".  *Plaintiff's Response* ¶ 251. Godino never reviewed the CI's file to
ascertain his history as a CI; he never checked the CI's criminal record and did
not see the CI on the surveillance video recovered from the bodega.  *Plaintiff's
Response ¶ 111.* Godino did not know that the CI had a drug problem although
the CI's handler was aware of the problem.  *Plaintiff's Response ¶ 252-253.* The
CI had an extensive criminal history and was a drug addict who was actually
doing drugs at the time he claims to have seen K. Creighton pass the gun to Dior.
Plaintiff's Response ¶ *246, 249.*

6.   Denies that the CI told Godino that, just prior to the shooting, he saw plaintiff
Kenneth Creighton hand a firearm to plaintiff's brother, Dior Creighton, inside of

a bodega. Plaintiff objects to the characterization of a paid confidential informant with a history of drug abuse as a "Grand Jury Witness". Notwithstanding the foregoing, plaintiff admits that Godino testified that the CI made such a statement. The evidenced strongly suggests that it was Godino who fed the information to the CI. Statement.  Plaintiff's Response ¶ *250*.

7. Denies that the CI told Godino that he saw Dior Creighton use that firearm in a shooting outside of the bodega. Plaintiff objects to the characterization of a paid confidential informant with a history of drug abuse as a "Grand Jury Witness". Notwithstanding the CI's denial that he saw Dior use the firearm, plaintiff admits that Godino testified that the CI told him he saw Dior use the firearm. The CI testified that he did not see Dior use the firearm. There is evidence by which the jury could reasonably conclude that defendant Godino prompted/coached the CI's testimony.

8. DKI the truthfulness of this assertion inasmuch as plaintiff cannot admit or deny that Godino entered into the spiral notebook everything the CI allegedly told him. Plaintiff objects to the characterization of a paid confidential informant with a history of drug abuse as a "Grand Jury Witness".  Notwithstanding the foregoing, plaintiff admits that Godino wrote down some of what he claims the CI told him in an undated entry in his spiral notebook and nowhere else. *Plaintiff's Response ¶ 118, 120, 141.*

9. Admits that Det. Godino wrote in his notebook, inter alia, that "Dior . . . comes back with a black hoody. Kenny had a white and burgundy shirt. Dior and Ken went into the store. The CI was by the plastic door that goes behind the counter

4

getting his scratch off tickets. Kenny passed the gun to Dior inside the store. . . .
Dior was shooting from behind a car just inside the street." The CI, however,
testified that he was in the back of the store. *Plaintiff's Response ¶ 257.*

10. Admits that during the police investigation, Det. Godino came into possession of
a surveillance videotape from the bodega.

11. Admits that Det. Godino was not able to identify the person who passed the gun
to Dior Creighton by viewing the surveillance videotape.

12. Denies that Det. Godino reviewed the surveillance videotape with the CI and the
CI told Det. Godino where he was standing when he witnessed plaintiff hand the
firearm to plaintiff's brother, Dior Creighton. Plaintiff objects to the
characterization of a paid confidential informant with a history of drug abuse as a
"Grand Jury Witness."  Notwithstanding the foregoing, plaintiff admits that
Godino testified that the CI told him that he was standing by the plastic door that
goes behind the counter when he saw the gun passed. *Plaintiff's Response, ¶ 258.*
At his deposition, the CI testified that he was in the back of the store buying and
doing drugs when the gun was passed. *Plaintiff's Response, ¶ 257.*  During his
deposition, the CI identified Kijafa Spruell without prompting and without
hesitation as the person who passed the gun. *Exh. U, p. 141, ll. 17-24.*

13. Denies that based on his review of the surveillance videotape and the information
provided by the CI, Det. Godino believed that the CI had an opportunity to see
plaintiff handing the firearm to plaintiff's brother, Dior Creighton.  Godino's
belief is not a fact and the statement is conclusory at best. The CI was not
identified on the surveillance video. *Plaintiff's Response ¶ 140.*

14. Admits that Det. Godino informed Assistant District Attorney Bruce Birns ("A.D.A. Birns") about what the CI had told him regarding what he witnessed on December 26, 2006.

15. Denies that Det. Godino also provided the New York City Police Department files regarding the criminal investigation to A.D.A. Birns. Godino testified that when he reviewed the file in the District Attorney's office, "a lot of DD5s" and an identification photo that had been in the file were missing from the file. *Godino deposition, p.* 96. Godino does not know if, when he transferred the original file to the DA's office, the missing DD5s and identification photo were in the folder at that time.

16. Denies to the extent that the word "shortly" is a characterization, not a fact. Disputed.  Plaintiff objects to the characterization of a paid confidential informant with a history of drug abuse as a "Grand Jury Witness. Notwithstanding the foregoing, plaintiff admits that A.D.A. Birns met with the CI.

17. Admits that there was a general practice within the Bronx District Attorney's Office which required that a district attorney authorize any arrests associated with a homicide investigation.

18. Denies that A.D.A. Birns made an assessment of the CI's credibility and determined that he was credible. Plaintiff objects to the characterization of a paid confidential informant with a history of drug abuse as a "Grand Jury Witness." Notwithstanding the foregoing, plaintiff admits that A.D.A. Birns testified he interviewed the CI. The CI's credibility is not a statement of fact and attempts to usurp the function of the jury.  The CI testified under a false name and was paid

for his grand jury testimony. *Plaintiff's Response ¶ 244.* Defendant Godino

withheld from the D.A., the Grand Jury ad the Court exculpatory information by

not providing it to the DA.

19. Plaintiff denies that based upon the information provided by the CI, A.D.A. Birns

believed there was probable cause to arrest plaintiff. Plaintiff objects to the

characterization of a paid confidential informant with a history of drug abuse as a

"Grand Jury Witness. ADA Birns testified he would not have authorized

plaintiff's arrest if he had been told about Terab's identification of Kijafa Spruell

as the perpetrator. *Plaintiff's Response ¶ 183.*

20. Admits that A.D.A. Birns and Assistant District Attorney Ed Talty authorized

plaintiff's arrest.

21. Admits that on January 10, 2007, at approximately 4:50 p.m., plaintiff was

arrested and charged with Criminal Facilitation in the Second Degree, Criminal

Possession of a Weapon in the Second Degree, and Criminal Possession of a

Weapon in the Third Degree.

22. Admits that the "Details" Section of the Arrest Report reads, in part, that "[a]t

t/p/o Deft, [sic] did hand a loaded firearm to an unapprehended subject who then

used the firearm which resulted in the fatal shooting of C/V #1 as well as the non-

fatal shooting of C/V #2.

