UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 2/14/2017
```

KENNETH CREIGHTON,

               Plaintiff,

    - against -

THE CITY OF NEW YORK, DETECTIVE
DEAN ROBERTS (Shield No. 05861),
DETECTIVE GLENN GODINO (Shield No.
2756), ASSISTANT DISTRICT
ATTORNEY BRUCE BIRNS, ASSISTANT
DISTRICT ATTORNEY ED TALTY a/k/a
ED TULTY, and ASSISTANT DISTRICT
ATTORNEY MICHAEL COOPER,

               Defendants.

**MEMORANDUM**
**OPINION & ORDER**

12 Civ. 7454 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

      On January 10, 2007, Plaintiff Kenneth Creighton was arrested by New York City

Police Department ("NYPD") officers and charged with criminal facilitation and criminal

possession of a weapon in connection with December 26, 2006 shootings in the Bronx. Bail was

set in the amount of $10,000. Creighton was not able to post bail, however, and he remained in

pre-trial detention for the next five years. On January 19, 2012 – at the recommendation of the

Bronx County District Attorney's Office – all charges against Creighton were dismissed.

      In this action against the City of New York (the "City"), two of the NYPD

detectives who investigated the shootings, and three Bronx County Assistant District Attorneys

involved in the prosecution,[1] Creighton alleges claims for, inter alia, false arrest, malicious

prosecution, and unreasonably prolonged detention under 42 U.S.C. § 1983 and New York law.

---

[1] Detective Glenn Godino was the lead detective investigating the December 26, 2006 shootings.
Detective Dean Roberts signed the criminal complaint against Plaintiff and arrested him on

Defendants have moved for summary judgment on all of Plaintiff's remaining claims. (Dkt. No. 164) Plaintiff has moved for summary judgment on his claims for (1) false arrest under New York law as against all Defendants other than Michael Cooper; (2) malicious prosecution under New York law as against the City and Defendants Glenn Godino and Dean Roberts; (3) malicious prosecution under Section 1983 as against Defendants Godino and Roberts; and (4) deprivation of his Due Process rights under Section 1983 as against Defendant Godino. (Dkt. No. 172) Plaintiff has also moved for sanctions pursuant to Federal Rule of Civil Procedure 37 based on Defendants' alleged spoliation of evidence. (Dkt. No. 173)

---

January 10, 2007. Assistant District Attorney ("ADA") Bruce Birns authorized Plaintiff's arrest and presented the case to a grand jury. ADA Ed Talty was the Chief of Homicide at the Bronx County District Attorney's Office and, as a supervisor, participated in the decision to authorize Plaintiff's arrest. ADA Michael Cooper was a bureau chief at the Bronx County District Attorney's Office and also had supervisory authority over the prosecution.

## BACKGROUND

I.    FACTS[2]

   A.    **The Investigation**

On December 26, 2006, at approximately 5:50 p.m., two people were shot in the

vicinity of 810 East 168th Street in the Bronx. (Def. R. 56.1 Stmt. (Dkt. No. 167) at ¶ 1; Pltf.

---

[2]  To the extent that this Court relies on facts drawn from a party's Local Rule 56.1 statement, it has done so because the opposing party has either not disputed those facts or has not done so with citations to admissible evidence. See Giannullo v. City of New York, 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party . . . fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted.") (citations omitted). Where a party opposing a motion disputes the movant's characterization of cited evidence, and has presented an evidentiary basis for doing so, the Court relies on the adversary's characterization of the evidence. See Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001) (court must draw all rational factual inferences in non-movant's favor in deciding summary judgment motion).

In responding to factual assertions in Defendants' Local Rule 56.1 statement, Plaintiff frequently "denies" without providing supporting citations to the record (see Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 189) at ¶¶ 6-7, 12-13, 15, 18-19, 30-31, 42-43, 47-48), or "den[ies] upon information and belief[, stating that the] facts . . . are not capable of independent verification by Kenneth Creighton." (See id. at ¶¶ 8, 47) "[A]ny of [Defendants'] Rule 56.1 Statements that [Plaintiff does] not specifically deny – with citations to supporting evidence – are deemed admitted for purposes of [Defendants'] summary judgment motion." Ezagui v. City of New York, 726 F. Supp. 2d 275, 285 n.8 (S.D.N.Y. 2010) (citing Universal Calvary Church v. City of New York, No. 96 Civ. 4606 (RPP), 2000 WL 1745048, at *2 n.5 (S.D.N.Y. Nov. 27, 2000)). Moreover, "[a] party's statement that it 'can neither admit nor deny [an adversary's] statement based upon the factual record is not a sufficient response to establish a disputed fact,'" and will be treated as an admission. Id. (quoting Universal Calvary Church, 2000 WL 1745048, at *2 n.5).

In responding to Defendants' Local Rule 56.1 statement, Plaintiff also repeatedly objects to factual assertions on the grounds that Defendants overlooked other facts or have improperly characterized facts. (See Pltf. Resp. to Def. R. 56.1 Statement (Dkt. No. 189) at ¶¶ 6-7, 12-13, 15, 18-19, 29, 31-32) Such responses – unsupported by citations to admissible evidence – are likewise insufficient to create a disputed issue of fact. "'Local Rule 56.1 states that the moving party's 56.1 statement "will be deemed to be admitted unless controverted," Rule 56.1(c), and requires that such denials be supported by a specific citation to admissible evidence, Rule 56.1(d).'" Ezagui, 726 F. Supp. 2d at 285 n.8 (quoting Universal Calvary Church, 2000 WL 1745048, at *2 n.5).

Unless otherwise indicated, the facts cited by the Court are undisputed.

3

Resp. to Def. R. 56.1 Stmt. (Dkt. No. 189) at ¶ 1)  John Caldwell was shot in the head and later

died, while Lisette Ayala suffered a gunshot wound to her left leg. (Def. R. 56.1 Stmt. (Dkt. No.

167) at ¶¶ 2-3; Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 189) at ¶¶ 2-3; see also Gross Decl.,

Ex. W (Dkt. No. 214-26) (Crime Scene Unit Report))

        Fawaz Terab owns a bodega – the Prospect Mini Mart (the "Mini Mart") – located

at 820 East 168th Street, near the site of the shootings. (Pltf. R. 56.1 Stmt. (Dkt. No. 178) at ¶

12; Def. Resp. to Pltf. R. 56.1 Stmt. (Dkt. No. 176) at ¶ 12)  Terab was working as the cashier at

his bodega when the shootings took place. (Gross Decl., Ex. O (Dkt. No. 214-17) (Terab Dep.)

at 9:3-16[3])  Terab knows Plaintiff Kenneth Creighton and his brother, Dior Creighton. (Pltf. R.

56.1 Stmt. (Dkt. No. 178) at ¶¶ 14-15; Def. Resp. to Pltf. R. 56.1 Stmt. (Dkt. No. 176) at ¶¶ 14-

15)

        When police canvassed the area on the night of the shootings, Terab did not

volunteer any information and stated that he "didn't see anything." (Gross Decl., Ex. O (Dkt.

No. 214-17) (Terab Dep.) at 32:19-33:23, 64:18-65:2; Def. Resp. to Pltf. R. 56.1 Stmt. (Dkt. No.

176) at ¶ 20)  During a meeting with NYPD Detective Glenn Godino on December 31, 2006,

however – five days after the shootings – Terab stated that Kijafa Spruell, a regular customer at

the Mini Mart, had passed a gun to Dior Creighton shortly before the shootings. (Gross Decl.,

Ex. K-1 (Dkt. No. 214-11) (Godino Dep.) at 137:20-152:7; Gross Decl., Ex. O (Dkt. No. 214-17)

(Terab Dep.) at 10:6-18, 34:3-37:3; Gross Decl., Ex. II (Dkt. No. 214-38) (Dec. 31, 2006 Terab

Stmt.); Pltf. R. 56.1 Stmt. (Dkt. No. 178) at ¶¶ 16, 20, 31-32; Def. Resp. to Pltf. R. 56.1 Stmt.

(Dkt. No. 176) at ¶¶ 16, 20, 31-32)  Terab told Detective Godino that the gun he had seen was

---

[3] Citations to deposition transcripts reflect the page numbers assigned by the court reporter.  All
other page citations correspond to the page numbers designated by this District's Electronic Case
Filing system.

silver and black. (Pltf. R. 56.1 Stmt. (Dkt. No. 178) at ¶ 33; Def. Resp. to Pltf. R. 56.1 Stmt.

(Dkt. No. 176) at ¶ 33; Gross Decl., Ex. K-1 (Dkt. No. 214-11) (Godino Dep.) at 149:9-16)

Terab had not observed Dior Creighton shooting the gun outside the Mini Mart, however.

(Gross Decl., Ex. K-1 (Dkt. No. 214-11) (Godino Dep.) at 154:11-23; Gross Decl., Ex. O (Dkt.

No. 214-17) (Terab Dep.) at 30:6-12)

        On January 2, 2007, police conducted a computer search concerning Spruell.

(Pltf. R. 56.1 Stmt. (Dkt. No. 178) at ¶ 38; Def. Resp. to Pltf. R. 56.1 Stmt. (Dkt. No. 176) at ¶

38; Gross Decl., Ex. K-3 (Dkt. No. 214-13) (Godino Dep.) at 394:22-398:5)  The search

disclosed an address and other pedigree information for Spruell. (See Gross Decl., Ex. BB (Dkt.

No. 214-31) (Spruell Records))  Godino also obtained Spruell's photograph. (Gross Decl., Ex.

K-3 (Dkt. No. 214-13) (Godino Dep.) at 393:20-394:2)  The NYPD made no further effort to

locate Spruell, however, and did not question him at that time.[4]  (Pltf. R. 56.1 Stmt. (Dkt. No.

178) at ¶ 41; Def. Resp. to Pltf. R. 56.1 Stmt. (Dkt. No. 176) at ¶ 41; Gross Decl., Ex. K-3 (Dkt.

No. 214-13) (Godino Dep.) at 397:8-20)

        After Terab's December 31, 2006 identification of Spruell as the source of the gun,

Detective Godino interviewed a second eyewitness to the passing of the gun. (Def. R. 56.1 Stmt.

(Dkt. No. 167) at ¶ 4; Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 189) at ¶ 4; see Gross Decl., Ex.

K-1 (Dkt. No. 214-11) (Godino Dep.) at 146:7-13, 155:17-24, 173:16-25)  This witness (the

"CI") had previously served as an NYPD confidential informant and had given Detective Godino

information about an earlier shooting in front of the same building where Caldwell had been

shot. (Def. R. 56.1 Stmt. (Dkt. No. 167) at ¶ 5; Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 189)

---

[4]  Godino testified that he did not immediately bring Spruell in for questioning because – for
purposes of a homicide charge – he needed a witness who had observed Dior Creighton shooting
outside the store. (Gross Decl., Ex. K-3 (Dkt. No. 214-13) (Godino Dep.) at 398:6-399:22)

at ¶ 5; Gross Decl., Ex. K-1 (Dkt. No. 214-11) (Godino Dep.) at 116:23-118:2)  The CI's

information had led to an arrest and a guilty plea in that case.  (Id.)

       The CI called his NYPD handler – Detective John Elliott – shortly after the

December 26, 2006 shootings, told Elliott that he had been "right there," and reported that he had

seen Plaintiff pass the gun to his brother, Dior Creighton.[5]  (Gross Decl., Ex. U (Dkt. No. 214-

24) (Informant Dep.) at 22:4-9, 56:15-57:15, 197:10-16)  Detective Elliott told the CI he would

call him back, which he did later that same evening.  (Id. at 57:6-22)  Detective Elliott also

reported to Detective Godino that the CI had information about the shootings outside the Mini

Mart.  (Gross Decl., Ex. K-3 (Dkt. No. 214-13) (Godino Dep.) at 479:21-480:15)

       The CI later met with Detective Godino (id. at 482:16-25), who took the following

handwritten notes during the interview:

> Dior . . . comes back with a black hoody.  Kenny had a white and burgundy shirt.
> Dior and Ken went into the store.  The CI was by the plastic door that goes behind
> the counter getting his scratch off tickets.  Kenny passed the gun to Dior inside
> the store. . . .  Dior was shooting from behind a car just inside the street.

(Def. R. 56.1 Stmt. (Dkt. No. 167) at ¶ 9; Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 189) at ¶ 9;

June 27, 2016 Thadani Decl., Ex. F (Dkt. No. 166-6) (Godino Notes))[6]

      At the time of the shootings, the Mini Mart contained a surveillance camera that

recorded onto a digital video recorder ("DVR") maintained in the store's basement.[7]  (Pltf. R.

---

[5]  Plaintiff complains that there is "no record" of this call.  (Pltf. Reply to Def. Resp. to Pltf. R. 56.1 Stmt. (Dkt. No. 186) at ¶ 36)  For purposes of summary judgment, however, this Court may rely on the CI's deposition testimony concerning the call he made to his NYPD handler.

[6]  Godino's notes are considered not for the truth of the matters asserted in the notes, but rather "for the purpose of showing that these statements were made to the [detective] and provided probable cause to arrest and prosecute [Plaintiff]."  Richards v. City of New York, No. 97 Civ. 7990 (MBM), 2003 WL 21036365, at *6 (S.D.N.Y. May 7, 2003).

[7]  Unlike a VHS or DVD recorder, a DVR does not require a user to insert some form of blank media for recording.  A DVR has an internal hard drive with a memory capacity.  See "Digital

56.1 Stmt. (Dkt. No. 178) at ¶ 18; Def. Resp. to Pltf. R. 56.1 Stmt. (Dkt. No. 176) at ¶ 18; Gross

Decl., Ex. O (Dkt. No. 214-17) (Terab Dep.) at 13:20-18:12)  After the shootings, Terab – the

owner of the Mini Mart – arranged for the NYPD to obtain a VHS copy of what had been

recorded on the DVR's hard drive.  (Def. R. 56.1 Stmt. (Dkt. No. 167) at ¶ 10; Pltf. Resp. to Def.

R. 56.1 Stmt. (Dkt. No. 189) at ¶ 10; Gross Decl., Ex. O (Dkt. No. 214-17) (Terab Dep.) at

13:20-18:12, 33:5-34:2; Gross Decl., Ex. K-1 (Dkt. No. 214-11) (Godino Dep.) at 52:12-22;

Gross Decl., Ex. E (Dkt. No. 214-5) (Afrides Decl.) at ¶¶ 7-8)

   The surveillance footage shows the following:  a man in a burgundy-and-white

striped shirt enters the Mini Mart with Dior Creighton, who is wearing a black jacket.  The two

men are shown standing in the front area of the store, by the front corner of the checkout counter

and near the store's entrance.  The man in the striped shirt appears to pass an object to Dior while

standing face-to-face with him.  Dior then turns around, towards the surveillance camera.  He

appears to be holding an object that briefly reflects a glint from the store's lighting.  The man in

the striped shirt then walks out of the store.  Dior Creighton walks toward the back of the store,

and is off-camera briefly.  He then re-appears, pulls up the hood of his jacket, and walks out the

store's front door.  (See Gross Decl., Ex. CC (Dkt. No. 214) (Mini Mart Surveillance Footage))

According to the surveillance system's time stamp, the encounter and events described above

consume about twenty-one seconds.  (Id.)  Other customers are present in the store at the time of

the exchange.  The hands and arms of someone working behind the checkout counter are briefly

visible from time to time, but no more of this person can be seen, because of shelving and the

angle of the surveillance camera.  (Id.)

---

Video Recorder," Oxford Dictionaries,
https://en.oxforddictionaries.com/definition/digital_video_recorder (last visited Jan. 26, 2017).

Detective Godino testified that – based on the surveillance footage – he could not identify the man who had passed the gun to Dior Creighton. (Def. R. 56.1 Stmt. (Dkt. No. 167) at ¶ 11; Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 189) at ¶ 11; Gross Decl., Ex. K-1 (Dkt. No. 214-11) (Godino Dep.) at 137:15-19, 197:16-20) Detective Dean Roberts testified that, "as the investigation ensued," he watched the Mini Mart surveillance footage, and "based . . . on [his] experience of Kenneth Creighton and the general makeup of him, the physical appearance," he "believed" that Plaintiff was the individual who passed the gun to Dior Creighton.[8] (Gross Decl., Ex. OO-1 (Dkt. No. 214-44) (Roberts Dep.) at 44:19-45:5, 58:16-60:7, 130:9-20)

Godino testified that after the CI had identified Plaintiff as the source of the gun, Godino contacted Terab and asked whether Terab was sure that Spruell was the source of the gun. (Gross Decl., Ex. K-1 (Dkt. No. 214-11) (Godino Dep.) at 182:23-183:5) Godino told Terab that another witness had identified someone else. (Id.) Terab said that his view had been partially blocked, and that he had assumed that Spruell was the source of the gun because he and Dior Creighton were always together. (Id. at 182:17-183:12, 208:5-16)

Godino then asked Terab to come to the 42nd Precinct to view the surveillance footage. (Id.) After looking at the surveillance footage, Terab identified Plaintiff as the person who had passed the gun to Dior Creighton.[9] (Id. at 131:10-23, 182:9-183:12, 207:25-210:9,

---

[8]  Prior to this investigation, Detective Roberts had become "very familiar with Kenneth Creighton, Dior Creighton, their mother, their brother . . . and a sister" as a result of his work at the 42nd Precinct. (Gross Decl., Ex. OO-1 (Dkt. No. 214-44) (Roberts Dep.) at 41:17-25, 42:7-25) Roberts testified that he had had personal contact with Plaintiff before 2006, but could not recall "the context or the settings" for that contact. (Id. at 43:2-13)

[9]  Plaintiff objects to Godino's testimony on this point as "rank hearsay." (Pltf. Reply to Def. Resp. to Pltf. R. 56.1 Stmt. (Dkt. No. 186) at ¶ 41) Godino's testimony is not hearsay, however, because Terab's statement is not being offered for its truth, but rather for the effect of that statement on Godino's state of mind. See United States v. Dupree, 706 F.3d 131, 136 (2d Cir. 2013) ("'[I]f the significance of an offered statement lies solely in the fact that it was made, no

292:9-25)  Although Godino could not precisely date Terab's recantation, it took place before

Plaintiff's January 10, 2007 arrest.  (See id. at 131:10-132:2, 182:17-21, 185:10-16)  Detective

Godino and ADA Theresa Gottlieb testified that Terab was shown the surveillance footage again

on August 9, 2011, at the Bronx County District Attorney's Office, and that he again identified

Plaintiff as the person who passed a gun to Dior Creighton.  (Id. at 210:10-20, 211:8-13, 212:8-9;

Gross Decl., Ex. R (Dkt. No. 214-20) (Gottlieb Dep.) at 134:13-19, 136:11-137:5, 143:2-19,

218:25-219:18; see also Thadani Decl., Ex. I (Dkt. No. 175-9) (Aug. 19, 2011 Gottlieb Ltr.))

At his deposition, Terab recalled meeting Godino at the 42nd Precinct, and also

recalled a later meeting with Godino and a female assistant district attorney, who showed him the

surveillance video.  (Gross Decl., Ex. O (Dkt. No. 214-17) (Terab Dep.) at 34:3-38:21, 40:22-

41:13, 45:6-46:12, 47:3-48:14, 50:16-22, 85:7-87:4)  Terab denied that he ever told Detective

Godino or the female ADA that Plaintiff had passed a gun to his brother Dior Creighton,

however.[10]  (Id. at 45:18-48:6, 50:16-52:2, 55:5-56:6, 84:24-86:23)  Terab also testified that he

was contacted by Detective Godino two days after Plaintiff's arrest, and that Terab told

Detective Godino that the police had arrested the wrong person.  (Id. at 83:7-84:4)

Detective Godino informed ADA Bruce Birns of the CI's identification of Plaintiff

as the individual who had passed the firearm to the shooter.  (Def. R. 56.1 Stmt. (Dkt. No. 167)

---

issue is raised as to the truth of anything asserted, and the statement is not hearsay.'" (quoting
Fed. R. Evid. 801(c) advisory committee's note)).

[10]  Defendants contend that Terab is biased and may have been threatened by Plaintiff.  (Def.
Resp. to Pltf. R. 56.1 Stmt.  (Dkt. No. 176) at ¶ 59)  Defendants' arguments about Terab's
credibility – and the witnesses' conflicting accounts as to Terab's alleged recantation – raise
issues of fact that this Court cannot resolve on summary judgment, however.  See Vital v.
Interfaith Med. Ctr., 168 F.3d 615, 622 (2d Cir. 1999) ("'Assessments of credibility and choices
between conflicting versions of events are matters for the jury, not for the court on summary
judgment.'"  (quoting Rule v. Brine, Inc., 85 F.3d 1002, 1011 (2d Cir. 1996))).

at ¶ 14; Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 189) at ¶ 14)  ADA Birns then interviewed the

CI.  (Def. R. 56.1 Stmt. (Dkt. No. 167) at ¶ 16; Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 189) at

¶ 16)  Birns testified that the CI "provided a completely reasonable explanation of how he knew

[Plaintiff and Dior], where he was, [and] what he witnessed. . . ."  (Def. R. 56.1 Stmt. (Dkt. No.

167) at ¶ 18; Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 189) at ¶ 18; Gross Decl., Ex. M (Dkt.

No. 214-15) (Birns Dep.) at 227:7-228:13)  Birns further noted that the CI's account of the

events in the Mini Mart was corroborated by the Mini Mart surveillance footage.  (Gross Decl.,

Ex. M (Dkt. No. 214-15) (Birns Dep.) at 227:7-228:13)  Based on the CI's account, Birns

believed "[w]ithout question" that there was probable cause to arrest Plaintiff.  (Id. at 228:14-17)

### B.       Plaintiff's Arrest and Detention

Plaintiff was arrested on January 10, 2007,[11] and was charged in a criminal

complaint with Criminal Facilitation in the Second Degree, Criminal Possession of a Weapon in

the Second Degree, and Criminal Possession of a Weapon in the Third Degree.  (Def. R. 56.1

---

[11]  In his Local Rule 56.1 statement, Plaintiff repeatedly asserts that the NYPD had no legal basis
to arrest him in light of Terab's statement implicating Spruell.  (See, e.g., Pltf. R. 56.1 Stmt.
(Dkt. No. 178) at ¶¶ 125-126, 140, 146, 154, 158, 168 (alleging, inter alia, that there was
probable cause to arrest Spruell, and complaining that the police failed to follow certain leads
and to properly investigate contradictory evidence about whether Plaintiff or Spruell passed the
gun to Dior))  Such legal arguments and assertions have no place in a Rule 56.1 statement and
have not been considered by the Court.  See Congregation Rabbinical Coll. of Tartikov, Inc. v.
Vill. of Pomona, 138 F. Supp. 3d 352, 394 (S.D.N.Y. 2015) ("[T]he Court can . . . disregard legal
conclusions or unsubstantiated opinions in a Local Rule 56.1 statement."); Antunes v. Putnam/N.
Westchester Bd. of Co-op. Educ. Servs., No. 09 Civ. 3063 (CS), 2011 WL 1990872, at *2 n.9
(S.D.N.Y. May 19, 2011) ("[The court] need not consider statements in a Local Rule 56.1
submission that are 'legal conclusions in the guise of an undisputed statement of fact.'" (quoting
Wojcik v. 42nd St. Dev. Project, 386 F. Supp. 2d 442, 448 n.5 (S.D.N.Y. 2005)); Cruz v. Duane
Reade Pharmacy Co., No. 03 Civ. 3418 (LAP), 2005 WL 1251649, at *4 (S.D.N.Y. May 25,
2005) (disregarding portions of Rule 56.1 statement containing "legal conclusions that are
clearly improper under Local Rule 56.1"); see also Schwapp v. Town of Avon, 118 F.3d 106,
111 (2d Cir. 1997) ("To satisfy Rule 56(e), affidavits must be based upon 'concrete particulars,'
not conclusory allegations.  To the extent that these affidavits contain bald assertions and legal
conclusions . . . the district court properly refused to rely on them.") (internal citation omitted).

Stmt. (Dkt. No. 167) at ¶ 21; Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 189) at ¶ 21)  ADA Birns

and ADA Ed Talty authorized the arrest, and Detective Roberts was the arresting officer.  (Def.

R. 56.1 Stmt. (Dkt. No. 167) at ¶¶ 20, 23; Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 189) at ¶¶

20, 23)  The NYPD arrest report for Plaintiff – which was prepared by Detective Roberts – states

that Plaintiff "hand[ed] a loaded firearm to an unapprehended subject who then used the firearm

which resulted in the fatal shooting of [John Caldwell] as well as the non-fatal shooting of

[Lisette Ayala]."  (Def. R. 56.1 Stmt. (Dkt. No. 167) at ¶ 22; Pltf. Resp. to Def. R. 56.1 Stmt.

(Dkt. No. 189) at ¶ 22; June 27, 2016 Thadani Decl., Ex. H (Dkt. No. 166-8) (Arrest Report))

      The criminal complaint against Plaintiff – which was signed by Detective Roberts

– states the following:

> Deponent states, based upon official investigation, and witnesses known to the
> Police Department, that, at the above time and place, inside a bodega, defendant
> and a separately unapprehended individual engaged in a brief conversation, after
> which defendant passed a shiny metallic object to the separately unapprehended
> individual.  Deponent further states that immediately afterwards, the separately
> unapprehended individual and defendant went outside the above location.