23. Admits that Detective Dean Roberts was the arresting officer.

24. Admits that on January 10, 2007, at approximately 9:00 p.m., the criminal

complaint, in which plaintiff was charged with Criminal Possession of a Weapon

in the Second Degree, Criminal Facilitation in the Second Degree, and Criminal

Possession of a Weapon in the Third Degree, was signed.

25. The Criminal Complaint states, in part, that:

> [B]ased upon official investigation, and witnesses known to the Police Department, that, at the above time and place, inside a bodega, defendant and a separately unapprehended individual engaged in a brief conversation, after which defendant passed a shiny metallic object to the separately unapprehended individual. Deponent further states that immediately afterwards, the separately unapprehended individual and defendant went outside the above location. Deponent further states he is informed by Lisette Ayala that informant was standing outside the above location at the above time, and informant observed the above-described separately unapprehended individual pointing a metallic object in both her direction and in the direction of John Caldwell, and then heard several noises and observed several flashes coming from the above-mentioned object, and then immediately felt a sharp pain on her left calf. Deponent is further informed that informant then observed her left leg to be bleeding severely. Deponent further states that, based upon official police investigation and witnesses known to the police department, also at the above time and place, John Caldwell was struck on the side of his head by one of the above-mentioned shots, causing his death. (*Id.*)

26. Plaintiff admits that prior to plaintiff's arraignment on January 11, 2007, the

Criminal Justice Agency did not recommend plaintiff for "ROR," or release on

his own recognizance, and classified plaintiff as a "HIGH RISK FOR FTA," or

failure to appear. Had false evidence not been presented by defendant Godino and

had Godino provided the District Attorney's Office with exculpatory evidence,

plaintiff would not have been arrested and no CJA report, based on false

evidence, would have issued.

27. Plaintiff denies that the Criminal Justice Agency is an agency which makes

recommendations to the court regarding bail. The Criminal Justice Agency makes

"release" recommendations, not bail recommendations.  The CJA "interviews

virtually all defendants in NYC that are held for arraignment in police detention, to determine their ties to the community. CJA attempts to verify the information provided during the interview then makes a release recommendation to the Court assessing the likelihood of continued appearance in court if the defendant is released in lieu of money bail." See "Services: Operation's Pretrial Services and Special Programs" at  http://www.nycja.org/operations-pretrial-services-and-special-programs/

28. Admits that bail was set at $10,000.

*29.* Admits that on January 16, 2007, the CI testified before the Grand Jury. Plaintiff objects to the characterization of a paid confidential informant with a history of drug abuse as a "Grand Jury Witness."  He testified under a false name and was paid for his testimony. *Plaintiff's Response ¶ 244.*

30. Admits that the CI testified, inter alia, that he "walked into the store to buy my scratch off. And as I was going into the store Kenny was passing something. He was passing a gun to Dior," but denies the truth of the matter asserted.  The CI also claims that he was in the back of the store buying drugs when he saw Ken Creighton passing a gun to Dior. .

31. Admits that the CI also testified that "Dior went outside the store" and he "just pulled out and started shooting."  Plaintiff objects to the characterization of a paid confidential informant with a history of drug abuse as a "Grand Jury Witness," but admits that the CI gave this testimony at the grand jury but denies the truth of the matter asserted.  The CI also claims that he did not see actually the shooting **(quote EBT).**

32. Admits that the CI also testified that he knew plaintiff personally and objects to the characterization of a paid confidential informant with a history of drug abuse as a "Grand Jury Witness."

33. Admits that on January 23, 2007, plaintiff was indicted by the Grand Jury for two counts of Criminal Possession of a Weapon in the Second Degree and one count of Criminal Facilitation in the Second Degree.

34. Admits that on or about February 1, 2007, plaintiff was charged with violating the terms of his probation and a probation hold took effect against plaintiff.  The Department of Probation issued two specifications, Def. Exh N, the first restated the weapons charge based on the December 26, 2006 incident, and the second was based on a June 28, 2006 arrest and resulting July 17, 2006 conviction for Harassment in the Second Degree for which he received a conditional discharge. Id.

35. Admits that on November 21, 2005, plaintiff was sentenced to five years' probation to expire on November 20, 2010 as a result of a conviction for Attempted Robbery in the Second Degree, and objects to this as immaterial.  Mr. Creighton was subject to supervision by probation from November 21, 2005 to November 20, 2010.  Def. Exh. O: Conditions of Probation.  Even had probation proceeded against Mr. Creighton without the January 2007 arrest and subsequent imprisonment to January 2012, the maximum plaintiff could have been jailed under the terms of probation was until late November 2010, about fourteen months before the January 2012 dismissal of the weapons charges.

36. Admits that on December 28, 2006, two days after the shooting and nearly two

weeks before his arrest on January 10, 2007, Probation Officer Benitez tol Mr.

Creighton that "he will be filing" a Violation of Probation ("VOP") against him as

a result of three arrests while on probation, but objects to this as immaterial.  On

July 18, 2006, plaintiff reported his June 28, 2006 arrest and guilty plea. Def. Exh.

P. at NYC235.  On July 28, 2006, an administrative hearing was held addressing

non-compliance, Id at NYC 233-234 (noting May 31, 2006 undocketed arrest).

Plaintiff was arrested on pled guilty on December 15, 2006 to marijuama

possession. Id. at NYC231 (December 22, 2006 Notes).   The Probation Officer,

on January 16, 2007, and only after Mr. Creighton's arrest, noted that a probation

petition would be filed. Id. at NYC229.  Plaintiff also disputes defendants'

Statement 36 insofar as it suggests or infers that, absent the weapons charges,

there would have a been a probation petition filed and, had there been, whether

Mr. Creighton would have been remanded, or that plaintiff would have been jailed

for violation of probation let alone jailed until January 19, 2012, about fourteen

months after the expiration of plaintiff's supervised probation.

37. Plaintiff admits the probation proceeding" essentially" tracked the prosecution. Pl.

Exh. Q: Raskin Dep. p.74 l.22; Def. Exh. P: Probation Records, NYC221-237

(143 entries from November 21, 2005 through January 19, 2012).  The probation

matter is immaterial to the issues in this case and relates at most to damages and

not liability.