>
> Deponent further states that he is informed by [Lisette] Ayala that informant was
> standing outside the above location at the above time, and informant observed the
> above-described separately unapprehended individual pointing a metallic object in
> both her direction and in the direction of John Caldwell, and then heard several
> loud noises and observed several flashes coming from the above-mentioned
> object, and then immediately felt a sharp pain on her left calf.  Deponent is further
> informed that informant then observed her left leg to be bleeding severely.
>
> Deponent further states that, based upon official police investigation and
> witnesses known to the police department, also at the above time and place, John
> Caldwell was struck on the side of his head by one of the above-mentioned shots,
> causing his death.

(June 27, 2016 Thadani Decl., Ex. C (Dkt. No. 166-3) (Criminal Cmplt.))

      The New York City Criminal Justice Agency conducts pre-arraignment

interviews of arrestees and makes release recommendations to the court that assess a defendant's

likelihood of returning to court. Here, the Criminal Justice Agency concluded that Plaintiff was a "HIGH RISK FOR FTA," or failure to appear. (Def. R. 56.1 Stmt. (Dkt. No. 167) at ¶¶ 26-27; June 27, 2016 Thadani Decl., Ex. I (Dkt. No. 166-9) (Criminal Justice Agency Interview Report)) The court set bail in the amount of $10,000. (Def. R. 56.1 Stmt. (Dkt. No. 167) at ¶ 28; Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 189) at ¶ 28) Plaintiff did not post bail and remained in pre-trial detention for the next five years – until January 19, 2012. (Pltf. R. 56.1 Stmt. (Dkt. No. 178) at ¶ 189; Def. Resp. to Pltf. R. 56.1 Stmt. (Dkt. No. 176) at ¶ 189; June 27, 2016 Thadani Decl., Ex. Z (Dkt. No. 166-26) (Jan. 19, 2012 Supreme Court Proceedings) at 6:22-7:3)

In 2006, ADA Ed Talty was the Chief of Homicide at the Bronx County District Attorney's Office. (Gross Decl., Ex. N (Dkt. No. 214-16) (Talty Dep.) at 10:21-11:3, 12:7-9) Talty testified that, at that time, it was the policy of the District Attorney's Office to require that the NYPD obtain approval from an ADA before preparing a criminal complaint in a homicide case. (Id. at 127:14-22) He also testified that, before authorizing an arrest, it was his practice to determine whether there was probable cause for the arrest. (Id. at 133:21-135:7) Moreover, where "a detective told [Talty that] the only evidence that exists is a confidential informant, [Talty] would probably want to have them bring the confidential informant in to have an ADA speak to that confidential informant about the fact that confidentiality was no – would be an issue." (Id. at 136:4-19) Talty does not recall speaking with the CI prior to the issuance of a criminal complaint against Plaintiff. (Id. at 42:2-15) As noted above, however, ADA Birns recalls interviewing the CI prior to authorizing the arrest of Plaintiff, and concluding that the CI's account "without question" constituted probable cause. (Gross Decl., Ex. M (Dkt. No. 214-15) (Birns Dep.) at 228:14-17)

On January 16, 2007, the CI was called to testify before a grand jury. (Def. R. 56.1 Stmt. (Dkt. No. 167) at ¶ 29; Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 189) at ¶ 29) The CI testified that he had known Plaintiff and his brother, Dior Creighton, since 1993. (Id. at ¶ 32; June 27, 2016 Thadani Decl., Ex. K (Dkt. No. 166-11) (CI's Grand Jury Testimony) at DJ5:7-8, DJ6:16-DJ7:3) The CI described his observations in the Mini Mart as follows: "I walked into the store to buy my scratch off. And as I was going into the store Kenny was passing something. He was passing a gun to Dior. . . . Dior went outside the store . . . [and he] just pulled out and started shooting." (Def. R. 56.1 Stmt. (Dkt. No. 167) at ¶¶ 30-31; Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 189) at ¶¶ 30, 31; June 27, 2016 Thadani Decl., Ex. K (Dkt. No. 166-11) (CI's Grand Jury Testimony) at DJ9:3-6, DJ11:9, DJ12:16-17) The District Attorney's Office did not call Terab to testify before the grand jury. (Pltf. R. 56.1 Stmt. (Dkt. No. 178) at ¶ 108; Def. Resp. to Pltf. R. 56.1 Stmt. (Dkt. No. 176) at ¶ 108) On January 23, 2007, the grand jury voted an indictment that charged Plaintiff with Criminal Facilitation in the Second Degree and two counts of Criminal Possession of a Weapon in the Second Degree. (Def. R. 56.1 Stmt. (Dkt. No. 167) at ¶ 33; Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 189) at ¶ 33; June 27, 2016 Thadani Decl., Ex. L (Dkt. No. 166-12) (Kenneth Creighton Indictment))

On January 26, 2007, Dior Creighton was arrested and charged with murder and other crimes. (Pltf. R. 56.1 Stmt. (Dkt. No. 178) at ¶ 176; Def. Resp. to Pltf. R. 56.1 Stmt. (Dkt. No. 176) at ¶ 176) On February 1, 2007, a grand jury issued an indictment charging Dior Creighton with, inter alia, Murder in the Second Degree, Attempted Murder in the Second Degree, Manslaughter in the First Degree, and Criminal Possession of a Weapon in the Second Degree. (Gross Decl., Ex. NN (Dkt. No. 214-43) (Dior Creighton Indictment))

On May 10, 2007, Plaintiff moved to inspect the grand jury minutes and to dismiss the indictment. (Def. R. 56.1 Stmt. (Dkt. No. 167) at ¶ 40; Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 189) at ¶ 40) On October 3, 2007, a Supreme Court justice issued an order granting Plaintiff's motion for an inspection of the grand jury minutes. (Id. at ¶ 41) After reviewing the minutes, the judge determined that "[t]he evidence presented to the Grand Jury establishes a prima facie case of the defendant's commission of the charges contained in the indictment." (June 27, 2016 Thadani Decl., Ex. T (Dkt. No. 166-20) (Oct. 3, 2007 Supreme Court Order)) The judge did not authorize Plaintiff's criminal defense lawyer to inspect the minutes, explaining that "[i]t is not necessary to release the minutes or any portion thereof to the defendant's attorney to assist the court in making the determination." (Id.) Plaintiff thus did not learn of the CI's identity at that time, and he was not aware that the eyewitness who testified before the grand jury had previously served as an NYPD confidential informant. (Pltf. R. 56.1 Stmt. (Dkt. No. 178) at ¶ 102; Def. Resp. to Pltf. R. 56.1 Stmt. (Dkt. No. 176) at ¶ 102)

On May 12, 2008, ADA Birns filed a motion to consolidate the indictments against Plaintiff and his brother, Dior Creighton. (June 27, 2016 Thadani Decl., Ex. U (Dkt. No. 166-21) (Affirmation in Support of Motion to Consolidate Indictments); Def. R. 56.1 Stmt. (Dkt. No. 167) at ¶ 44; Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 189) at ¶ 44) On August 7, 2008, a Supreme Court justice issued an order stating that the consolidation motion would be stayed "pending resolution of all pre-trial hearings." (Thadani Decl., Ex. V (Dkt. No. 166-22) (Aug. 7, 2008 Supreme Court Order))

During discovery in Plaintiff's criminal case, the Bronx County District Attorney's Office produced to Plaintiff, inter alia, the following materials: (1) Terab's statement to the NYPD – in which he identified Spruell as the source of the gun; (2) a photo array from

14

which Terab had identified Spruell as the source of the gun; and (3) a copy of the surveillance

footage obtained from the DVR maintained at the Mini Mart.[12]  (Def. R. 56.1 Stmt. (Dkt. No.

167) at ¶¶ 46, 48; Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 189) at ¶¶ 46, 48; June 27, 2016

Thadani Decl., Ex. X (Dkt. No. 166-24) (Plaintiff Dep.) at 48:18-49:15)  Plaintiff's criminal

defense lawyer made no motions or applications to the court after receiving these materials.

(Def. R. 56.1 Stmt. (Dkt. No. 167) at ¶ 47; Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 189) at ¶

47; Gross Decl., Ex. Q (Dkt. No. 214-19) (Raskin Dep.) at 54:16-22)  On December 22, 2010,

however, Plaintiff filed a petition for a writ of habeas corpus in New York County Supreme

Court.[13]  (Thadani Decl., Ex. W (Dkt. No. 166-23) (Habeas Corpus Petition))  Attached as

exhibits to Plaintiff's habeas corpus petition are, inter alia, Terab's statement and the photo

array.  (Id.)  In his petition, Plaintiff states that he has reviewed "a video tape that was given to

my attorney that clearly shows that I am not the person who they are looking for."  (Id. at 5)

---

[12]  Plaintiff's criminal defense attorney, Michael Raskin, testified "that the existence of [the surveillance footage] was known early on and it was disclosed early on [by ADA Birns]." (Gross Decl., Ex. Q (Dkt. No. 214-19) (Raskin Dep.) at 13:19-24, 45:18-46:5, 53:10-12; July 19, 2016 Thadani Decl., Ex. C (Dkt. No. 175-3) (Dec. 13, 2007 Supreme Court Proceedings) at 2:11-16)

Raskin also learned from discovery provided by the District Attorney's Office that a witness had identified Spruell as the source of the gun, and Raskin received a copy of the witness's statement and a photo array.  (Id. at 53:16-24, 56:7-57:5)  Raskin also knew that the witness was the bodega's owner or a bodega employee.  (Id. at 57:6-16, 58:22-59:4)  Raskin believes that he received this exculpatory information during the time that ADA Birns was the assigned prosecutor.  (Id. at 53:21-54:4, 54:23-55:3, 57:20-58:10)  Dior Creighton's lawyer sent an investigator to interview the bodega witness, and Raskin learned that the investigator "confirmed what was contained in the [witness] statement and that it was someone named Kalifa [i.e., Kijafa Spruell], not someone named Kenneth Creighton, who had [passed the gun]."  (Id. at 59:9-61:15)  Raskin did not attempt to interview Spruell, because he believed that it was unlikely that Spruell would admit his role, thus "subjecting [himself] to prosecution for arguably homicide."  (Id. at 62:16-63:14)

[13]  Plaintiff was being held at the Manhattan Detention Center.  (June 27, 2016 Thadani Decl., Ex. W (Dkt. No. 166-23) (Habeas Corpus Petition) at 2)

On January 3, 2012, Dior Creighton pleaded guilty to Attempted Murder in the Second Degree. (Def. R. 56.1 Stmt. (Dkt. No. 167) at ¶ 49; Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 189) at ¶ 49) He was sentenced to fourteen years' imprisonment. (Id.)

On January 18, 2012, ADA Gottlieb filed in Bronx County Supreme Court a Recommendation for Dismissal of the charges against Plaintiff. (Id. at ¶ 50) In the Recommendation for Dismissal, ADA Gottlieb states the following:

FACTS AND PROCEDURAL HISTORY:

On December 26, 2006 at 5:48 P.M., defendant along with his brother Dior Creighton were inside a bodega at 800 East 168th Street. Defendant and Dior Creighton had a brief conversation. Defendant then handed Dior Creighton a handgun. Both men then left the bodega. Once outside, Dior Creighton fired several shots, hitting Lisette Ayala in the leg and John [Caldwell] in the head, killing him. Kenneth Creighton was arrested on January 10, 2007 and bail was set at $10,000. Defendant has been unable to post bail and has remained incarcerated since his arrest.

Dior Creighton was arrested and charged (indictment 626/2007) with Murder in the Second Degree and Attempted Murder in the Second Degree. On January 3, 2012, Dior Creighton plead guilty to Attempted Murder in the Second Degree. He was sentenced on January 19, 2012, to 14 years in prison with 5 years post-release supervision.

. . . .

REASON FOR RECOMMENDATION:

Kenneth Creighton was arrested and charged based upon the statements of a single eyewitness. This eyewitness knows Kenneth Creighton and saw him hand Dior Creighton a handgun inside the bodega. This witness has now become unavailable to the Bronx District Attorney's Office. The witness could not be located by the case Detective at any of the telephone numbers or addresses provided. Further efforts to locate this witness by the Detective Investigator have been unsuccessful.

CONCLUSION

Therefore, the People would be unable to proceed to trial. . . .
[T]he indictment against Kenneth Creighton should be dismissed. . . .

16

(June 27, 2016 Thadani Decl., Ex. Y (Dkt. No. 166-25) (Jan. 18, 2012 Recommendation for

Dismissal) at 1-2)[14]  The charges against Plaintiff were dismissed on January 19, 2012, on the

grounds that "the People do not have the cooperation of a necessary eyewitness to this matter,"

and the prosecution "would not be able to go forward."[15]  (Def. R. 56.1 Stmt. (Dkt. No. 167) at ¶

53; Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 189) at ¶ 53; June 27, 2016 Thadani Decl., Ex. Z

(Dkt. 166-26) (Jan. 19, 2012 Criminal Court Proceedings) at 2:18-25)

### C.   Plaintiff's Probation Violation

On November 21, 2005, Plaintiff was convicted of Attempted Robbery in the

Second Degree and sentenced to five years' probation.  (Def. R. 56.1 Stmt. (Dkt. No. 167) at ¶

35; Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 189) at ¶ 35)  Plaintiff sustained multiple arrests

and convictions in 2006 while on probation, and on February 1, 2007, a violation of probation

---

[14] The parties agree that the witness referred to in the Recommendation for Dismissal is the CI. (See Def. R. 56.1 Stmt. (Dkt. No. 167) at ¶ 51; Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 189) at ¶ 51)  As Plaintiff's criminal case neared trial, ADA Gottlieb met with Detective Godino and Detective Elliott. Gottlieb "notified Detective Elliott to find the CI, and he went several times to try to find him and he couldn't find him." (Gross Decl., Ex. K-3 (Dkt. No. 214-13) (Godino Dep.) at 388:4-11; Gross Decl., Ex. R (Dkt. No. 214-20) (Gottlieb Dep.) at 27:24-30:9)

The CI testified that he recalled Detective Elliott calling him at some point and saying that "the DA" "was looking for me at the time. . . . [w]hen Dior was going to trial." (Gross Decl., Ex. U (Dkt. No. 214-24) (Informant Dep.) at 150:16-151:7)  The CI had told Elliott that he would not testify against Dior Creighton if the case went to trial. (Id. at 149:9-150:11, 151:8-19)

[15] Michael Raskin, Plaintiff's criminal defense lawyer, was questioned at his deposition "as to the reasons why it took as long as it did for the case to resolve itself." (Gross Decl., Ex. Q (Dkt. No. 214-19) (Raskin Dep.) at 63:24-25)  Raskin attributed the delay to "requests for postponements that were made by either . . . Dior Creighton's attorney or the District Attorney's office." (Id. at 64:1-3)  ADA Birns testified that Dior Creighton's attorney "was involved in . . . an eight defendant case with seven different defense attorneys, as well as him, which was taking forever and so [the Creighton] case was following it." (Gross Decl., Ex. M (Dkt. No. 214-15) (Birns Dep.) at 80:14-22)  Raskin complained about the delay to the administrative judges managing the case, and informally sought a severance, but obtained no relief. (Gross Decl., Ex. Q (Dkt. No. 214-19) (Raskin Dep.) at 64:19-65:19, 67:15-69:9)  Raskin testified that no relief was available under New York's speedy trial statute, because the postponements requested by Dior Creighton's lawyer resulted in no time "chargeable" to the People. (Id. at 70:6-73:15)

petition was filed against him. (Def. R. 56.1 Stmt. (Dkt. No. 167) at ¶¶ 34, 36; Pltf. Resp. to Def.

R. 56.1 Stmt. (Dkt. No. 189) at ¶¶ 34, 36; June 27, 2016 Thadani Decl., Ex. P (Dkt. No. 166-16)

(Probation Records) at NYC000230)  Plaintiff was arrested on the violation of probation and was

remanded by a Supreme Court justice. (Def. R. 56.1 Stmt. (Dkt. No. 167) at ¶ 38; Pltf. Resp. to

Def. R. 56.1 Stmt. (Dkt. No. 189) at ¶ 38)  At his deposition, Michael Raskin – Plaintiff's

criminal defense lawyer – testified that even if Plaintiff had posted bail in the criminal

facilitation/weapons case, he would have remained in detention on the probation violation.[16]

(See Gross Decl., Ex. Q (Dkt. No. 214-19) (Raskin Dep.) at 73:25-74:18)

       The probation violation petition against Plaintiff remained unresolved until

January 19, 2012.  On that date, and during the same proceeding in which the criminal

facilitation/weapons charges against Plaintiff were dismissed, Plaintiff pleaded guilty to violating

the terms of his probation by committing the crime of Harassment in the Second Degree in June

2006. (Def. R. 56.1 Stmt. (Dkt. No. 167) at ¶¶ 54-55; Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No.

189) at ¶¶ 54-55; Thadani Decl., Ex. Z (Dkt. No. 166-26) (Jan. 19, 2012 Supreme Court

Proceedings) at 3:2-6:25; Gross Decl., Ex. Q (Dkt. No. 214-19) (Raskin Dep.) at 76:18-77:11)

The Supreme Court justice who accepted Plaintiff's guilty plea to the probation violation

imposed no additional term of incarceration, noting that Plaintiff had "spent five years in jail" on

---

[16] Raskin explained that, as a practical matter, bail is not available in probation violation cases;
"remand[] . . . is the standard practice." (Gross Decl., Ex. Q (Dkt. No. 214-19) (Raskin Dep.) at
73:22-74:18) As the case against Plaintiff "dragg[ed] on," Raskin proposed to the assigned
judge that the probation violation be resolved by Plaintiff admitting that he had been "indicted
for possession of a gun" and had "been convicted of disorderly conduct at some point while he
was on probation. . . . You then violate him and then sentence him to something we can agree
on." (Id. at 75:5-76:6) The judge rejected Raskin's proposal, stating that resolution of the
probation violation would require Plaintiff to admit that he had possessed a gun on December 26,
2006, not simply that he had been indicted for possessing a gun. (Id.) "[T]hat was the end of
[Raskin's] attempts and effort to get Mr. Creighton out from under the probation remand." (Id.)

the criminal facilitation/weapons charges. (June 27, 2016 Thadani Decl., Ex. Z (Dkt. No. 166-26) (Jan. 19, 2012 Supreme Court Proceedings) at 6:21-7:3)

### D.    **Alleged Spoliation**

#### 1.    **Mini Mart Surveillance Footage**

As noted above, during the NYPD's investigation of the December 26, 2006 shootings, Fawaz Terab -- the owner of the Mini Mart -- arranged for detectives to obtain a VHS copy of surveillance footage captured on the hard drive of a DVR maintained in the Mini Mart basement. The DVR was connected to a surveillance camera inside the Mini Mart. (Pltf. R. 56.1 Stmt. (Dkt. No. 178) at ¶ 18; Def. Resp. to Pltf. R. 56.1 Stmt. (Dkt. No. 176) at ¶ 18; Gross Decl., Ex. O (Dkt. No. 214-17) (Terab Dep.) at 13:20-18:12) Plaintiff contends, however, that Defendants were obligated to seize and preserve the hard drive of the DVR containing the surveillance footage. (Pltf. Sanctions Br. (Dkt. No. 182) at 5-7, 11) Plaintiff further complains that Defendants lost the original VHS copy made from the footage stored on the DVR, and that

> the repeated copying of the original VHS tape and the subsequent transfer to a DVD that was produced during discovery[] has irreparably altered the original images[,] thereby precluding [P]laintiff from conclusively establishing that he was not the person shown in the video to be passing an object to Dior Creighton. . . .

(Id. at 5; see also Pltf. Reply Sanctions Br. (Dkt. No. 219) at 7-11) Plaintiff also claims that Defendants have edited the surveillance footage. (Id. at 8, 14; Pltf. Reply Sanctions Br. (Dkt. No. 219) at 4, 7-9)

In arguing that (1) the DVD tape produced during discovery is an edited and altered version of the surveillance footage originally recorded on the hard drive of the DVR; and (2) Defendants lost the first generation VHS copy of the surveillance footage, Plaintiff relies on Detective Godino's deposition testimony. Detective Godino testified that the surveillance footage he obtained from the Mini Mart had no "slow motion or . . . reverse on it"; it was "just a

tape running." (Gross Decl., Ex. K-2 (Dkt. No. 214-12) (Godino Dep.) at 334:12-335:3)  The

tape produced by Defendants in this action, however, contains "fast forward, slow motion,

rewind and multiple views all on one tape."  (Id. at 341:5-11)

At deposition, Godino testified that the tape produced by Defendants during

discovery "is not the same version of the tape that [Godino] reviewed when [he] first looked at

it."  (Id. at 334:21-24)  Godino also testified that – within a month of Plaintiff's arrest – he

delivered the NYPD's folders concerning the December 26, 2006 shootings – which contained

the VHS tape obtained from the Mini Mart's DVR – to the Bronx County District Attorney's

Office.  (Id. at 335:10-336:8; see also Gross Decl., Ex. K-1 (Dkt. No. 214-11) (Godino Dep.) at

46:12-21)  According to Godino, the original VHS tape was lost after it was sent to the District

Attorney's Office:

> A:     . . . . I gave [the original VHS tape] to [ADA Bruce Birns] so it could be
>        reviewed and apparently it's nowhere to be found.
>
> Q:     What's nowhere to be found?
>
> A:     The tape.
>
> Q:     The original tape is gone?
>
> A:     I don't know where it is.
>
> Q:     You said that in a way that I took to mean that you believe that the original
>        tape is amongst those things that are missing from this file, is that a fair
>        statement?
> . . . .
>
> A:     Yes.  I was shown a tape that was edited like this.
>
> Q:     When you were shown that tape, were you led to believe that the original,
>        unaltered tape was not to be found anymore?
> . . . .
>
> A:     Yes.

20

(Gross Decl., Ex. K-2 (Dkt. No. 214-12) (Godino Dep.) at 338:6-23)

Defense counsel – Kavin Thadani – confirmed at Detective Godino's deposition that the only version of the Mini Mart surveillance footage produced in this litigation is "an edited copy which has fast forward, slow motion, rewind and multiple views all on one tape." (Id. at 341:5-24)  Thadani also stated at Godino's deposition that "[t]he original tape that would have come out from Mr. Terab's player and video surveillance recorder . . . has never been produced in this case and . . . is not in the possession of [the] [C]orporation [C]ounsel."  (Id. at 341:11-24)

In opposing Plaintiff's motions, however, Defendants now state that both Thadani and Detective Godino "mistakenly believed [at the time of Godino's deposition] that the original videotape was lost or missing because [the videotape played at Godino's deposition] did not play in real time." (Def. Opp. Sanctions Br. (Dkt. No. 208) at 8 n.4)  Relying on the testimony of Plaintiff's video expert – John Afrides – Defendants assert that the playback functions and multiple views originated from the original DVR recording, and thus the presence of these playback functions does not indicate editing or alteration.  (Id. at 7-8, 8 n.4 (citing Afrides Decl. (Dkt. No. 214-5) at ¶ 15))

Accordingly, Defendants now contend that a VHS copy made from the Mini Mart DVR was produced by the Bronx District Attorney's Office to Plaintiff during the criminal case,[17] and re-produced to Plaintiff during discovery in the instant case.  Defendants further contend that the surveillance footage produced to Plaintiff during both proceedings contains the

---

[17]  During a December 13, 2007 conference in Plaintiff's criminal case, Raskin acknowledges having received a copy of the surveillance footage from the District Attorney's Office. (See July 19, 2016 Thadani Decl., Ex. C (Dkt. No. 175-3) (Dec. 13, 2007 Supreme Court Proceedings) at 2:11-16)

original surveillance footage from the Mini Mart DVR, and that that footage has not been edited

or altered in any way.  (Def. Resp. to Pltf. R. 56.1 Stmt. (Dkt. No. 176) at ¶ 62; July 19, 2016

Thadani Decl. (Dkt. No. 175) ¶ 3, Ex. B)

   In support of his summary judgment and sanctions motions, Plaintiff has

submitted a declaration from John Afrides, a photographer and videographer.  (Gross Decl., Ex.

E (Dkt. No. 214-5) (Afrides Decl.))  Afrides states that Plaintiff's counsel asked him to review a

DVD containing surveillance footage from the Mini Mart.[18]  (Id. at ¶ 3)  Based on his review,

Afrides determined that "[a] VHS tape was used to download the DVR images from the DVR,"

and that the DVD provided to him by Plaintiff's counsel had been "digitized from a second

generation VHS tape."  (Id. at ¶¶ 7, 17)  Afrides notes that the DVD he reviewed contains

portions "in real time, slow motion, played forward and reverse and frame-by-frame."  (Id. at ¶

15)  According to Afrides – based on "data embedded in the video" – "[t]hese playback functions

originated at the original DVR recordings."  (Id.)