38. Plaintiff admits that bail was not set on the probation proceeding and that he was

"remanded [on the probation petition] … pending resolution of the petition. He

was remanded, which is the standard practice." Pl. Exh. Q: Raskin Dep. p.74 ll.13-14.   The probation matter is immaterial to the issues in this case and relates at most to damages and not liability.   Moreover, it is speculation whether, absent the arrest and prosecution for weapons charges, there would have a been a probation petition filed and, even had there been, whether Mr. Creighton would have been remanded, the results of any bail hearing, what conditions would have been set for his release during the pendency of the probation matter, and what the disposition of the petition would have been without the weapons charges.

39. Plaintiff disputes whether, had he posted bail on the weapons charges, he would have remained incarcerated as a result of the VOP and resulting probation hold and objects that the probation matter is immaterial to the issues in this case and relates at most to damages and not liability.   It is speculation whether, absent the arrest and prosecution for weapons charges, there would have a been a probation petition filed and, even had there been, whether Mr. Creighton would have been remanded, the result of any bail hearing, what conditions would have been set for his release during the pendency of the probation matter, and what the disposition of the petition would have been without the weapons charges.

40. Plaintiff admits that on May 10, 2007, he made a motion to, *inter alia*, inspect the Grand Jury minutes and to dismiss the indictment and objects to this as immaterial.

41. Plaintiff admits that on October 23, 2007, criminal court judge Troy Webber granted plaintiff's motion for an order granting inspection of the Grand Jury minutes insofar as Judge Webber inspected the grand jury minutes and not that he

permitted plaintiff's defense counsel to inspect.  Plaintiff notes that this is
immaterial to the issues in this case.

42. Admits that Judge Webber ruled that "[u]pon inspection of the Grand Jury
minutes, [plaintiff's] motion to dismiss and reduce the charges in the indictment is
denied," but objects to this as immaterial to the issues in this case and, further,
that defendant Godino withheld from the District Attorney's Office exculpatory
information which was required to be presented to the grand jury.

43. Admits that Judge Webber found that "[t]he evidence presented to the Grand Jury
established a *prima facie* case of the [plaintiff's] commission of the charges
contained in the indictment. Additionally, the instructions on the law were
adequate and complete. It is not necessary to release the minutes or any portion
thereof to the [plaintiff's] attorney to assist the court in making the determination,
objects to this as immaterial and, further, that Judge Webber's findings were
based on CI having lied about his identity, no proof presented to the grand jury
about the witness being a CI, and defendant Godino withheld from the District
Attorney's Office exculpatory information which was required to be presented to
the grand jury, such as Terab's statements inculpating Spruell. **CITE.**

44. Admits that on May 12, 2008, Birns served plaintiff a Motion to Consolidate
Indictment Nos. 626/2007 (Dior Creighton) and 639/2007 (plaintiff), but objects
to this as immaterial.

45. Admits that on August 7, 2008, criminal court judge Troy Webber held the
motion to consolidate in abeyance pending resolution of all pre-trial hearings, but

objects to this as immaterial.  Plaintiff notes that no pretrial hearings were held

before the case was dismissed prior to that event.

46. Admits that at some unknown time during the pendency of the criminal case,

plaintiff was in possession of documents produced by the District Attorney's

Office during discovery, including a signed statement by another witness, in

which he states that he observed an individual other than plaintiff hand a firearm

to Dior Creighton, and a signed photo array, in which this witness identifies that

other individual and objects to this as immaterial.

47. Deny knowledge or information sufficient to form a belief as to the truth of the

assertion that plaintiff's criminal defense attorney made any motions or

applications following the receipt of these documents and notes that this is

immaterial to the issues in this case.  Defense counsel did not know when he

received documents **CITE** and, therefore, it cannot be determined whether or not

motions or applications were made subsequent thereto

48. Admits that at some time prior to December 2010, plaintiff's defense counsel but

not plaintiff was in possession of the surveillance videotape taken from the

bodega. Defendants do not specify when Mr. Creighton received the video, and it

is immaterial to the issues in this case.   Plaintiff denies insofar as this suggests

that Mr. Creighton had a copy of the tape during the pendency of the criminal

prosecution.

49. Admits that on January 3, 2012, plaintiff's brother, Dior Creighton pled guilty to

Attempted Murder in the Second Degree. He was sentenced to fourteen years in

prison, and objects to this as immaterial.

14

50. Admits that on January 18, 2012, Assistant District Attorney Theresa Gottlieb
filed a Recommendation for Dismissal with the criminal court.

51. Admits that Ms. Gottlieb asserted as the basis for the dismissal recommendation
that she was unable to locate the Grand Jury Witness and, as a result, would not
be able to proceed to trial but denies the truth of that assertion.  The CI was living
on Gun Hill Road in the Bronx at the time and was in contact with and available
to his handler, Detective Elliot. Exh. U at p. 204 l.8-p.205 l.3.  The CI was not
"unavailable;" he had told Detective Elliot that he would not come into court to
testify. Exh. U, p.149 l.15-p.151 l.19; p.204 ll.8-16.

52. Admits that the Recommendation for Dismissal states, *inter alia*, that "Kenneth
Creighton was arrested and charged based upon the statements of a single
eyewitness. This eyewitness knows Kenneth Creighton and saw him hand Dior
Creighton a handgun inside the bodega. This witness has now become unavailable
to the Bronx District Attorney's Office. The witness could not be located by the
case Detective at any of the telephone numbers or addresses provided. Further
efforts to locate this witness by the Detective Investigator have been
unsuccessful," but denies the truth of that assertion.  The CI was living on Gun
Hill Road in the Bronx at the time and was in contact with and available to his
handler, Detective Elliot. Exh. U at p. 204 l.8-p.205 l.3.  The CI was not
"unavailable;" he had told Detective Elliot that he would not come into court to
testify. Exh. U, p.149 l.15-p.151 l.19; p.204 ll.8-16.

53. Admits that on January 19, 2012 criminal court judge Efrain Alvarado dismissed
the indictment against plaintiff on the grounds that "the People do not have the

15

cooperation of a necessary eyewitness to this matter. They would not be able to go forward," but asserts that The CI was living on Gun Hill Road in the Bronx at the time and was in contact with and available to his handler, Detective Elliot. Exh. U at p. 204 l.8-p.205 l.3.  The CI was not "unavailable;" he had told Detective Elliot that he would not come into court to testify. Exh. U, p.149 l.15-p.151 l.19; p.204 ll.8-16.