   Afrides further opines that "if the original DVR had been retained in its native

format (Hard Drive) . . . the images would have been significantly clearer and more details in the

video could be discerned."  (Id. at ¶ 5)  The transfer of material from a DVR to a VHS tape can

"only resolve, at best, 50% of the original DVR information."  (Id. at ¶ 7)  Afrides believes that

the DVD copy he reviewed – which "was of very poor quality" – "was digitized from a second

generation VHS tape," because the DVD contains "'dropouts' and tape distortions that are

usually seen from a tape to tape copy."  (Id. at ¶¶ 10, 17, 20)  Afrides explains that "[m]ultiple

---

[18]  In discovery in the instant case, Defendants provided Plaintiff with a DVD copy of the VHS
copy of the surveillance footage stored on the Mini Mart DVR.  (See Pltf. Reply to Def. Resp. to
Pltf. R. 56.1 Stmt. (Dkt. No. 186) at ¶ 62; Gross Decl., Ex. K-2 (Dkt. No. 214-12) (Godino Dep.)
at 341:5-11)

viewings of the same VHS tape including fast forward, rewind, frame-by-frame, and pausing for still images can and will degrade a tape." (Id. at ¶ 14)  Moreover, some pixilation results when a VHS tape is converted to a DVD format.  (Id. at ¶ 18)

## 2.   NYPD Reports

NYPD officers prepare complaint information reports – known as "DD5s" – that "outlin[e] the various investigative steps taken[,]" such as "interviews of witnesses, computer checks, identification procedures, arrests, [and] requests for subpoenas and other documentation. . . ." (Gross Decl., Ex. K-1 (Dkt. No. 214-11) (Godino Dep.) at 38:18-39:7)  These reports are generally maintained in a case folder bearing a crime victim's name.  (Id. at 39:8-21)  Detective Godino testified that he provided case folders for Caldwell and Ayala – the victims of the December 26, 2006 shootings – to ADA Birns within a month of Plaintiff's arrest.  (Id. at 44:2-24, 46:7-21, 96:10-17)

Godino further testified that – after ADA Birns retired from the Bronx District Attorney's Office and ADA Dan McCarthy was assigned to the case[19] – Godino went to the District Attorney's Office to "go over the case folder[s]," in order to prepare for trial.  Godino noticed at that time that "a lot of the DD5s were missing." (Id. at 45:5-11, 95:25-96:9)  Godino believes that the missing DD5 reports were in the case folders when he delivered them to the District Attorney's Office in early 2007.[20]  (Id. at 96:10-17)  After the charges against Plaintiff

---

[19]  ADA Birns was responsible for the Creighton prosecution from its initiation in January 2007 to his retirement from the District Attorney's Office in 2010. (Gross Decl., Ex. M (Dkt. No. 214-15) (Birns Dep.) at 4:5-7, 25:7-13)  After Birns' departure, ADA Dan McCarthy was assigned to the case.  McCarthy died in February 2011, however.  (Id. at 82:12-15; Gross Decl., Ex. R (Dkt. No. 214-20) (Gottlieb Dep.) at 60:25-61:25, 66:19-22)  ADA Gottlieb became responsible for the case as of April 2011.  (Gross Decl., Ex. R (Dkt. No. 214-20) (Gottlieb Dep.) at 48:10-21, 60:25-61:25)

[20]  Birns testified that he has "no recollection" that any DD5 reports were missing from the case folders.  (Gross Decl., Ex. M (Dkt. No. 214-15) (Birns Dep.) at 105:22-106:5)

were dismissed, Godino picked up the case folders from ADA Gottlieb and brought them to the Corporation Counsel's Office. (Id. at 42:3-25, 43:15-25, 45:12-21)  There is no index for the case folders and the DD5 reports are not numbered; accordingly, the number of missing DD5 reports is unknown. (See Pltf. R. 56.1 Stmt. (Dkt. No. 178) at ¶¶ 110-111, 114-115; Def. Resp. to Pltf. R. 56.1 Stmt. (Dkt. No. 176) at ¶¶ 110-111, 114-115)

## II.   **PROCEDURAL HISTORY**

Plaintiff filed this action in Supreme Court of the State of New York, Bronx County, on August 22, 2012. (Cmplt. (Dkt. No. 1-1))  Defendants removed the action on October 4, 2012. (Dkt. No. 1)  On August 21, 2013, Plaintiff filed an Amended Complaint setting forth seventeen causes of action. (Dkt. No. 10)

In a May 28, 2015 letter, Defendants sought permission to file a motion to dismiss. (Dkt. No. 64)  At a subsequent conference, this Court expressed concern about whether a number of Plaintiff's claims could survive a motion to dismiss. (Dec. 10, 2015 Conf. Tr. (Dkt. No. 83) at 3)  The parties agreed to meet and confer about whether certain of Plaintiff's claims should be dismissed on consent. (Id. at 8, 11)

In a December 23, 2015 joint letter, the parties stated that Plaintiff had agreed to withdraw his claims for Monell liability, negligence, "unreasonable continued prosecution," and false arrest/false imprisonment under Section 1983. (Dkt. No. 82)  Plaintiff also agreed to withdraw his intentional infliction of emotional distress claim against the City of New York and District Attorney Robert Johnson in his official capacity. (Id.)  In the December 23, 2015 letter, Defendants explained that – although they believed that Plaintiff's remaining claims were subject to dismissal – they would move for summary judgment at the close of discovery rather than file a motion to dismiss. (Id.)

At a May 19, 2016 conference, the parties stated that discovery would be complete by May 25, 2016.  (May 19, 2016 Conf. Tr. (Dkt. No. 143) at 14-15)  The Court directed Plaintiff to submit a letter setting forth the legal and factual bases for the claims on which he intended to proceed.  (Id. at 45; see also Dkt. No. 138)  At this conference, Plaintiff raised for the first time the issue of potential spoliation relating to the Mini Mart surveillance footage and the DD5 reports.  (May 19, 2016 Conf. Tr. (Dkt. No. 143) at 18-21)

On May 20, 2016, this Court issued an order setting deadlines for the filing of summary judgment motions, motions in limine, and other pretrial submissions.  (Dkt. No. 138)

In a May 25, 2016 letter, Plaintiff stated that he would proceed on the following claims:  (1) false arrest under New York law; (2) malicious prosecution under New York law; (3) malicious prosecution under Section 1983; (4) violation of Due Process rights under Section 1983; (5) unreasonably prolonged detention under Section 1983; (6) abuse of process under Section 1983; (7) conspiracy under Section 1983; and (8) failure to intervene under Section 1983.[21]  (Pltf. May 25, 2016 Ltr. (Dkt. No. 141))  In the May 25, 2016 letter, Plaintiff also withdrew all claims against Bronx County District Attorney Robert Johnson.  (Id. at 1-2)

Defendants have now moved for summary judgment on all of Plaintiff's remaining claims.  (Dkt. No. 164)  Plaintiff has moved for summary judgment on his claims for (1) false arrest under New York law against all defendants other than Michael Cooper; (2) malicious prosecution under New York law against the City and Defendants Glenn Godino and Dean Roberts; (3) malicious prosecution under Section 1983 as against Defendants Godino and Roberts; and (4) deprivation of his Due Process rights under Section 1983 as against Defendant

---

[21]  The Amended Complaint's other causes of action were dismissed in a January 18, 2017 order. (Dkt. No. 241)

Godino. (Dkt. No. 172) Plaintiff has also moved for sanctions pursuant to Federal Rule of Civil

Procedure 37, based on Defendants' alleged spoliation of evidence. (Dkt. No. 173)

On September 9, 2016, the City of New York and Defendants Birns, Godino,

Johnson, and Roberts filed a Suggestion of Death as to Defendant Ed Talty. (Dkt. No. 220) In a

September 20, 2016 order, this Court adjourned the trial date to January 9, 2017, to permit the

parties to consider whether another party should be substituted for Talty. (See Dkt. Nos. 222,

223) On December 30, 2016, Plaintiff requested an adjournment of the January 9, 2017 trial date

until after the resolution of criminal proceedings currently pending against Plaintiff in Bronx

County Supreme Court.[22] (Dkt. No. 232) Fawaz Terab – who is a critical witness in the instant

case – is the complaining witness in the state court criminal proceedings currently pending

against Plaintiff.[23] (Id.) This Court adjourned the trial date but did not set a new date, given

---

[22] Plaintiff is charged with two counts of robbery, four counts of burglary, six counts of petit
larceny, four counts of criminal trespass, and one count of aggravated harassment. (Jan. 12,
2017 Thadani Ltr., Ex. B (Dkt. No. 237-2) (Mar. 24, 2016 Indictment in People v. Kenneth
Creighton, No. 974-2016))

[23] In a criminal complaint, Terab alleges that on numerous occasions between February 28, 2016
and March 3, 2016, Plaintiff removed cash from the Mini Mart cash register. According to
Terab, while stealing money, Plaintiff sometimes threatened to kill him. (See Jan. 12, 2017
Thadani Ltr., Ex. A (Dkt. No. 237-1) (Mar. 7, 2016 Criminal Cmplt.))

During proceedings in the criminal case currently pending against Plaintiff, his criminal defense
lawyer – Pamela S. Roth – told a Criminal Court judge that

> about two-and-a-half to three years ago, my client, Mr. Creighton, lent Mr. Tareb
> approximately $15,000 to help him keep his store running. Mr. Tareb has [been]
> a father-figure, older-brother-figure, to Mr. Creighton for many, many years.
> They've had a business arrangement that due to the amount of money that my
> client lent him in order to keep his business afloat, that my client can go into his
> business establishment up to two times a day and remove no more than $200 each
> time for a total of $400 from the cash register.

(Id., Ex. C (Dkt. No. 237-3) (Mar. 8, 2016 Criminal Court Proceedings) at 6:23-7:7)

The $15,000 loan described by Roth appears to have been made in some proximity to two
affidavits Terab executed for Plaintiff in connection with the instant case. On February 7, 2013 –
about three years before Plaintiff's March 8, 2016 appearance in Bronx Criminal Court – Terab

uncertainty about when the state court criminal proceedings against Plaintiff would be

completed.[24]  (Dkt. No. 233)

## DISCUSSION

## I.      SANCTIONS MOTION

Plaintiff seeks sanctions against Defendants based on their alleged spoliation of

evidence, including the Mini Mart surveillance footage and DD5 reports discussed above.

Plaintiff contends that he is entitled to judgment against Defendants based on the alleged

spoliation, or to an order "directing that the DVD provided by [D]efendants during discovery

conclusively establishes that the person shown in the video passing an object to Dior [Creighton]

---

executed a handwritten affidavit in which he states that he was the owner of the Prospect Mini
Mart on December 26, 2006, and gives the following account of events that day:

> On that day at about 5 pm I was working in the store & I saw Dior and Kafia
> come into the store.  Kafia took out a silver & black gun from inside his jacket &
> I saw him hand it to Dior.  Dior then walked into the aisle & pulled back on the
> gun to make it ready.  I also heard its sound.  After that Dior put on his hoody &
> left the store with Kafia.  About 5-10 seconds later I heard 6-7 shots from outside
> the store. . . ."

(Pltf. Trial Ex. 2 (Dkt. No. 204-1) (Feb. 7, 2013 Tareb Aff.) at 5)  Terab executed a typed version
of this affidavit on February 21, 2013.  (Gross Decl., Ex. G (Dkt. No. 214-7) (Feb. 21, 2013
Tareb Aff.))

As to the source of the $15,000 Plaintiff loaned to Terab, Roth explained to a Criminal Court
judge that he had borrowed against the judgment he expects to receive in the instant case.  A
"cash advance company" provided the $15,000 that Plaintiff loaned to Terab.  (Jan. 12, 2017
Thadani Ltr., Ex. D (Dkt. No. 237-4) (Nov. 21, 2016 Supreme Court Proceedings) at 3-5)

Records submitted to the Court show that Plaintiff received multiple cash advances over a four-
year period that may amount to as much as $64,000.  (See Pltf. Funding Docs. (Dkt. No. 247))
Plaintiff's counsel in the instant case state that, while they were aware that Plaintiff was
obtaining advances, they had no knowledge that he had loaned money to Terab.  (Jan. 9, 2017
Conf. Tr. (Dkt. No. 239) at 21-23; Jan. 17, 2017 Pltf. Ltr. (Dkt. No. 246) at 1-2)

[24]  Counsel has also informed the Court that criminal charges are pending against Fawaz Terab
for robbery, grand larceny, assault, petit larceny, menacing, and harassment.  In an August 30,
2016 criminal complaint, Terab is alleged to have "acted in concert with Tyrone Creighton" –
Plaintiff's brother – to assault the complainant and steal money from his person.  (Jan. 12, 2017
Thadani Ltr., Ex. E (Dkt. No. 237-5) (People v. Fawaz Terab, Criminal Cmplt.))

is not [P]laintiff, Kenneth Creighton." (Pltf. Sanctions Br. (Dkt. No. 182) at 5-6)  Plaintiff also requests "binding instructions to the jury that it can infer that the original videotape and missing DD5s would be both relevant and favorable to [P]laintiff's case." (Id.)

### A.    Timing of Resolving Spoliation Issue

The parties disagree as to when Plaintiff's sanctions motion should be addressed. Plaintiff contends that the spoliation issue must be resolved now, because this Court may grant Plaintiff relief that could affect resolution of the cross-motions for summary judgment.  (See Dkt. No. 155)  Defendants argue that Plaintiff's sanctions motion and spoliation claim should be treated as a motion in limine, and considered only after the cross-motions for summary judgment have been resolved.  (June 30, 2016 Ltr. (Dkt. No. 153) at 1-2; Def. Opp. Sanctions Br. (Dkt. No. 208) at 3)

Given that Plaintiff seeks judgment against Defendants based on the alleged spoliation – and not merely a jury instruction – it would not be appropriate to treat Plaintiff's sanctions motion as a motion in limine.  Moreover, the Second Circuit has made clear that where a party has intentionally destroyed relevant evidence, such conduct may – under certain circumstances – affect the outcome of a summary judgment motion.  See Byrnie v. Town of Cromwell, Bd. of Educ., 243 F.3d 93, 110-11 (2d Cir. 2001) ("[W]hile the . . . evidence might not have been sufficient in itself to defeat summary judgment, it does when coupled with the allowable inference of spoliation."); Kronisch v. United States, 150 F.3d 112, 126-30 (2d Cir. 1998) ("[A]t the margin, where the innocent party has produced some (not insubstantial) evidence in support of his claim, the intentional destruction of relevant evidence by the opposing party may push a claim that might not otherwise survive summary judgment over the line.").

Accordingly, this Court will address Plaintiff's sanctions motion and spoliation claim before considering the parties' cross-motions for summary judgment.

**B.**     **Applicable Law**

"It is a well-established and long-standing principle of law that a party's intentional destruction of evidence relevant to proof of an issue at trial can support an inference that the evidence would have been unfavorable to the party responsible for its destruction." Kronisch, 150 F.3d at 126. Although Plaintiff seeks sanctions pursuant to Federal Rule of Civil Procedure 37(b) – which provides for sanctions "when a party spoliates evidence in violation of a court order" – Rule 37(b) is not applicable here, because no discovery order was in place when (1) the Mini Mart surveillance footage was allegedly not preserved, or (2) the DD5 reports were allegedly destroyed. "Even without a discovery order, [however,] a district court may impose sanctions for spoliation, exercising its inherent power to control litigation." West v. Goodyear Tire & Rubber Co., 167 F.3d 776, 779 (2d Cir. 1999).

"Where a party seeks sanctions based on the spoliation of evidence, it must establish 'that the sought-after evidence actually existed and was destroyed.'" Skyline Steel, LLC v. PilePro, LLC, 101 F. Supp. 3d 394, 408 (S.D.N.Y. 2015) (quoting Farella v. City of New York, No. 05 Civ. 5711 (NRB), 2007 WL 193867, at *2 (S.D.N.Y. Jan. 25, 2007)). Moreover, "'[a] party seeking an adverse inference instruction [or some other sanction] based on the destruction of evidence must establish (1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a culpable state of mind; and (3) that the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense.'" Chin v. Port Auth. of N.Y. & N.J., 685 F.3d 135, 162 (2d Cir. 2012) (quoting

Residential Funding Corp. v. DeGeorge Fin. Corp., 306 F.3d 99, 107 (2d Cir. 2002)).  Where

these three elements are established, a court must then decide what, if any, sanction is

appropriate.  That determination "is confined to the sound discretion of the trial judge, and is

assessed on a case-by-case basis."  Fujitsu Ltd. v. Fed. Express Corp., 247 F.3d 423, 436 (2d Cir.

2001) (internal citations omitted).

### C.   Discussion

#### 1.   Surveillance Footage

With regard to the Mini Mart surveillance footage, Defendants contend that (1)

the surveillance footage captured on the hard drive of the Mini Mart DVR was properly

preserved; (2) in any event, there was no obligation to preserve the surveillance footage, because

civil litigation was not foreseeable; and (3) even if the copy of surveillance footage produced in

discovery is inferior to the footage originally captured on the hard drive of the Mini Mart DVR,

Plaintiff has not demonstrated that the version captured on the DVR would have supported his

claim.  (Def. Opp. Sanctions Br. (Dkt. No. 208) at 3-8)

##### a.   Whether Evidence Was Destroyed or Materially Altered

"Spoliation is the destruction or significant alteration of evidence, or the failure to

preserve property for another's use as evidence in pending or reasonably foreseeable litigation."

West, 167 F.3d at 779.  A spoliation claim is thus "predicated on 'evidence actually . . . [having

been] destroyed [or materially altered].'"  Khaldei v. Kaspiev, 961 F. Supp. 2d 564, 569

(S.D.N.Y. 2013) (quoting Orbit One Commc'ns v. Numerex Corp., 271 F.R.D. 429, 441

(S.D.N.Y. 2010)).

Plaintiff contends that Defendants were obligated to preserve the hard drive of the

Mini Mart DVR, because images stored on a DVR are clearer than images that are copied onto a

VHS tape from a DVR.  (Pltf. Reply Sanctions Br. (Dkt. No. 219) at 7-11)  Moreover, images

stored on the hard drive of a DVR may be enhanced, whereas a VHS tape cannot be enhanced.

Plaintiff also contends that Defendants lost the original VHS copy, leading to the inferior copy of

surveillance footage that was produced to Plaintiff in discovery.  (Pltf. Sanctions Br. (Dkt. No.

182) at 11)

   In <u>Crawford v. City of New London</u>, No. 11 Civ. 1371 (JBA), 2014 WL 2168430

(D. Conn. May 23, 2014), the court addressed a spoliation argument similar to that raised here.

In that case, plaintiff sought sanctions against defendants, because the original hard drive

containing relevant security camera footage from the New London High School gym lobby had

been recorded over, leaving only a DVD copy of the surveillance footage. <u>Id.</u> at *2.  Plaintiff

contended that the DVD format was "very difficult to enhance" and that the loss of the original

recording on the hard drive deprived plaintiff of an opportunity to enhance the footage and

present a clearer recording "that could have corroborated his version of events." <u>Id.</u>  The court

rejected this argument:

> Plaintiff cites no authority for the proposition that a defendant has a duty to
> anticipate the format that would be most convenient for the plaintiff and to
> preserve evidence in that format, especially where the standard practice for
> preservation is to record a copy of the footage and re-use the original hard drive.
> Thus, it is doubtful that any evidence was "destroyed or materially altered" as
> those terms are typically understood in the context of a motion for spoliation
> sanctions.

<u>Id.</u>

   In reaching this conclusion, however, the <u>Crawford</u> court relied on evidence not

present here. First, the New London Public Schools Chief Information Officer had submitted an

affidavit stating that "the standard procedure for preserving security footage is to make a copy of

that footage on a DVD and to record over the original hard drive after the sixteen-day retention

period has passed, and that this procedure was followed in this case." <u>Id.</u>  Here, Defendants have

offered no evidence of what the NYPD's standard procedure is in such circumstances,[25] and

Plaintiff has submitted a declaration from an expert witness – a former high-ranking NYPD

officer – stating that standard police procedure is to preserve the hard drive.[26]  (Gross Decl., Ex.

D (Dkt. No. 214-4) (Signorelli Decl.) at ¶ 22)

---

[25]  Instead of presenting evidence concerning the NYPD's standard procedures regarding video evidence, Defendants cite testimony concerning Fawaz Terab's standard practice when police officers request surveillance footage from his DVR.  (Def. Opp. Sanctions Br. (Dkt. No. 208) at 3)  What matters here is the NYPD's standard procedure, not Terab's standard practice when the police request surveillance footage.

[26]  Defendants have moved to preclude the declaration of Walter Signorelli (Gross Decl., Ex. D (Dkt. No. 214-4) (Signorelli Decl.)), who is Plaintiff's "police practices and procedures" expert. Defendants contend that Signorelli's declaration should be precluded because, inter alia, Plaintiff did not provide a timely expert disclosure and Defendants have not had an opportunity to depose Signorelli.  (Def. Opp. Br. (Dkt. No. 177) at 16-17)

Fed. R. Civ. P. 37(c)(1) provides that "[i]f a party fails to . . . identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that . . . witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."  Preclusion is a "'harsh remedy'" that "'should be imposed only in rare situations,'" however.  Ritchie Risk-Linked Strategies Trading (Ireland), Ltd. v. Coventry First LLC, 280 F.R.D. 147, 156 (S.D.N.Y. 2012) (quoting Izzo v. ING Life Ins. & Annuity Co., 235 F.R.D. 177, 186 (E.D.N.Y. 2005)).  "In determining whether preclusion or another sanction would be appropriate, courts should consider:  '(1) the party's explanation for the failure to comply with the discovery [requirement]; (2) the importance of . . . the precluded [evidence]; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance.'"  Ritchie Risk-Linked Strategies, 280 F.R.D. at 157 (quoting Softel, Inc. v. Dragon Med. & Sci. Comme'ns., Inc., 118 F.3d 955, 961 (2d Cir. 1997)).

Here, Defendants argue that Plaintiff produced Signorelli's expert report on June 30, 2016, three days after the June 27, 2016 deadline for expert disclosures.  (See Def. Opp. Br. (Dkt. No. 177) at 16)  While this Court does not condone missing discovery deadlines, Plaintiff's delay was minimal and does not warrant the "harsh" sanction of precluding Signorelli's testimony. Plaintiff had indicated to the Court that it would be difficult for Signorelli to complete his report by June 27, 2016, and – taking that representation into account – this Court directed Plaintiff's expert to use his "best efforts" to issue the report by June 27, 2016.  (See Dkt. No. 149) Moreover, Defendants have identified no prejudice flowing from the three-day delay in producing the expert report.  Nor is there any indication that Defendants attempted to depose Signorelli.  Accordingly, Defendants' request to preclude Signorelli's declaration is denied.

Second, the New London Public Schools Chief Information Officer's affidavit also states that "'there is no difference between the content and quality of the footage captured on the security camera hard drives and the same footage as extracted and burned onto a DVD.'" Crawford, 2014 WL 2168430, at *2. Here, of course, there is evidence to the contrary. Plaintiff has offered expert testimony that the footage captured on the DVR's hard drive would have been much clearer than the VHS copy made from the Mini Mart DVR. (Gross Decl., Ex. E (Dkt. No. 214-5) (Afrides Decl.) at ¶¶ 5, 7, 14, 17-18, 20) According to Plaintiff's expert, as much as 50% of the data might have been lost in the transfer. (Id. at ¶ 7) Plaintiff's expert has also opined that the DVD version of the surveillance footage produced by Defendants in discovery was made from a second generation VHS tape and not the original VHS copy. (Id. at ¶¶ 7, 17) By contrast, Defendants have offered no evidence that the DVD produced in discovery – or the VHS copy used at depositions – is substantially the same as the footage that had been stored on the DVR's hard drive.

Accordingly, as a threshold matter, there is sufficient evidence that the transfer of surveillance footage from the hard drive of the Mini Mart DVR to a VHS tape resulted in the loss or material alteration of the surveillance footage.[27]

However, to the extent that Plaintiff's spoliation claim is premised on the contention that the Defendants lost the original VHS copy made from the Mini Mart DVR – and then utilized second or later generation VHS copies of the surveillance footage – that claim fails. As an initial matter, the declaration from Plaintiff's video expert – John Afrides – states that

---

[27]  To the extent Plaintiff contends that the surveillance footage has been edited – because the tape provided in discovery contains playback functions such as slow motion – the Court rejects that argument.  Plaintiff's expert has opined that the "playback functions originated at the original DVR recordings." (Gross Decl., Ex. E (Dkt. No. 214-5) (Afrides Decl.) at ¶ 15)

most of the degradation to the surveillance footage would have occurred when the footage was transferred from the Mini Mart DVR to the original VHS tape. Afrides estimates that, "at best, 50% of the original DVR information" would have been successfully transferred from the DVR to the original VHS tape. (Id. at ¶¶ 7, 16)

While Afrides also states that (1) the DVD copy he reviewed – which was made from a VHS copy of the surveillance footage – is "of very poor quality"; (2) repeated viewing of VHS tapes will degrade their quality; and (3) the reproduction of "[a] VHS copy to another VHS copy would further degrade the image[,] as the VHS format is an analog signal and every generation in the analog world degrades" (id. at ¶¶ 10, 14, 16, 20), none of these statements is sufficient to demonstrate spoliation. Afrides reviewed only the DVD version of the surveillance footage produced by Defendants during discovery. (See id. at ¶¶ 3, 8-10, 15, 17-18, 21) He is thus in no position to opine as to the VHS copy that would be introduced at trial. Accordingly, Plaintiff's sanctions motion is denied to the extent it is based on Defendants' failure to preserve the original VHS copy of the surveillance footage.