54. Admits that on January 19, 2012, plaintiff pled guilty to violating the terms of his probation insofar as Mr. Creighton admitted to specification 2, that he was arrested on June 28, 2006 and pled guilty to Harassment in the Second Degree on July 17, 2006.  Specification 1, relating to the claim that he possessed and passed a weapon on December 26, 2006, was dismissed.  See Def. Exh. Z.

55. Admits that plaintiff violated the terms of his probation because he was arrested on June 28, 2006 and pled guilty to Harassment in the Second Degree on July 17, 2006.

56. Admits that Judge Alvarado accepted plaintiff's guilty plea and terminated plaintiff's violation of probation unfavorably but notes that "unfavorable" is a conclusion of law not of fact.  The Judge stated that "[w]ith respect to the violation of probation, it is my intent to declare you guilty of the violation of probation, in *view of the fact that you have spent the last five years in jail*, and to terminate your probation unfavorably," Def. Exh. Z at p.5 ll.15-19 (emphasis supplied), and that "*[i]n view of the fact that he has spent five years in jail on 626 of 07* which has just been dismissed, and is now sealed, probation is terminated

unfavorably with no further negative implications."  Def. Exh. Z at p.6 l.25- p.7

l.3 (emphasis supplied).

57. Denies that plaintiff was sentenced to time served. Nowhere in the transcript of

the January 19, 2012 Court proceeding does the judge indicate that plaintiff was

sentenced to any time for the probation violation. Def. Exh. Z.

### PLAINTIFF'S ASSERTIONS OF FACTS IN RESPONSE TO DEFENDANTS STATEMENT PURSUANT TO LOCAL RULE 56.1

Plaintiff respectfully requests that this document be read in conjunction with, and in

addition to Plaintiff's. R. 56.1 Statement submitted with his motion for summary

judgment and Exhibits dated June 27, 2016.

58. Detectives from the 42nd detective squad, including Detective Glenn Godino ("Godino"),

the lead detective, responded to the scene within an hour of the shooting. Exh. K, p.357

LL. 3-5.

59. Fawaz Terab ("Terab"), was the owner of a bodega known "Prospect Mini Mart" located

820 East 168th Street, Bronx, near the area where the shooting took place. Exh. II: Fawaz

Terab sworn statement dated February 21, 2013.

60. Terab was in the bodega at the time the gun was passed to Dior.  Exh. O: Terab

Deposition, p. 9 L. 3-10.

61. Prior to December 26, 2006, Terab knew Dior. Exh. O, p.7 L.23; p.8 L.7.

62. Prior to December 26, 2006, Terab knew plaintiff, Creighton. Exh. O, p.8 L8-L16.

63. Prior to December 26, 2006, Terab knew a man by the name of Kijafa Spruell

("Spruell"). Exh. O. p.8 L8-L16.

64. Terab often saw Spruell and Dior together in the bodega. Exh. K, p.152 LL.17-25; p.153

17

L.6-17.

65. There was a surveillance DVR camera in the bodega at the time a gun was passed to. Exh. O, p.13 L.20-24.

66. After the shooting, Terab reviewed surveillance video taken at the time of the passing of the gun in the bodega. Exh. O, p.19 LL.16-18.

67. On or about December 27, 2006, the surveillance video was extracted from the DVR located in the bodega and given one of the investigating detectives conducting the investigation. Exh. K, p. 52 LL.18-24; p.103 LL. 12-17; p.141 LL.4-9; Exh. O, p.31 LL.15-16.

68. Godino reviewed the surveillance video before December 31, 2006. Exh. K, p.103 LL.12-23.

69. Godino did not find any inaccuracies when comparing Terab's stated observations to the surveillance video. Exh. K, p.151 LL.6-12.

70. Godino did not request to have the video or photographs enhanced to make a positive identification of who was passing the gun. Exh. K, p.406 L.4-10.

71. The original video surveillance disappeared after it was turned over to the District Attorney's Office. Exh. K, p.338 LL.6-15; p.337-338, p.343 L.3 - l.6; p.344- p.345.

72. The original surveillance tape was never returned to the police by the district Attorney's office. Exh. K, p.345 LL.13-20.

73. Godino reviewed the original surveillance video with defendant, ADA Bruce Birns ("Birns") but he does not remember when they did so. Exh. K, Godino p.373 LL.2- 15; p.373 LL.2-24.

74. Still photographs were made from the videotape. Exh. K, p.403 L.25 - p.404 L.18.

75. On December 31, 2006, Godino interviewed Terab at the 42nd precinct. Exh. O, p. 141 L.10 -13.

76. On December 31, 2006, merely five days following the shooting, Terab identified Spruell as the person he observed passing the gun to Dior in the bodega on December 26, 2006. Exh. K p.140 LL.10-22; Exhibit G.

77. On December 31, 2006, Terab provided a sworn statement to Godino identifying Spruell as the person who passed a gun to Dior at the bodega on December 26, 2006. Exh. G, Exh. K, p.140 LL.9-13; Exh. G.

78. Terab also identified Spruell from a photo array as the person who passed the gun to Dior in the bodega on December 26, 2006. Exh. Z, Photographic Lineup NYC004747.

79. Terab identified Dior in a photo array as the person who received the gun in the bodega on December 26, 2006.  Exh. AA, Photographic Lineup NYC004590

80. Terab gave Godino Spruell and Dior's names so he could pull their mugshots for a photo array. Exh. K, p.434-435.

81. On December 31, 2006, Godino concluded that Terab had no doubt about who passed the gun and had given specific information about what he had directly observed. Exh. K, p.392 L.24 - p.393 L.12.

82. As of December 31, 2006, Dior was a suspect in the shooting. Exh. K, p.399 LL.8 - 22.

83. As of December 31, 2006 no one had implicated Creighton in any criminal activity in connection with the shooting. Exh. K, p.399 LL.8-22.

84. On December 31, 2006, based on Terab's signed statement and identification of Spruell as the person who passed the gun to Dior, there was probable cause to arrest Spruell. Exh. K, p.153 LL.18-25.

85. Terab testified during his deposition in this case that Spruell, not Creighton, passed the gun to Dior. Exh. O, p.43 LL.11-16.

86. Viewing the surveillance video during his deposition in this case, Terab identified Spruell as the one who passed the gun. Exh. O, p.43 LL.11-16.

87. On January 2, 2007 a computer search was run on Spruell. Exh. BB, Booking Arraignment Disposition Inquiry System NYC004761 - NYC004763 (Spruell Records).

88. On January 2, 2007 when the computer search was run, Spruell was the only person who had been identified as having passed the gun to Dior. Exh. K, p.395 L.8 - p.396 L.15.