### b.    Obligation to Preserve

"In order for an adverse inference to arise from the destruction of evidence, the party having control over the evidence must have had an obligation to preserve it at the time it was destroyed." Kronisch, 150 F.3d at 126. "Th[e] obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation . . . [or] when a party should have known that the evidence may be relevant to future litigation." Id. "Courts have held[, however,] that [a spoliation sanction] is not appropriate where the [movant has not shown that the alleged spoliators had] 'any control over the [relevant] recordings, any duty to maintain them, or were in any way involved in the failure to preserve them.'" Deanda v. Hicks, 137 F. Supp. 3d 543, 556

34

(S.D.N.Y. 2015) (quoting Grant v. Salius, No. 09 Civ. 21, 2011 WL 5826041, at *2 (D. Conn. Nov. 18, 2011)).

      Here, Defendants contend that they had no obligation to preserve the surveillance footage because civil litigation was not foreseeable during the pendency of Plaintiff's criminal case. (Def. Opp. Sanctions Br. (Dkt. No. 208) at 6)  In Manganiello v. City of New York, 612 F.3d 149 (2d Cir. 2010), however, the Second Circuit rejected as "frivolous" defendant's argument that a police detective "had no obligation to preserve the case file" during a criminal case and before civil litigation commenced.[28]  Id. at 166.  Accordingly, this Court assumes – for purposes of Plaintiff's spoliation claim – that the NYPD and the Bronx County District Attorney's Office had an obligation to preserve evidence relevant to Plaintiff's underlying criminal case.

      "Spoliation sanctions are applicable only when a party loses or destroys evidence, [however,] not when he or she fails to collect it." Sachs v. Cantwell, No. 10 Civ. 1663 (JPO), 2012 WL 3822220, at *9 (S.D.N.Y. Sept. 4, 2012) (denying spoliation sanctions in a Section 1983 action against the City of New York and NYPD officers, where officers were allegedly negligent in failing to secure surveillance video from a restaurant where an altercation took place); see also Stern v. Shammas, No. 12 Civ. 5210 (NGG) (RER), 2015 WL 4530473, at *13-

---

[28]  In Manganiello, the entire NYPD detective file – which contained the original copies of DD5 reports, handwritten notes from which the DD5 reports were created, the arrest report, the results of gunshot residue tests, and other documents – disappeared before plaintiff's criminal trial. Manganiello, 612 F.3d at 159.  The Second Circuit observed that the file "had been committed to the custody" of defendant Agostini, the lead detective, and that "it was his responsibility to preserve the evidence until the time of [the criminal] trial." Id. at 166.  The court further determined that, at the time the file went missing, it was in Agostini's custody and control. Id. Under these circumstances, the Second Circuit rejected Agostini's argument that he had no obligation to preserve the case file.  The court reached this conclusion even though there is no suggestion in the opinion that defendants were on notice of a potential civil claim at the time the file was lost. See id. at 166-67.

14 (E.D.N.Y. July 27, 2015) (denying adverse inference instruction where portion of a video recording had been lost because, inter alia, "Plaintiff has failed to show that the original recording was in the custody or control of the individual Defendants. . . ."). Poux v. County of Suffolk, No. 09 Civ. 3081 (SJF) (WDW), 2012 WL 1020302 (E.D.N.Y. Mar. 23, 2012), is instructive on this point.

In Poux, Citibank employees investigating a fraudulent check cashing scheme provided police officers with still photographs and tapes of surveillance video from Citibank branches. Poux, 2012 WL 1020302, at *15-16. Plaintiff contended, however, that other surveillance video was lost when Citibank recycled the tapes pursuant to its standard policy of putting surveillance tapes back in service after 60 to 90 days. Id. In denying plaintiff's motion for sanctions against police and prosecutor defendants, the court determined, inter alia, that there was "no evidence in the record . . . that [those defendants] ever had control over the allegedly lost or destroyed videotapes or played any part in the destruction of the videotapes." Id. at *19.

The Second Circuit has likewise distinguished between the destruction of evidence and a failure to collect it. In United States v. Greenberg, 835 F.3d 295 (2d Cir. 2016), the court addressed a similar claim of spoliation, albeit in the context of a due process claim in a criminal case. The legal standard applicable to such claims contains an analogous threshold requirement that "'the record must . . . show that evidence has been lost and that this loss is "chargeable to the State."'" Id. at 303 (quoting United States v. Rahman, 189 F.3d 88, 139 (2d Cir. 1999)).

In Greenberg, defendant sought dismissal of the indictment on grounds of spoliation where the FTC's civil investigators had copied computer hard drives in a "deficient and incomplete" fashion. Id. The Second Circuit found it "doubtful" that defendant had

succeeded in "even rais[ing] a due process issue regarding the failure to preserve evidence" because, inter alia, he had "not provide[d] substantive support for his argument that the failure to collect evidence could ground a due process claim. . . ." Id. (emphasis in original).

      Here, Plaintiff's spoliation claim is – as to the surveillance footage – premised on the notion that the NYPD was legally obligated to seize the Mini Mart DVR. Spoliation sanctions address the destruction, alteration, or loss of evidence in a party's control, however, and the Mini Mart DVR was owned and maintained by Terab, a private third-party. There is no evidence that the DVR was ever in Defendants' custody or control, or that Defendants played a role in the loss or destruction of the surveillance footage stored on the DVR's hard drive. Because spoliation sanctions are not available where, as here, "a party [merely] . . . fails to collect" evidence, Sachs, 2012 WL 3822220, at *9, Plaintiff's sanctions motion will be denied to the extent it is premised on the NYPD's failure to seize the Mini Mart DVR.

### 2.    DD5 Reports

      As to the DD5 reports, Defendants contend that Plaintiff has not shown (1) that any DD5 reports are actually missing; (2) what information was contained in the DD5 reports that are allegedly missing; (3) that Defendants had an obligation to maintain the DD5 reports at the time they went missing; or (4) that any Defendant destroyed a DD5 report with a culpable state of mind. (Def. Opp. Sanctions Br. (Dkt. No. 208) at 9-10)

### a.    Whether DD5 Reports Are Missing

      "[T]he spoliation doctrine is predicated on 'evidence actually exist[ing] and [being] destroyed.'" Khaldei, 961 F. Supp. 2d at 569 (quoting Orbit One Commc'ns, 271 F.R.D. at 441). "Case law is clear, however, that 'speculative assertions as to the existence of documents do not suffice to sustain a motion for spoliation of evidence.'" Dilworth v. Goldberg,

3 F. Supp. 3d 198, 202 (S.D.N.Y. 2014) (quoting Tri-County Motors, Inc. v. Am. Suzuki Motor

Corp., 494 F. Supp. 2d 161, 177 (E.D.N.Y. 2007)); see also Khaldei, 961 F. Supp. 2d at 570

("[B]ecause plaintiff's argument that there has been any actual loss of evidence relevant to the

claims or defenses in this case amounts to pure speculation, it is insufficient to sustain a motion

for spoliation sanctions.").

      Here, there is some evidence that DD5 reports originally maintained in the

relevant case folders are now missing.  Detective Godino testified that, when reviewing the case

folders with ADA McCarthy in preparation for trial, he observed that "a lot of the DD5s were

missing" from the case folders.  (Gross Decl., Ex. K-1 (Dkt. No. 214-11) (Godino Dep.) at 45:5-

11, 95:25-96:9)  Godino "d[oes]n't know the amount" and "wouldn't say more than thirty, but a

few documents" were missing from the case folders.  (Id. at 96:18-25)  The absence of a "blue

DD5" indicated to Godino that DD5 reports were missing from the case folders, because

ordinarily a "blue DD5" appears as the last page in a case folder and signifies that an arrest was

made.  (Id. at 100:19-101:6, 101:25-102:7, 106:9-14)  Aside from the "blue DD5," however,

Godino could not "specif[y] . . . which "DD5s [he] noticed were missing" from the case folders.

(Id. at 99:7-14)  Because (1) there is no index for the case folders, and (2) the DD5 reports are

not numbered, how many DD5 reports are missing is unknown.  (See Pltf. R. 56.1. Stmt. (Dkt.

No. 178) at ¶¶ 110-111, 114-115; Def. Resp. to Pltf. R. 56.1 Stmt. (Dkt. No. 176) at ¶¶ 110-

111,114-115)

      ADA Gottlieb testified that when she received the case folders, a "memo book[,]

. . . original photo identification forms and those kind of things" were missing.  (Gross Decl., Ex.

R (Dkt. No. 214-20) (Gottlieb Dep.) at 41:8-15)  Because Gottlieb had never seen the case

folders before, however, she could not specify what, if any, DD5 reports were missing.[29]  (Id. at
41:23-42:5)

The Court concludes that the record supports Plaintiff's contention that an
unknown number of DD5 reports are missing from the case folders.  The Court further concludes
that the case folders were in the possession of the Bronx County District Attorney's Office at the
time that some number of DD5 reports went missing, and that these reports were lost during the
pendency of Plaintiff's criminal case, between early 2007 and early 2011.  In light of
Manganiello, the Court also concludes that the Bronx County District Attorney's Office had an
obligation to preserve the contents of the case folders, including any DD5 reports, during the
pendency of Plaintiff's criminal case, even though the City had not received notice of a potential
civil claim.  See Manganiello, 612 F.3d at 166.

### b.    Culpable State of Mind

"[W]here the preservation obligation has been breached, sanctions will only be
warranted if the party responsible for the loss had a sufficiently culpable state of mind.'"  In re
Pfizer Inc. Sec. Litig., 288 F.R.D. 297, 314 (S.D.N.Y. 2013) (quoting In re WRT Energy Sec.
Litig., 246 F.R.D. 185, 195 (S.D.N.Y. 2007)).  "A court may impose sanctions if it finds that the
party acted at least negligently in destroying or losing the spoliated material."  Id. (citing Harkabi
v. SanDisk Corp., 275 F.R.D. 414, 418 (S.D.N.Y. 2010)); see also Byrnie, 243 F.3d at 108 ("[A]t
times, [the Second Circuit has] required a party to have intentionally destroyed evidence; at other
times [it has] required action in bad faith; and at still other times [it has] allowed an adverse

---

[29]  Although both Godino and Gottlieb testified that documents other than DD5 reports were
missing from the case folders, Plaintiff's spoliation claim is limited to DD5 reports.  (See Pltf.
Notice of Motion (Dkt. No. 173) at 1; Pltf. Sanctions Br. (Dkt. No. 182) at 5-8, 17; Pltf. Reply
Sanctions Br. (Dkt. No. 219) at 4-5, 11-13)

inference based on gross negligence. . . .”).  The Second Circuit has stated that “‘a case by case approach [is] appropriate’ to determine whether an adverse inference [or some other sanction] is warranted.”  Deanda, 137 F. Supp. 3d at 555 (quoting Byrnie, 243 F.3d at 107-08).

      “The sanction of an adverse inference may be appropriate in some cases involving the negligent destruction of evidence because each party should bear the risk of its own negligence.”  Residential Funding Corp., 306 F.3d at 108.  “‘In the discovery context, negligence is a “failure to conform to the standard” of “what a party must do to meet its obligation to participate meaningfully and fairly in the discovery phase of a judicial proceeding.”’”  In re Pfizer Inc. Sec. Litig., 288 F.R.D. at 314 (quoting Harkabi, 275 F.R.D. at 418-19).  Courts in this district have acknowledged that “‘[o]nce the duty to preserve attaches, any destruction [] is, at a minimum, negligent.’”  Slovin v. Target Corp., No. 12 Civ. 863 (HB), 2013 WL 840865, at *4 (S.D.N.Y. Mar. 7, 2013) (quoting Zubulake v. UBS Warburg LLC, 220 F.R.D. 212, 220 (S.D.N.Y. 2003)); see also Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona, 138 F. Supp. 3d 352, 388-89 (S.D.N.Y. 2015) (same).  “A party [may be] negligent even if the failure ‘results from a pure heart and an empty head.’”  Curcio v. Roosevelt Union Free Sch. Dist., 283 F.R.D. 102, 111 (E.D.N.Y. 2012) (quoting Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC, 685 F. Supp. 2d 456, 464 (S.D.N.Y. 2010)).

      “Gross negligence is the ‘failure to exercise even that care which a careless person would use.’”  Harkabi, 275 F.R.D. at 419 (quoting Pension Comm. of Univ. of Montreal Pension Plan, 685 F. Supp. 2d at 464).  “In the discovery context, courts have found gross negligence where data was spoliated because a party failed to take widely-recognized steps to preserve it, such as failing to issue a written litigation hold or failing to prevent backup tapes from being erased.”  Id. (citing In re NTL, Inc. Sec. Litig., 244 F.R.D. 179, 198-99 (S.D.N.Y.

2007)); see also In re Pfizer Inc. Sec. Litig., 288 F.R.D. at 314-15 (identifying discovery failures sufficient to support a finding of gross negligence). "[A] finding of gross negligence merely permits, rather than requires, a district court to give an adverse inference instruction." Chin, 685 F.3d at 162.

Here, Detective Godino testified that he brought the case folders containing the relevant DD5 reports to ADA Birns in early 2007, and that the case folders remained at the District Attorney's Office over the next five years, during the pendency of Plaintiff's criminal case. (Gross Decl., Ex. K-1 (Dkt. No. 214-11) (Godino Dep.) at 44:2-24, 45:12-21, 46:7-21, 96:10-17, 168:21-169:2; Gross Decl., Ex. K-2 (Dkt. No. 214-12) (Godino Dep.) at 335:10-336:8) Detective Godino became aware that DD5 reports were missing from the case folders when, in 2010 or early 2011, he met with ADA McCarthy to prepare for trial in Plaintiff's criminal case. (See Pltf. R. 56.1 Stmt. (Dkt. No. 178) at ¶ 179; Def. Resp. to Pltf. R. 56.1 Stmt. (Dkt. No. 176) at ¶ 179; Gross Decl., Ex. K-1 (Dkt. No. 214-11) (Godino Dep.) at 45:5-11, 95:25-96:25; Gross Decl., Ex. R (Dkt. No. 214-20) (Gottlieb Dep.) at 41:6-15, 131:4-17) While it appears that DD5 reports went missing at some point between early 2007 and early 2011, and that the case folders were in the custody of the Bronx County District Attorney's Office at that time, there is no evidence as to (1) when during the 2007 to 2011 time period the DD5 reports went missing, or (2) which ADA had custody of the case folders at the time the DD5 reports went missing. There is likewise no evidence that any Defendant intentionally or willfully destroyed the missing DD5 reports.

Nor is there evidence that any Defendant acted with gross negligence. Gross negligence may exist where a party "failed to take widely-recognized steps to preserve [materials relevant to a claim]," such as failing to implement a litigation hold or preventing the destruction

of files pursuant to a pre-existing recycling policy. See Harkabi, 275 F.R.D. at 419. Here, there

is no evidence that the DD5 reports went missing as a result of such an omission. As to

Detective Godino, the record shows that he delivered the entire case folders to the Bronx County

District Attorney's Office in early 2007 for use in Plaintiff's criminal case. (Gross Decl., Ex. K-

1 (Dkt. No. 214-11) (Godino Dep.) at 44:2-24, 45:12-21, 46:7-21, 96:10-17, 168:21-169:2; Gross

Decl., Ex. K-2 (Dkt. No. 214-12) (Godino Dep.) at 335:10-336:8) While the District Attorney's

Office had a duty to preserve the contents of the case folders, the City had not yet received notice

of a potential civil claim at the time the DD5 reports went missing. Even where a duty to

preserve has attached, the absence of notice of a civil claim mitigates against a finding of gross

negligence. See Taylor v. City of New York, 293 F.R.D. 601, 612-13 (S.D.N.Y. 2013)

(destruction of prison surveillance footage did not constitute gross negligence; although prison

had duty to preserve such footage, it was destroyed under existing video recycling policy prior to

notice of a civil claim). Under the circumstances here, this Court finds that Plaintiff has not

demonstrated that any Defendant acted with gross negligence.

Accordingly, any loss of DD5 reports was, at most, negligent. See Slovin, 2013

WL 840865, at *4 ("'[O]nce the duty to preserve attaches, any destruction [] is, at a minimum,

negligent.'").

### c.    **Whether Relevant Evidence Was Lost**

"'[W]hen the destruction [of evidence] is negligent, relevance must be proven by

the party seeking the sanctions.'" Deanda, 137 F. Supp. 3d at 555 (quoting Crawford, 2014 WL

2168430, at *4). A party need not demonstrate relevance where the destruction was willful,

because "'bad faith alone is sufficient circumstantial evidence from which a reasonable trier of

fact could conclude that the missing evidence was unfavorable to that party.'" Id. at 557

42

(quoting Residential Funding Corp., 306 F.3d at 109). Because there is no evidence that any Defendant intentionally or willfully destroyed DD5 reports, or acted with gross negligence, Plaintiff has the burden of proving that the allegedly lost evidence was "relevant" to his claims. Id. at 555.

       "In the context of an application for an adverse inference [jury instruction or some other sanction for spoliation], relevance 'means something more than sufficiently probative to satisfy Rule 401 of the Federal Rules of Evidence.'" Curcio, 283 F.R.D. at 112 (quoting Residential Funding Corp., 306 F.3d at 108-09) (emphasis omitted). A party seeking sanctions for negligent spoliation must demonstrate that the destroyed, altered, or lost evidence "was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." Chin, 685 F.3d at 162.

       While "[c]ourts must take care not to 'hold[] the prejudiced party to too strict a standard of proof regarding the likely contents of the destroyed [or unavailable] evidence. . . ,'" Residential Funding Corp., 306 F.3d at 109 (quoting Kronisch, 150 F.3d at 128), a party seeking spoliation sanctions for negligent conduct "must show through extrinsic evidence that the destroyed evidence would have been favorable to [his] case. Without such extrinsic evidence showing that the destroyed evidence would have been helpful in proving a claim or defense, more severe sanctions such as an adverse inference are not warranted." Curcio, 283 F.R.D. at 112 (internal citations omitted); see also Great N. Ins. Co. v. Power Cooling, Inc., No. 06 Civ. 874 (ERK) (KAM), 2007 WL 2687666, at *11 (E.D.N.Y. 2007) ("'[W]here the culpable party was negligent, there must be extrinsic evidence to demonstrate that the destroyed evidence was relevant and would have been unfavorable to the destroying party.'" (quoting De Espana v. Am. Bureau of Shipping, No. 03 Civ. 3573 (LTS) (RLE), 2007 WL 1686327, at *6 (S.D.N.Y. June 6,

2007)). "'This corroboration requirement is . . . necessary where the destruction was merely

negligent, since in those cases it cannot be inferred from the conduct of the spoliator that the

evidence would even have been harmful to him.'" Great N. Ins. Co., 2007 WL 2687666, at *11

(quoting Zubulake, 220 F.R.D. at 221). "'Typically, the evidence used to establish relevance of

missing documents is deposition testimony.'" Id. (citations omitted). "For example, . . . the

party seeking the adverse inference [may] establish[] relevance through deposition testimony

regarding the nature of the missing documents. . . ." Residential Funding Corp., 306 F.3d at 109

(citing Byrnie, 243 F.3d at 109-10).

      Here, Plaintiff has not demonstrated that any missing DD5 reports are relevant to

a claim or defense in this litigation.  The testimony of Detective Godino and ADA Gottlieb

suggests that some DD5 reports and other documents might be missing from the case folders, but

neither witness could state what reports are missing, what information the missing reports

contain, or to which aspects of the Creighton investigation the allegedly missing documents

relate.  (See Gross Decl., Ex. K-1 (Dkt. No. 214-11) (Godino Dep.) at 95:25-96:25, 99:7-14;

Gross Decl., Ex. R (Dkt. No. 214-20) (Gottlieb Dep.) at 40:25-42:5)  For his part, Plaintiff states

that he "cannot possibly know what was contained in [the missing DD5 reports]." (Pltf.

Sanctions Br. (Dkt. No. 182) at 14)

      While cognizant of its obligation not to impose "too strict a standard of proof" on

Plaintiff, see Residential Funding Corp., 306 F.3d at 109, this Court concludes that there is no

evidence from which it can divine the content of the allegedly missing DD5 reports.  "The only

evidence that Plaintiff has adduced suggesting that the [the missing DD5 reports] would [have]

be[en] []favorable to [Plaintiff] is the non-production itself." Cortes v. Peter Pan Bus Lines, Inc.,

455 F. Supp. 2d 100, 103 (D. Conn. 2006).  This showing is not sufficient to demonstrate

relevance for purposes of obtaining sanctions for spoliation.  Accordingly, as to the missing DD5 reports, Plaintiff's sanctions motion will likewise be denied.[30]

## II.   CROSS-MOTIONS FOR SUMMARY JUDGMENT

The Court's resolution of the cross-motions for summary judgment has been hampered by Plaintiff's consistent practice of referring – throughout the pleadings and the summary judgment briefing – to "Defendants," without making any effort to separately analyze the relevant evidence and legal issues as to each of Detective Godino, Detective Roberts, ADA Birns, ADA Talty, and ADA Cooper.  (See Pltf. Opp. Br. (Dkt. No. 184); Pltf. Moving Br. (Dkt. No. 180))  The Defendants played vastly different roles in the arrest and prosecution of Plaintiff, and the practice of lumping them together throughout the Amended Complaint[31] and in the summary judgment briefing obscures and confuses the evidence as to each Defendant and renders the application of law more difficult.  As best as this Court can discern, Plaintiff's theory of liability is, as to each Defendant, as follows:

Plaintiff further contends that Detective Godino lacked probable cause to arrest him, because (1) Terab had contradicted the CI's account; (2) the CI was a "known crack-

---

[30] Manganiello is not to the contrary.  In Manganiello, the lead detective's entire case folder disappeared before the plaintiff's criminal trial.  Manganiello, 612 F.3d at 158.  Although the District Attorney's Office had retained copies of the DD5 reports, the lost case folder contained the original "handwritten notes of [detectives'] interviews" from which the DD5 reports were generated.  Id. at 158, 166.  In concluding that the missing documents were relevant, the Second Circuit reasoned that "[t]he handwritten notes made prior to the preparation of the various DD5s may have contained clarifying information that was not incorporated in the DD5s, including information as to the provenance of the variations in the versions [of inconsistent statements] given by [a witness]."  Id. at 166.  Accordingly, in Manganiello, the record offered insight into the nature of the missing documents and how they related to the claims in the case, even though it could not be established with precision what the missing handwritten notes said.  Here, however, the record offers no insight into the relevance of the allegedly missing DD5 reports.
[31] All Defendants are named in all of the remaining counts.  (See Am. Cmplt. (Dkt. No. 10) at ¶¶ 42-55, 56-76, 83-84, 91, 95-100, 101-106, 150-163, 179-185)

addicted paid informant"; and (3) "the CI's identification of K[enneth] Creighton as the person who passed the gun was fabricated with the assistance and blessing of [D]efendant[] Godino." (Pltf. Opp. Br. (Dkt. No. 184) at 14-16; see also id. at 22, 22 n.4)

Plaintiff contends that Detective Godino is liable for malicious prosecution because he suppressed Terab's exculpatory information and supplied false information to ADA Birns. (Id. at 13-14, 24; see also id. at 25 ("ADAs Birns and Talty were misled as they did not know about Terab's statement"); id. at 26 ("The prosecutors were precluded from making an informed decision about whether to proceed with the prosecution because Godino suppressed evidence and failed to make a complete statement of facts to the DA."); Pltf. Moving Br. (Dkt. No. 180) at 15 ("before obtaining approval from Birns and Talty to arrest [Kenneth] Creighton, Godino did not inform either one [of Terab's exculpatory information]"); id. at 25 ("neither Godino nor anyone else from the Police Department advised the Assistant District Attorneys involved in the criminal prosecution [of Terab's exculpatory information]"); id. at 28 (Godino's failure to disclose Terab's exculpatory information "prevented the ADAs from making an informed decision about the reliability of [the CI's] evidence"))

Plaintiff further contends that Godino (and all other Defendants) are liable for malicious prosecution and abuse of process because "defendants' avowed purpose to arrest [Kenneth] Creighton was so he would tell where his brother was." (Pltf. Opp. Br. (Dkt. No. 184) at 27, 34; see also Pltf. Moving Br. (Dkt. No. 180) at 25 ("the real reason for Creighton's arrest was to put pressure on him . . . to turn his brother in"); Pltf. Reply Br. (Dkt. No. 187) at 11 ("the only reason for getting the CI to identify [Plaintiff as the source of the gun] . . . was to arrest Kenneth Creighton so he would tell the police where his brother was 'hiding out'"))

46

Plaintiff also contends that Detective Godino violated his due process rights by fabricating evidence and suppressing exculpatory evidence. (Pltf. Opp. Br. (Dkt. No. 184) at 28-30)

In connection with his claim for unreasonably prolonged detention – and in contradiction to Plaintiff's earlier assertion that Godino arrested Plaintiff in order to pressure him to reveal the location of his brother – Plaintiff asserts that "Godino arrested plaintiff and initiated a prosecution against [him] for criminal facilitation for the sole purpose of pressur[ing] Dior [Creighton] to confess to the shooting of two bystanders." (Id. at 37) (emphasis added)

As to Detective Roberts – who signed the criminal complaint against Plaintiff – Plaintiff asserts that he is liable for false arrest because Detective Godino did not provide Roberts with sufficient information to give him probable cause to arrest Plaintiff.[32] (Id. at 18-19; Pltf. Moving Br. (Dkt. No. 180) at 20-22)

As to ADA Birns and Talty, Plaintiff claims that they are liable for false arrest, because they approved Plaintiff's arrest. (Pltf. Opp. Br. (Dkt. No. 184) at 19-20; Pltf. Moving Br. (Dkt. No. 180) at 22-23) Plaintiff also appears to claim that they are liable for malicious prosecution, abuse of process, and Section 1983 conspiracy because their alleged purpose in prosecuting Plaintiff was to pressure him to reveal where his brother was hiding and/or to pressure Dior Creighton "into taking a plea to rescue plaintiff from a wholly baseless prosecution." (Pltf. Opp. Br. (Dkt. No. 184) at 27, 34-35) Plaintiff also appears to claim that

---

[32] Detective Roberts testified that his involvement in this case ended with Plaintiff's arrest. (Gross Decl., Ex. OO-1 (Dkt. No. 214-44) (Roberts Dep.) at 40:19-25, 103:11-25) There is no evidence that Detective Roberts played any role in the prosecution of Plaintiff after Plaintiff's arrest.