89. An investigation card known as an I-card issued by the police to pick up a suspect for questioning was never issue for Spruell. Exh. K, p.397 LL.8-20.

90. No attempt was ever made to locate or question Spruell despite Terab's sworn statement that Spruell had passed the gun used in a homicide. Exh. K, p.398 LL.6-20.

91. Godino recognized Dior as the person who received the gun in the bodega from the surveillance video. Exh. K, p.137 LL.3-10; p.251 L.3-13.

92. Godino could not recognize the person who passed the gun in the bodega from the surveillance video. Exh. K, p.137 LL.3-19.

93. The person who passed the gun was wearing a white and dark colored horizontally striped shirt. Exh. K, Godino pp.251-252; Exh. CC, Surveillance DVD.

94. The surveillance video Godino reviewed during the investigation has been edited and altered and the original is irretrievably lost. Exh. K: p.334-335; Exh. K, p.340 L.24 – p.341 l.4

95. The original surveillance video was never vouchered with the property clerk which was the customary practice for chain of custody purposes. Exh. K, p.336 LL.9-20; p.336-337.

96. Terab identified Spruell and Dior from photo arrays as the ones who passed and received the gun in the bodega respectively. Exh. K, Godino p.434-435.

97. Terab gave Godino Spruell and Dior's names so he could pull their mugshots for a photo array. Exh. K, p.434-435.

98. On December 31, 2006, based on the information Godino obtained from Terab, Godino had probable cause to charge Spruell with having passed the gun. Exh. K, p.153 LL.18-25.

99. Godino believed that Terab's identification of Dior Creighton as the one who received the gun in the bodega put Terab at risk. Exh. K, p.391 LL.9-17.

100.    After Terab identified Spruell on December 31, 2007 as the person one who passed the gun, Godino claims that a confidential informant (CI) stated to him that Ken Creighton had passed the gun Exh. K, p.155; p.370 LL.4-9.

101.    Defendants' Response to Plaintiff's First Set of Interrogatories, Interrogatory #9, which sought the identity of all persons in the bodega at the time the gun was passed, stated that "plaintiff Kenneth Creighton, Dior Creighton, and Fawaz Terab were present in the bodega at or about the time that K. Creighton is alleged to have passed a firearm to D. Creighton". Exh. PP.

102.     A couple of weeks after the shooting, the CI heard that Kijafa (Spruell) had said he was the one who passed the gun in the store. Exh. U, p.205 l.24 - p.206 l.6

103.     Godino learned of the existence of the CI through a phone call from the CI's handler, Detective Elliott. Exh. K, p.482 LL.16 - L.25.

104.     Godino does not know how long after he received the phone call from the CI's handler he met with CI. Exh. K: Godino p.482 LL.6 -25.

105.     Godino met with the CI for the first time at some unknown date at the precinct. Exh. K, p.262-263.

106.     Godino met with the CI at the precinct in the presence of his handler. Exh. K, p. 479-482.

107.     Godino first met with the (CI) after he had interviewed Terab. Exh. K, p.146 LL.1-11.

108.     Godino met with the CI and ADA Birns after Godino's first meeting with the CI at the precinct. Exh. K, p.262-263.

109.     Godino never learned the CIs name. Exh. K, p.202 LL.2-6.

110.     Godino never attempted to learn the CI's name. Exh. K, p.483-486.

111.     Godino never investigated the CIs criminal history of arrests or convictions. Exh. K, p.483-486.

112.     Godino never investigated or inquired about the CIs previous reliability. Exh. K, p.483-486.

113.     Godino never investigated whether the CI was being paid on this case. Exh. K, p.483- 486.

22

114.     Godino never investigated what connection existed between the CI and Ken Creighton. Exh. K, p.483-486.

115.     Godino never attempted to determine if there was any animosity or ill feelings between CI either of Creighton brothers. Exh. K. p.488 L.4-L.21.

116.     The only information Godino had about the CI came from the handler who informed him that the CI was an informant in narcotics cases. Exh. K, p.488-489.

117.     None of the official police records prepared in connection with the investigation of the shooting state that anyone other than Spruell was identified as having passed the gun to Dior in the bodega.  Exh. K, p.431 L7-15.

118.     The only reference to a CI having been involved in the identification of Creighton as the person who passed the gun appears in an undated entry in a spiral notebook belonging to Godino. Exhibit K, p.431 LL.7-15; Exh J.

119.     Godino has no recollection of when the interview of CI referred to in the notes in his spiral notebook was conducted. Exh. K, p.229 L.23 - p. 230 L. 7.

120.     Godino's spiral notebook entry concerning the existence of a CI is undated. Exh. K, p.229-230.

121.     Godino does not know the date he made the entry concerning the CI in his spiral notebook. Exh. K, p.229-230.

122.     Godino generally dates entries into his spiral notebook but did not date the entry concerning the CI. Exh. K, p. 51 L.24-p.51 L.23; 241 LL.12-15.

123.     Godino did not create a DD 5 memorializing the interview with the CI without identifying him by name. Exh. K, p.231 L.2 - L.17; p.244 L.4 - L.13.

124.     Godino saw a photo that has been lost where the CI made an identification of

somebody. Exh. K, p.232 L.23 - p.233 L.18; p.232 L.6 - L.22

125.     The records in the case folder were inconsistent with the CIs information about

who passed the gun. Exh. K, p.235 l.24 - p.236 l.6

126.     The CI identified someone named Quan as a witness. Exh. K, p.239 L.9 - L.16;

Exh. J.

127.     Godino does not remember if anything was done to find Quan beyond finding out

his real name. Exh. K, p.239 L.9 - L.16.

128.     It would have been good practice to find an interview Quan but it was not done.

Exh. K, p.240 l.2 - L.14.

129.     Prior to taking the CI's statement Godino had reviewed the surveillance video.

Exh. K, p.248 l.20-l.25.

130.     DD 5, also known as Complaint Follow-Up Report, were customarily

chronologically numbered. Exh. K, p.38 ll.3-17.

131.     The DD 5s in this case were not numbered and should have been. Exh. K, p.99

l.19 – p.100 l.4; p.38 ll.6-7.

132.     An index sheet that is customarily created that indicates the records created in the

case file was not prepared in this case. Exh. K, p.38 ll.3-5

133.     The original case file was delivered to defendant Birns by Godino and was never

returned to the NYPD during the pendency of the prosecution. Exh. M, p. 110 ll.15-24;

Exh. K, p.44 l.24-p.45 l.4.