ADA Birns is liable for Section 1983 conspiracy because he did not disclose to the grand jury that the CI was a paid informant. (Id. at 35)

As to ADA Michael Cooper, Plaintiff's three summary judgment briefs make no reference whatsoever to him.[33]  Accordingly, Defendant Cooper is entitled to summary judgment on all claims against him.  See Nzegwu v. Friedman, No. 10 Civ. 02994 (CBA) (RML), 2014 WL 1311428, at *1 n.2 (E.D.N.Y. Mar. 31, 2014) (deeming claim abandoned where defendant moved for summary judgment on all claims and plaintiff "failed to raise any arguments in support of . . . [that] claim"), aff'd, 605 F. App'x 27 (2d Cir. 2015); Taylor v. City of New York, 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003) ("Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way." (citing Douglas v. Victor Capital Grp., 21 F. Supp. 2d 379, 393 (S.D.N.Y. 1998) (collecting cases))).

### A.    Summary Judgment Standard

Summary judgment is warranted where the moving party shows that "there is no genuine dispute as to any material fact" and that it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." Beyer v. County of Nassau, 524 F.3d 160, 163 (2d Cir. 2008).  "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper."  Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994) (citing Dister v. Cont'l Grp.,

---

[33]  The parties agree that, in his supervisory capacity, ADA Cooper authorized the arrest of Dior Creighton. (Pltf. R. 56.1 Stmt. (Dkt. No. 178) at ¶ 69; Def. Resp. to Pltf. R. 56.1 Stmt. (Dkt. No. 176) at ¶ 69)  There is no evidence that he played any role in the prosecution of Plaintiff.

Inc., 859 F.2d 1108, 1114 (2d Cir. 1988)).  "'[T]hat opposing parties assert competing versions

of the same event is not in itself sufficient to preclude summary judgment,' in that contradictory

testimony only establishes a 'genuine' issue for trial if it 'lead[s] to a different legal outcome.'"

Yi Fu Chen v. Spring Tailor, LLC, No. 14 Civ. 218 (PAE), 2015 WL 3953532, at *4 (S.D.N.Y.

June 29, 2015) (quoting Krynski v. Chase, 707 F. Supp. 2d 318, 322 (E.D.N.Y. 2009)}.

      In deciding a summary judgment motion, the Court "'resolve[s] all ambiguities,

and credit[s] all factual inferences that could rationally be drawn, in favor of the party opposing

summary judgment.'"  Spinelli v. City of New York, 579 F.3d 160, 166 (2d Cir. 2009) (quoting

Brown v. Henderson, 257 F.3d 246, 251 (2d Cir. 2001) (internal quotation marks and citation

omitted)).  However, a "'party may not rely on mere speculation or conjecture as to the true

nature of the facts to overcome a motion for summary judgment. . . .  [M]ere conclusory

allegations or denials . . . cannot by themselves create a genuine issue of material fact where

none would otherwise exist.'"  Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (alterations in

original) (quoting Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d Cir. 1995)).

      "The same standard[s] appl[y] where, as here, the parties file[] cross-motions for

summary judgment. . . ."  Morales v. Quintel Entm't, Inc., 249 F.3d 115, 121 (2d Cir. 2001).

"[W]hen both parties move for summary judgment, asserting the absence of any genuine issues

of material fact, a court need not enter judgment for either party.  Rather, each party's motion

must be examined on its own merits, and in each case all reasonable inferences must be drawn

against the party whose motion is under consideration."  Id. (internal citations omitted).

**B.**    **False Arrest**

      "To state a claim for false arrest under New York law, a plaintiff must show that

'(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the

confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged.'" Savino v. City of New York, 331 F.3d 63, 75 (2d Cir. 2003) (quoting Bernard v. United States, 25 F.3d 98, 102 (2d Cir. 1994)).

### 1.    Probable Cause

"The existence of probable cause to arrest constitutes justification and 'is a complete defense to an action for false arrest,' whether that action is brought under state law or under § 1983." Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996) (internal citations omitted).

"'Probable cause to arrest exists when the arresting officer has knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime.'" Figueroa v. Mazza, 825 F.3d 89, 99 (2d Cir. 2016) (quoting Escalera v. Lunn, 361 F.3d 737, 743 (2d Cir. 2004)).  "Probable cause is a 'fluid' standard that 'does not demand hard certainties or mechanistic inquiries'; nor does it 'demand that an officer's good-faith belief that a suspect has committed or is committing a crime be correct or more likely true than false.'" Id. (quoting Zalaski v. City of Hartford, 723 F.3d 382, 389, 390 (2d Cir. 2013)). "Rather, it requires only facts establishing 'the kind of fair probability' on which a 'reasonable and prudent' person, as opposed to a 'legal technician[ ],' would rely." Id. (quoting Florida v. Harris, 133 S.Ct. 1050, 1055 (2013)) (internal quotation marks omitted). "The question of whether or not probable cause existed may be determinable as a matter of law if there is no dispute as to the pertinent events and the knowledge of the officers. . . ." Weyant, 101 F.3d at 852. "[E]ven where factual disputes exist, a [false arrest] claim may fail if the plaintiff's version of events establishes the existence of probable cause to arrest." Drummond v. Castro, 522 F.

Supp. 2d 667, 673 (S.D.N.Y. 2007) (citing Mistretta v. Prokesch, 5 F. Supp. 2d 128, 133

(E.D.N.Y. 1998)).

Moreover, under the "collective knowledge doctrine," all information known to

one officer is imputed to all other officers involved in the same investigation:

> "[A]n arrest . . . is permissible where the actual arresting or searching officer lacks the
> specific information to form the basis for probable cause or reasonable suspicion but
> sufficient information to justify the arrest or search was known by other law enforcement
> officials initiating or involved with the investigation."

Zellner v. Summerlin, 494 F.3d 344, 369 (2d Cir. 2007) (quoting United States v. Colon, 250

F.3d 130, 135 (2d Cir. 2001)). "This principle, known as the collective or imputed knowledge

doctrine, recognizes that, 'in light of the complexity of modern police work, the arresting officer

cannot always be aware of every aspect of an investigation; sometimes his authority to arrest a

suspect is based on facts known only to his superiors or associates.'" Id. (quoting United States

v. Valez, 796 F.2d 24, 28 (2d Cir. 1986)).

In order to determine whether an arrest was supported by probable cause, courts

must consider the "totality of the circumstances" in light of the facts known to the arresting

officer at the time of the arrest. See Jenkins v. City of New York, 478 F.3d 76, 90 (2d Cir. 2007)

("Probable cause is, of course, evaluated on the totality of the circumstances"); Zellner, 494 F.3d

at 369 ("'Whether probable cause exists depends upon the reasonable conclusion to be drawn

from the facts known to the arresting officer at the time of the arrest.'" (quoting Devenpeck v.

Alford, 543 U.S. 146, 152 (2004))). It is, therefore, axiomatic that "facts learned subsequent to

the arrest, 'whether they buttress or belie the existence of probable cause, are irrelevant to the

false arrest claim.'" Pace v. Town of Southampton, 678 F. Supp. 2d 79, 85 (E.D.N.Y. 2010)

(quoting Parisi v. Suffolk County, 04 Civ. 2187, 2009 WL 4405488, at *6 (E.D.N.Y. Nov. 30,

2009)); see also Mejia v. City of New York, 119 F. Supp. 2d 232, 253 (E.D.N.Y. 2000)

("[S]ubsequently discovered evidence cannot be used to cure an arrest that was made without probable cause."). The eventual disposition of a criminal charge is likewise irrelevant to the probable cause determination for false arrest. Allen v. City of New York, 480 F. Supp. 2d 689, 711-12 (S.D.N.Y. 2007); see also Pierson v. Ray, 386 U.S. 547, 555-57 (1967).

It is, of course, "'well-established that a law enforcement official [may have] probable cause to arrest . . . [based on] information [the officer obtains] from some [other] person, normally the putative victim or eyewitness.'" Martinez v. Simonetti, 202 F.3d 625, 634 (2d Cir. 2000) (quoting Miloslavsky v. AES Eng'g Soc'y, 808 F. Supp. 351, 355 (S.D.N.Y. 1992), aff'd, 993 F.2d 1534 (2d Cir. 1993)); see also Panetta v. Crowley, 460 F.3d 388, 395 (2d Cir. 2006) ("[I]nformation gleaned from informants can be sufficient to justify the existence of probable cause."). Moreover, "[w]hen information is received from a putative victim or an eyewitness, probable cause exists unless circumstances raise doubt as to the person's veracity." Curley v. Vill. of Suffern, 268 F.3d 65, 70 (2d Cir. 2001) (citation omitted); see also Williams v. City of New York, No. 14 Civ. 7158 (JPO), 2016 WL 3194369, at *6 (S.D.N.Y. June 7, 2016) ("Given the absence of 'circumstances that would raise doubt' as to the veracity of [an eyewitness's] identification of [plaintiff], the rule that eyewitness identification 'is typically sufficient to provide probable cause' controls this case." (quoting Stansbury v. Wertman, 721 F.3d 84, 90-91 (2d Cir. 2013))); Dunkelberger v. Dunkelberger, No. 14 Civ. 3877 (KMK), 2015 WL 5730605, at *9 (S.D.N.Y. Sept. 30, 2015) ("Courts have also held that identification by an eyewitness alone can suffice to establish probable cause, in the absence of any reason to believe that person is not telling the truth.") (collecting cases). "'[A] tip from a known informant whose reputation can be assessed and who can be held responsible if [his] allegations turn out to be

fabricated' is especially significant in establishing probable cause." Panetta, 460 F.3d at 395

(quoting Florida v. J.L., 529 U.S. 266, 270 (2000)).

### (a)    Reasons to Credit the CI's Account

      Here, the CI – an eyewitness inside the Mini Mart at the relevant time – told the

NYPD that Plaintiff had passed his brother a gun shortly before Dior Creighton shot Caldwell

and Ayala outside the store.  The record demonstrates that Detective Godino and ADA Birns –

who both interviewed the CI – had compelling reasons to credit his account.

      As an initial matter, the CI had proven reliable in the past.  The CI had provided

information to Detective Godino about an earlier shooting in front of the same building where

Caldwell had been shot.  (Def. R. 56.1 Stmt. (Dkt. No. 167) at ¶ 5; Pltf. Resp. to Def. R. 56.1

Stmt. (Dkt. No. 189) at ¶ 5; Gross Decl., Ex. K-1 (Dkt. No. 214-11) (Godino Dep.) at 116:23-

118:2; see also Gross Decl., Ex. U (Dkt. No. 214-24) (Informant Dep.) at 46:13-48:15)  The CI's

information had led to an arrest and a guilty plea in that case.  (Gross Decl., Ex. K-1 (Dkt. No.

214-11) (Godino Dep.) at 116:23-118:2)  The CI had also been providing narcotics-related

information to his NYPD handler – Detective John Elliott – for at least three years.  (Gross Decl.,

Ex. U (Dkt. No. 214-24) (Informant Dep.) at 19:7-20:23)  Elliott used the information provided

by the CI to obtain search warrants for apartments at which drugs were sold.  (Id. at 28:11-13,

42:20-43:24, 175:23-176:6)  Courts have recognized that it is reasonable for police officers to

rely on information provided by an informant who has proven reliable in the past.  See McColley

v. County of Rensselaer, 740 F.3d 817, 842 (2d Cir. 2014) ("We have observed that information

provided by an informant from whom the government 'has received consistently reliable

information in the past is likely to be sufficiently reliable to establish probable cause.'" (quoting

United States v. Wagner, 989 F.2d 69, 73 (2d Cir. 1993))); Nelson v. Hernandez, 524 F. Supp. 2d

212, 222 (E.D.N.Y. 2007) ("It is reasonable to believe that an informant who has provided reliable information in the past will be reliable in the present.").

The CI contacted Detective Elliott shortly after the shootings, told Elliott that he had been "right there," and reported that he had seen Plaintiff pass a gun to his brother, Dior Creighton, shortly before the shootings. (Gross Decl., Ex. U (Dkt. No. 214-24) (Informant Dep.) at 21:25-22:9, 56:15-57:2) Accordingly, the CI's account was provided to the NYPD soon after the shootings, and was based on eyewitness observation rather than hearsay or rumor. Detective Godino was also aware that the CI was related to the Creighton brothers by marriage; given this family relationship, the CI was well situated to make an identification of the Creighton brothers. (Gross Decl., Ex. K-3 (Dkt. No. 214-13) (Godino Dep.) at 485:10-16, 488:4-8) The exchange in the Mini Mart described by the CI was also entirely consistent with the Mini Mart surveillance footage, and there is no evidence that the CI viewed the surveillance footage before giving his account to Elliott. The details that the CI later provided to Detective Godino (see id. at 482:19-25; Gross Decl., Ex. J (Dkt. No. 214-10) (Godino Notes) at NYC003526) are likewise entirely consistent with the surveillance footage, and there is no evidence that Godino showed the CI the surveillance footage before eliciting the CI's account.

The CI's assertion that Plaintiff had passed a gun to his brother was also confirmed by Detective Roberts, after Roberts viewed the surveillance footage. Detective Roberts – who was "very familiar" with the Creighton brothers – concluded from the surveillance footage that Plaintiff had in fact passed a gun to his brother.[34] (Gross Decl., Ex. OO-1 (Dkt. No. 214-44) (Roberts Dep.) at 41:17-45:23, 58:16-60:7, 130:9-20)

---

[34] Plaintiff contends that Detective Roberts was equivocal in his identification of Plaintiff, and conceded that Plaintiff's face could not be clearly seen in the surveillance footage. (Pltf. Reply to Def. Resp. to Pltf. R. 56.1 Stmt. (Dkt. No. 186) at ¶¶ 36, 39, 52) Detective Roberts testified,

It is also worth noting that, in making his observations inside the Mini Mart, the CI was not acting in his role as a confidential informant. The CI's presence in the Mini Mart had not been directed by law enforcement, and the initial call the CI made to Detective Elliott was at the CI's own volition. (Gross Decl., Ex. U (Dkt. No. 214-24) (Informant Dep.) at 22:6-9, 51:13-52:9, 203:23-204:7) The CI was not paid for his initial report concerning the shooting, had no expectation that he would be paid, and did not provide information about the shootings as part of an effort to "work off a case." (Id. at 22:4-19, 103:2-23, 196:7-197:9)

Moreover, while the CI has known Plaintiff and his brother since they were children (Gross Decl., Ex. U (Dkt. No. 214-24) (Informant Dep.) at 174:21-175:7, 208:17-21), Plaintiff does not contend that the CI had a grudge against the Creighton brothers, or a motive to falsely implicate Plaintiff or his brother, much less that Defendants were aware that the CI had a motive to falsely implicate the Creightons. (See Gross Decl., Ex. K-3 (Dkt. No. 214-13) (Godino Dep.) at 488:4-14 (Detective Godino had "nothing to indicate that" CI had a motive to falsely implicate the Creighton brothers))

(b)   **Whether There Were Reasons to Doubt the CI's Account**

Plaintiff argues that the CI's information did not provide the NYPD with probable cause to arrest Plaintiff, because there were numerous reasons to doubt the CI's veracity,

---

however, that he concluded – based on the surveillance footage – that Plaintiff had passed a gun to his brother inside the Mini Mart. (Gross Decl., Ex. OO-1 (Dkt. No. 214-44) (Roberts Dep.) at 44:19-45:5, 58:16-60:7, 130:9-20) Given his familiarity with Plaintiff, Detective Roberts' conclusion that Plaintiff is shown in the surveillance footage passing "a shiny metallic object" to his brother shortly before the shootings (see id.; June 27, 2016 Thadani Decl, Ex. C (Dkt. No. 166-3) (Criminal Cmplt.)) constitutes significant corroboration of the CI's account. Moreover, "[e]ven if insufficient on its own to establish probable cause, an officer's determination that a suspect resembles an individual caught on surveillance video 'contribute[s] meaningfully to [an officer's] probable cause to arrest [a suspect].'" Nzegwu, 2014 WL 1311428, at *9 (quoting Stansbury, 721 F.3d at 90) (emphasis in Stansbury).

including Fawaz Terab's identification of Sprueil as the source of the gun.  (Pltf. Opp. Br. (Dkt. No. 184) at 12, 16-18)

        It is not unusual for police to encounter conflicting eyewitness accounts, however, and the Second Circuit and lower courts have consistently held that the existence of such conflicting evidence does not vitiate the probable cause established by an eyewitness identification. See, e.g., Panetta, 460 F.3d at 395-96 ("[A]n officer's failure to investigate an arrestee's protestations of innocence generally does not vitiate probable cause."); Curley, 268 F.3d at 70 (finding probable cause despite conflicting accounts of arrestee and two eyewitnesses, where eyewitnesses' statements inculpated arrestee); Martinez, 202 F.3d at 634-35 (probable cause existed as a matter of law even though plaintiff and his girlfriend asserted that police had assaulted plaintiff, while police officers contended that plaintiff had been the aggressor); Ricciuti v. N.Y.C. Transit Auth., 124 F.3d 123, 128 (2d Cir. 1997) (no dispute of fact as to probable cause despite arrestee's claims of innocence; "[o]nce a police officer has a reasonable basis for believing there is probable cause, he is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest"); Singer v. Fulton County Sheriff, 63 F.3d 110, 113, 119 (2d Cir. 1995) (no dispute of fact as to probable cause despite conflicting accounts offered by alleged victim and arrestee); Crews v. County of Nassau, 996 F. Supp. 2d 186, 205-06 (E.D.N.Y. 2014) (no dispute of fact as to probable cause despite contradictory witness statements); Gaston v. City of New York, 851 F. Supp. 2d 780, 788-91 (S.D.N.Y. 2012) (no dispute of fact as to probable cause where victim identified plaintiff, notwithstanding alibi supplied by plaintiff's wife); Mazza v. City of New York, No. 98 Civ. 2343, 1999 WL 1289623, at *5-6 (E.D.N.Y. July 13, 1999) (probable cause existed as a matter of law where "[d]etective . . . decided to credit [the complainant's] version of events over that of [another witness]"); see

also Christman v. Kick, 342 F. Supp. 2d 82, 88 (D. Conn. 2004) ("[I]t would seem that a police

officer may cho[o]se to rely on either of two conflicting sworn statements in determining

probable cause. . . ."); Pawlicki v. City of Ithaca, 993 F. Supp. 140, 145 (N.D.N.Y. 1998) ("Even

when an arresting officer is faced with competing accounts from different eyewitnesses, an

officer is entitled to make an arrest based on believing the testimony of one side or the other

. . . ."); Kruppenbacher v. Mazzeo, 744 F. Supp. 402, 407 (N.D.N.Y. 1990) (same); Collom v.

Vill. of Freeport, 691 F. Supp. 637, 640 (E.D.N.Y. 1988) ("[T]he existence of competing

accounts cannot of itself render the issue of probable cause a jury question. . . . If the mere

existence of a 'swearing contest' permitted a jury to reexamine an officer's decision, law

enforcement officials would be discouraged from taking any action at all.  This would frustrate

the public's expectation that the laws are being enforced.").[35]

---

[35] Most of the cases discussing conflicting witness accounts involve a crime victim who accuses an arrestee, who protests his innocence.  In such circumstances there are, of course, often reasons to question the veracity of the arrestee and to rely on the veracity of the victim.  See De Santis v. City of New York, No. 10 Civ. 3508 (NRB), 2011 WL 4005331, at *7 (S.D.N.Y. Aug. 29, 2011) ("[T]he protestations of innocence by an arrestee are so common as to be virtually a matter-of-course."); see also Martinez, 202 F.3d at 634 ("We have previously held that police officers, when making a probable cause determination, are entitled to rely on the victims' allegations that a crime has been committed."); Miloslavsky, 808 F. Supp. at 355 ("The veracity of citizen complain[an]ts who are the victims of the very crime they report to the police is assumed.").

There are cases outside this context, however, that reiterate the central point that police officers are permitted to choose between conflicting witness accounts, so long as the account they rely on provides probable cause and is sufficiently reliable.  See Crews, 996 F. Supp. 2d at 194-97, 205-06 (granting defendants summary judgment where police arrested plaintiff based on victim's identification – despite the fact that a witness participating in the crime denied plaintiff's involvement – because "police had probable cause to arrest plaintiff on the basis of [the victim's] identification alone"); Mazza, 1999 WL 1289623, at *5-6 (granting defendants summary judgment where police arrested plaintiff based on complainant's version of events, despite another witness's claim that plaintiff had not been involved in the crime).

Moreover, in a number of the "conflicting witness account" cases in which courts have found material issues of fact concerning probable cause, the witness the police chose to rely on had given inconsistent accounts.  See, e.g., Simuro v. Shedd, 176 F. Supp. 3d 358, 377-79 (D. Vt. 2016) (finding material issues of fact as to probable cause where five-year-old victim of sexual assault had made inconsistent statements regarding the sexual abuse); Richards, 2003 WL

Moreover, "[d]eciding one witness is more credible than another is not equivalent to 'ignoring' evidence." Mazza, 1999 WL 1289623, at *5 (citations omitted). "'Once officers possess facts sufficient to establish probable cause, they are neither required nor allowed to sit as prosecutor, judge or jury. Their function is to apprehend those suspected of wrongdoing, and not to finally determine guilt through a weighing of the evidence.'" Panetta, 460 F.3d at 396 (quoting Krause v. Bennett, 887 F.2d 362, 372 (2d Cir. 1989)).

The same rule is applied in New York courts:

> In any investigation the police are likely to encounter discrepancies, particularly in cases involving eyewitness identification. These matters may impair their ability to prove guilt beyond a reasonable doubt at trial, but they generally have little bearing at preliminary stages where the only relevant concern is whether there is sufficient evidence to show probable cause to believe the defendant committed the crime.

Gisondi v. Harrison, 72 N.Y.2d 280, 285 (1988); see also Orminski v. Vill. of Lake Placid, 268 A.D.2d 780, 782 (3rd Dep't 2000) ("Police officers are routinely called upon to investigate allegations of criminal conduct and, in the face of conflicting versions of events, make determinations whether probable cause exists to believe that crimes have been committed.").

Here, Plaintiff has cited no case suggesting that Terab's identification of Spruell as the source of the gun precluded detectives from relying on the CI's account and the other information that corroborated it.[36] This Court's research indicates that Terab's identification of

---

21036365, at *2, *6 (material issues of fact regarding probable cause where five-year-old witness had reported to police that her mother had shot victim, but told her grandmother that "a black man with dreadlocks shot [the victim]"). There is no evidence here that the CI gave conflicting accounts of his observations at the Mini Mart at any point prior to Plaintiff's arrest or the grand jury's indictment.

[36] Defendants claim, of course, that Terab recanted his identification of Spruell, and told Detective Godino and ADA Gottlieb that Plaintiff was the source of the gun. (Gross Decl., Ex. K-1 (Dkt. No. 214-11) (Godino Dep.) at 131:10-23, 182:9-183:21, 207:25-212:9, 292:9-21; Gross Decl., Ex. R (Dkt. No. 214-20) (Gottlieb Dep.) at 134:13-19, 136:11-137:5, 143:2-19, 144:13-16, 218:25-219:18) At his deposition, however, Terab denied recanting and denied ever having implicated Plaintiff. (Gross Decl., Ex. O (Dkt. No. 214-17) (Terab Dep.) at 36:14-37:3,

Spruell, at most, required the detectives to consider whether there was corroborating evidence for the CI's account. Bail v. Ramirez, No. 04 Civ. 5084 (WHP), 2007 WL 959045, at *7 (S.D.N.Y. Mar. 29, 2007) ("Where there are doubts as to a witness's truthfulness, rather than require that his statement be wholly ignored, 'the police [must gather] additional information to buttress [the statement].'" (quoting McBride v. City of New Haven, No. 97 Civ. 1475 (AWT), 2000 WL 559087, at *11 (D. Conn. Mar. 30, 2000))); Williams v. City of New York, No. 02 Civ. 3693 (CBM), 2003 WL 22434151, at *5 (S.D.N.Y. Oct. 23, 2003) (same); see also United States v. Gagnon, 373 F.3d 230, 236 (2d Cir. 2004) ("In addition to considering an informant's veracity, reliability, and basis of knowledge, in assessing the totality of the circumstances we also evaluate whether the information an informant provides is corroborated by independent police investigation."). As discussed above, the detectives had such corroborating evidence here, in the form of the surveillance footage and Detective Roberts' review of that footage – which indicated to Roberts that Plaintiff had passed a "shiny metallic object" to his brother inside the Mini Mart shortly before the shootings. While Terab appeared to be a disinterested observer – as opposed to a "professional criminal informant[]," Gagnon, 373 F.3d at 236 – there were reasons to question his account even before his disputed recantation. For example, Terab testified at his deposition that, when he spoke with NYPD detectives on the night of the shooting, he stated that he had not seen anything. (Def. Resp. to Pltf. R. 56.1 Stmt. (Dkt. No. 176) at ¶ 20; Gross Decl., Ex. O (Dkt. No. 214-17) (Terab Dep.) at 32:23-33:23, 64:18-65:2)

Plaintiff also contends that the law does not permit Defendants to rely on the CI for probable cause, because he was "a known crack-addicted paid informant." (Pltf. Opp. Br.