134.      Turning over the original case folder to the DA and not having it returned was unusual and a cause for concern. Exh. N, p.28 LL.14-29.

135.      In June 2012 Godino learned that a lot of the DD fives were missing from the file. Exh. K, p.96 LL.2-13.

136.      An unknown amount, up to 30 documents, was missing from the case file when Godino reviewed it at the District Attorney's Office. Exh. K, p.96 LL.18-25.

137.      Prior to Godino interviewing the CI, he had no evidence that anyone other than Spruell passed the gun in the bodega. Exh. K, p.398-399.

138.      Other than the CI, no person was ever located who claims to have witnessed Dior firing a gun on December 26, 2006. Exh. K, p.398 LL.16-20; Exh. M: Birns Deposition Transcript pp. 5-23; p.131 LL.2-21.

139.      Until Godino interviewed the CI, the only information Godino had linking Dior Creighton to the shooting in any respect was Terab's statement that the gun had been passed to Dior in the bodega. Exh. K, p.398 l.21 - p.399 l.7.

140.      The CI is not visible in the surveillance video. Exh. K, p.254-255; Exh. CC.

141.      There is no documentation anywhere in the NYPD file that warranted arresting and charging Kenneth Creighton with criminal facilitation other than the undated spiral notebook entry. Exh. K, p.448 LL.16-22

142.      In homicide-related cases, detectives assigned to the 42nd Precinct Detective Squad in the Bronx conferred regularly with Assistant District Attorneys with regard to when authorizations to arrest would be forthcoming. Exh. K, p.348-349.

143.     Godino conferred only with Birns with regard to this case before plaintiff's arrest. Exh. K, p.351 LL.11-19.

144.     On January 2, 2007, and thereafter canvases were conducted to apprehend Dior Creighton. Exh. CC:  DD 5 P00185, p.1.

145.     On January 4, 32007, defendant, Godino, and PO Brown canvassed the area of 818 Home St and East 168 St for Dior but were met with negative results. Exh. DD: DD5 P00186, p.1.

146.     Starting on January 5, 2007 and on subsequent days a search for Dior Creighton by detectives pursuant to an I-card met with negative results. Exh. EE: LaDuca Deposition Transcript, p.22 L.21- p.23 L.16; p.32 L.20- L.24; pp.37-38.

147.     Other than the CI, no one else claimed to have witnessed Dior discharge a firearm on December 26, 2006.

148.     Other than the CI, no one else claimed to have witnessed K. Creighton pass the gun to his brother on December 26, 2006.

149.     Godino did not create a DD 5 memorializing the interview with the CI without identifying him by name. Exh. K, p.231 L.2 - L.17; p.244 L.4 - L.13.

150.     Godino never knew the CIs name during the pendency of the criminal case. Exh. K, p.231 l.2 - L.17.

151.     Godino saw a photo that has been lost where the CI made an identification of somebody. Exh. K, p.232 L.23 - p.233 L.18; p.232 L.6 - L.22

152.     The records in the case folder were inconsistent with the CIs information about who passed the gun. Exh. K, p.235 l.24 - p.236 l.6

153.    The CI identified someone named Quan as a witness. Exh. K, p.239 L.9 - L.16; Exh. J.

154.    Godino does not remember if anything was done to find Quan beyond finding out his real name. Exh. K, p.239 L.9 - L.16.

155.    It would have been good practice to find an interview Quan but it was not done. Exh. K, p.240 l.2 - L.14.

156.    Prior to taking the CI's statement Godino had reviewed the surveillance video. Exh. K, p.248 l.20-l.25.

157.    On January 8, 2007, a criminal history computer check was run on Kenneth Creighton and a handwritten note was added with the name and phone number of Kenneth's probation officer. Exh. FF:  CRIMS Appearance History- Creighton, Kenneth NYC005509.

158.    A meeting attended by Godino, Birns and the CI took place before the authorization to make the arrest. Exh. K, p.262-263.

159.    In the Bronx all homicide arrests were to be authorized by the Chief of Homicide if he was available. Exh. M, p.25 l.14 - p.26 l.11.

160.    On January 8, 2007 ADA Birns and Talty authorized Godino's arrest of Kenneth Creighton. Exh. GG: DD5 or Complaint-Follow-Up Informational P00024. Exh. N: Talty Deposition Transcript, p.132 LL.17-20.

161.    K. Creighton was arrested on January 10, 2007, after his arrest had been authorized by Edward Talty, Chief of Homicide. Exh. N, p.132 l.17 – p.133 l.20

162.    Talty's practice was to determine if there was probable cause at the time he authorized an arrest. Exh. N, p.134 l.23 -135 l.7

163.    Before authorizing a homicide arrest involving a CI, Talty required talking directly to the CI rather than relying on what the detective tells him. Exh. N, p.136 ll.4 – 19.

164.    Talty never spoke to the CI. Exh. N, p.42 L.2- L17.

165.    Talty considered it important information to have been informed about Terab's identification of Spruell when he was asked to authorize the arrest. Exh. N, p.142 LL.11- 19.

166.    Failure to inform the district attorney that someone other than the person to be arrested has been identified for the same crime constitutes a "real problem". Exh. N, p.142 L.20 – p.143 L.7

167.    Failing to inform the grand jury that Spruell had been identified as someone who passed the gun is a *Brady* violation. Exh. N, p.143 l.8 – p.144 l.5.

168.    The Terab exculpatory evidence should have been turned over to the ADA before he was asked to authorize the arrest. Exh. N, p.147 LL.7 – 25.

169.    Exculpatory evidence that should be turned over to the District Attorney as soon as it becomes clear that it is disclosable. Exh. N, p.147 ll.7- 25.

170.    The exculpatory information provided by Terab should have been disclosed to the defense for the purpose of making a bail application. Exh. N, p.150 ll. 3 – 14.

171.    Birns would have turned over exculpatory information prior to the bail hearing. Exh. M, p.124 L.10-p.125 L.5.

28

172.     There is no indication that the court was advised that there was a different suspect identified at Ken Creighton's bail hearing. Exh. N, 4-25-16 p.202 ll.16 -19.

173.     Had Talty been advised of Terab's identification of Spruell as the perpetrator, which directly contradicted the CI's alleged identification of Creighton, he would not one would have approved Creighton's arrest.