---

45:18-48:6, 50:16-52:2, 55:5-56:6, 84:24-86:23) Accordingly, this Court has assumed, for purposes of resolving the cross-motions for summary judgment, that Terab identified Spruell as the source of the gun, never recanted, and never implicated Plaintiff.

(Dkt. No. 184) at 14)  As discussed above, however, the CI was not acting as a paid informant when he called his NYPD handler shortly after the shootings outside the Mini Mart.  Indeed, the CI's presence in the Mini Mart at the moment that Plaintiff allegedly passed a gun to his brother was entirely unrelated to the CI's informant activities for the NYPD.  (Gross Decl., Ex. U (Dkt. No. 214-24) (Informant Dep.) at 203:23-204:7)  Although Plaintiff contends that the CI "had a motivation to lie (to get paid and avoid jail)" (Pltf. Opp. Br. (Dkt. No. 184) at 18), the CI testified that he provided the initial information to his handler, and testified in the grand jury, with no expectation that he would be paid.[37]  (Gross Decl., Ex. U (Dkt. No. 214-24) (Informant Dep.) at 22:17-25, 103:2-23, 196:7-197:9)  According to the CI, he called his handler because an innocent man had been shot and killed.  (Id. at 51:13-19, 197:14-21)  There is likewise no evidence that the CI was facing criminal charges at that time, or that he was providing information about the shootings to the NYPD in order to "avoid jail."

Most importantly, Plaintiff does not explain why the CI's alleged "motivation to lie" would cause the CI to implicate Plaintiff as the source of the gun, rather than Spruell or someone else.  Indeed, despite the extensive discovery in this case – which took place over a three-year period (see May 16, 2013 Civil Case Management Plan (Dkt. No. 8); May 19, 2016 Conf. Tr. (Dkt. No. 143) at 14-15) – Plaintiff has put forth no evidence suggesting that the CI had a motive to falsely implicate Plaintiff.  Cf. Selvaggio v. Patterson, 93 F. Supp. 3d 54, 69 (E.D.N.Y. 2015) ("'The most common situation in which doubts arise [as to a witness's veracity]

---

[37]  While the CI's handler gave the CI $100 after his testimony in the grand jury, the CI testified that the payment was unexpected.  The CI was told that the money was offered because the CI had been asked to testify against a member of his extended family.  (Gross Decl., Ex. U (Dkt. No. 214-24) (Informant Dep.) at 50:19-51:12, 103:14-23, 195:25-197:9)  The CI had not been promised money for testifying in the grand jury, however, and he never asked for money in connection with this incident.  (Id. at 196:7-17, 201:4-10)

is when there exists a prior relationship between the victim and the accused that gives rise to a

motive for a false accusation.'" (quoting DiStefano v. Sedita, No. 11 Civ. 1125 (MKB), 2014

WL 349251, at *4 (E.D.N.Y. Jan. 31, 2014)); Sankar v. City of New York, 867 F. Supp. 2d 297,

306 (E.D.N.Y. 2012) (finding material issue of fact regarding probable cause where arresting

officer "was aware of the contentious relationship that existed between [landlord complainant]

and plaintiff [tenant]").

      Detective Godino was likewise not required to reject the CI's account because of

the CI's drug use.  While there is evidence that the CI was using drugs in 2006, there is no

evidence that he was under the influence of drugs when he (1) observed Plaintiff pass a gun to

his brother Dior Creighton; (2) called his NYPD handler to report the shootings and the

Creighton brothers' roles in the shootings; or (3) was debriefed by Detective Godino – much less

that Defendants were aware that he was under the influence of drugs at these times.  At his

deposition, the CI testified that he had not used drugs on December 26, 2006, prior to the

shootings (Gross Decl., Ex. U (Dkt. No. 214-24) (Informant Dep.) at 207:10-12), and there is no

contrary evidence.[38]  See Curley, 268 F.3d at 70 (rejecting argument that witness was not

credible where the police officer "knew that [the witness] had been drinking," but the record did

not show "to what extent").[39]

---

[38]  Although Plaintiff asserts that the CI "was actually doing drugs at the time he claims he saw
the gun being passed" (Pltf. R. 56.1 Stmt. (Dkt. No. 178) at ¶ 204), the evidence Plaintiff cites
does not support this assertion.  While there is evidence that the CI went to the Mini Mart to
purchase both crack cocaine and scratch-off tickets, there is no evidence that he ingested drugs
before the incident.  (See Gross Decl., Ex. U (Dkt. No. 214-24) (Informant Dep.) at 29:20-23,
30:13-31:11, 38:14-39:23, 40:15-18, 79:17-18, 82:23-83:8, 105:24-106:4, 137:17-138:3, 207:10-
12)

[39]  In contending that there was no probable cause for his arrest, Plaintiff cites the declaration of
Walter Signorelli.  Signorelli – a former NYPD Inspector – is Plaintiff's "police practices and
procedures" expert.  (Pltf. Moving Br. (Dkt. No. 180) at 16, 19-20)  Signorelli opines that
Defendants' "reliance on the confidential informant's statements as grounds to arrest and

Plaintiff also contends that Detective Godino "fed information to the [CI] and/or coached him about the scene of the crime" in a bad faith attempt to gather evidence against Plaintiff. (Pltf. Opp. Br. (Dkt. No. 184) at 22, 22 n.4)  According to Plaintiff,

> [w]hen it became clear that the police could not find Dior [Creighton], Godino and his colleagues devised a plan: ignore Terab's identification, arrest [Plaintiff] instead of Spruell for criminal facilitation so that, "in turn, Kenneth [Creighton] may inform this department where defendant Dior Creighton is hiding out."

(Id. at 12-13 (quoting July 26, 2016 Gross Decl. (Dkt. No. 185) Ex. HH (Jan. 10, 2007 Police Report)))  In short, Plaintiff contends that "Detective Godino and his colleagues" arrested Plaintiff in order "to pressure [him] into telling them of his brother's whereabouts."  (Id. at 12)

As an initial matter, Defendants' alleged motive in arresting Plaintiff is irrelevant to the determination of whether Plaintiff's arrest was supported by probable cause.  See Devenpeck, 543 U.S. at 153 ("[A]n arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause.  That is to say, his subjective reason for

---

prosecute Kenneth Creighton" – and the "rel[iance] on the confidential informant to establish probable cause under the circumstances presented here" – violates "proper police practices and procedures."  (See Gross Decl., Ex. D (Dkt. No. 214-4) (Signorelli Decl.) at ¶¶ 5, 25-26)

Defendants argue that Signorelli's declaration is inadmissible.  (Def. Opp. Br. (Dkt. No. 177) at 16-17)  "When deciding a motion for summary judgment, a federal district court may consider only admissible evidence.  Pursuant to Rule 104(a), the court must evaluate evidence for admissibility before it considers that evidence in ruling on a summary judgment motion." Colon ex rel. Molina v. BIC USA, Inc., 199 F. Supp. 2d 53, 68 (S.D.N.Y. 2001) (internal citations omitted).  "[A]lthough an expert may opine on an issue of fact within the jury's province, he may not give testimony stating ultimate legal conclusions based on those facts." United States v. Bilzerian, 926 F.2d 1285, 1294 (2d Cir. 1991).  Indeed, an expert may not offer "legal conclusions [of any sort]," make "credibility determinations," or provide "opinions concerning [a party or witness's] motives, intent, or state of mind."  See Stern, 2015 WL 4530473, at *3-4.  An expert may, however, "offer his opinions regarding generally accepted police standards and whether defendants deviated from such standards," based on the expert's acceptance of certain facts as true.  Id. at *5.  In resolving the cross-motions for summary judgment, this Court has considered Signorelli's declaration to that extent, and concluded that it does not require this Court to find that Defendants lacked probable cause to arrest Plaintiff.

making the arrest need not be the criminal offense as to which the known facts provide probable cause."); Fabrikant v. French, 691 F.3d 193, 217 (2d Cir. 2012) ("[A]s a matter of law the relevant question is not the officers' subjective motivation for making an arrest, but whether objectively they had probable cause.").

Even if motive were relevant – and it is not – Plaintiff's theory of motive makes no sense. Given the CI's identification of Plaintiff as the source of the gun, and the circumstances surrounding the arrest and prosecution of Plaintiff, no reasonable jury could accept Plaintiff's argument that Defendants' true purpose in arresting and prosecuting Plaintiff was to discover where his brother was hiding. Dior Creighton was arrested approximately two weeks after Plaintiff's arrest (Pltf. R. 56.1. Stmt. (Dkt. No. 178) at ¶ 176; Def. Resp. to Pltf. R. 56.1 Stmt. (Dkt. No. 176) at ¶ 176), and yet Defendants pursued criminal charges against Plaintiff for the next five years. If Defendants' true purpose in arresting Plaintiff was to pressure him into disclosing the whereabouts of his brother Dior Creighton – as Plaintiff claims – then presumably the charges against Plaintiff would have been quickly dropped after Dior Creighton was apprehended on January 26, 2007. (Pltf. R. 56.1 Stmt. (Dkt. No. 178) at ¶ 176) That did not happen.

As to Godino's alleged fabrication of evidence, Plaintiff contends that "Godino fed information to the CI and/or coached him about the scene of the crime, by among other things, showing him the surveillance video to induce him to identify K[enneth] Creighton instead of Spruell as the culprit [who was the source of the gun]." (Pltf. Opp. Br. (Dkt. No. 184) at 22) According to Plaintiff, "Godino's involvement in [the] fabrication of evidence" is also shown by

(1) Terab's June 3, 2015 deposition testimony that Plaintiff was not in the Mini Mart when the gun was passed to Dior;

(2) the CI's May 5, 2016 deposition testimony, in which – while viewing the surveillance footage – he identifies Spruell as the individual who passed the gun to Dior Creighton;

(3) the fact that the CI does not appear in the surveillance footage; and

(4) the CI's deposition testimony that he was in the back of the store purchasing drugs when the gun was passed, while the surveillance footage "shows the gun being passed in the front of the store."

(Id. at 22 n.4 (citing Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 189) at ¶¶ 235, 242, 257-58))

Having reviewed the evidence cited by Plaintiff, the Court concludes that none of it suggests that Godino was involved in fabricating evidence.

As to Plaintiff's claim that Detective Godino showed the CI the surveillance footage "to induce him to identify K[enneth] Creighton instead of Spruell as the culprit" (id. at 22), this hardly suggests fabrication of evidence. The surveillance footage would only induce the CI to identify Plaintiff as the source of the gun if the footage showed Plaintiff handing a gun to his brother. In any event, the record shows that the CI told detectives multiple times about Plaintiff's role in the shootings before being shown the surveillance footage. (Gross Decl., Ex. U (Dkt. No. 214-24) (Informant Dep.) at 56:23-57:22 (to NYPD handler on the night of the shootings); id. at 57:23-59:6 (to NYPD handler the morning after the shootings); id. at 60:2-61:11 (to NYPD handler and another officer "[a] couple of days later"); id. at 61:14-16, 174:7-177:12 (repeating account to ADA before watching the surveillance footage in the District Attorney's Office))[40] In sum, the evidence demonstrates that the CI gave his account of Plaintiff's role in the shootings prior to seeing the surveillance footage. And even assuming

---

[40] Although Detective Godino does not recall whether the surveillance footage was first shown to the CI at the precinct house or the District Attorney's Office, it is not his practice to "show somebody a tape and then get what they recall. I want them to tell me what they recall first." (Gross Decl., Ex. K-2 (Dkt. No. 214-12) (Godino Dep.) at 260:19-261:4, 367:25-368:6)

arguendo that Detective Godino later showed the surveillance footage to the CI at the 42nd

Precinct, that would not suggest that Detective Godino was involved in fabricating evidence.

Terab's claim that Plaintiff was not at the Mini Mart at the time of the shooting

likewise does not suggest that Detective Godino was engaged in fabricating evidence. As

discussed above, police officers frequently must choose between conflicting witness accounts.

Here, Godino chose to accept the CI's account rather than Terab's recollection. For the reasons

discussed above, Godino was free to make that choice. In any event, choosing between

conflicting witness accounts is not evidence of fabrication.

At the CI's May 5, 2016 deposition – nearly ten years after the December 26,

2006 shootings – the CI – while viewing the Mini Mart surveillance footage – initially identifies

a man wearing a striped shirt as Spruell. (Gross Decl., Ex. U (Dkt. No. 214-24) (Informant Dep.)

at 141:13-143:10, 216:24-217:4)  In January 2007, the CI had identified the man in the striped

shirt – who appears to pass a shiny object to Dior Creighton – as Plaintiff. (Gross Decl., Ex. J

(Dkt. No. 214-10) (Godino Notes) at NYC003526)  As the CI's May 5, 2016 deposition

proceeds, he variously testifies that (1) he does not see Plaintiff in the surveillance footage

(Gross Decl., Ex. U (Dkt. No. 214-24) (Informant Dep.) at 165:8-166:11); (2) the footage shows

Plaintiff passing a gun to Dior Creighton (id. at 166:21-167:13, 177:23-179:7, 194:25-195:14,

218:2-24, 228:4-23); (3) it is "possible" that the footage shows Plaintiff passing a gun to Dior

Creighton (id. at 168:17-21, 178:19-179:7); and (4) it is "possible" that the video shows either

Plaintiff or Spruell passing a gun to Dior Creighton.  (Id. at 222:19-23)

Plaintiff contends that the CI's testimony at his 2016 deposition demonstrates that

Detective Godino was fabricating evidence in late 2006 and early 2007.  It does no such thing.

The CI's uncertain identifications ten years after the shootings tell us little about the account he

gave Detective Godino in 2007.  Suffice it to say that there is no evidence that the CI

equivocated in the days and weeks following the shootings as to who passed the gun to Dior

Creighton.

The absence of the CI from the surveillance footage – and the CI's initial

testimony at his deposition that he was at the back of the Mini Mart when the gun was passed –

likewise do not demonstrate that Detective Godino fabricated evidence.  In January 2007, the CI

told Detective Godino that he was standing "by the plastic door that goes behind the counter [in

the Mini Mart] getting his scratch off tickets" when Plaintiff passed the gun to his brother.

(Gross Decl., Ex. J (Dkt. No. 214-10) (Godino Notes) at NYC003526)  At his 2016 deposition,

the CI initially testified that he was at the back of the store buying crack when the gun was

passed.  (Gross Decl., Ex. U (Dkt. No. 214-24) (Informant Dep.) at 38:19-39:23, 40:15-41:13,

55:2-9, 80:11-19, 98:13-99:2, 105:5-8, 113:5-114:25)  After being shown the surveillance

footage, however, the CI recalled that he was standing in the front area of the Mini Mart, by the

doorway, when the gun was passed.  (Id. at 172:3-173:20, 176:7-177:12, 192:25-194:11)

The fact that the CI cannot be seen in the surveillance footage does not

demonstrate that Detective Godino fabricated evidence.  Godino's notes from the investigation

state that the CI reported that he was "by the plastic door that goes behind the counter getting his

scratch off tickets." (Gross Decl., Ex. J (Dkt. No. 214-10) (Godino Notes) at NYC003526)  This

area is not visible in the surveillance footage because it is blocked by shelving.  Terab himself –

whom both sides agree was behind the counter when the exchange took place – is not visible in

the surveillance footage because the area in which he is standing is likewise blocked by shelving.

In sum, the fact that the CI cannot be seen on the video does not establish that he was not

present, or that Godino knew that he was not present.

In asserting that Godino fabricated evidence, Plaintiff cites other inconsistencies arising from the CI's 2016 deposition. The critical issue before this Court, however, is not whether the CI gave testimony in 2016 that is inconsistent with the account that he gave to Detective Elliot shortly after the December 26, 2006 shootings, and later repeated to Detective Godino in early January 2007. Instead, this Court must determine whether – at the time of Plaintiff's arrest – "the circumstances [were such as to] raise doubt as to the [CI's] veracity." Panetta, 460 F.3d at 395.

Although Plaintiff contends that the CI's account "was fabricated with the assistance and blessing of [D]efendant[] Godino" (Pltf. Opp. Br. (Dkt. No. 184) at 15), he has offered no evidence to support this allegation. Having deposed the CI, Detective Godino, and countless other witnesses over the past three years, Plaintiff must now come forward with evidence to support his claims of fabrication. That he has not done, and speculation and innuendo are not sufficient to defeat summary judgment. See Shannon v. New York City Transit Auth., 332 F.3d 95, 99 (2d Cir. 2003) ("'Conclusory allegations, conjecture, and speculation . . . are insufficient to create a genuine issue of material fact.'").

*      *      *      *

This Court concludes that Defendants had probable cause to arrest Plaintiff based on the information provided by the CI, the surveillance footage, and Detective Roberts' determination – after viewing the surveillance footage – that Plaintiff had indeed passed a "shiny metallic object" to his brother in the Mini Mart shortly before the December 26, 2006 shootings. Because Defendants have demonstrated that there is no material issue of fact as to whether there was probable cause to arrest Plaintiff, they are entitled to summary judgment on Plaintiff's false

arrest claim under New York law. Plaintiff's cross-motion for summary judgment on this claim

will be denied.[41]

_____

[41] Detective Roberts signed the criminal complaint against Plaintiff. (See June 27, 2016
Thadani Decl., Ex. C (Dkt. No. 166-3) (Criminal Cmplt.)) Plaintiff contends that Roberts is
liable for false arrest because Godino did not provide Roberts with sufficient information to give
him probable cause to arrest Plaintiff. (Pltf. Opp. Br. (Dkt. No. 184) at 18-19) In the criminal
complaint – which charges Plaintiff with criminal facilitation and criminal possession of a
weapon – Roberts states, based on

> official investigation, and witnesses known to the Police Department, that, at the
> above time and place, inside a bodega, defendant and a separately unapprehended
> individual engaged in a brief conversation, after which defendant passed a shiny
> metallic object to the separately unapprehended individual. Deponent further
> states that immediately afterwards, the separately unapprehended individual and
> defendant went outside the above location.

> Deponent further states that he is informed by [Lisette] Ayala that informant was
> standing outside the above location at the above time, and informant observed the
> above-described separately unapprehended individual pointing a metallic object in
> both her direction and in the direction of John Caldwell, and then heard several
> loud noises and observed several flashes coming from the above-mentioned
> object, and then immediately felt a sharp pain on her left calf. Deponent is further
> informed that informant then observed her left leg to be bleeding severely.

> Deponent further states that, based upon official police investigation and
> witnesses known to the police department, also at the above time and place, John
> Caldwell was struck on the side of his head by one of the above-mentioned shots,
> causing his death.

(June 27, 2016 Thadani Decl., Ex. C (Dkt. No. 166-3) (Criminal Cmplt.)) Plaintiff complains
that "Roberts had no such knowledge." (Pltf. Moving Br. (Dkt. No. 180) at 21)

Roberts testified at his deposition, however, that the criminal complaint he signed was based on
information he learned from Godino. (Gross Decl., Ex. OO-2 (Dkt. No. 214-45) at 99:19-
103:18) Roberts recalled that Godino "had a CI that was either a witness or was there, you know
– was directly there when the shooting occurred." (Gross Decl., Ex. OO-1 (Dkt. No. 214-44) at
46:16-47:5) Roberts also viewed the surveillance footage and was himself able to identify
Plaintiff as the individual who passed a gun to Dior Creighton. (Id. at 44:19-45:5, 58:16-60:7,
130:9-20)

In any event, under the "collective knowledge doctrine," Roberts was permitted to rely on
information supplied by Godino in signing the complaint and in arresting Plaintiff. Colon, 250
F.3d at 135 ("Under the collective or imputed knowledge doctrine, an arrest . . . is permissible
where the actual arresting . . . officer lacks the specific information to form the basis for probable
cause . . . but sufficient information to justify the arrest . . . was known by other law enforcement
officers initiating or involved with the investigation."). While Roberts was unclear at his
deposition – ten years after he signed the criminal complaint – as to whether the source

C.   **Malicious Prosecution**

Plaintiff has brought malicious prosecution claims against all Defendants under both New York law and Section 1983.

> Under New York law, "[t]he elements of an action for malicious prosecution are (1) the initiation of a proceeding, (2) its termination favorably to plaintiff, (3) lack of probable cause, and (4) malice." Colon v. City of New York, 60 N.Y.2d 78, 82, 468 N.Y.S.2d 453, 455, 455 N.E.2d 1248 (1983). Liability for the tort of malicious prosecution also gives rise to liability under 42 U.S.C. § 1983. See, e.g., Cook v. Sheldon, 41 F.3d 73, 77-79 [2d Cir.] 1994).

Savino, 331 F.3d at 72.

As discussed above, Plaintiff's primary malicious prosecution theory as against Detective Godino is that he suppressed Terab's exculpatory information.

As to Detective Roberts, Plaintiff has not articulated a theory, but presumably Plaintiff's claim would be based on Roberts' signing of the criminal complaint without having received an adequate briefing from Godino. This Court rejects any such claim for the same reasons discussed above in connection with Plaintiff's false arrest claim. Accordingly, Defendant Roberts is entitled to summary judgment on Plaintiff's malicious prosecution claims.

As to ADA Birns and ADA Talty, Plaintiff appears to claim that they are liable for malicious prosecution because their alleged purpose in prosecuting Plaintiff was to pressure Plaintiff to reveal where his brother was hiding and/or to pressure Dior Creighton "into taking a plea to rescue plaintiff from a wholly baseless prosecution." (Pltf. Opp. Br. (Dkt. No. 184) at 27, 34, 35) There is no evidence that Birns or Talty were involved in any effort to determine Dior Creighton's whereabouts, however, much less that they participated in a plot to prosecute

---

mentioned in the complaint was Terab or the CI, Roberts did not need to know the identity of the source in order to sign the complaint. He was entitled to rely on Godino for that purpose. (Id.)

Plaintiff in order to pressure him to reveal his brother's location. And again, this theory makes no sense, because (1) there is no evidence that Birns and Talty – at the time they authorized Plaintiff's arrest – knew that the NYPD was having difficulty finding Dior Creighton (see Gross Decl., Ex. K-1 (Dkt. No. 214-11) (Godino Dep.) at 159:25-160:23, 179:8-21; Gross Decl., Ex. GG (Dkt. No. 214-36) (Jan. 9, 2007 Police Report)); and (2) charges remained pending against Plaintiff for five years after his brother was arrested. As to Plaintiff's assertion that Birns and Talty somehow maintained the charges against Plaintiff until 2012 in order to pressure Dior Creighton to plead guilty, there is no evidence that Talty played any role in this case after Plaintiff's arrest in January 2007. (See Gross Decl., Ex. N (Dkt. No. 214-16) (Talty Dep.) at 43:3-15, 73:12-74:2) And Birns left the District Attorney's Office in 2010. (Gross Decl., Ex. M (Dkt. No. 214-15) (Birns Dep.) at 4:5-7, 25:7-13) In any event, there is no evidence that Birns or Talty ever used or attempted to use the charges against Plaintiff as leverage to pressure Dior Creighton to plead guilty. Accordingly, Defendants Birns and Talty are entitled to summary judgment on Plaintiff's malicious prosecution claims.

The Court addresses below Plaintiff's malicious prosecution claims against Detective Godino.

### 1.    The Presumption of Probable Cause Created by an Indictment

As with false arrest, "the existence of probable cause is a complete defense to a claim of malicious prosecution," whether brought under Section 1983 or New York law. Savino, 331 F.3d at 72. Moreover – in the context of a malicious prosecution claim – "indictment by a grand jury creates a presumption of probable cause." Id. A plaintiff may overcome that presumption "only by evidence establishing that the police witnesses have not made a complete and full statement of facts either to the Grand Jury or to the District Attorney, that they have

misrepresented or falsified evidence, that they have withheld evidence or otherwise acted in bad faith." Colon, 60 N.Y.2d at 82-83; see also Savino, 331 F.3d at 72 (presumption "may only be rebutted by evidence that the indictment was procured by 'fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith'" (quoting Colon, 60 N.Y.2d at 83)) (emphasis in Savino); Bernard v. United States, 25 F.3d 98, 104 (2d Cir. 1994) (same); Broughton v. State, 37 N.Y.2d 451, 456 (1975) (same).

"[T]he plaintiff's avenue for rebuttal is not limited to proof of misconduct in the grand jury alone. Rather, the plaintiff may show that the officer misrepresented the facts to the District Attorney or otherwise acted in bad faith in a way that led to the indictment." Manganiello v. Agostini, No. 07 Civ. 3644 (HB), 2008 WL 5159776, at *5 (S.D.N.Y. Dec. 9, 2008), aff'd, Manganiello v. City of New York, 612 F.3d 149 (2d Cir. 2010).