174.     If Terab had been disclosed as an eyewitness who had identified someone other than Creighton as having passed the gun at the bail hearing it would've improved the chances to get lower bail or a release on recognizance (ROR). Exh. Q, p.35 l.19-p.36 l.10.

175.     Talty became aware of for the first time that there was a confidential informant involved in the Creighton prosecution in 2016. Exh. N, p.42 LL.2- 20.

176.     Evidence that someone other than plaintiff had passed the gun was material that was be required to be turned over to defense counsel. Exh. M, p.33 LL.2-6.

177.     Information that would impeach the credibility of material a witness was required to be turned over to the defense. Exh. M, p.33 LL.13-21.

178.     Birns may not have been aware that the CI was a confidential informant.  Exh. M, pp.38-39.

179.     Birns does not know if Spruell was ever a suspect in the passing of the gun to Dior Creighton. Exh. M, p.74 LL.6-9.

180.     Birns reviewed the video surveillance before going over the CI's testimony in preparation for the grand jury presentation. Exh. M, p.120 LL.11-15.

181.     Talty's authorization for Creighton's arrest was based on the information Godino provided which came from the CI. Exh. M, p.51 ll.16-25

182.     Based on the conflicting identifications, more investigation was required to determine who should be arrested for the facilitation (passing the gun). Exh. M, p.63 LL.12-16

183.     Had Birns been aware of the exculpatory information provided by Terab, he would have declined to authorize Ken Creighton's arrest until the information could be further investigated. Exh. M, p.54 LL.8-16; p.60 l.18-p.61 L.8.

184.     Had Birns been made aware of the photo array identifications and the Terab statement he would have required more investigation to be conducted. Exh. M, p.54 l.8-p.55 L.18.

185.     Birns would not have authorized the arrest without approval from Talty. Exh. M, p.49 LL.9-15

186.     No arrest of Ken Creighton should have been made without investigating the circumstances of Terab's signed statement implicating Spruell. Exh. M, p.54 l.17- p.55 l.3

187.     Edward Talty is the Chief of Homicide in the Bronx District Attorney's Office and supervised the ADA's handling all homicide cases. Exh. N, p.18 LL.3-9.

188.     If the Terab had been disclosed as an eyewitness who had identified someone other than Creighton as having passed the gun at the bail hearing it would've improved the chances to get lower bail or a release on recognizance (ROR). Exh. Q, p.35 l.19-p.36

189.     On January 8, 2007 Godino called Kenneth Creighton's probation officer and instructed him to arrest Creighton during his probation appointment on January 10. Exh. GG.

190.     A DD5 dated January 10, 2007 states "detectives will arrest Kenneth on I card #
12007000405 for criminal facilitation. In turn Kenneth may inform this department where
defendant Dior Creighton is hiding out." Exh. HH: DD5 P00025.

191.     Dean Roberts (Roberts) K. Creighton's was the arresting officer. Exh. V.

192.     Roberts signed the Criminal Complaint against Creighton.  Exh. V.

193.     Roberts (Roberts) believed the store owner (Terab) had identified plaintiff as the
one who passed the gun. Exh. V, p.51 ll.4-12.

194.     Roberts learned for the first time at his deposition that Terab had identified
someone other than plaintiff as the one who passed the gun. Exh. V. p.51 ll.13-18.

195.     Roberts never knew that there was a person other than Ken Creighton who had
been identified as the one who passed the gun to Dior Creighton. Exh. V. p.53 ll.5-17

196.     Godino does not know if he ever conferred with Roberts about the investigation.
Exh. K, p.408 l.6 - l.12

197.     Godino does not know how often or what he discussed with Roberts about the
case. Exh. K, p.410 l.10 - l.17

198.     Michael Raskin ("Raskin), plaintiff's criminal attorney, was never told who was
the eye witness was who testified before the grand jury. Exh. Q, p.12 11.12-18.

199.     Raskin, plaintiff's criminal attorney, was never told who the eye witness was who
testified before the grand jury. Exh. Q, p.12 11.12-18.

200.     Raskin was aware that there was a surveillance video of the passing of the gun
incident. Exh. Q, p.12 ll.18-25

201.     Raskin never knew during the pendency of the criminal case that the eye witness was a confidential informant. Exh. Q, p.18 l.24 -p.19 l.2

202.     Raskin was never made aware that the investigation disclosed there were two shooters involved. Exh. Q, p.118 l.11- p.119 l.2

203.     The grand jury minutes of the CI's testimony had to be disclosed to the defense before any hearing or trial that the CI would be called to testify at. Exh. Q, p. 122.

204.     Terab did not testify before the grand jury. Exh. JJ.

205.     Godino did not testify at the grand jury presentation regarding Ken Creighton. Exh. K, p.351 ll.11 – 19.

206.     New York City Police Department had contradictory evidence about whether it was Ken Creighton or Spruell who passed the gun. Exh. N, p.140 L.13- p.141 L.5.

207.     Without resolving the conflict about who passed the gun, there was no probable cause to prosecute Kenneth Creighton. Exh. N, p.141 LL.6-21.

208.     Based on the information provided by Terab, Talty would likely have authorized the arrest of Spruell. Exh. N, p.141 L.22- p.142 l.3

209.     It is good police practice to determine whether an accused had an alibi. Exh. K, p.288 l.12 - p.289 l.3; p.289 l.10 - l.22

210.     Godino did not know whether an attempt was made to find out if Kenneth Creighton had an alibi. Exh. K, p.289-291.

211.     Where, as here, there was a conflict with regard to identification as who passed the gun, it was good police practice to determine whether an accused had an alibi. Exh. K, p.290 l.23 - p.291 L.14.

212.     Godino knew that where a witness was a paid confidential informant it had to be disclosed to the defense. Exh. K, p.293 L.18 - L.23.

213.     The CI informed his handler that he would not come into court to testify. Exh. U, p.149 LL.8-12; p.150 LL.15; p. 204 L.8-12CI.

214.     The CI claims he went to the precinct the day after the shooting. Exh. U, p.198 l.16 - p.199 L.5.

215.     There were no identified witnesses that saw Dior fire the weapon other than the CI. Exh. K, p.275 ll.5 - 12

216.     Based Godino's spiral notebook notes, there were other potential witnesses identified but they were not interviewed. Exh. K, p.275 l.5 - l.19; p.276 l.18 - p.277 l.7.