A police officer "fail[s] to make a complete and full statement of facts to the District Attorney" where the officer "d[oes] not alert the prosecutor to the statement by another witness, which was inconsistent with the statement given by the individual who accused plaintiff, and arguably implicated that individual in the shooting." Sital v. City of New York, 60 A.D.3d 465, 466 (1st Dep't 2009) (finding that presumption of probable cause from grand jury indictment had been rebutted).

Here, Plaintiff contends that the presumption of probable cause has been rebutted because Detective Godino did not (1) make further inquiry into the facts before pursuing charges against Plaintiff; (2) present to the grand jury Terab's statement identifying Spruell as the source of the gun; or (3) notify the Bronx District Attorney's Office about Terab's statement that Spruell was the source of the gun. (Pltf. Opp. Br. (Dkt. No. 184) at 26)

Plaintiff's claim that Detective Godino's investigation of the shooting was inadequate does not rebut the presumption of probable cause created by the indictment. As the Second Circuit has explained, the presumption "may <u>only</u> be rebutted by evidence that the indictment was procured by 'fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith.'" <u>Savino</u>, 331 F.3d at 72 (quoting <u>Colon</u>, 60 N.Y.2d at 83) (emphasis in <u>Savino</u>). And even where "further avenues of investigation were open to the police[,] . . . their failure to pursue the investigation is not the equivalent of fraud or the suppression of evidence." <u>Colon</u>, 60 N.Y.2d at 83. Plaintiff contends, however, that under New York law the presumption may also be overcome by "evidence that the police failed to make further inquiry when a reasonable person would have done so." (Pltf. Moving Br. (Dkt. No. 180) at 24 (citing <u>Haynes v. City of New York</u>, 29 A.D.3d 521 (2d Dep't 2006) and <u>Carlton v. Nassau County Police Dep't</u>, 306 A.D.2d 365 (2d Dep't 2003))) Assuming <u>arguendo</u> that such evidence would permit a court to make a finding that the police had acted in bad faith, the facts here do not support this theory of liability.

Detective Godino made "further inquiry" after receiving conflicting accounts from Terab and the CI. According to Godino, after the CI had identified Plaintiff as the source of the gun, Godino contacted Terab and told Terab that another witness had identified someone else. (Gross Decl., Ex. K-1 (Dkt. No. 214-11) (Godino Dep.) at 182:20-183:12, 207:25-208:16) Godino asked Terab whether he was certain that Spruell was the source of the gun, and he asked Terab to come to the 42nd Precinct to view the surveillance footage. (<u>Id.</u> at 136:17-23, 182:20-183:12, 207:25-208:16) According to Godino, at this meeting, Terab recanted and identified Plaintiff as the source of the gun. (<u>Id.</u>)

72

As discussed above, Terab denies that he ever recanted (Gross Decl., Ex. O (Dkt. No. 214-17) (Terab Dep.) at 45:24-46:4), but he does not deny that Godino contacted him – after the CI had identified Plaintiff as the source of the gun – to discuss which man had passed the gun to Dior Creighton. According to Terab, Godino called him two days after Plaintiff's arrest and the two men discussed who had passed the gun to Dior Creighton. (Id. at 83:7-16) Terab testified that, during this conversation, he told Godino that the police had arrested the "wrong person." (Id.) While Defendants dispute that Terab told police that they had arrested the wrong man, and while Terab maintains that he never changed his identification from Spruell to Plaintiff, there is no dispute that Godino continued his investigation after he received the conflicting accounts from Terab and the CI.

The continued investigation also included Detective Roberts' review of the surveillance footage. Roberts – who was familiar with Plaintiff – concluded that the footage showed Plaintiff passing a "shiny metallic object" to Dior Creighton shortly before the shootings. (Gross Decl., Ex. OO-1 (Dkt. No. 214-44) (Roberts Dep.) at 41:17-45:23, 58:16-60:7, 130:9-20)

In sum, Godino did not blindly choose between two conflicting witness accounts concerning who had passed a gun to Dior Creighton. He contacted Terab again after Plaintiff's arrest and discussed with him whether Plaintiff had been the source of the gun, and he utilized other sources of information, including the surveillance footage and Detective Roberts' review of that footage, in deciding to pursue charges against Plaintiff.

As to Plaintiff's contention that Detective Godino was obligated to present exculpatory information to the grand jury, that is incorrect as a matter of law. The Second Circuit has stated that

> "[i]t is axiomatic that the grand jury sits not to determine guilt or innocence, but to assess whether there is adequate basis for bringing a criminal charge." It has

therefore "always been thought sufficient to hear only the prosecutor's side."
This means that "the suspect under investigation by the grand jury [has never]
been thought to have a right to testify or to have exculpatory evidence presented."

Morse v. Fusto, 804 F.3d 538, 547 (2d Cir. 2015) (quoting United States v. Williams, 504 U.S.

36, 51-52 (1992)) (internal citations omitted); see also Savino, 331 F.3d at 75 (there is "no duty

to present every item of arguably exculpatory evidence in seeking an indictment"); United States

v. Regan, 103 F.3d 1072, 1081 (2d Cir. 1997) ("The government ha[s] no obligation to present

exculpatory material to a grand jury [under either Federal or New York law].").

 New York courts have likewise acknowledged that "the People maintain broad

discretion in presenting their case to the Grand Jury and need not seek evidence favorable to the

defendant or present all of their evidence tending to exculpate the accused." People v. Mitchell,

82 N.Y.2d 509, 515 (1993); see also People v. Gray, 284 A.D.2d 664, 665 (3d Dep't 2001)

(finding no defect in grand jury proceedings where exculpatory statements of alibi witnesses

were not presented to the grand jury, because the victim's testimony established a prima facie

case against defendant); People v. Dillard, 214 A.D.2d 1028, 1028 (4th Dep't 1995) ("The

prosecutor's failure to present exculpatory evidence that the surviving victim had not identified

defendant from a photographic array and that the witness [to the shooting] had recanted his

earlier statement that the defendant was the perpetrator does not render the Grand Jury

proceeding defective."); People v. Morris, 204 A.D.2d 973, 974 (4th Dep't 1994) (failure to

present witness's exculpatory statement that defendant was not involved in altercation "did not

render Grand Jury proceeding defective," given victim's testimony identifying defendant as

perpetrator). Accordingly, although Terab's statement identifying Spruell as the source of the

gun was exculpatory of Plaintiff, neither Detective Godino nor any other Defendant was

obligated to present that evidence to the grand jury.

"Notwithstanding the legally permissible one-sided nature of grand jury proceedings[, however]," Morse, 804 F.3d at 547, "a police officer's fabrication and forwarding to prosecutors of known false evidence works an unacceptable 'corruption of the truth-seeking function of the trial process.'" Manganiello, 612 F.3d at 162 (quoting Ricciuti, 124 F.3d at 162). "Where there is some indication . . . that, as to a fact crucial to the existence of probable cause, the arresting officers may have 'lied in order to secure an indictment,' and 'a jury could reasonably find that the indictment was secured through bad faith or perjury,' the presumption of probable cause created by the indictment may be overcome." Id.; see also McClellan v. Smith, 439 F.3d 137, 145 (2d Cir. 2006) (finding presumption rebutted where there was evidence that police officer committed perjury before the grand jury and that "prosecution of the case was impelled solely by personal animus"); Boyd v. City of New York, 336 F.3d 72, 77 (2d Cir. 2003) (finding presumption rebutted where there was evidence that the police "lied in order to secure an indictment"). Here, Detective Godino did not testify against Plaintiff in the grand jury (Gross Decl., Ex. K-1 (Dkt. No. 214-11) (Godino Dep.) at 203:2-4), and there is no evidence that he fabricated evidence or lied in order to secure an indictment.

Plaintiff also argues, however, that Detective Godino did not inform the Bronx County District Attorney's Office about Terab's statement identifying Spruell as the source of the gun. This issue is considered below.

### 2.    Whether Detective Godino Suppressed Terab's Exculpatory Statement

As an initial matter, it is undisputed that the Bronx County District Attorney's Office produced to Plaintiff's criminal defense lawyer – during discovery – both Terab's statement identifying Spruell as the source of the gun and a signed photo array in which Terab identified Spruell. (See Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 189) at ¶ 46) Michael Raskin,

Plaintiff's criminal defense lawyer, testified that ADA Birns supplied him with both the bodega

owner's statement and a photo array during discovery. (Gross Decl., Ex. Q (Dkt. No. 214-19)

(Raskin Dep.) at 56:7-58:10)  Raskin recalled that the bodega owner had stated that "someone

named Kalifa [i.e., Kijafa Spruell], not someone named Kenneth Creighton, . . . had [passed the

gun]." (Id. at 53:16-20, 59:25-60:21)  Given that it is undisputed that the District Attorney's

Office provided Plaintiff's criminal defense lawyer with Terab's statement and the photo array

he initialed during discovery, it is apparent that Detective Godino – the custodian of the case

folders (Gross Decl., Ex. K-1 (Dkt. No. 214-11) (Godino Dep.) at 204:19-205:2) – supplied these

materials to the District Attorney's Office, as he has represented. (Id. at 44:2-46:21, 96:10-17)

This Court must go on to determine, however, whether Detective Godino supplied

the District Attorney's Office with Terab's exculpatory information prior to indictment. The

timing of this transfer of information is significant, because in determining whether a police

officer withheld exculpatory evidence from a district attorney's office, courts look to the time

period preceding indictment. See McClellan, 439 F.3d at 145 (malicious prosecution claim

against police officer may proceed where plaintiff has shown that "the indictment was produced

by . . . suppression of evidence"); Manganiello, 2008 WL 5159776, at *5 (malicious prosecution

claim against police officer may proceed where plaintiff "show[s] that the officer misrepresented

the facts to the District Attorney or otherwise acted in bad faith in a way that led to the

indictment").

Detective Godino testified that he delivered the case folders to ADA Birns

"within a month" of the arrests of the Creighton brothers, and that the case folders contained

Terab's statement and the photo array. (Gross Decl., Ex. K-1 (Dkt. No. 214-11) (Godino Dep.)

at 44:2-24, 46:7-21, 96:10-13, 168:24-169:2, 172:6-8, 202:7-12, 206:22-207:5)  Plaintiff was

arrested on January 10, 2007, and was indicted on January 23, 2007, however. (Def. R. 56.1

Stmt. (Dkt. No. 167) at ¶¶ 21, 33; Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 189) at ¶¶ 21, 33;

June 27, 2016 Thadani Decl., Ex. L (Dkt. No. 166-12) (Kenneth Creighton Indictment))

Accordingly, Detective Godino's testimony that he provided the case folders to ADA Birns

"within a month" of the arrests of the Creighton brothers does not establish that the case folders

were provided to ADA Birns prior to indictment.

      At his deposition, Godino testified that he could not recall whether he discussed

Terab's statement with ADA Birns prior to Plaintiff's arrest.[42] (Gross Decl., Ex. K-1 (Dkt. No.

214-11) (Godino Dep.) at 167:23-169:5, 171:3-173:5, 181:6-20)  When asked whether Terab's

exculpatory information had been shared with ADA Birns prior to the grand jury presentation,

however, Godino answered yes:

> Q.    You knew when Ken was indicted, did you not, that there was exculpatory
> evidence in the folder unrebutted that Ken was not the one who passed the gun,
> correct?
>
>           Mr. Thadani:  Objection.
>
> A.    Could you just rephrase that.  I'm sorry.  I didn't –
>
> Q.    I'll rephrase it, sure.
>
>     You knew that as far as the case against Ken that there existed in the case folder
> documentation by Terab that indicated that Ken was not the person who passed
> the gun to Dior, correct?
>
>           Mr. Thadani:  Objection.

---

[42]  Godino believes that he told ADA Birns about Terab's statement prior to Plaintiff's arrest.  It
would have been his ordinary practice to do so, both because Terab's statement constituted
<u>Brady</u> material as to Plaintiff and provided probable cause to arrest Spruell.  (Gross Decl., Ex. K-
1 (Dkt. No. 214-11) (Godino Dep.) at 169:11-20, 171:3-172:22, 181:6-182:3; Gross Decl. Ex. K-
2 (Dkt. No. 214-12) (Godino Dep.) at 348:18-350:9)  Godino also testified that ADA Birns did
not call Terab to testify in the grand jury because – although he identified Plaintiff as the source
of the gun after being shown the surveillance footage – he had first stated that Spruell provided
the gun to Dior Creighton.  (Gross Decl., Ex. K-1 (Dkt. No. 214-11) (Godino Dep.) at 182:6-21)

A.    Correct.

Q.    You also knew, did you not, that that information had been imparted to the ADA
      before he presented the case to the grand jury, correct?

                    Mr. Thadani: Objection.

A.    Correct.

(Id. at 205:3-21)

         ADA Birns – who was employed at the Bronx County District Attorney's Office

for 32 years between 1978 and 2010 (Gross Decl., Ex. M (Dkt. No. 214-15) (Birns Dep.) at 3:16-

18, 4:5-7) – was questioned repeatedly and extensively at his May 23, 2016 deposition about

whether he recalled being informed of Terab's exculpatory statement and the photo array he had

initialed. Although – according to Michael Raskin, Plaintiff's criminal defense lawyer – Birns

produced these materials to Raskin during discovery, Birns testified that he had "no specific

recollection" of Terab's exculpatory statement and the photo array:

Q.    At some point during the time that you were in charge of this prosecution, were
      you made aware of the bodega owner, Fawaz Terab, having identified a man
      know[n] as Kijafa Spruell as the person who passed the gun?

                    Mr. Thadani: Objection.

A.    I have no specific recollection of that, but as I indicated earlier, I was aware of the
      fact that there was somebody at the bodega who –

Q.    Okay.

A.    – has some familiarity –

Q.    Okay.

A.    I'm not saying yes or no. I just don't have any specific recollection.

Q.    The information that is reflected on those exhibits from Terab and the photo array,
      at some point in the prosecution, were you aware of the fact that Mr. Terab had
      given that kind of information to the police when they investigated the case?

Mr. Thadani:  Objection.

A.      I have no specific recollection of it.

. . . .

Q.      During the pendency of the prosecution, before the case was dismissed, are you aware of whether or not the exculpatory information that we've been talking about here by Terab was ever provided to Mr. Raskin, Ken's defense counsel?

Mr. Thadani:  Objection

A.      I don't have any specific recollection of my involvement. . . .

Q.      Let me ask you specifically.  What I'm asking, if you can help me with it, is if you can fix a time when the particular exculpatory information we're talking about, the signed statement and the two photo arrays, were provided to Ken's lawyer.

Mr. Thadani:  Objection.

A.      I don't have any specific recollection of it in any manner so I certainly couldn't answer that question.

(Gross Decl., Ex. M (Dkt. No. 214-15) (Birns Dep.) at 125:9-127:20)

At numerous points during his May 23, 2016 deposition, Birns repeats that he has "no specific recollection" of Terab's exculpatory statement or the photo array Terab had initialed.  (See, e.g., id. at 60:19-24 ("I have no specific recollection of any of this."); id. at 63:22-24 ("I have no specific recollection of . . . the Spruell [photo array] and the handwritten [Terab] note."); id. at 67:5-6 ("I have no specific recollection of being aware of this. . . ."); id. at 69:5-6 ("I have no recollection of specifically being aware of [Terab's statement and the Spruell photo arrays]."); id. at 75:12-13 ("If you're asking me specifically about these two documents, I have no independent recollection one way or the other about them."); id. at 179:12-13 ("I'm telling you I have no recollection whatsoever."); id. at 184:4-5 ("I have no specific recollection of the handwritten statement you showed me last week."); id. at 187:2-3 ("I have no recollection

of finding out about [Terab's exculpatory statement and photo array at any point.]"); id. at 187:4-15 (Q. "You're saying for the entire time that you were the prosecuting DA on this case, you have no recollection of ever knowing . . . about the exculpatory information that we've been discussing . . . that was provided by Mr. Terab about Mr. Spruell being the one who passed the gun; is that your testimony? Just yes or no. Mr. Thadani: Objection. A. Yeah, that's my testimony. I have no specific recollection of it."); id. at 195:18-19 ("I'm telling you I have no recollection of learning of it."))[43]

At one point in Birns' deposition, he deviates from this pattern of stating that he has "no specific recollection" "one way or the other" as to whether he was told about Terab's exculpatory information. On this occasion, Birns adopts Plaintiff's counsel's suggestion that he did not know about this exculpatory information at the time he presented Plaintiff's case to the grand jury:

> Q.    As I just read to you, Detective Godino indicated in his sworn testimony that he did not remember one way or the other whether he told you about this exculpatory evidence. Is it a fair statement that as you sit here right now you did not know about this when you presented to the grand jury?
>
>            Mr. Thadani: Objection.
>
> A.    Yes, it's a fair statement. . . .

(Id. at 60:8-15)

---

[43] Birns has little recollection of most aspects of the Creighton prosecution, including when or how he first became involved in the investigation (Gross Decl., Ex. M (Dkt. No. 214-15) (Birns Dep.) at 225:24-226:8); whether Detective Godino or Detective Roberts supplied the information that he relied on to authorize the arrest (id. at 52:2-15); which detective introduced him to the CI (id. at 225:21-24); whether he was informed that the CI was a "registered CI" (id. at 39:2-16, 203:13-22); whether he reviewed the Mini Mart surveillance footage or still photographs with the CI (id. at 230:6-13); whether ADA Talty authorized the arrest (id. at 48:5-14); the order in which Dior Creighton and Kenneth Creighton were arrested (id. at 77:9-78:19, 227:3-6); whether the CI used his real name in the grand jury (id. at 132:12-18); and the substance of his conversations with Detective Godino in preparation for the grand jury presentation. (Id. at 201:14-22)

This Court sustains defense counsel's objection to the form of the question, and will not consider Birns' answer in resolving the cross-motions for summary judgment. See Presbyterian Church of Sudan v. Talisman Energy, Inc., 582 F.3d 244, 264 (2d Cir. 2009) ("'[O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment. . . . [and] it is appropriate for district courts to decide questions regarding the admissibility of evidence on summary judgment.'" (quoting Raskin v. Wyatt Co., 125 F.3d 55, 65-66 (2d Cir. 1997)). In purporting to inform Birns about the substance of Godino's testimony on this point, Plaintiff's counsel misrepresented Godino's testimony. As noted above, when Detective Godino was asked directly whether Terab's exculpatory information "had been imparted to the ADA before he presented the case to the grand jury," Godino answered, "Correct." (Gross Decl., Ex. K-1 (Dkt. No. 214-11) (Godino Dep.) at 205:11-21) Accordingly, in telling Birns that Detective Godino had testified that he could not recall "one way or the other" whether Terab's exculpatory information had been shared with Birns, Plaintiff's counsel mischaracterized Godino's testimony.

The question remains, however, whether Plaintiff has demonstrated that there is a material issue of fact as to whether Detective Godino informed ADA Birns of Terab's exculpatory information prior to indictment. Birns testified repeatedly that he has "no specific recollection" "one way or the other" – that he cannot say "yes or no" – as to whether he was ever informed of this information. Detective Godino testified, however, that Terab's exculpatory information "had been imparted to the ADA before he presented the case to the grand jury." (Id.) No issue of fact exists where, as here, one witness has a recollection of an event, while another actor in the same event has no recollection, "one way or the other." See Faruki v. City of New York, No. 10 Civ. 9614 (LAP), 2012 WL 1085533, at *5 (S.D.N.Y. Mar. 30, 2012)

("Plaintiff's statement that she did not recall . . . is insufficient to create a genuine dispute on [the] material issue [of probable cause]."), aff'd, 517 F. App'x 1 (2d Cir. 2013); Bryant v. Ward, No. 09 Civ. 981 (AWT), 2011 WL 2896015, at *4 (D. Conn. July 18, 2011) ("no genuine issue as to whether [police officer] had probable cause to initiate the traffic stop" where officer observed traffic violation and plaintiff testified he "does not recall"); see also F.D.I.C. v. Nat'l Union Fire Ins. Co. of Pittsburgh, 205 F.3d 66, 75 (2d Cir. 2000) ("[V]ague denials and memory lapses . . . do not create genuine issues of material fact."); Fed. Election Comm'n v. Toledano, 317 F.3d 939, 950 (9th Cir. 2002) ("[F]ailure to remember and lack of knowledge are not sufficient to create a genuine dispute.  The district court was entitled to treat these facts as established for purposes of summary judgment.").

The Court concludes that Plaintiff has not offered evidence sufficient to create a material issue of fact as to whether Detective Godino "intentionally withheld" Terab's exculpatory information from the District Attorney's Office.  See Savino, 331 F.3d at 74 (presumption of probable cause not rebutted where plaintiff "presented no evidence that [the alleged exculpatory] information was intentionally withheld" from the ADA).  Accordingly, the presumption of probable cause flowing from the indictment has not been rebutted, and Defendant Godino is entitled to summary judgment on Plaintiff's malicious prosecution claims.

### 3.    Malice

Plaintiff's malicious prosecution claims also fail because he has not put forth evidence satisfying the element of malice.

A plaintiff bringing a malicious prosecution claim must demonstrate that a defendant acted with malice towards plaintiff.  Savino, 331 F.3d at 72.  "[M]alice may be shown by proving that the prosecution complained of was undertaken from improper or wrongful

motives, or in reckless disregard of the rights of the plaintiff." Manganiello, 612 F.3d at 160

(internal quotations and citations omitted). Here, Plaintiff does not allege personal animus on the

part of any Defendant. Plaintiff nonetheless contends, however, that Defendants had improper

motives in pursuing his prosecution.

According to Plaintiff, "[D]efendants' avowed purpose to arrest [Plaintiff] was so

he would tell where his brother was." (Pltf. Opp. Br. (Dkt. No. 184) at 27; see also id. at 12

(contending that Defendants relied on "the unreliable information of a paid drug addicted CI in

order to suit their purpose[,] to pressure K[enneth] Creighton into telling them of his brother's

whereabouts"); id. at 13 ("When it became clear that the police could not find Dior, Godino and

his colleagues devised a plan:  ignore Terab's identification, arrest K[enneth] Creighton instead

of Spruell for criminal facilitation so that 'in turn, Kenneth may inform this department where

defendant Dior Creighton is hiding out.'" (quoting July 26, 2016 Gross Decl. (Dkt. No. 185) Ex.

HH (Jan. 10, 2007 Police Report))); id. at 20 (arrest of Plaintiff "was motivated by [Godino's]

desire to find out where [P]laintiff's brother was hiding and not by probable cause")).  There is

no evidence that Detective Godino or any other Defendant had Plaintiff arrested for this purpose,

however.

Plaintiff's sole evidentiary support for his improper motive claim is a January 10,

2007 police report prepared by NYPD Detective Paul LaDuca.  (See July 26, 2016 Gross Decl.

(Dkt. No. 185) Ex. HH (Jan. 10, 2007 Police Report))  Detective LaDuca is a member of the

NYPD's Fugitive Apprehension Team in the Bronx (Gross Decl., Ex. EE (Dkt. No. 214-34)

(LaDuca Dep.) at 5:3-10), and his report states that "Detective Rivera" informed him that Dior

Creighton's brother, Kenneth Creighton, "is suppose[d] to be reporting to his probation officer

on this date 1-10-07 at which time the 42 pct sqd. Detectives will arrest Ken[n]eth . . . for

83

criminal facilitation." (July 26, 2016 Gross Decl. (Dkt. No. 185) Ex. HH (Jan. 10, 2007 Police

Report)) LaDuca goes on to state that "[i]n turn Ken[n]eth may inform [this] Department

wher[e] deft - Dior Creighton is hiding out." (Id.; Gross Decl., Ex. K-3 (Dkt. No. 214-13)

(Godino Dep.) at 436:11-437:23, 442:16-25) Detective LaDuca and other members of the

Fugitive Apprehension Team began searching for Dior Creighton on January 5, 2007 after

"receiv[ing] . . . an I-card on [him]."[44] (Gross Decl., Ex. EE (Dkt. No. 214-34) (LaDuca Dep.) at

23:5-24:9)

       Although LaDuca's report suggests that he believed that Plaintiff might be willing

to disclose his brother's whereabouts, there is no evidence that Detective Godino shared that

view, or that Detective Godino ever suggested to LaDuca or any other member of the Fugitive

Apprehension Team that Plaintiff might be willing to assist in the capture of his brother. Godino

testified that he never thought of using Plaintiff as an informant against his brother, and that he

has no idea why LaDuca expressed the view that Plaintiff might be willing to provide

information concerning the whereabouts of his brother. (Gross Decl., Ex. K-3 (Dkt. No. 214-13)

(Godino Dep.) at 451:5-452:18, 456:20-457:5, 469:5-470:5) LaDuca testified that he

"remember[s] very little, if nothing at all about [Plaintiff's] case," and does not recall any

interactions with Detective Godino or Detective Roberts. (Gross Decl., Ex. EE (Dkt. No. 214-

34) at 15:12-19, 18:4-5)

---

[44] An "I-card" is "an investigative card" that is "put out by a precinct [or] a detective, [and]
means that th[e] particular person is wanted on a specific crime." (Gross Decl., Ex. K-1 (Dkt.