217.     Based on the surveillance video there were other people shown who could have given information about the passing of the gun. Exh. K, p.284 l.18 - p.285 l.3

218.     No attempts were made to identify people shown in the video who could have identified who was passing the gun. Exh. K, p.285 L.16 - l.25

219.     Good police practice required resolving the clear conflict in identification so the right person would be charged in passing the gun. Exh. K, p.286 l.21 - p.287 l.10

220.     The CI's grand jury testimony was contradictory to the documentary evidence from Terab about who passed the gun to Dior Creighton. Exh. JJ; Exh. G.

221.     Birns was not aware that the witness testified before the grand jury was a CI. Exh. M, p.38 l.15-L.19

222.     Birns was not aware of the Terab exculpatory evidence when he presented the case to the grand jury. Exh. M, p.60 l.8-l.17

223.     If the district attorney knew and a witness was actually present and was an actual witness to an event and identified somebody other than the defendant, it would be their obligation to present that evidence to the grand jury. Exh. N, p.143 l.14 – p.144 l.5

224.     Birns was not aware that the CI was going to be paid by the police for his testimony before the grand jury. Exh. M, p.134 L.14- p.135 l.6

225.     The same set of grand jurors indicted Kenneth Creighton and Dior Creighton on different dates. Exh. N, p.152 l.16 – p.153 L.8

226.     On January 23, 2007, Kenneth Creighton was indicted by a grand jury. Exh. KK: Kenneth Creighton Indictment P00098.

227.     Dior Creighton was arrested for murder and other felonies on January 26, 2007. Exh. LL: DD five P00161; Exh. 00: NYC004458.

228.     Dior Creighton was indicted on February 1, 2007. Exh. NN: Dior Creighton Indictment.

229.     On February 1, 2007 Godino testified before the grand jury when the presentment was made regarding Dior Creighton. Exh. OO: Dior Creighton Grand Jury Presentation. Exh: JJ. NYC004693, p.32.

230.     Theresa Gottlieb an ADA in the Bronx County District Attorney's Office was aware in 2011 that there were files missing, including the memo book, original identification forms and other materials. Exh. R, p.41 L.4-15.

231.     Gottlieb does not know what are missing from the original missing from the NYPD file. Exh. R, p.132 l.22-p.L33 L.6.

232.    On August 9, 2011, Terab reviewed the altered surveillance video at Gottlieb's office in the presence of Detective Godino. Exh. K, p.373 l.25 – p.374 l.9

233.    No record was made of what went on in Gottlieb's office on August 9, 2011. Exh. K, Godino p.380 l.2 - l.25

234.    On June 3, 2015 Terab testified that it was not Ken Creighton passing the gun to Dior Creighton and verified it while viewing the surveillance tape. Exh. O, p.___.

235.    On June 3, 2015 Terab testified that Ken Creighton was not in the store at the time the gun was passed to Dior Creighton. Exh. O, p.45 L.2-4.

236.    Gottlieb was aware that when a witness is a paid confidential informant it must be disclosed to defense counsel as part of discovery as soon as reasonably practicable. Exh. R, p.170 Ll.8 – p.172 L.9.

237.    Dior Creighton pled guilty to attempted murder in 2012. Exh. R, p.102 LL.5-14

238.    On January 18, 2012, Gottlieb wrote a letter to the court where she made a Recommendation for Dismissal that indicated that "Kenneth Creighton was arrested and charged upon the statements of a single eyewitness" who has become unavailable. Exh. PP: Defendants' Responses to First Set of Interrogatories, p. 57.

239.    On  January 19, 2012 all charges were dismissed and plaintiff was released. Certificate of Disposition. Exh. F:  Certificate of Disposition.

240.    On April 19, 2016 Kavan Thadani, defense counsel, stated "I have since made inquiries to obtain the tape and as far as I'm aware, the only tape that we have, the only VHS that I'm aware of, is the same tape that I showed them last summer or fall when they came into my office." Exh. K, p.340 L.24- p.341 L.4.

241.    On April 19, 2016 Thadani, defense counsel acknowledged that the original tape has never been produced and it is not in the possession of any of the parties or Corporation Counsel and its whereabouts is unknown. Exh. K, p.341 L.5 – p.342 L.10

242.    When the CI was shown the surveillance video from the bodega during his deposition on May 25, 2016, he identified Kijafa Spruell as the person who passed the gun without prompting and without hesitation.  Exh. U, p. 141, L. 17-24).

243.    Even though Godino spoke to the CI after he had obtained the written statement from Terab implicating Spruell and not Creighton and after Terab had identified Spruell from a photo array, Godino's spiral notebook, the only record that contains any information whatsoever about the CI, does not mention Spruell. Exh. J.

244.    At the Grand Jury, the CI testified under a false name. Exh. JJ.

245.    Had Talty been advised of the conflicting identifications, he would not have authorized Creighton's arrest without further investigation. Exh. N, p.164 L25 - 165 L.16.

246.    The CI in this case had an extensive criminal history Statement Exh. U p135 l16 – 136 l4, Exh. RR.

247.    The CI was a heavily-addicted drug addict. Exh. U. p154 l23 – 155 l13, 156 l6 – l17.

248.    The CI and was paid for his grand jury testimony.  Rule 56.1 Statement Exh. Up. 50 l18 -51 L.12.

249.    The CI was actually doing drugs at the time he claims he saw the gun being passed. 29 Exh. U. p.38 l14 - p39 l23.

250.      Detective Godino showed the surveillance video to the CI. Exhibit K, pp. 260-261.

251.      Godino claims he knew only of one instance where the CI allegedly provided information that led to an arrest but in that instance, the CI was not a witness but instead told Godino "who he thought the perp was".  Exh. K, p.116-117.

252.      Godino claims not to have known the CI had a problem. Exh. K, 459.

253.      The CI's handler knew that he had a drug problem. Exh. U, pp. 155-156.

254.      Godino had never handled a CI. Exh. K, p.234, L.6-13.

255.      Godino did not prepare a DD5 concerning his interview with the CI

          Exh. K., p. 244 Ll4 -13.

256.      At his deposition, Spruell admitted that he was the person who passed the gun to Dior. Exh. P.9 L.4-9.

257.      The CI testified that he was in the back of the store buying and doing drugs when the gun was passed. Exh. U, p. 98 L15; p. 99, L.2.

258.      Godino testified that the CI told him he was standing by the plastic door that goes behind the counter getting his scratch off tickets.  Exh. K, p.260, L. 11-12.

259.      CI did not see Dior shoot a firearm on December 26, 2006.  *Exhibit U, pp. 106-108.*

Dated: July 19, 2016
          New York, New York



                              ____S/_____
                                        RICHARD GROSS