No. 214-11) (Godino Dep.) at 64:11-65:16; Gross Decl., Ex. EE (Dkt. No. 214-34) (LaDuca
Dep.) at 8:25-9:3) Detective Godino explained that police officers issue I-cards when they want
to "speak to somebody who might be a suspect or . . . have probable cause to arrest that person."
(Gross Decl., Ex. K-1 (Dkt. No. 214-11) (Godino Dep.) at 64:11-65:16) Once an I-card is
issued, the issuing officer is "made aware" when the individual is "arrested or stopped." (Id.)

LaDuca's report does not demonstrate that Detective Godino had an improper motive in arresting Plaintiff, and it sheds no light on Godino's state of mind. There is no evidence that Godino ever intended to use Plaintiff as an informant against his brother, nor is there any evidence that he ever communicated this idea to anyone. Moreover, as discussed above, the alleged motive cited by Plaintiff makes no sense, because Dior Creighton was arrested on January 26, 2007 (Pltf. R. 56.1. Stmt. (Dkt. No. 178) at ¶ 176; Def. Resp. to Pltf. R. 56.1 Stmt. (Dkt. No. 176) at ¶ 176), and Defendants nonetheless pursued charges against Plaintiff for the next five years – until January 18, 2012. (Def. R. 56.1 Stmt. (Dkt. No. 167) at ¶ 50) Given these circumstances, and the evidence available to Defendants indicating that Plaintiff was the source of the gun used by his brother, no reasonable jury could accept Plaintiff's argument that Detective Godino's true purpose in arresting Plaintiff, and the ADAs' true purpose in prosecuting Plaintiff, was to discover where his brother was hiding.[45]

---

[45] In two throwaway lines in his summary judgment briefing, Plaintiff asserts that Defendants prosecuted him in order to "pressure Dior into taking a plea to save his brother from serving more time for a crime the police knew full-well he had not committed." (Pltf. Moving Br. (Dkt. No. 180) at 26; see also Pltf. Opp. Br. (Dkt. No. 184) at 35 (contending that Defendants "conspired to accuse plaintiff of the crimes for which he was charged . . . in order to . . . pressure [Dior] . . . into taking a plea to rescue plaintiff from a wholly baseless prosecution")) Plaintiff's sole factual support for this claim is that "when Dior pled guilty to the charges of which he was accused, all charges against Kenneth Creighton were dismissed." (Pltf. Moving Br. (Dkt. No. 180) at 26-27)

As an initial matter, and for reasons discussed at length above, the charges against Plaintiff were not "baseless." There is likewise no evidence that "the police knew full-well [that Plaintiff] had not committed [the crimes with which he was charged]." Moreover, the evidence demonstrates that ADA Gottlieb dropped the charges against Plaintiff in January 2012 because the CI could not be located.

As discussed above, ADA Gottlieb made the following representations in the Recommendation for Dismissal that she submitted to the court:

> Kenneth Creighton was arrested and charged based upon the statements of a single eyewitness. This eyewitness knows Kenneth Creighton and saw him hand Dior Creighton a handgun inside the bodega. This witness has now become unavailable to the Bronx District Attorney's Office. The witness could not be

                        *        *        *        *

Defendant Godino is entitled to summary judgment on Plaintiff's malicious

prosecution claims under Section 1983 and New York law. Plaintiff's cross-motion for summary

judgment on these claims will be denied.

---

located by the case Detective at any of the telephone numbers or addresses
provided. Further efforts to locate this witness by the Detective Investigator have
been unsuccessful.

(June 27, 2016 Thadani Decl., Ex. Y (Dkt. No. 166-25) (Jan. 18, 2012 Recommendation for
Dismissal) at 2) ADA Gottlieb further represented that "the People would be unable to proceed
to trial [without this witness]." (Id.) The parties agree that the witness referred to in the
Recommendation for Dismissal is the CI. (See Def. R. 56.1 Stmt. (Dkt. No. 167) at ¶ 51; Pltf.
Resp. to Def. R. 56.1 Stmt. (Dkt. No. 189) at ¶ 51)

Detective Godino testified that the "case Detective" referred to in the Recommendation for
Dismissal is the CI's handler, Detective John Elliott. (Gross Decl., Ex. K-3 (Dkt. No. 214-13)
(Godino Dep.) at 386:13-388:3) According to Godino, when the case against Plaintiff appeared
to be heading to trial, he and Detective Elliott went to Gottlieb's office, "and she notified
Detective Elliott to find the CI, and he went several times to try to find him and he couldn't find
him." (Id. at 388:4-11)

ADA Gottlieb testified that she used two officers to search for the CI. (Gross Decl., Ex. R (Dkt.
No. 214-20) (Gottlieb Dep.) at 29:13-25) Gottlieb confirmed that she spoke with the CI's
handler from Bronx Narcotics. (Id. at 29:18-30:9) Gottlieb later asked John Wall, a detective-
investigator employed by the District Attorney's Office, to find the CI. (Id. at 25:11-19, 27:24-
29:6) The efforts Gottlieb made to find the CI were unsuccessful. (See id. at 29:3-30:13,
154:22-155:5, 199:19-25)

The CI testified that he recalled Detective Elliott calling him at some point and saying that "the
DA" "was looking for [him] at the time. . . . [w]hen Dior was going to trial." (Gross Decl., Ex.
U (Dkt. No. 214-24) (Informant Dep.) at 149:9-151:19) The CI had told Elliott that he would not
testify against Dior Creighton if the case went to trial. (Id.)

Detective Elliott was apparently not deposed.

The evidence before the Court indicates that while Elliott may have periodically been in contact
with the CI, Gottlieb and Godino's understanding was that – when the case against Plaintiff
appeared to be headed to trial in early 2012 – the CI could not be located. In any event,
Detective Godino played no role in the decision to drop the charges against Plaintiff, and there is
no evidence that he ever used, or sought to use, the arrest or prosecution of Plaintiff as leverage
to induce Dior Creighton to plead guilty.

### D.    Due Process Violation

The Amended Complaint's Sixth Request for Relief pleads a cause of action

under Section 1983 against all Defendants for the alleged deprivation of Plaintiff's right to

procedural and substantive due process.  (Am. Cmplt. (Dkt. No. 10) at ¶¶ 101-106)  In this cause

of action, Plaintiff repeats his claims of false arrest/false imprisonment and malicious

prosecution.  In opposing Defendants' motion for summary judgment, however, Plaintiff

explains that his due process claim is based on Detective Godino's alleged fabrication of

evidence, and on Detective Godino's transmission of this alleged fabricated evidence to ADA

Birns and ADA Talty.  (Pltf. Opp. Br. (Dkt. No. 184) at 28-30)  The Court considers below

Plaintiff's due process claim against Detective Godino; the remaining Defendants will be granted

summary judgment on Plaintiff's due process claim.

Where "'a particular Amendment "provides an explicit textual source of

constitutional protection" against a particular sort of government behavior, "that Amendment,

not the more generalized notion of 'substantive due process,' must be the guide for analyzing

these claims."'"  Singer, 63 F.3d at 115 (quoting Albright v. Oliver, 510 U.S. 266, 273 (1994)

(plurality opinion)); Aretakis v. Durivage, No. 07-CV-1273, 2009 WL 249781, at *21 (N.D.N.Y.

Feb. 3, 2009) ("Accepting that [plaintiff] was arrested and had to endure a criminal prosecution,

those pretrial deprivations of liberty and other substantive due process rights were subsumed into

the Fourth Amendment.").  For example, "the Fourth Amendment is the proper source of

constitutional protection for claims, such as malicious prosecution, that implicate a person's

liberty interest in respect of criminal prosecutions (and, in particular, one's pretrial liberty)[.]"

Singer, 63 F.3d at 115.  Where a due process claim is "based on the same conduct that gave rise

to [a] plaintiff's . . . false arrest and malicious prosecution claims," the due process claim should

be dismissed "as both duplicative and merit[]less." Osuna v. City of New York, No. 08 Civ. 4759 (JSR), 2009 WL 2356424, at *6 (S.D.N.Y. July 30, 2009); Ambrose v. City of New York, 623 F. Supp. 2d 454, 474 n.9 (S.D.N.Y. Mar. 31, 2009) (dismissing procedural due process claim "because New York allows Plaintiff to sue in tort for false arrest and malicious prosecution").

Accordingly, to the extent that Plaintiff's due process claim against Detective Godino rests on theories of false arrest and malicious prosecution, Godino is entitled to summary judgment on this claim. To the extent that Plaintiff's due process claim is premised on a theory that Godino fabricated evidence against him, and knowingly submitted this fabricated evidence to the Bronx County District Attorney's Office, Plaintiff's due process claim is not duplicative of his false arrest and malicious prosecution claims.

The Second Circuit has made clear that the fabrication of evidence by a police officer constitutes an independent due process violation that impinges on a defendant's constitutional right to a fair trial:

> No arrest, no matter how lawful or objectively reasonable, gives an arresting officer or his fellow officers license to deliberately manufacture false evidence against an arrestee. To hold that police officers, having lawfully arrested a suspect, are then free to fabricate false confessions at will, would make a mockery of the notion that Americans enjoy the protection of due process of the law and fundamental justice. Like a prosecutor's knowing use of false evidence to obtain a tainted conviction, a police officer's fabrication and forwarding to prosecutors of known false evidence works an unacceptable "corruption of the truth-seeking function of the trial process." United States v. Agurs, 427 U.S. 97, 104 (1976); Giglio v. United States, 405 U.S. 150, 153 (1972); Mooney v. Holohan, 294 U.S. 103, 112 (1935).

> [Accordingly,] [w]hen a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial, and the harm occasioned by such an unconscionable action is redressable in an action for damages under 42 U.S.C. § 1983.

Ricciuti, 124 F.3d at 130 (citations omitted).[46]

       Moreover, "the absence of probable cause is not an element of a due process claim." Bermudez v. City of New York, 790 F.3d 368, 376 n.5 (2d Cir. 2015) (citing Poventud v. City of New York, 750 F.3d 121, 134 (2d Cir. 2014) (en banc)). Accordingly, Plaintiff's due process claim is not barred as a result of this Court's finding that there was probable cause for his arrest and subsequent prosecution. Id. at 376; see also Morse v. Spitzer, No. 07 Civ. 4793 (CBA) (RML), 2012 WL 3202963, at *5 (E.D.N.Y. Aug. 3, 2012).

       "To prevail on a denial of fair trial claim, a plaintiff must show that 'an (1) investigating official (2) fabricates evidence (3) that is likely to influence a jury's decision, (4) forwards that information to prosecutors, and (5) the plaintiff suffers a deprivation of liberty as a result.'" Soomro v. City of New York, 174 F. Supp. 3d 806, 815 (S.D.N.Y. 2016) (quoting Jovanovic v. City of New York, 486 F. App'x 149, 152 (2d Cir. 2012)). For a denial of fair trial claim to proceed, there need not have been a trial; rather, "the claim can accrue when fabricated information is forwarded to a prosecutor and results in the deprivation of a defendant's liberty." Id. (citing Ricciuti, 124 F.3d at 130). Moreover, "[t]he deprivation need not be in the form of post-trial confinement." Id. (citing Ricciuti, 124 F.3d at 130; Jean-Laurent v. Bowman, No. 12 CV 2954, 2014 WL 4662232, at *3 n.1 (E.D.N.Y. Sept. 18, 2014)).

---

[46] Defendants complain that Plaintiff has transformed his due process claim into a fair trial claim. (Def. Reply Br. (Dkt. No. 169) at 12) As discussed above, however, a claim for denial of a right to a fair trial is rooted in the constitutional guarantee of due process. See, e.g., Bailey v. City of New York, 79 F. Supp. 3d 424, 445 (E.D.N.Y. 2015) (a claim for denial of a right to a fair trial "finds its roots in the Sixth Amendment, as well as the due process clauses of the Fifth and Fourteenth Amendments"). Accordingly, Plaintiff has not injected a new claim into this litigation.

Here, Plaintiff's due process claim fails on the merits, because – as discussed in detail above, see Section II(B)(1)(b) supra – there is no evidence that Detective Godino fabricated evidence.[47]

Defendant Godino is entitled to summary judgment on Plaintiff's due process claim, and Plaintiff's cross-motion for summary judgment on this claim will be denied.

### E.   Unreasonably Prolonged Detention

The Second Circuit has recognized a claim, arising under the Fourth Amendment, for unreasonably prolonged detention. Russo v. City of Bridgeport, 479 F.3d 196, 208 (2d Cir. 2007). To prevail on such a claim against individual defendants, a plaintiff must establish "(1) that he has a right to be free from continued detention stemming from law enforcement officials' mishandling or suppression of exculpatory evidence, (2) that the actions of the officers violated that right, and (3) that the officers' conduct 'shocks the conscience.'" Russo, 479 F.3d at 205 (quoting County of Sacramento v. Lewis, 523 U.S. 833, 846 (1998)).

In determining whether a plaintiff's right to be free from unreasonably prolonged detention was violated, courts consider "(1) the length of time the plaintiff was incarcerated; (2) the ease with which the exculpatory evidence in the defendant officers' possession could have been checked; and (3) the alleged intentionality of the defendants' behavior." Harewood v. Braithwaite, 64 F. Supp. 3d 384, 402 (E.D.N.Y. 2014) (citing Russo, 479 F.3d at 209-10); see also Thompson v. City of New York, 603 F. Supp. 2d 650, 656 (S.D.N.Y. 2009) (damages are

---

[47] Plaintiff cites to allegations in the Amended Complaint to support his claim of fabricated evidence. (See Pltf. Opp. Br. (Dkt. No. 184) at 29) Allegations in a complaint provide no basis for opposing summary judgment. Hernandez v. Coca Cola Refreshments USA, Inc., No. 12 Civ. 234 (BMC), 2013 WL 6388654, at *3 (E.D.N.Y. Dec. 6, 2013) ("[I]t is of course fundamental that allegations in a complaint are not 'evidence' that can defeat a motion for summary judgment." (citing Graham v. Lewinski, 848 F.2d 342, 344 (2d Cir. 1988))).

available under Section 1983 where a plaintiff "(i) . . . was wrongfully incarcerated for an unreasonable length of time; (ii) the defendant-officer, by expending reasonable cost and effort, could have conclusively established the plaintiff's innocence; (iii) the defendant-officer failed to do so; and (iv) the defendant-officer acted with a culpable mental state").

"In order to satisfy the Russo standard for excessive pre-trial detention, such exculpatory evidence must have conclusively or affirmatively established [Plaintiff's] innocence." King v. City of New York, Nos. 12-CV-2344 (NGG) (RER), 13-CV-0037 (NGG) (RER), 2014 WL 4954621, at *29 (E.D.N.Y. Sept. 30, 2014); see also Husbands ex rel. Forde v. City of New York, No. 05 Civ. 9252 (NRB), 2007 WL 2454106, at *12 (S.D.N.Y. Aug. 16, 2007) (rejecting excessive pre-trial detention claim where the evidence that the police had failed to investigate "in no way affirmatively established [plaintiff's] innocence"). Russo is instructive as to the factual record necessary to sustain an excessive pretrial detention claim.

Russo was arrested for a robbery at a gas station and was detained for 217 days before the charges against him were dismissed. Russo, 479 F.3d at 199-203. The cashier of the gas station had identified Russo from a photo array, but there were differences between Russo's physical appearance and the cashier's description of the robber. Id. at 199-200 (Russo was "younger, taller, balder, and with different colored hair than the person whom the victim had described to the police"). Moreover, the robbery had been captured by a security camera, and the videotape showed the perpetrator's left and right forearms, both of which were free of tattoos. Id. Russo had "prominent tattoos on his forearms," however, which dated back from before his arrest. Id. at 200.

After his arrest, Russo directed the defendant officers' attention to his tattoos, and asked the officers to check the surveillance footage to determine whether the robber had tattoos.

Defendants told Russo, erroneously, that the videotape showed a robber with tattoos.  Id.  Even

after Russo's counsel moved for the production of exculpatory material, the security camera

videotape was not produced.  Id. at 201.  Russo repeatedly sought production of the videotape,

hoping to compare his tattoos to the tattoos of the perpetrator.  Id.  After the videotape was

produced to Russo's defense lawyer, the prosecutor – who had previously seen only still

photographs from the videotape – watched the footage, observed that there were no tattoos on the

perpetrator's arms, and requested a nolle prosequi.  Id. at 201-02.  The court dismissed the case

against Russo.  Id. at 202.

Russo filed a Section 1983 action against the City of Bridgeport and four

Bridgeport police officers.  The district court granted defendants summary judgment on Russo's

Section 1983 claim for unreasonably prolonged detention, but the Court of Appeals reversed.  Id.

at 210.  The Second Circuit found that the Fourth Amendment protected Russo "from a sustained

detention stemming directly from [] law enforcement officials' refusal to investigate available

exculpatory evidence."  Id. at 208.  The court found that the police officers' "failure to perform

the simple task of checking the tape resulted in all of Russo's 217-day incarceration," and that

Russo had provided a "specific, readily-verifiable claim[] of innocence" that the officers had a

duty to investigate "in a reasonable time period[.]"  Id. at 208-09.

The facts in Russo are quite different from the facts here.  Unlike the videotape in

Russo that provided "readily-verifiable" evidence of Russo's innocence, there was no "smoking

gun" exculpatory evidence available to Defendants that proved Plaintiff's innocence.  Instead,

Detective Godino confronted two conflicting witness accounts concerning who provided a

firearm to Dior Creighton.  Moreover, as to the surveillance footage, Plaintiff's criminal defense

lawyer regarded it as inconclusive (see Gross Decl., Ex. Q (Dkt. No. 214-19) (Raskin Dep.) at

21:24-22:5 ("I looked at [the video] as potentially exculpatory, at best a wash. . . . I looked at it and did not believe that in [any] shape or form could anybody look at that and say that that was Kenneth Creighton passing a gun."); id. at 48:18-52:12 (stating that surveillance footage was "not inculpatory" due to its poor quality)), while Detective Roberts saw it as inculpatory. (Gross Decl., Ex. OO-1 (Dkt. No. 214-44) (Roberts Dep.) at 44:19-45:5, 58:16-60:7, 130:9-20)

    In sum, unlike in Russo, there was no videotape or any other "readily-verifiable" evidence available to Defendants that affirmatively established Plaintiff's innocence. See Nelson, 524 F. Supp. 2d at 225 (videotape was not "exculpatory" evidence for purposes of an unreasonably prolonged detention claim where – although plaintiff claimed that the individual captured on a videotape was not him – "his previous attorney, after viewing the videotape, was unable to determine whether the individual was or was not [plaintiff]"). Moreover, unlike in Russo – where Russo did not receive a copy of the exculpatory videotape until shortly before the charges against him were dismissed – Plaintiff was given a copy of the surveillance footage "early on," and was provided with Terab's exculpatory statement and photo array during discovery, after which the case proceeded for several years. (See Gross Decl., Ex. Q (Dkt. No. 214-19) (Raskin Dep.) at 13:19-24, 41:10-16, 45:18-46:5, 53:10-54:4, 56:7-57:5) Plaintiff's criminal defense lawyer made no application to the court after receiving these materials (see id. at 54:5-22, 61:16-62:15) precisely because they do not constitute the type of "readily-verifiable" exculpatory information that would justify dismissal.

    In order to recover under Section 1983 for unreasonably prolonged detention, it is not sufficient to show that charges were ultimately dismissed. Instead, Plaintiff must demonstrate that evidence was available to Defendants from which they, "at reasonable cost and effort, could have ascertained [plaintiff's] innocence." Thompson, 603 F. Supp. 2d at 656. Here,

there was no such evidence. See Nelson, 524 F. Supp. 2d at 225 (rejecting plaintiff's

"conclusory statement" that defendants would have "easily" concluded that the plaintiff was not

the perpetrator "had [they] done a thorough and proper investigation into the complete

information they had").

Defendants are entitled to summary judgment on Plaintiff's claim for

unreasonably prolonged detention.

### F.   **Malicious Abuse of Process**

"In New York, 'a malicious abuse-of-process claim lies against a defendant who

(1) employs regularly issued legal process to compel performance or forbearance of some act (2)

with intent to do harm without excuse o[r] justification, and (3) in order to obtain a collateral

objective that is outside the legitimate ends of the process.'" Savino, 331 F.3d at 76 (quoting

Cook v. Sheldon, 41 F.3d 73, 80 (2d Cir. 1994)).  "The crux of a malicious abuse of process

claim is the collateral objective element." Douglas v. City of New York, 595 F. Supp. 2d 333,

344 (S.D.N.Y. 2009).  "To meet this element, a plaintiff must prove not that defendant acted with

an improper motive, but rather an improper purpose – that is, 'he must claim that [the defendant]

aimed to achieve a collateral purpose beyond or in addition to his criminal prosecution.'" Id.

(quoting Savino, 331 F.3d at 76).

Here, Plaintiff has offered no evidence that Defendants acted "to obtain a

collateral objective that is outside the legitimate ends of the process." While Plaintiff argues that

he "was arrested in order to pressure him into informing the police of his brother's whereabouts"

(Pltf. Opp. Br. (Dkt. No. 184) at 34), there is no evidence supporting this allegation.

As discussed above, Detective LaDuca's January 10, 2007 report speculating that

Plaintiff might provide information concerning Dior Creighton's whereabouts (see July 26, 2016

Gross Decl. (Dkt. No. 185) Ex. HH (Jan. 10, 2007 Police Report)) sheds no light on the state of mind of Detective Godino or any other Defendant.  Given that the detectives had sufficient evidence to arrest Plaintiff for criminal facilitation and criminal possession of a weapon, the fact that Plaintiff might be able to provide information about his brother's whereabouts does not give rise to a reasonable inference that the purpose in arresting him was to obtain such information. Even if such an inference could be drawn, the fact that the prosecution of Plaintiff continued for five years after Dior Creighton was arrested demonstrates conclusively that Plaintiff was not arrested and prosecuted in order to pressure him to reveal the whereabouts of his brother.

Defendants are entitled to summary judgment on Plaintiff's malicious abuse of process claim.

### G. Conspiracy and Failure to Intervene

Plaintiff's two remaining claims – Section 1983 conspiracy and Section 1983 failure to intervene – each have as an element that Plaintiff suffered a constitutional injury. "'[A] claim of conspiracy to violate a constitutional right cannot be maintained where no constitutional right was violated.'" Raffaele v. City of New York, 144 F. Supp. 3d 365, 375 (E.D.N.Y. 2015) (quoting Manbeck v. Micka, 640 F. Supp. 2d 351, 378 (S.D.N.Y. 2009)). Similarly, no claim for failure to intervene exists where plaintiff has not suffered a constitutional deprivation.  See Soto v. City of New York, 132 F. Supp. 3d 424, 455-59 (E.D.N.Y. 2015) ("'[A]n underlying constitutional violation is an essential element of a failure to intercede claim under § 1983." (quoting Henry-Lee v. City of New York, 746 F. Supp. 2d 546, 566 (S.D.N.Y. 2010))).

Because Plaintiff has not put forth sufficient evidence to demonstrate a material issue of fact as to whether he suffered a constitutional deprivation, Defendants' motion for summary judgment on Plaintiff's conspiracy[48] and failure to intervene claims will be granted.[49]

## CONCLUSION

Defendants' motion for summary judgment (Dkt. No. 164) is granted. Plaintiff's motions for sanctions and for partial summary judgment (Dkt. Nos. 172, 173) are denied. The Clerk of the Court is directed to close this case. Any other pending motions are denied as moot.

Dated: New York, New York
      February 14, 2017

                                   SO ORDERED.

                                   *Paul G. Gardephe*
                                   Paul G. Gardephe
                                   United States District Judge

---

[48] Plaintiff appears to claim that ADA Birns is liable for Section 1983 conspiracy because he did not disclose to the grand jury that the CI was a paid informant. (Pltf. Opp. Br. (Dkt. No. 184) at 35) Plaintiff does not identify the constitutional right that Birns allegedly violated through this omission, however, and New York imposes no duty on prosecutors to make such a disclosure. In New York, a prosecutor's failure to disclose that a grand jury witness was paid or received leniency in exchange for his testimony does not "impair[]" the "integrity of the Grand Jury proceeding" and does not justify dismissal of the indictment, because such information "pertain[s] only to the collateral issue of the CI's credibility and not the core question for the grand jury to decide as to whether a prima facie case exist[s]." People v. Hotaling, 135 A.D.3d 1171, 1172 (3d Dep't 2016) (CI's representation that he was not being compensated for his grand jury testimony, when in fact he was being paid, did not prejudice defendant and did not warrant dismissal of indictment); People v. Hansen, 290 A.D.2d 47, 50-51 (3d Dep't 2002) (prosecutor's failure to disclose that a grand jury witness – in exchange for her testimony – would not be charged with murder "did not materially affect the Grand Jury's investigation"; such information "was not essential to the Grand Jury's responsibility to determine whether a prima facie case existed"), aff'd, 99 N.Y.2d 339 (2003); People v. Bartolomeo, 126 A.D.2d 375, 396 (2d Dep't 1987) ("The fact that the Grand Jury was not informed of the promises of immunity made to [two witnesses] does not affect the validity of the proceedings since such evidence merely related to the witnesses' credibility.").

[49] Because Plaintiff has not demonstrated that he suffered any constitutional deprivation, this Court does not reach Defendants' arguments that they are entitled to absolute or qualified immunity.